**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action Number: 1:16-cv-02242-KLM

FRANKLIN MERRILL;
BRENT LEE; ANTHONY GLOVER;
KEITH HERRING; ANTHONY DENNIS;
LARRY JURCAK; SAMI NASR;
JENNIFER THOMAS; ROBERT
THOMAS; RONALD DENNIS;
RODNEY LACY; JAMES NEWBERRY;
TAMI POTIRALA; CRAIG WILLIAMS;
ZIGMUND GUTOWSKI; JOSEPH HORION;
ERIC ARD; and TIM HOLLINGSWORTH,

all individuals,

                Plaintiffs,

v.

PATHWAY LEASING LLC, a Colorado
limited liability company; and
MATTHEW HARRIS, an individual,

                Defendants.

---

**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

       Plaintiffs, by and through the undersigned, hereby submit *Plaintiffs' Motion for Partial Summary Judgment*. As there are no disputed issues of material fact between the Parties with respect to whether Pathway Defendants and Former XPO Defendants are joint employers within the meaning of the FLSA, Plaintiffs respectfully request the Court grant the instant Motion holding the same.

## I.      INTRODUCTION

In this Motion, Plaintiffs request the Court decide, as a matter of law, that Pathway Leasing LLC and Matthew Harris (collectively the "Pathway Defendants") are joint employers, as defined under the FLSA, with Transforce, Inc., XPO Logistics Truckload, Inc., and Con-way Truckload Inc. (collectively the "Former XPO Defendants"). As explained below, it is undisputed between the parties that the Pathway Defendants and Former XPO Defendants negotiated a "Carrier Agreement" which created a relationship between the two entities such that Pathway Defendants were obligated to provide truck drivers in the form of "independent contractors" to the Former XPO Defendants, while the Former XPO Defendants were obligated to provide truck "lessees" to Pathway Defendants. As part of this relationship both Pathway Defendants and the Former XPO Defendants agreed to execute and finalize "leases" for trucks as well as "independent contractor agreements," which collectively, set the rate of pay for Plaintiffs and all other terms and conditions of employment.

Moreover the Carrier Agreement made the approval of Pathway Defendants' truck "leases" and Former XPO Defendants' "independent contractor agreements" interdependent on one another. Former XPO Defendants even agreed to assist Pathway Defendants in overseeing the performance of Pathway Defendants' "leases." For example, Former XPO Defendants agreed to "use [their] reasonable best efforts to assist Pathway in locating the Vehicle covered by the applicable lease financing arrangement" in the event of default or early termination.

After any given Plaintiff was induced into signing a truck lease with Pathway Defendants *and* an independent contractor agreement with the Former XPO Defendants, both Pathway Defendants and Former XPO Defendants shared the responsibility of administering payroll,

assigning and managing work, controlling Plaintiffs' spending of funds on maintenance, determining which entities Plaintiffs could drive for, and other terms and conditions of employment. Pathway Defendants and Former XPO Defendants created this business arrangement and held themselves out as "partners" in a "joint venture." In fact, Former XPO Defendants' employees recruit drivers for Pathway Defendants (and themselves) and assist in the execution of truck "leases." At one point, Former XPO Defendants even allowed Pathway Defendants' trucks to be parked on their property at their headquarters in Joplin, Missouri for the purpose of advertising their "joint venture." This relationship was created to be permanent and continues to this day, and therefore, Plaintiffs respectfully request the Court grant the instant Motion thereby holding Pathway Defendants and Former XPO Defendants to be joint employers.

## II.    STATEMENT OF UNDISPUTED FACTS

1.    Pathway Defendants and Former XPO Defendants executed a "Carrier Agreement." **Exhibit 1**, Carrier Agreement dated May 13, 2013.



PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT



PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

4.      While the Carrier Agreement was executed between Pathway Leasing LLC and Con-way Truckload, Inc., the Carrier Agreement does in fact apply to all Former XPO Defendants. **Exhibit 2**, Civil Rule 30(b)(6) Deposition of Pathway Leasing LLC, at 169:21-170:5; **Exhibit 3**, Civil Rule 30(b)(6) Deposition of Former XPO Defendants, at 106:21-107:4.

5.      Pathway Defendants and Former XPO Defendants did in fact operate in an intertwined nature as demonstrated by their holding themselves out as being partners in a "joint venture." **Exhibit 4**, Email from Anita Stewart [recruiter for Former XPO Defendants] to Plaintiff Franklin Merrill dated July 6, 2015; **Exhibit 21**, Email between Matthew Harris and Susi Killinger dated October 23, 2013 (in which Ms. Killinger, an employee of Former XPO Defendants, provides Matthew Harris with an "update" on the status of leases yet to be signed and with regard to one outstanding potential lessee asks, "Do I need to call Michael?").

6.      Ms. Stewart, the author of Exhibit 4, and her co-worker, Anita Stewart, confirmed in their depositions that this "joint venture" language was "template" language drafted and approved by a supervisor. **Exhibit 5**, Deposition of Anita Stewart dated August 31, 2017, at 18:18-19:12; 33:3-11; **Exhibit 6**, Deposition of Leslie (Susi) Killinger dated August 31, 2017, at 16:24-17:7.

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

7.     Pathway Defendants and Former XPO Defendants did act as if they were in a joint venture. For example, Pathway Defendants were able to place their available trucks on the property of Former XPO Defendants "for visibility to the program." Ex. 2 at 47:11-48:10.

8.     Pathway Defendants' trucks, sitting on Former XPO Defendants' property, would typically be marked with a banner for advertising purposes and this was done without charge to Pathway Defendants. Ex. 2 at 48:11-49:2.

9.     Former XPO Defendants' employees would assist potential drivers in completing Pathway Defendants' lease agreements. Ex. 5 at 29:17-30:9; **Exhibit 7**, Deposition of Franklin Merrill, at 10:9-11:9 ("They were pushing Pathway Leasing trucks . . . They were sold on Matthew Harris' trucks more and that's what they pushed [referring to Former XPO Defendants' employees].").

10.     Former XPO Defendants maintained a bulletin board at their office in Joplin, Missouri with information on available trucks to lease from Pathway Defendants. Ex. 7 at 16:2-17:10. Former XPO Defendants also displayed Pathway Defendants' advertising materials in their office in Joplin, Missouri. **Exhibit 22**, Email between Lenise Ruff and Susi Killinger dated April 13, 2017 ("Can you fix us up some new fliers with the new incentives that Matt wants to offer on trucks?").

11.      Once a driver agreed to sign up to drive for Pathway Defendants and Former XPO Defendants, they were no longer allowed to go back to driving solely for Former XPO Defendants, if that is where they started. **Exhibit 8**, Deposition of Rodney Lacy dated October 27, 2017, at 12:23-13:20.

12.    Pathway Defendants retained discretion over which carrier company any given Plaintiff could drive for, that is, Pathway Defendants have similar joint venture arrangements with carrier companies other than just Former XPO Defendants. **Exhibit 9**, Deposition of Matthew Harris dated August 15, 2017, at 39:21-40:1.

13.    Pathway Defendants would buy trucks from Former XPO Defendants and then "lease" those trucks back to drivers recruited by Former XPO Defendants. Ex. 9 at 42:12-43:7; **Exhibit 10**, Email from Matthew Harris to Former XPO Defendants dated October 29, 2013 ("If you have any questions or find any other trucks you think may be a good fit for the program, please don't hesitate to let me know.").

14.    Pathway Defendants and Former XPO Defendants were jointly responsible for issuing pay to drivers, including tracking the breakdown of various deductions from pay. Ex. 2 at 29:10-24; Ex. 3 at 57:22-58:3.

15.    Pathway Defendants worked closely with Former XPO Defendants to set the rate of pay drivers would receive. **Exhibit 11**, Email from Matthew Harris to Former XPO Defendants dated April 18, 2013 ("If we bump the pay up $.04 per mile using the rates under the rate escalator Con-way is testing, the net income jumps over $100 per week . . . Along with reviewing for accuracy, I would like you each to review to make sure the projections are something we all feel comfortable with and confident we can sell."); **Exhibit 23**, Email from Matthew Harris to TJ Hunt dated July 29, 2014 ("To keep similar results to what ICs see today by running at least 11,000 miles per month, I think you could escalate pay at $.015 - $.02 per mile for all miles once that minimum target mileage point is reached.").

16.     Former XPO Defendants were primarily responsible for dispatching Plaintiffs on specific routes, Ex. 8 at 68:13-14, however Pathway Defendants would sometimes assist Plaintiffs in obtaining dispatched loads. Ex. 8 at 65:1-5; **Exhibit 19**, Email between Matthew Harris and Susi Killinger dated July 26, 2013 ("Can you check with his FM [fleet manager], Scott, to see if he can make sure Gary is given a little extra attention to make sure his miles really pick up (or stay up if he's now getting over 3k per week)?").

17.     Pathway Defendants and Former XPO Defendants worked together to determine where and which drivers needed to be able to cover workers compensation insurance or occupational accident insurance. **Exhibit 12**, Email String between Matthew Harris and Various of Former XPO Defendants' Employees dated June 9, 2014 ("[Matthew Harris] is stating he may have to change the way we [referring to both Pathway Defendants and Former XPO Defendants] do business and not allow any drivers in those states to purchase trucks through his program because of the drastic price difference between WC and Occ Acc.").

18.     Pathway Defendants and Former XPO Defendants created a program for the drivers' purchase of tires that was jointly administered by both Pathway Defendants and XPO Defendants. **Exhibit 13**, Email between Barbara Haslip, Matthew Harris, TJ Hunt, and Others dated January 4, 2014 ("Looks good! [referring to draft outline of tire purchase program] The only thing I can think to add is a statement that, in order to be reimbursed from their maintenance escrow account with Pathway Leasing, the IC will need send either a copy of the settlement statement from Con-Way Truckload showing the tire expense or the invoice . . . .").

19.     Pathway Defendants regularly communicated with Former XPO Defendants for the purpose of gauging the performance of their drivers. **Exhibit 14**, Email between Barbara

Haslip, Matthew Harris, and Others dated December 16, 2013 ("How's he doing in general? Is operations fairly happy with him? Before I think about doing a prom note, I want to make sure I'm not 'putting good money to bad use.'").

20.     Pathway Defendants and Former XPO Defendants regularly worked on solutions to problems, such as whether or not certain drivers could "get Occ/Acc rather than have to get WC insurance." **Exhibit 15**, Email between Connie Anderson, Susi Killinger, and Matthew Harris dated December 2, 2013.

21.     Both Pathway Defendants and Former XPO Defendants exercised control over Plaintiffs' spending of funds set aside for maintenance. **Exhibit 16**, Email between Connie Anderson and Pathway Defendants dated September 17, 2014 ("Jim, [a Pathway Leasing LLC employee] . . . He [referring to Plaintiff Eric Ard] would like to be reimbursed from his Maintenance at Pathway . . . Will you do this from your side?).

22.     Pathway Defendants and Former XPO Defendants worked collaboratively to monitor how much money drivers were making, even if they desired to keep Plaintiffs in the dark regarding the same. **Exhibit 17**, Email between Barbara Haslip and Matthew Harris dated December 22, 2015 ("Matt, Here is some info on Ben Johnson [a driver]. I included the settlement sheets, please don't advise Ben that you have those.").

23.     Pathway Defendants and Former XPO Defendants utilized trucks in which Former XPO Defendants placed their logos on such that the truck was branded as being used for Former XPO Defendants' business. Ex. 3 at 71:15-20. Former XPO Defendants would also install an onboard GPS and communications system known as a "Qualcomm" unit on Pathway Defendants' property. Ex. 3 at 71:21-73:22.

24.     Pathway Defendants and Former XPO Defendants worked together to make repairs to trucks, with some repairs occurring at Former XPO Defendants' repair shop in Joplin, Missouri. **Exhibit 18**, Email between Matthew Harris, Susi Killinger, and Others dated March 4, 2015 ("My comments are below. Steve [Former XPO Defendants' Senior Manager for Fleet Service], are these things your shop could address?").

25.     Former XPO Defendants sometimes picked out which trucks Pathway Defendants would buy and which drivers would be assigned those trucks. **Exhibit 20**, Email between Susi Killinger and Matthew Harris dated July 18, 2013 ("This is a truck I have picked out. I haven't decided what driver gets this. I have two more picked out and I am waiting on the maintenance and ECM reports before I send them to you.").

26.     Taken together, all undisputed material facts show that Pathway Defendants and Former XPO Defendants are joint employers within the meaning of the FLSA.

## III.     LEGAL STANDARD

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Davis v. United States Dept. of Veterans Affairs*, 2017 WL 3608192, at *2 (D. Colo. Aug. 22, 2017) (M.J. Shaffer) (quoting Fed. R. Civ. P. 56(a)). "A material fact is one which could have an impact on the outcome of the lawsuit." *Id.* (quoting *Chasteen v. UNISIA JECS Corp.*, 216 F.3d 1212, 1216 (10th Cir. 2000) (internal quotation omitted)). "A dispute over a material fact is genuine if a rational [trier of fact] could find in favor of the nonmoving party on the evidence presented." *Id.* (quoting *E.E.O.C. v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1190 (10th. Cir. 2000) (internal quotation

omitted)). The burden shifts to the party opposing summary judgment once the movant has made

its initial showing. *Id.*

The court must view the factual record and draw all reasonable inferences therefrom in

the light most favorable to the party opposing the motion for summary judgment. *Id.* (citing

*United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)). However, "a District Court must

resolve any factual issues of controversy in favor of the non-moving party only in the sense that,

where the facts specifically averred by the party contradict facts specifically averred by the

movant, the motion must be denied." *Id.* (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871,

888 (1990)). "Affidavits or other evidence offered by a nonmovant must create a genuine issue

for trial . . . it is not enough that the evidence be merely colorable or anything short of

significantly probative." *Id.* (quoting *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991)).

## IV.    ARGUMENT

In this Motion, Plaintiffs seek judgment as a matter of law that Pathway Defendants and

former XPO Defendants are joint employers, as defined under the FLSA.[1] The analysis begins,

of course, with the United States Department of Labor's properly promulgated regulation that is

directly on point:

> The Department of Labor regulation implementing the FLSA distinguishes
> 'separate and distinct employment' from 'joint employment.' 29 C.F.R. §
> 792.1(a). 'Separate employment' exists when 'all relevant facts establish that two
> or more employers are acting entirely independently of each other and are
> completely disassociated with respect to the' the individual's employment. *Id.* By
> contrast, 'joint employment' exists when 'employment by one employer is not
> completely disassociated from employment by the other employer(s).' *Id.* When
> two or more entities are found to jointly employ a particular worker, 'all of the

---

[1] To the best of the undersigned's knowledge the Tenth Circuit has not directly addressed the

> employee's work for all of the joint employers during the workweek is considered as *one employment* for purposes of the [FLSA].' *Id.* (emphasis added).

*Hall v. DIRECTV, LLC*, 846 F.3d 757, 765-66 (4th Cir. 2017) (emphasis in original). "We addressed the proper order of analysis in FLSA joint employment actions in *Schultz*. There we established a two-step framework for determining whether a defendant may be held liable for an alleged FLSA violation under a joint employment theory." *Id.* at 767 (citing *Schultz v. Capital International Securities Inc.*, 466 F.3d 298, 305-09 (4th Cir. 2006)).

> Under this framework, we first must determine whether the defendant and one or more additional entities shared, agreed to allocate responsibility for, or otherwise codetermined the key terms and conditions of the plaintiff's work . . . The second step of the analysis—which asks whether a worker was an employee or independent contractor for purposes of the FLSA—depends in large part upon the answer to the first. Namely, if we determine that the defendant and another entity codetermined the key terms and conditions of the worker's employment, then we must consider whether the two entities' *combined* influence over the terms and conditions of the worker's employment render the worker an employee as opposed to an independent contractor. By contrast, if the two entities are disassociated with regard to the key terms and conditions of the worker's employment, we must consider whether the worker is an employee or independent contractor with regard to *each* putative employer separately.

*Id.* at 767 (emphases in original). In *Hall*, the Court went on to observe that "[f]ocusing on the relationship between putative joint employers is essential to accomplishing the FLSA's remedial and humanitarian purpose." *Id.* at 769 (internal quotation and citations omitted). "Indeed, a worker who performs services for two or more entities that are 'not completely disassociated' with respect to his work may not amount to an 'employee' protected by the FLSA when his relationship to each entity is considered separately, but may come within the statutory definition of an 'employee' when his relationships to all of the relevant entities are considered in the aggregate." *Id.*

The *Hall* court identified six, "nonexhaustive" factors to aid trial courts in deciding whether a joint employer relationship exists:

(1)      Whether, formally or as a matter of practice, the putative joint employers jointly determine, share, or allocate the ability to direct, control, or supervise the worker, whether by direct or indirect means;

(2)      Whether, formally or as a matter of practice, the putative joint employers jointly determine, share, or allocate the power to—directly or indirectly—hire or fire the worker or modify the terms and conditions of the worker's employment;

(3)      The degree of permanency and duration of the relationship between the putative joint employers;

(4)      Whether through shared management or a direct or indirect ownership interest, one putative joint employer controls, is controlled by, or is under common control with the other putative joint employer;

(5)      Whether the work is performed on premises owned or controlled by one or more of the putative joint employers, independently or in connection with one another; and

(6)      Whether, formally or as a matter of practice, the putative joint employers jointly determine, share, or allocate responsibility over the functions ordinarily carried out by an employer, such as handling payroll; providing workers' compensation insurance; paying payroll taxes; or providing the facilities, equipment, tools, or materials necessary to complete the work.

*Id.* at 769-70 (citing *Salinas v. Commercial Interiors, Inc.*, 848 F.3d 125, 140-43 (4th Cir. 2017)). This analysis is "highly fact-dependent," and therefore, the "absence of a single factor— or even a majority of factors—is not determinative of whether joint employment does or does not exist." *Id.* at 770 (internal citation omitted). The "fundamental question" guiding this analysis is "whether two or more persons or entities are 'not completely disassociated' with respect to a worker such that the persons or entities share, agree to allocate responsibility for, or otherwise codetermine—formally or informally, directly or indirectly—the essential terms and conditions of the worker's employment." *Id.* at 769.

When all factors are examined below, in light of the undisputed material facts outlined above, Plaintiffs assert this Court should conclude Pathway Defendants and Former XPO Defendants are not completely disassociated in that they share responsibility for—informally or formally, directly or indirectly—the essential terms and conditions of Plaintiffs' employment, *i.e.*, they are joint employers as defined by the FLSA.

**1. Pathway Defendants and Former XPO Defendants jointly determined, shared, or allocated the ability to direct, control, or supervise Plaintiffs.**

The undisputed material facts leave no question that Pathway Defendants and Former XPO Defendants jointly shared or allocated direction, control and supervision over Plaintiffs' work. Former XPO Defendants' employees would assist potential drivers in completing Pathway Defendants' lease agreements. Ex. 5 at 29:17-30:9; **Exhibit 7**, Deposition of Franklin Merrill, at 10:9-11:9 ("They were pushing Pathway Leasing trucks . . . They were sold on Matthew Harris' trucks more and that's what they pushed [referring to Former XPO Defendants' employees].").

Additionally, once a driver agreed to sign up to drive for Pathway Defendants and Former XPO Defendants, they were no longer allowed to go back to driving solely for Former XPO

Defendants, if that is where they started. **Exhibit 8**, Deposition of Rodney Lacy dated October 27, 2017, at 12:23-13:20.

Moreover, Pathway Defendants retained discretion over which carrier company any given Plaintiff could drive for, that is, Pathway Defendants have similar joint venture arrangements with carrier companies other than just Former XPO Defendants. **Exhibit 9**, Deposition of Matthew Harris dated August 15, 2017, at 39:21-40:1. While Former XPO Defendants were primarily responsible for dispatching Plaintiffs on specific routes, Ex. 8 at 68:13-14, Pathway Defendants would sometimes assist Plaintiffs in obtaining dispatched loads. Ex. 8 at 65:1-5; **Exhibit 19**, Email between Matthew Harris and Susi Killinger dated July 26, 2013 ("Can you check with his FM [fleet manager], Scott, to see if he can make sure Gary is given a little extra attention to make sure his miles really pick up (or stay up if he's now getting over 3k per week)?").

Pathway Defendants regularly communicated with Former XPO Defendants for the purpose of gauging the performance of their drivers. **Exhibit 14**, Email between Barbara Haslip, Matthew Harris, and Others dated December 16, 2013 ("How's he doing in general? Is operations fairly happy with him? Before I think about doing a prom note, I want to make sure I'm not 'putting good money to bad use.'"). Both Pathway Defendants and Former XPO Defendants exercised control over Plaintiffs' spending of funds set aside for maintenance. **Exhibit 16**, Email between Connie Anderson and Pathway Defendants dated September 17, 2014 ("Jim, [a Pathway Leasing LLC employee] . . . He [referring to Plaintiff Eric Ard] would like to be reimbursed from his Maintenance at Pathway . . . Will you do this from your side?).

Even the truck a purported "independent contractor" would drive was often out of the control of the individual driver as Former XPO Defendants sometimes picked out which trucks Pathway Defendants would buy and which drivers would be assigned those trucks. **Exhibit 20**, Email between Susi Killinger and Matthew Harris dated July 18, 2013 ("This is a truck I have picked out. I haven't decided what driver gets this. I have two more picked out and I am waiting on the maintenance and ECM reports before I send them to you."). Between the actions of Pathway Defendants and Former XPO Defendants, virtually all aspects of Plaintiffs' work were controlled. As such, this factor cuts in favor of finding that Pathway Defendants and Former XPO Defendants are joint employers, as defined by the FLSA.

    **2.** **Pathway Defendants and Former XPO Defendants jointly determined, shared, or allocated the power to hire, fire, or modify the terms and conditions of Plaintiffs' employment.**

Here, Plaintiffs exercised virtually no authority over the terms and conditions of their employment despite being purported "independent contractors." Rather, Plaintiffs were at the mercy of Pathway Defendants and Former XPO Defendants. For example, Pathway Defendants and Former XPO Defendants did in fact operate in an intertwined nature as demonstrated by their holding themselves out as being partners in a "joint venture." **Exhibit 4**, Email from Anita Stewart [recruiter for Former XPO Defendants] to Plaintiff Franklin Merrill dated July 6, 2015; **Exhibit 21**, Email between Matthew Harris and Susi Killinger dated October 23, 2013 (in which Ms. Killinger, an employee of Former XPO Defendants, provides Matthew Harris with an "update" on the status of leases yet to be signed and with regard to one outstanding potential lessee asks, "Do I need to call Michael?").

Ms. Stewart, the author of Exhibit 4, and her co-worker, Anita Stewart, confirmed in their depositions that this "joint venture" language was "template" language drafted and approved by a supervisor. **Exhibit 5**, Deposition of Anita Stewart dated August 31, 2017, at 18:18-19:12; 33:3-11; **Exhibit 6**, Deposition of Leslie (Susi) Killinger dated August 31, 2017, at 16:24-17:7. As such, Plaintiffs were described as "independent contractors" but were actually subject to the control of a "joint venture" consisting of the two entities with total control over the terms and conditions of their employment: Pathway Defendants (their purported lessor) and Former XPO Defendants (their purported dispatcher).

In practice this turned out to be detrimental to Plaintiffs from the very beginning of the employment relationship. Former XPO Defendants' employees would assist potential drivers in completing Pathway Defendants' lease agreements. Ex. 5 at 29:17-30:9; **Exhibit 7**, Deposition of Franklin Merrill, at 10:9-11:9 ("They were pushing Pathway Leasing trucks . . . They were sold on Matthew Harris' trucks more and that's what they pushed [referring to Former XPO Defendants' employees]."). Former XPO Defendants maintained a bulletin board at their office in Joplin, Missouri with information on available trucks to lease from Pathway Defendants. Ex. 7 at 16:2-17:10. Former XPO Defendants also displayed Pathway Defendants' advertising materials in their office in Joplin, Missouri. **Exhibit 22**, Email between Lenise Ruff and Susi Killinger dated April 13, 2017 ("Can you fix us up some new fliers with the new incentives that Matt wants to offer on trucks?"). Former XPO Defendants sometimes even picked out which trucks Pathway Defendants would buy and which drivers would be assigned those trucks. **Exhibit 20**, Email between Susi Killinger and Matthew Harris dated July 18, 2013 ("This is a

truck I have picked out. I haven't decided what driver gets this. I have two more picked out and I am waiting on the maintenance and ECM reports before I send them to you.").

After lease signing, Pathway Defendants retained discretion over which carrier company any given Plaintiff could drive for, that is, Pathway Defendants have similar joint venture arrangements with carrier companies other than just Former XPO Defendants. **Exhibit 9**, Deposition of Matthew Harris dated August 15, 2017, at 39:21-40:1. Moreover, Pathway Defendants and Former XPO Defendants also created a program for the drivers' purchase of tires that was jointly administered by both Pathway Defendants and XPO Defendants. **Exhibit 13**, Email between Barbara Haslip, Matthew Harris, TJ Hunt, and Others dated January 4, 2014 ("Looks good! [referring to draft outline of tire purchase program] The only thing I can think to add is a statement that, in order to be reimbursed from their maintenance escrow account with Pathway Leasing, the IC will need send either a copy of the settlement statement from Con-Way Truckload showing the tire expense or the invoice . . . .").

Inexplicably, given that Pathway Defendants ostensibly operate an equipment leasing company, Pathway Defendants regularly communicated with Former XPO Defendants for the purpose of gauging the performance of their drivers. **Exhibit 14**, Email between Barbara Haslip, Matthew Harris, and Others dated December 16, 2013 ("How's he doing in general? Is operations fairly happy with him? Before I think about doing a prom note, I want to make sure I'm not 'putting good money to bad use.'").

And perhaps most frustrating to Plaintiffs, both Pathway Defendants and Former XPO Defendants exercised control over Plaintiffs' spending of funds set aside for maintenance. **Exhibit 16**, Email between Connie Anderson and Pathway Defendants dated September 17,

2014 ("Jim, [a Pathway Leasing LLC employee] . . . He [referring to Plaintiff Eric Ard] would like to be reimbursed from his Maintenance at Pathway . . . Will you do this from your side?). As such, this factor also cuts in favor of finding that Pathway Defendants and Former XPO Defendants are joint employers, as defined by the FLSA.

**3. Pathway Defendants and Former XPO Defendants created a permanent working relationship.**

Here, Pathway Defendants and Former XPO Defendants sought to memorialize their "joint venture" in writing for the purpose of creating an ongoing and lasting relationship – one that continues to this day.





███████████████████████████████████

█████████████████████

While the Carrier Agreement was executed between Pathway Leasing LLC and Con-way Truckload, Inc., the Carrier Agreement does in fact apply to all Former XPO Defendants. **Exhibit 2**, Civil Rule 30(b)(6) Deposition of Pathway Leasing LLC, at 169:21-170:5; **Exhibit 3**, Civil Rule 30(b)(6) Deposition of Former XPO Defendants, at 106:21-107:4. The fact that the Carrier Agreement has been assigned to the various changes in entity experienced by Former XPO Defendants throughout the years also supports the permanency of this relationship.

Moreover, Pathway Defendants and Former XPO Defendants did in fact operate in an intertwined nature as demonstrated by their holding themselves out as being partners in a "joint venture." **Exhibit 4**, Email from Anita Stewart [recruiter for Former XPO Defendants] to Plaintiff Franklin Merrill dated July 6, 2015; **Exhibit 21**, Email between Matthew Harris and Susi Killinger dated October 23, 2013 (in which Ms. Killinger, an employee of Former XPO Defendants, provides Matthew Harris with an "update" on the status of leases yet to be signed and with regard to one outstanding potential lessee asks, "Do I need to call Michael?").

Ms. Stewart, the author of Exhibit 4, and her co-worker, Anita Stewart, confirmed in their depositions that this "joint venture" language was "template" language drafted and approved by a supervisor. **Exhibit 5**, Deposition of Anita Stewart dated August 31, 2017, at 18:18-19:12; 33:3-11; **Exhibit 6**, Deposition of Leslie (Susi) Killinger dated August 31, 2017, at 16:24-17:7. Pathway Defendants and Former XPO Defendants did act as if they were in a joint venture. For example, Pathway Defendants were able to place their available trucks on the property of Former XPO Defendants "for visibility to the program." Ex. 2 at 47:11-48:10.

Pathway Defendants' trucks, sitting on Former XPO Defendants' property, would typically be marked with a banner for advertising purposes and this was done without charge to Pathway Defendants. Ex. 2 at 48:11-49:2. Former XPO Defendants maintained a bulletin board at their office in Joplin, Missouri with information on available trucks to lease from Pathway Defendants. Ex. 7 at 16:2-17:10. Former XPO Defendants also displayed Pathway Defendants' advertising materials in their office in Joplin, Missouri. **Exhibit 22**, Email between Lenise Ruff and Susi Killinger dated April 13, 2017 ("Can you fix us up some new fliers with the new incentives that Matt wants to offer on trucks?"). Once a driver agreed to sign up to drive for Pathway Defendants and Former XPO Defendants, they were no longer allowed to go back to driving solely for Former XPO Defendants, if that is where they started. **Exhibit 8**, Deposition of Rodney Lacy dated October 27, 2017, at 12:23-13:20. Again, the inability of a driver to undo their "independent contractor" status and return to the status quo is part of the permanency of the relationship created by Pathway Defendants and Former XPO Defendants.

Other facts lead to a finding of the permanency of the relationship. Pathway Defendants would buy trucks from Former XPO Defendants and then "lease" those trucks back to drivers recruited by Former XPO Defendants. Ex. 9 at 42:12-43:7; **Exhibit 10**, Email from Matthew Harris to Former XPO Defendants dated October 29, 2013 ("If you have any questions or find any other trucks you think may be a good fit for the program, please don't hesitate to let me know."). Pathway Defendants and Former XPO Defendants created a program for the drivers' purchase of tires that was jointly administered by both Pathway Defendants and XPO Defendants. **Exhibit 13**, Email between Barbara Haslip, Matthew Harris, TJ Hunt, and Others dated January 4, 2014 ("Looks good! [referring to draft outline of tire purchase program] The

only thing I can think to add is a statement that, in order to be reimbursed from their maintenance escrow account with Pathway Leasing, the IC will need send either a copy of the settlement statement from Con-Way Truckload showing the tire expense or the invoice . . . .").

Pathway Defendants and Former XPO Defendants worked hard to maintain the permanency of their relationship. Pathway Defendants and Former XPO Defendants regularly worked on solutions to problems, such as whether or not certain drivers could "get Occ/Acc rather than have to get WC insurance." **Exhibit 15**, Email between Connie Anderson, Susi Killinger, and Matthew Harris dated December 2, 2013. Pathway Defendants and Former XPO Defendants worked collaboratively to monitor how much money drivers were making, even if they desired to keep Plaintiffs in the dark regarding the same. **Exhibit 17**, Email between Barbara Haslip and Matthew Harris dated December 22, 2015 ("Matt, Here is some info on Ben Johnson [a driver]. I included the settlement sheets, please don't advise Ben that you have those."). As such, this factor cuts in favor of finding that Pathway Defendants and Former XPO Defendants are joint employers, as defined by the FLSA.

   **4. Pathway Defendants and Former XPO Defendants are under common control with regard to Plaintiffs' employment.**

Here, Pathway Defendants and Former XPO Defendants reduced this factor to writing, while also proving this to be true with their actions.



PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT



While the Carrier Agreement was executed between Pathway Leasing LLC and Con-way Truckload, Inc., the Carrier Agreement does in fact apply to all Former XPO Defendants. **Exhibit 2**, Civil Rule 30(b)(6) Deposition of Pathway Leasing LLC, at 169:21-170:5; **Exhibit 3**, Civil Rule 30(b)(6) Deposition of Former XPO Defendants, at 106:21-107:4.

Pathway Defendants and Former XPO Defendants did in fact operate in an intertwined nature as demonstrated by their holding themselves out as being partners in a "joint venture." **Exhibit 4**, Email from Anita Stewart [recruiter for Former XPO Defendants] to Plaintiff Franklin Merrill dated July 6, 2015; **Exhibit 21**, Email between Matthew Harris and Susi Killinger dated October 23, 2013 (in which Ms. Killinger, an employee of Former XPO Defendants, provides

Matthew Harris with an "update" on the status of leases yet to be signed and with regard to one outstanding potential lessee asks, "Do I need to call Michael?").

Ms. Stewart, the author of Exhibit 4, and her co-worker, Anita Stewart, confirmed in their depositions that this "joint venture" language was "template" language drafted and approved by a supervisor. **Exhibit 5**, Deposition of Anita Stewart dated August 31, 2017, at 18:18-19:12; 33:3-11; **Exhibit 6**, Deposition of Leslie (Susi) Killinger dated August 31, 2017, at 16:24-17:7.

Pathway Defendants and Former XPO Defendants did act as if they were in a joint venture. For example, Pathway Defendants were able to place their available trucks on the property of Former XPO Defendants "for visibility to the program." Ex. 2 at 47:11-48:10. Former XPO Defendants maintained a bulletin board at their office in Joplin, Missouri with information on available trucks to lease from Pathway Defendants. Ex. 7 at 16:2-17:10. Former XPO Defendants also displayed Pathway Defendants' advertising materials in their office in Joplin, Missouri. **Exhibit 22**, Email between Lenise Ruff and Susi Killinger dated April 13, 2017 ("Can you fix us up some new fliers with the new incentives that Matt wants to offer on trucks?"). As such, this factor cuts in favor of finding that Pathway Defendants and Former XPO Defendants are joint employers, as defined by the FLSA.

### 5. While the majority of Plaintiffs' work is completed in various locations across the country, some is completed on premises owned or controlled by Former XPO Defendants.

The majority of Plaintiffs' work is completed in various locations across the country as Plaintiffs are over-the-road, or long haul, truck drivers. Notwithstanding, some work is completed on Former XPO Defendants' property in Joplin, Missouri, including the hiring

process itself, as well as maintenance and truck selection. The branding of the trucks with

Former XPO Defendants' logos also occurs on their property in Joplin, Missouri.

Pathway Defendants and Former XPO Defendants utilized trucks in which Former XPO

Defendants placed their logos on such that the truck was branded as being used for Former XPO

Defendants' business. Ex. 3 at 71:15-20. Former XPO Defendants would also install an onboard

GPS and communications system known as a "Qualcomm" unit on Pathway Defendants'

property. Ex. 3 at 71:21-73:22.

Moreover, Pathway Defendants and Former XPO Defendants worked together to make

repairs to trucks, with some repairs occurring at Former XPO Defendants' repair shop in Joplin,

Missouri. **Exhibit 18**, Email between Matthew Harris, Susi Killinger, and Others dated March 4,

2015 ("My comments are below. Steve [Former XPO Defendants' Senior Manager for Fleet

Service], are these things your shop could address?"). As such, this factor cuts in favor of finding

that Pathway Defendants and Former XPO Defendants are joint employers, as defined by the

FLSA, even if this factor is probably least applicable of the six (6) to the instant dispute.

> **6. Pathway Defendants and Former XPO Defendants jointly determined, shared, or allocated responsibility for functions ordinarily carried out by an employer including handling payroll and providing the facilities, equipment, tools or materials necessary for Plaintiffs to drive.**

Here, all functions that would normally be carried out by an employer were accomplished

by Pathway Defendants and Former XPO Defendants. This is in part because there was no

difference between what a company driver, *i.e.*, an acknowledged employee of Former XPO

Defendants, did in any given day vis-à-vis a supposed "independent contractor." Ex. 3 at 97:6-

13.

One of the most axiomatic functions of an employer—paying employees—was shared by the putative joint employers. Pathway Defendants and Former XPO Defendants were jointly responsible for issuing pay to drivers, including tracking the breakdown of various deductions from pay. Ex. 2 at 29:10-24; Ex. 3 at 57:22-58:3. Pathway Defendants worked closely with Former XPO Defendants to set the rate of pay drivers would receive. **Exhibit 11**, Email from Matthew Harris to Former XPO Defendants dated April 18, 2013 ("If we bump the pay up $.04 per mile using the rates under the rate escalator Con-way is testing, the net income jumps over $100 per week . . . Along with reviewing for accuracy, I would like you each to review to make sure the projections are something we all feel comfortable with and confident we can sell."); **Exhibit 23**, Email from Matthew Harris to TJ Hunt dated July 29, 2014 ("To keep similar results to what ICs see today by running at least 11,000 miles per month, I think you could escalate pay at $.015 - $.02 per mile for all miles once that minimum target mileage point is reached.").

Maintaining proper insurance—another axiomatic function of an employer—was shared between the putative joint employers. Pathway Defendants and Former XPO Defendants worked together to determine where and which drivers needed to be able to cover workers compensation insurance or occupational accident insurance. **Exhibit 12**, Email String between Matthew Harris and Various of Former XPO Defendants' Employees dated June 9, 2014 ("[Matthew Harris] is stating he may have to change the way we [referring to both Pathway Defendants and Former XPO Defendants] do business and not allow any drivers in those states to purchase trucks through his program because of the drastic price difference between WC and Occ Acc."). Pathway Defendants and Former XPO Defendants regularly worked on solutions to problems, such as whether or not certain drivers could "get Occ/Acc rather than have to get WC insurance."

**Exhibit 15**, Email between Connie Anderson, Susi Killinger, and Matthew Harris dated December 2, 2013.

And finally, certain alleged "independent contractors" did not even have control over which truck they would "purchase." Former XPO Defendants sometimes picked out which trucks Pathway Defendants would buy and which drivers would be assigned those trucks. **Exhibit 20**, Email between Susi Killinger and Matthew Harris dated July 18, 2013 ("This is a truck I have picked out. I haven't decided what driver gets this. I have two more picked out and I am waiting on the maintenance and ECM reports before I send them to you."). As such, this final factor cuts in favor of finding that Pathway Defendants and Former XPO Defendants are joint employers, as defined by the FLSA.

While the "absence of a single factor—or even a majority of factors—is not determinative of whether joint employment does or does not exist," here all factors cut in favor of finding a joint employment relationship; and importantly, none of the above-described material facts are in dispute. Thus, Plaintiffs assert this Court should conclude Pathway Defendants and Former XPO Defendants are not completely disassociated, which answers the "fundamental question" guiding this analysis, in that they share responsibility for—informally or formally, directly or indirectly—the essential terms and conditions of Plaintiffs' employment, *i.e.*, they are joint employers as defined by the FLSA.

**V.    CONCLUSION**

For the aforementioned reasons, Plaintiffs respectfully request the Court grant the instant Motion thereby holding Pathway Defendants and Former XPO Defendants to be joint employers as defined by the FLSA.

Respectfully submitted this 15th day of December, 2017.

/s/ John R. Crone
John R. Crone
CO Bar No. 48284
ANDRUS WAGSTAFF PC
7171 West Alaska Drive
Lakewood, Colorado 80226
Telephone: (303) 376-6360
Facsimile: (303) 376-6361
John.Crone@andruswagstaff.com
*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on December 15, 2017, a true and correct copy of the foregoing *Plaintiffs' Motion for Partial Summary Judgment* was electronically filed with the Clerk of the Court using the CM/ECF system, which also electronically served Pathway Defendants through their attorneys:

Mark Wiletsky
mbwiletsky@hollandhart.com

Robert M. Thomas
rmthomas@hollandhart.com

Jeremy Merkelson
jbmerkelson@hollandhart.com

Dated: December 15, 2017

By:   /s/ John R. Crone
John R. Crone
ANDRUS WAGSTAFF, PC
7171 West Alaska Drive
Lakewood, Colorado 80226
John.Crone@andruswagstaff.com