1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF COLORADO

3
    Civil Action No. 16-cv-02242-KLM
4

5    FRANKLIN MERRILL, et al.,                Volume I of VII

6          Plaintiffs,                     (Pages 1 - 257)

7          vs.

8
    PATHWAY LEASING LLC, a Colorado
9    limited liability company,
    MATTHEW HARRIS, an individual,
10
          Defendants.
11   ------------------------------------------------------------

12                    REPORTER'S TRANSCRIPT
13                       BENCH TRIAL

14   ------------------------------------------------------------

15         Proceedings before the HONORABLE KRISTEN L. MIX,
    Magistrate Judge, United States District Court for the
16   District of Colorado, commencing at 9:05 a.m. on the 25th day
    of June, 2018, in Courtroom A401, Alfred A. Arraj United
17   States Courthouse, Denver, Colorado.

18                         APPEARANCES
19
    For the Plaintiffs:
20   JOHN R. CRONE and SARAH A. WOLTER, ANDRUS WAGSTAFF, P.C.,
    7171 West Alaska Drive, Lakewood, CO 80226
21
    For the Defendants:
22   MARK B. WILETSKY and JEREMY B. MERKELSON, HOLLAND & HART, LLP,
    1800 Broadway, One Boulder Plaza, Suite 300, Boulder, CO 80302
23

24
        JULIE H. THOMAS, RMR, CRR, 901 19th Street, Room A256,
25       Denver, CO 80294, (303)296-3056  (CA CSR No. 9162)

            Proceedings reported by mechanical stenography;
                 transcription produced via computer.

16-cv-02242-KLM                Bench Trial                      I - 2

1                         I N D E X

2

     OPENING STATEMENTS                                    PAGE
3
     Mr. Crone                                                7
4    Mr. Wiletsky                                             12

5

     PLAINTIFFS' WITNESSES                                 PAGE
6
     FRANKLIN MERRILL
7        Direct - Mr. Crone                                  20
         Voir Dire - Mr. Wiletsky                            80
8        Direct (Resumed) - Mr. Crone                        86
         Cross - Mr. Wiletsky                               114
9        Redirect - Mr. Crone                               143
     BECKY AUSTIN
10       Direct - Mr. Crone                                 146
         Cross - Mr. Wiletsky                               185
11       Redirect - Mr. Crone                               207
     VIDEO TESTIMONY OF MELINDA CREED
12       Presented to The Court                             218
     RODNEY LACY
13       Direct - Mr. Crone                                 227

14
                     PLAINTIFFS'
15                   EXHIBITS              RECEIVED

16           50                               45

17           52                               93

18           106                             164

19           108                             166

20           109                             168

21           112                             183

22           136:4                           181

23           136:46                           88

24           136:46*                         113

25   * indicates only a portion of the exhibit is received


     Julie H. Thomas, RMR, CRR                    (303)296-3056

| | |
|---|---|
| DEFENDANTS'<br>EXHIBITS | RECEIVED |
| Z6 | 5 |

| | |
|---|---|
| EXHIBITS<br>REFUSED | PAGE |
| 82:218-219 | 100 |
| 114 | 223 |

Julie H. Thomas, RMR, CRR                              (303)296-3056

1          (Proceedings commenced 9:05 a.m.,

2          June 25, 2018.)

3                    THE COURT:  Thank you.  Please be seated.

4            Good morning.  This is 16-cv-02242, Franklin Merrill,

5    et al., versus Pathway Leasing LLC.  Let's have counsel enter

6    appearances, please.

7                    MR. CRONE:  Good morning, Your Honor.  John Crone for

8    the Plaintiffs.

9                    THE COURT:  Good morning.

10                   MS. WOLTER:  Good morning, Your Honor.  Sarah Wolter

11   on behalf of Plaintiffs.

12                   THE COURT:  Good morning.

13                   MR. MERKELSON:  Good morning.  Jeremy Merkelson on

14   behalf of Defendants.

15                   THE COURT:  Good morning.

16                   MR. WILETSKY:  Good morning, Your Honor.  Mark

17   Wiletsky on behalf of Defendants.

18                   THE COURT:  Good morning.

19            All right.  Counsel, we are here today for the

20   beginning of trial.  Do we have any housekeeping matters we

21   need to attend to before we begin trial?  Mr. Crone?

22                   MR. CRONE:  I think we do, but I kind of wanted to

23   let Mr. Wiletsky explain.

24                   THE COURT:  All right.  Fair enough.  Mr. Wiletsky,

25   go ahead.

1    MR. WILETSKY:  Three very small matters.  One, as we

2  mentioned at the final trial preparation conference, Mr. Crone

3  and I stipulated to a summary chart.  It's been marked as

4  Exhibit Z6.  We can pull it up for you if you want.  Our

5  thought was since we jointly are agreeing to this, we could

6  simply stipulate to its admissibility right now, if that's

7  okay.

8         THE COURT:  Fair enough.  Any objection, Mr. Crone?

9         MR. CRONE:  Not at all.

10         THE COURT:  Exhibit Z6 is received.

11     (Defendants' Exhibit Z6 received.)

12         MR. WILETSKY:  Second, Your Honor, Mr. Crone and I,

13  and I think we also mentioned this as well, had agreed to

14  essentially use exemplar equipment lease agreements and

15  contract hauling agreements.  There are a couple of each, but

16  with respect to the witnesses, we may be asking them about a

17  lease agreement that doesn't contain their signature, but we

18  have stipulated that the substance is materially the same for

19  those equipment lease agreements and contract hauling

20  agreements.

21         THE COURT:  All right.  Any problem with that,

22  Mr. Crone?

23         MR. CRONE:  Not at all.

24         THE COURT:  Thank you.

25         MR. WILETSKY:  The last housekeeping matter, and this

```
 1   is very minor, but Mr. Harris reminded me of this last week.

 2   We in our stipulations of fact noted that Pathway is located

 3   in Littleton.  It's actually Lone Tree because Lone Tree

 4   annexed the area where the office is.  We can submit a revised

 5   stipulation if you want.

 6            THE COURT:  Not necessary.

 7            MR. WILETSKY:  Thank you.

 8            THE COURT:  All right.  Are there any other

 9   stipulations as to exhibits that we can take care of now?

10            MR. CRONE:  I don't think there are, Your Honor, but

11   I imagine that may come up, and we will work together on that.

12            THE COURT:  All right.  Thank you.

13            All right.  Then I think we are prepared to begin

14   with opening statements.  Counsel, it occurred to me over the

15   weekend that I probably did not give you a definite time frame

16   for opening statements.  I would like to keep them under 30

17   minutes each if we can.  If you think you will need more time

18   than that, please let me know before you begin your statement.

19            Mr. Crone, is that going to work for you?

20            MR. CRONE:  That will, Your Honor, and thank you.  We

21   are going to shoot for about five minutes.

22            THE COURT:  That sounds perfect.

23            Mr. Wiletsky, how about you?

24            MR. WILETSKY:  Oh, yeah, that's fine, Your Honor.

25            THE COURT:  All right.  Fair enough.  Barring any
```

1   additional housekeeping matters, let's jump right in, and I'll

2   hear from the Plaintiff first.

3           MR. CRONE:  So, Your Honor, if you will bear with me,

4   we went through all of this, how to get our screen connected

5   to yours, but of course I'll forget something.  Maybe not.

6           Can Your Honor see that?

7           THE COURT:  I can.

8           MR. CRONE:  Okay.  Good.

9           So good morning, and I have prepared just a few brief

10  remarks, mindful of the Court's instruction.  I think what the

11  Court is really after is order of evidence, what type of

12  evidence, what's coming your way and that sort of general

13  roadmap, and that's what we are going to stick to.

14          Before I do that, I think it would help to introduce

15  you to some of the Plaintiffs that are sitting at the table.

16  So this gentleman is Franklin Merrill --

17          THE COURT:  Good morning.

18          MR. CRONE:  -- of Merrill, et al.  This is Becky

19  Austin.

20          THE COURT:  Good morning.

21          MR. CRONE:  You have already said hi to Sarah Wolter.

22  And this is Kevin Rowe, paralegal extraordinaire from our

23  office.

24          THE COURT:  Good morning.

25          MR. CRONE:  In the back are some of the Plaintiffs

1   that will testify in the course of the proceedings.

2          So we filed this lawsuit, by "we" I mean the

3   Plaintiffs, the drivers, filed this lawsuit about two years

4   ago, and so they are asking for wages two to three years prior

5   to that.  So it's been a long road for them from prior to the

6   filing of the lawsuit, and you'll hear from the Plaintiffs

7   about the financial hardship they endured despite working

8   many, many hours, at least 70 hours in each week that they

9   performed work for Pathway and Con-Way.

10          And I should take a brief moment to say that I will

11   refer to and the Plaintiffs will refer to Con-Way and CFI and

12   XPO, and they are all referring to the same entity.  And I

13   think Your Honor saw that in the prior briefing in this case.

14          So in their joint employment with Con-Way and

15   Pathway, they endured severe financial hardship.  In some

16   cases it caused the breakup of marriages, it caused people to

17   lose their homes, and that sort of thing.  And so it's been a

18   long road for them to get here today to this morning, and

19   they're excited to be here, and we are all excited to be here,

20   and we want to present this evidence to the Court.  And all

21   they are asking for simply is just honest pay for honest work.

22   That's all.  That is it.  And so in a way this case is that

23   simple, and of course the Court already knows nothing is ever

24   that simple.

25          And so on the second slide in front of the Court,

1   this is an e-mail from Matthew Harris to Susi Killinger.  Susi

2   Killinger is an employee of CFI.  And I have highlighted a

3   portion for you.  It says:  The industry as you know is

4   littered with programs where at least one of the three parties

5   doesn't do well, and I know that's something we all want to

6   avoid.

7            I have highlighted this language for you to show you

8   that at the beginning of the relationship, at the beginning of

9   the Pathway Con-Way relationship and then the drivers at the

10  bottom, that Pathway was aware that this could fail.  Pathway

11  was aware that the entire house of cards could fall down.  But

12  it wasn't Pathway that was going to be damaged when that house

13  of cards fell down, and it wasn't going to be Con-Way either.

14  It was going to be the drivers, my clients, sitting on this

15  side of the courtroom.  At every turn where somebody has to

16  take a financial hit, it's this side of the courtroom, and

17  they knew that from the start.

18           Now, let's get into that roadmap I was talking about.

19  So we're trying to order the evidence logically for the Court,

20  and so Franklin Merrill, who you've met, and Becky Austin, who

21  you've met, and Rodney Lacy, who is sitting in the gallery,

22  they will be the Plaintiffs that will testify about FLSA

23  matters.  And -- with the exception of Larry Jurcak, who is

24  the only Plaintiff who has an FLSA retaliation claim.  So they

25  will testify about the FLSA matters, and they will also

1    testify about their state law claims, so we are talking about

2    material misrepresentations, et cetera.  And so from them you

3    can expect to hear testimony about the joint employer

4    relationship from their perspective, so that is how did they

5    get recruited into this -- into this relationship.  And

6    Plaintiffs will tell you that -- that CFI and Con-Way

7    recruited them into the relationship on behalf of Pathway.

8    And we can get into all of that.  And so they will also tell

9    you about misclassification, in other words, who controlled

10   what they did, which of the joint employers controlled which

11   aspects of their employment, and then, of course, the state

12   law claims.  And then after that, all other Plaintiffs will

13   testify about their state law claims only.  Defendants will

14   elicit some FLSA testimony from some of those other

15   Plaintiffs, of course, but from Plaintiffs' perspective, after

16   you hear from Frank Merrill, Becky Austin, and Rodney Lacy,

17   you ought to hear a parade of just state law testimony.  And

18   that's where we think we can narrow this down and speed this

19   thing down the track.

20           Some testimony as to the joint employer relationship

21   will come via videotaped deposition testimony of employees or,

22   in the case of one individual, a former employee of

23   Con-Way/CFI.  And Plaintiffs have prepared deposition cuts,

24   video cuts, all the designations have been submitted to the

25   Court, and we have worked to edit those cuts down and get rid

1    of the pauses and try to save some time.  So some of that will

2    come in that form.  And then we hope -- I had prepared some

3    examples, but I'm going to skip through it because I wanted to

4    stick to five minutes.  I'm hoping I'm close.  And so we hope

5    at the end of the seventh day we can do some brief closing

6    arguments and have this trial wrapped up, if we can stick to

7    this -- this roadmap.  And that's all, Your Honor.  I'm sure

8    Defendants have some words they'd like to say to you, and once

9    they're done, we are happy to get started.

10              THE COURT:  All right.  Thank you.

11              Mr. Wiletsky, whenever you're ready.

12              COURTROOM DEPUTY:  I'm sorry, Your Honor.  Can I

13   interrupt for just a moment?

14              THE COURT:  You may.

15              COURTROOM DEPUTY:  Counsel, you can leave your laptop

16   plugged in.  The cord should stretch to the table.

17              MR. CRONE:  Thank you.

18              COURTROOM DEPUTY:  You're welcome.  And then just

19   switch the number.

20              MR. WILETSKY:  I'm not going to be using the screen

21   for my opening.

22              MR. CRONE:  I'm actually not going to be using this

23   until later in the day, so I'll just unplug this.

24              COURTROOM DEPUTY:  Okay.  Thank you, Judge.

25              THE COURT:  Thank you.

1           MR. WILETSKY:  Good morning, and thank you, Your

2    Honor.

3           THE COURT:  Good morning.

4           MR. WILETSKY:  We believe the evidence will show that

5    Pathway Leasing and Matthew Harris, its principal member, did

6    not employ, jointly or otherwise, the Plaintiffs.  Pathway

7    leased trucks to Plaintiffs who are or were over-the-road

8    truck drivers.  I want to start by talking just briefly about

9    the relationship between Pathway and former Defendant XPO.

10   Like Mr. Crone, I may use XPO and Con-Way interchangeably, but

11   I'm referring to the same entity.

12           Pathway has one and only one source of revenue, and

13   that's leasing its equipment.  It does not receive pay from

14   any of the 30 carriers with which it has a relationship, and

15   the lease obligations do not vary regardless of how much or

16   how little the drivers earn for their services contracted to

17   those various carriers.  Pathway does not share revenue or

18   costs or management or ownership with any carrier, including

19   XPO.

20           You will hear from TJ Hunt, who was formerly with

21   XPO, via deposition testimony, and he will testify that as to

22   XPO, it earns its revenue from hauling freight.  It hauls

23   freight for a variety of customers.  It has company drivers or

24   employees, and we might refer to them interchangeably, and it

25   contracts with owner-operators or independent contractors.

1   Some contractors own their own trucks.  Some lease from

2   Pathway, from other sources.  And you will hear Mr. Hunt will

3   testify they will take a truck from any source.

4          Pathway and XPO, you will hear from both Mr. Hunt and

5   Mr. Harris, are completely separate and independent entities.

6   One is not dependent on the other for its existence or for its

7   profits.  The relationship can be terminated by either party

8   on four months' notice.

9          With respect to the leasing program that's in place,

10  you will hear that XPO has its own process for vetting

11  owner-operators, and Pathway isn't involved in that.  Pathway

12  has its own process for approving lease applications, and XPO

13  is not involved in that.

14         You will also hear from the Plaintiffs, Mr. Harris,

15  and Mr. Hunt that once Pathway leases the truck, it has no

16  control over the day-to-day of what the drivers do.  The

17  drivers have the discretion to accept or reject loads as they

18  see fit.  They have the discretion to take time off.  They

19  have the discretion to take from XPO advances on their pay and

20  to use those advances for any purpose they see fit.  They can

21  and do put restrictions on where they will drive, the types of

22  roads they will drive, how much weight they will haul, and the

23  customers for whom they will haul freight.  They also decide

24  how fast or how slow they will drive, within the speed limit,

25  of course.

16-cv-02242-KLM                Defense Opening                    I - 14

1        Ultimately, what you will hear is that these drivers

2    took a risk by investing in a truck, and they ultimately had

3    to make the business decision on how to maximize their

4    earnings.  Pathway and XPO had no ability to discipline these

5    drivers if they weren't doing well.  They couldn't put them on

6    a performance improvement plan.  They couldn't terminate their

7    respective agreements with these drivers unless there was a

8    default or breach under the agreement.  Ultimately XPO and

9    Pathway could provide information and data to these drivers if

10   they were struggling or if they were not doing well or at risk

11   of default, but they couldn't force them to do anything

12   because it was up to the Plaintiffs to be successful.

13       You will hear that the Plaintiffs could do this work

14   themselves, they could drive the truck themselves as a solo,

15   or they could hire others to do the work for them, as

16   Mr. Hollingsworth and others did, driving as a team to

17   maximize their earnings.  You will hear that Plaintiffs can

18   and did switch carriers.  They were not wedded to XPO.

19       XPO could and did terminate some of the Plaintiffs'

20   services without any input from Pathway.  You will hear that

21   and about Tami Potirala, Duane Van Der Kamp, Chris Beaupre.

22   When that termination occurred, it was a termination of the

23   contract hauling agreement between XPO and the driver, not a

24   termination of the lease agreement, which remained in place.

25   And Pathway worked with those drivers to see if they could

1  find another carrier that would contract with them for their

2  services, and some of them did.

3       You will also hear that some of the Plaintiffs, in

4  fact, a number of the Plaintiffs successfully completed their

5  leases and purchased their truck at the end of the lease.

6  Ronald Dennis, Anthony Dennis, Rodney Lacy, Sami Nasr, and

7  many others.  Once they completed the lease and bought the

8  truck, they had no further relationship with Pathway at that

9  point.  They could continue to drive for XPO if they wanted,

10 or they could drive for another carrier.  They could hire

11 someone to drive with or for them.

12      And you will hear from Matthew Harris that he even

13 has repeat customers.  They complete the lease, buy the truck,

14 they come back and then lease another truck, building their

15 own small fleet.

16      You will hear about some cooperation and

17 communication between Pathway and XPO but, importantly, not as

18 to sharing or controlling the essential terms and conditions

19 of the alleged employment relationship between these two

20 entities.  XPO and Pathway did discuss rates of pay that were

21 offered by XPO and how that correlated to the cost of truck

22 ownership, but Mr. Hunt will testify that Pathway had no

23 ability to dictate XPO's pay rate, and XPO made those

24 decisions based on a variety of sources for all

25 owner-operators regardless of whether they leased from

1   Pathway.

2          You will also hear that XPO remitted funds earned by

3   the Plaintiffs when they were performing services for XPO to

4   Pathway per an authorization from the Plaintiffs.  But, again,

5   Pathway simply received a deposit.  They had no information

6   about and no way to calculate or check earnings.  That wasn't

7   their role.  What you will hear is their role was simply to

8   use that to deduct the lease -- lease-related obligations to

9   mitigate risk.  A truck is a very expensive asset, and that's

10  one way to mitigate the risk.

11         Before implementing DocuSign, a software that allows

12  for electronic signatures, it was easier for some drivers to

13  have the lease printed at XPO's office or some other place.

14  XPO would do that, clerical tasks, printing out the lease and

15  then sending it back to Pathway once the driver had signed it,

16  but again, and importantly, you will hear that XPO had no

17  authority to negotiate the terms of those leases between

18  Pathway and the drivers.

19         You will also hear some evidence regarding XPO's tire

20  discount program.  Again, there was communication between XPO

21  and Pathway with respect to allowing Pathway's lessees to

22  access their maintenance escrow account to take advantage of

23  this tire discount program that was offered to all of XPO's

24  owner-operators, but it was, again, limited to that

25  administrative task of allowing them to access an escrow

 1   account.

 2            There was similar coordination or discussions on

 3   various administrative issues, but as to all of them what you

 4   will hear is that at the end of the day, Pathway and XPO did

 5   not have the ability to control these drivers' day-to-day

 6   activities.  They certainly did discuss from time to time, as

 7   I mentioned, some drivers who were at risk of potentially

 8   defaulting.  Pathway did, sometimes even at the drivers'

 9   request, ask XPO if XPO could offer more loads or assignments

10   to the drivers, but Pathway couldn't force XPO to do that.

11   And XPO, you will hear from Mr. Hunt, even if it agreed to

12   offer more loads or assignments, could not force these drivers

13   to accept them, to change the restrictions they had put in

14   place on where they drove, or to not take time off.

15            Plaintiffs, you will hear, made a choice.  No one

16   forced them to become an owner-operator.  You will hear from

17   some, including Plaintiff Sami Nasr, that once he had been an

18   owner-operator, he simply could not go back to being a company

19   driver.  They wanted flexibility.  They wanted an opportunity

20   to be in business for themselves.  And some did very well,

21   grossing as much as 200,000 in a year.  They also had options

22   other than Pathway.

23            You'll hear, in contrast to that, from Mr. Hunt that

24   company drivers took no risk, they had no responsibility for

25   maintenance or for repairs, and as a result they had no

1    upside.  They didn't owe anything if a company driver left,

2    but they didn't own anything.  And that's the difference

3    between the company drivers and the owner-operators who leased

4    through Pathway once they completed the lease.

5            With respect to damages, I will just touch on this

6    briefly, we believe that the evidence will show that the

7    Plaintiffs did not do any damage calculations themselves.

8    They simply say that they essentially worked 70 hours every

9    single week, but that 70 hours is not based on an analysis of

10   compensable time under the Fair Labor Standards Act.  It is

11   instead a maximum amount of time that they could drive or

12   engage in driving-related activities under Department of

13   Transportation or DOT regulations.  The Plaintiffs did not

14   take into account the advances that they received, even though

15   those advances were oftentimes used for personal expenses and

16   bills.  They did not take into account the fact that they were

17   able to and sometimes did contact Pathway and say instead of

18   disbursing funds to me that would otherwise come to me, I want

19   to apply that against my lease obligations to pay down their

20   lease and move toward owning that truck.  And sometimes they

21   didn't drive at all.  The truck may have been in the shop, or

22   they just aren't sure where the truck was.

23           With respect to the state law claims, we believe the

24   evidence will show that the Plaintiffs -- I'm sorry -- I

25   should say the named Plaintiffs knowingly and voluntarily

1   entered into their equipment lease agreements after

2   investigating other options.  The agreements are

3   comprehensive, and they disclaim any alleged warranties.  And

4   what you will hear, Your Honor, is, primarily from Mr. Harris,

5   but also others, Pathway honored its contractual obligations.

6   And, importantly, almost half of the named Plaintiffs

7   completed their lease agreements, purchased their trucks,

8   realizing the ultimate benefit of the bargain, and now they

9   want the Court to rescind those agreements.  You will not hear

10  any admissible evidence that would justify ignoring and

11  invalidating those agreements.

12          On the other hand, with respect to Pathway's

13  counterclaims, you will hear what we believe will be

14  undisputed evidence that certain of the Plaintiffs defaulted

15  on their lease obligations and still owe Pathway money.

16          In closing, Your Honor, the evidence will demonstrate

17  that Pathway and Mr. Harris did not employ, jointly or

18  otherwise, any of the Plaintiffs, and, in fact, the Plaintiffs

19  were not employees at all, and that they are not entitled to

20  any relief in this case.  Thank you.

21          THE COURT:  Thank you.  All right.  Let's have

22  Plaintiff call its first witness.

23          MR. CRONE:  Thank you, Your Honor.  Plaintiffs call

24  Franklin Merrill.

25          THE COURT:  All right.  Mr. Merrill, if you would

1    come forward, please.  And if you would stand here in front of

2    the witness stand, and I'll swear you in.

3              THE WITNESS:  Give me a moment.

4              THE COURT:  You bet.

5              THE WITNESS:  I'm walking without my cane today.

6              THE COURT:  All right.

7              THE WITNESS:  Thank you.

8              THE COURT:  Raise your right hand.

9              THE WITNESS:  Yes, ma'am.

10        (The witness was sworn.)

11             THE COURT:  Thank you.  Please be seated, and make

12   sure you speak into the microphone.

13      **FRANKLIN MERRILL, A PLAINTIFF HEREIN, DIRECT EXAMINATION**

14   BY MR. CRONE:

15   Q.  Good morning, Mr. Merrill.  How are you?

16   A.  Doing well, and yourself, sir?

17   Q.  Good.  Bear with me while I get this set up.

18             Good morning.  Again, thanks for bearing with me

19   while I set up.  Can you see that okay in front of you,

20   Mr. Merrill?

21   A.  Yes, sir, I can.

22   Q.  Okay.  Can you start by just stating your name and

23   spelling it for the court reporter, please.

24   A.  Franklin Merrill, F-r-a-n-k-l-i-n, last name is Merrill,

25   M-e-r-r-i-l-l.

```
 1    Q.  And, Mr. Merrill, where are you from?
 2    A.  El Paso, Texas.
 3    Q.  How long have you lived in El Paso, Texas?
 4    A.  About 20 years.
 5    Q.  Are you currently employed?
 6    A.  No, I'm not.
 7    Q.  Okay.  And why is that?
 8    A.  I'm disabled.
 9    Q.  How did your disability come about?
10    A.  Being a veteran from the armed forces, I was disabled
11    through the armed forces, and I got my disability up to a
12    hundred percent.  So, therefore, I do not work any longer.
13    Q.  And do you remember when that 100 percent disability
14    occurred?
15    A.  November 19th, 2016.
16    Q.  And before that happened, where did you work?
17    A.  I worked for Con-Way, Pathway Leasing.
18    Q.  How long did you work there?
19    A.  As for Con-Way, I worked for a little over 11 years.  And
20    then I tried to do the owner -- or alleged owner-op program
21    for a year.
22    Q.  Okay.  And we'll back up and try to nail down those dates,
23    but right now just to sort of round out the background, are
24    you -- you are aware in this lawsuit that you are suing
25    Defendants Pathway Leasing and Matthew Harris.  Matthew Harris
```

1   is sitting at the table to my left.

2   A.  Yes, very aware.

3   Q.  How did somebody from El Paso, Texas, get to know the

4   Colorado company Pathway Leasing?

5   A.  We -- as we worked in Joplin, Missouri, and the

6   advertisement through CFI/Con-Way.  I prefer them as CFI

7   because that's what the company that I used to drive for,

8   first started.  But they advertised Pathway Leasing trucks,

9   and that's how I found out about them up there in Joplin,

10  Missouri.

11  Q.  Okay.  So, Mr. Merrill, bear with me a second.  I want to

12  keep us organized.  So you just testified that CFI introduced

13  you to Pathway Leasing.  Is that -- is that correct?

14  A.  Yes.

15          MR. WILETSKY:  Your Honor, I would just object to the

16  notes.  I don't think they are necessary or appropriate.  The

17  witness can testify to his recollection.

18          THE COURT:  Mr. Crone?

19          MR. CRONE:  Your Honor, I'm simply using a

20  demonstrative.  I think if I was standing in the well with a

21  big easel drawing things with a marker, I doubt there would be

22  an objection.  This is simply more efficient.

23          THE COURT:  The objection is overruled.  Be cautious,

24  however, about asking for the admission of any of your notes

25  because it's likely to be denied, to have them admitted into

1    evidence.

2              MR. CRONE:  Oh, no, I'm fine with throwing these out

3    the window when we're done.

4              THE COURT:  All right.  Thank you.

5              MR. CRONE:  Not a problem.

6    BY MR. CRONE:

7    Q.   So, Mr. Merrill, so you testified that CFI introduced you

8    to Pathway Leasing.

9    A.   Yes.

10   Q.   Do you know -- do you recall who at CFI introduced you to

11   Pathway Leasing?

12   A.   I remember one for sure, Anita, and I believe the other

13   one started with an S.  I can't remember her name.

14   Q.   Okay.  So --

15   A.   I think Susan or something like that.

16   Q.   So Anita Last Name Unknown --

17   A.   I do not know their last names.

18   Q.   -- and Susan Last Name Unknown, from CFI, introduced you

19   to Pathway Leasing.  Is that correct?

20   A.   Correct.

21   Q.   Okay.  Can you walk me through that process?  How exactly

22   did that occur?

23   A.   They advertised on the Qualcomm that -- it's a fleetwide

24   message to all company drivers if you want to do a better

25   career movement or advancement, to come in and talk with them.

1  Q.  And, Frank, let me stop you there just because I want to

2  make sure it's clear to the Court.  What's a Qualcomm?

3  A.  Qualcomm is our communication devices that are on a unit

4  so that we can communicate back to our main office.  In this

5  case, it would be Joplin, Missouri, where we'd get our load

6  plans and everything else.  All our information for the truck

7  to the driver gets put on a communication device, which is

8  called Qualcomm.  That's basic -- that's my definition of what

9  it is.

10 Q.  And that's fine, and I didn't mean to interrupt you.

11 A.  That's fine.

12 Q.  So I believe you were testifying that you saw a message on

13 the Qualcomm.

14 A.  It's an advertisement on the Qualcomm.

15 Q.  Then what happened after you saw the advertisement on the

16 Qualcomm?

17 A.  Well, I -- seeing how I drove for the company for 11

18 years, I might as well check it out, see what's going on with

19 it.  So we went into -- next time I was in Joplin, Missouri,

20 our home base, I elected to go into the area where the

21 recruiters are.  In this case, it's the human resource

22 department.  And then I was directed to one of the two

23 individuals to -- they said that we needed a $500 deposit, and

24 then they showed us trucks --

25          MR. WILETSKY:  Objection, Your Honor.  It's hearsay.

```
 1            THE COURT:  It's unclear what individuals he is
 2    talking about.  Clarify whether he is talking about
 3    individuals employed by the defendant.
 4    BY MR. CRONE:
 5    Q.  Yeah --
 6    A.  Individuals meaning Anita --
 7            THE COURT:  Just a minute.  We have to do this the
 8    right way.  So let's have the attorney ask a question.
 9    BY MR. CRONE:
10    Q.  Let's back it up step by step.  When you walked into the
11    human resources department, whose human resources department?
12    A.  CFI's human resource department.
13    Q.  Again, where was that located?
14    A.  In Joplin, Missouri.
15    Q.  And you walked through those doors, and you said you
16    saw --
17    A.  You had to make a right-hand turn, go over to the location
18    where Anita and -- Anita sat to speak with them in reference
19    to finding out about the program for this alleged -- and I
20    call it alleged because it's -- it was a Mickey Mouse court to
21    me.
22            MR. WILETSKY:  Objection, Your Honor.  Move to
23    strike.
24            THE COURT:  Sustained.
25    BY MR. CRONE:
```

1  Q.  Okay.  So you walked in, and -- and painting a picture --

2  we're trying to paint a picture for the Court.  There's some

3  desk where Anita Last Name Unknown sat.  Is that also where

4  Susan Last Name Unknown sat?

5  A.  She sat parallel with Anita.  So, yes, in this --

6  Q.  Okay.  What else was in the office?

7  A.  In the office, well, from where their desks sat behind --

8  or in this case in front of them was a big bulletin board with

9  a list of trucks that, you know, that you could rent, own.  So

10 I -- I assumed that Anita and Susan worked for Pathway

11 Leasing --

12        MR. WILETSKY:  Objection, Your Honor.

13        THE COURT:  Well, he can testify about his

14 assumption.  Overruled.

15        Go ahead, Mr. Merrill.

16 A.  I assumed that they were -- they worked for, um, Pathway

17 Leasing because of the fact that they had all Pathway Leasing

18 stuff right there on the board, everything you wanted to know

19 about the trucks, um, how much of a deposit that it needed to

20 be, just different materials on this board.  And that's how we

21 got to pick our trucks if we were going to rent it.

22 BY MR. CRONE:

23 Q.  Mr. Merrill, let me pause you there.  I think that's an

24 important point.  Let's keep ourselves organized.  So,

25 Mr. Merrill, you assumed Anita Last Name Unknown and Susan

1    Last Name Unknown worked for Pathway Leasing.  Is that

2    correct?

3    A.  Yes, sir.

4    Q.  Okay.  And you were explaining why.  And I believe you

5    just testified, before I interrupted you, that it was the

6    information on the bulletin board you saw.  Was that

7    information related to Pathway Leasing trucks?

8    A.  It was all about Pathway Leasing trucks.

9    Q.  What did it say?  What do you remember it saying?

10   A.  If I can recall it, it said available trucks, leased

11   trucks, seated trucks, on -- and you had three different

12   sections where it said it.

13   Q.  Okay.

14   A.  Then, of course, there was a fourth block; I don't

15   remember exactly what it said, but I know there was -- it was

16   like a -- cut in quad and then see what you had to do.

17   Q.  Okay.  Thank you, Mr. Merrill.  Then what happened next in

18   the process?

19   A.  Uh, you went and talked to them, the two individuals,

20   Anita, Anita or Susan.  Then they would take -- they said,

21   well, you need a $500 deposit.

22         MR. WILETSKY:  Same objection, Your Honor:  hearsay.

23         THE COURT:  Response to the hearsay objection?

24         MR. CRONE:  Your Honor, this testimony is not being

25   offered for the truth of the matter.  It doesn't matter if it

1    was a $500 deposit or a $5,000 deposit.  It's simply being

2    offered to prove the fact that he had a conversation with

3    these people about a Pathway Leasing term.  That's it.  Either

4    the conversation happened, or it didn't happen, and then he

5    reacted to it.  He's simply just testifying about his -- what

6    he recalls.

7              MR. WILETSKY:  It's absolutely being offered for the

8    truth of the matter, Your Honor.  He is saying exactly what

9    they said and as to the deposit and the substance of the

10   conversation.

11             THE COURT:  Well, I would be more concerned about the

12   hearsay nature of the statements if we had a jury trial, but

13   on the representation of Plaintiffs' counsel that this

14   testimony is not being offered for the truth of the matter,

15   the objection is overruled.  The Court will not accept it for

16   the truth of the matter.  The Court will accept the testimony

17   only to establish that a conversation occurred.

18             MR. CRONE:  And thank you, Your Honor.

19   BY MR. CRONE:

20   Q.  And so why don't we clean this up a little bit.  What do

21   you remember, what do you remember in terms of a security

22   deposit that you would have to put down to lease a Pathway

23   truck?

24   A.  A security deposit of $500 is what I remember.  It was

25   taken out of my payroll checks from CFI until the reached --

1   the amount of $500 was taken.

2   Q.  What else do you remember about any sort of conditions you

3   would need to satisfy to get into a Pathway Leasing truck at

4   that time, at the time you are standing in that office?

5   A.  That's all you needed was a $500 deposit, and then they

6   set you up for the -- you got to pick from what was on the

7   board or the trucks that were available to you.  And then

8   after everything was all set up, then we were to be -- there

9   was supposed to have been a contract been ready to be reviewed

10  and signed by us.

11  Q.  Okay.  Now, I want to -- I want to pause you there

12  conceptually, and I want to take you back to something you had

13  already testified to, which is that you worked for Con-Way

14  prior to walking into that office with Susan Last Name Unknown

15  and Anita Last Name Unknown.

16  A.  Yes.

17  Q.  In what capacity did you work for Con-Way?

18  A.  I was a company driver.

19  Q.  And how long were you a company driver?

20  A.  I believe I stated 11 years-plus.

21  Q.  And what does company driver mean to you?

22  A.  What it means to me --

23  Q.  Yeah.

24  A.  -- as a company driver?

25  Q.  What's being a company driver?

1    A.   Taking orders, doing as you're told, and getting -- and

2    delivering freight from Point A to Point B without recourse --

3    I mean, with recourse if you -- if you mess up.  Not having to

4    worry about taxes or anything like that because they were

5    already taken out of your paychecks.  Uh, getting a decent

6    wage.

7    Q.   Were you an employee of Con-Way?

8    A.   I was an employee of Con-Way.

9    Q.   So let's break this down.  What I want to do is I want to

10   break down your job duties as a company driver while you were

11   working for CFI.  So this is prior to the time that you walked

12   into that office with Anita Last Name Unknown and Susan Last

13   Name Unknown.  Does that question make sense to you?

14   A.   Yes.

15   Q.   Okay.  So what was your primary job duty as a company

16   driver?

17   A.   As a company -- to ensure the movement of freight from

18   Point A to Point B.

19   Q.   And bear with me because we're going to make this chart to

20   keep ourselves organized.  So move freight from Point A to

21   Point B.

22        What else did you do as a company driver for CFI?

23   A.   We had to maintain -- maintenance of the vehicles, of our

24   trucks, our trailers.

25   Q.   So --

1    A.  And to maintain the security of the load.

2    Q.  Let's -- bear with me.  So you have to maintain the truck

3    and trailer.  And by trailer do you mean --

4    A.  CFI's, the cargo trailer that we hooked onto the trucks.

5    Q.  And then you said you had to -- something about security.

6    What was that?

7    A.  To ensure security of -- security of the load.  That means

8    you lock it down.  You secure the load for movement, then you

9    close your doors and you put your padlock or other locking

10   device on it to secure the load --

11   Q.  Okay.

12   A.  -- so it will be ready for movement.

13   Q.  What else did you have to do as a company driver?

14   A.  Pretrip inspections.  We have to ensure that that truck

15   and trailer is ready and safe to be on the road, to be moved

16   from Point A to Point B.  It's a safe -- you have to be safe

17   when you are dealing with our trucks or any -- any type of

18   truck.

19   Q.  And so a pretrip inspection, what does that involve?

20   A.  It's -- it's about a 72-point inspection from the front

21   end of the truck to the rear of the trailer, to including the

22   oil change, checking your oils to fan belts.  So all the small

23   things that we take for granted in our little cars, we now

24   have to pay attention to it in the big trucks.

25   Q.  Okay.  What else did you have to do as a company driver

1    for CFI?

2    A.   We have to make sure that we're dispatched, take the

3    information off our Qualcomms to be able to read, understand

4    the communication device, excuse me, so that we can use it --

5    Q.   So, Mr. Merrill --

6    A.   -- on a day-to-day basis.

7    Q.   So, Mr. Merrill, if I write "receive dispatch" at number 5

8    here, is that accurate?

9    A.   Receiving dispatch?  I would -- communicating to our

10   bosses, to the -- whoever is on the other end of the computer.

11   Q.   Communicate to your bosses.

12   A.   There you go.

13   Q.   What else?

14   A.   On the most part, that's everything that we have to do.

15   Oh, if we break down, we have to basically babysit that load.

16   We have to drive the mileage that we're supposed to.

17   Q.   I want to get this onto the list.  Babysit the load if you

18   break down.

19   A.   We have -- again, I think that would fall under the

20   securement of my load, but it's just a different way of me

21   saying it, I guess.

22   Q.   Would you have to put fuel in the truck?

23   A.   We always have to.  That's part of our maintenance and

24   pretrip.  So you have to make sure your fuel -- that is the

25   load to me, but yes, you have to do that, yes.  You have to

1    clean your windows.  You have to do that.  That's all part of

2    your pretrip.  You have to be ready to go.  That's part of

3    your fueling.  That's a day-to-day activity.

4    Q.  Anything else you can think of when you were a company

5    driver for CFI that you had to do?

6    A.  As much as I -- there's -- we could probably spend on this

7    topic all day, but this is pretty much what we have to do on a

8    day-to-day basis.

9    Q.  You're in luck, Mr. Merrill, because we don't have all

10   day.  So we're going to -- we will move on.

11          All right.  So I want to take you back conceptually

12   to the time we just left, which is the time in which you were

13   in Anita Last Name Unknown and Susan Last Name Unknown's

14   office looking at that bulletin board.

15   A.  Yes.

16   Q.  And what happened next?  Because eventually you did lease

17   a Pathway truck; correct?

18   A.  Yes.

19   Q.  Okay.  So what happened next?  You are staring at that

20   bulletin board.  Walk us down that road.

21   A.  We just pick a -- we're allowed to pick a truck that's

22   available.  I believe I said that.  Then, after that, you are

23   allowed to go look at the vehicle, not test drive it or --

24   you're not allowed to -- because there was no keys available,

25   so I couldn't get into it.  I couldn't test drive this to make

1    sure it's sound or anything.  But after you get -- and then

2    you come back.  If you agree to take the vehicle, then you

3    would say -- then they would print up a lease agreement, and

4    then you would -- then there was nobody --

5    Q.  Mr. Merrill, let me interrupt you, and I apologize for

6    that.  Who would print up a lease agreement?

7    A.  Anita.

8    Q.  Okay.  Fair enough.

9    A.  Anita printed up the lease agreement for us.

10   Q.  Please carry on.

11   A.  In my case it was Miss Anita because I dealt with her

12   directly.

13   Q.  Thank you.

14   A.  So after -- then we pick up the lease agreement.  We would

15   sit down in a cubicle and go over the -- the lease agreement.

16   I had quite a few questions about mine, and I had made a lot

17   of remarks and everything else.  I started communicating with

18   Matthew Harris about, well, the discrepancies that I felt that

19   we needed to discuss before I signed this lease agreement.

20   Q.  Okay.  So let me pause you -- pause you there because this

21   is an important part.  We are going to make a chart again.  We

22   are going to keep ourselves organized.

23          You said you communicated with Matt Harris about the

24   lease agreement; right?

25   A.  Yes, I did.

1   Q.  Let's title this one "Communication with Mr. Harris."  My

2   first question is:  How did you communicate with Mr. Harris?

3   A.  By telephonic.

4   Q.  How did you get his telephone number?

5   A.  With, uh -- Miss Anita gave us the original phone number

6   to contact Mr. Matt -- excuse me -- Mr. Harris.

7   Q.  So Anita Last Name Unknown gave you Mr. Harris's telephone

8   number?

9   A.  Yes.

10  Q.  And you called him?

11  A.  Yes.

12  Q.  What did you discuss?

13  A.  The first time I called him, we discussed about the

14  original -- the $500 deposit.

15  Q.  Okay, hold on.  $500 deposit.

16  A.  What truck that I would like to see.  That if he would

17  have a truck that I -- you know, in this case I should have

18  been able to pick out the truck that I wanted to drive.

19  Q.  Okay.  So you -- how did you know, though, which trucks

20  were available?

21  A.  The board.

22  Q.  So you discussed picking a truck from the board?

23  A.  Yes.

24  Q.  If I "write truck from board," do you know what that

25  means?

1    A.  I do, yes.

2    Q.  Shorthand.

3    A.  Shorthand.  Sorry.

4    Q.  What else did you discuss with Mr. Harris?

5    A.  Well, we just -- then we just had a general conversation

6    of just introduction to each other.

7    Q.  Okay.

8    A.  You know, just see how each other is going to react with

9    each other to see -- see if it was going to be a fit and

10   maybe, yes, or no.  I had asked for a Freightliner at first,

11   and he didn't have any Freightliners available, and he only

12   had a Kenworth, which is the make and model of the trucks.

13   I'm sorry.  So at the time he didn't have any Freightliners,

14   but he had these two Kenworths that he was willing to put --

15   put a driver in.

16          So when I went down to look at them, he also had a

17   couple newer trucks.  Well, we're not allowed to have those

18   trucks because they were designed for team drivers.  He wanted

19   to put two drivers in those brand-newer trucks.  That's

20   exactly what he told me.  So, therefore, we, as solo drivers,

21   were not allowed to pick from them -- them trucks.

22   Q.  Let me ask you.  When you say you went down to look at

23   them, where were these trucks?

24   A.  These trucks were located in Joplin, Missouri, at the

25   Peterbilt storage yard located off in -- in Joplin, Missouri.

1   Q.  And Joplin, Missouri, is where you testified that CFI is

2   located?

3   A.  Yes.

4   Q.  Okay.  Did you go look at these trucks on your own?

5   A.  I did not.  I went and -- I went with my brother.  My

6   brother went with me because he was -- he's also a truck

7   driver.  He kind of had an idea.  But, yes, overall did I have

8   a member of Matthew's group or somebody else?  No.  I went

9   down on my own.

10  Q.  When you are talking to Mr. Harris, when you are having

11  this telephone conversation, did you discuss -- so you were

12  just testifying you discussed about the truck you want.

13  A.  Yes.

14  Q.  Did you discuss anything else?

15  A.  Not the first day because, like I said, you know, it was

16  just the -- the $500 deposit, what to expect, go pick your

17  vehicle up, go look -- or go look at your vehicle.  If you

18  agree to it, then you come back, and then we'll go over --

19  then we get the contract, and then we -- we sit down -- or you

20  didn't sit down.  You went over in a cubicle, looked over the

21  contract.  If you had any questions or concerns, try to get

22  ahold of Mr. Harris on the phone so that you can discuss it.

23  That didn't happen because, I mean, either he was busy, he

24  didn't have time for you, he -- anything and everything,

25  'cause there was quite a few concerns about the contract.

1          MR. WILETSKY:  Just object as to that speculation.

2    There's no foundation laid as to why -- what Mr. Harris was

3    doing or not doing.

4          THE COURT:  Overruled.  He can testify about his

5    recollection of Mr. Harris's availability.

6          Go ahead, Mr. Crone.

7    BY MR. CRONE:

8    Q.  And so you're talking about a second day now?

9    A.  Yes.

10   Q.  So let me back you up to the end of that first day.  Your

11   first conversation with Mr. Harris, how long was it?

12   A.  I don't recall how long it was.  I mean, it could have

13   been a minute.  It could have been five minutes.  I really --

14   I don't recall how long we were on the phone.

15   Q.  Could -- was it a long conversation?

16   A.  The first day, no.  It wasn't really that long.

17   Q.  Can I write "short conversation"?

18   A.  Short conversations.

19         MR. WILETSKY:  I'd just object to the leading, Your

20   Honor.

21         MR. CRONE:  Your Honor, I think in this context it's

22   permissibly leading.  I think we know --

23         THE COURT:  Mr. Crone, I'd admonish you to be careful

24   about that.

25         MR. CRONE:  Okay, and I will --

1           THE COURT:  The objection is sustained.

2           MR. CRONE:  -- I will be.

3    BY MR. CRONE:

4    Q.  Now, you had jumped ahead to the second day, and there was

5    a second conversation with Mr. Harris, but I want to ask you a

6    simpler question first.  Is the second day when you were

7    handed the lease agreement?

8    A.  Yes.

9    Q.  And who, again, handed you that lease agreement?

10   A.  Anita.

11   Q.  And then she -- you testified that she sent you to a

12   cubicle, and you looked at the lease agreement.

13   A.  Yes.

14   Q.  Okay.  And then you testified that you had some questions,

15   and you tried to get ahold of Mr. Harris.

16   A.  Yes.

17   Q.  And you were unable to do so.

18   A.  That is correct.

19   Q.  Then what happened?

20   A.  I -- at first I wasn't going to sign it.  You know, I

21   really didn't understand what I was reading or quite

22   understand it, but -- so I took an extra day off, just -- I

23   wanted to wait until I got to talk to Matt, Matthew Harris.

24   Well, the more you sit, the less money you make, no matter if

25   you are a company driver or a owner-operator.  I'm already in

 1   debt.  You know, I'm already trying to do something to, you

 2   know, supposedly better myself.  So I -- so I decided to just

 3   sign the paperwork, not read it through all the way through,

 4   and just say the heck with this, I need to get back to work, I

 5   need money, I need something.  And I thought I alleged that --

 6   if I'm an owner-operator, I'm going to be able to do this, you

 7   know, and make a little extra money so I can support my

 8   family, everything else.  It just did not work out the way I

 9   expected it, but -- so I just signed the -- I just signed the

10   contract, took -- took what was available, and went on from

11   there.

12   Q.  And -- and you -- you tried to read it.  Is that what you

13   testified?

14   A.  I did.  I did try to read it, and I did testify to that.

15   Q.  Were you able to understand it?

16   A.  Not parts of it, no.

17   Q.  Let's take a look at that lease.  And so, Mr. Merrill, you

18   have got a bunch of books in front of you, and I apologize for

19   how many there are, but if you could find Exhibit 50, it ought

20   to be in the first book.

21   A.  Exhibit -- excuse me?

22   Q.  I'm sorry.  If you could find Exhibit 50, and that should

23   be in the first book.

24           Once you get there, let me know.

25           MR. WILETSKY:  One moment, Your Honor.

```
 1              MR. CRONE:  Do you want a hard copy?

 2              MR. WILETSKY:  Yeah.  Thank you.

 3              I think those are ours.

 4              UNIDENTIFIED SPEAKER:  John.

 5              MR. CRONE:  Oh, here.

 6              THE WITNESS:  Exhibit 50.

 7    BY MR. CRONE:

 8    Q.  Mr. Merrill, are you at Exhibit 50?

 9    A.  Yes, sir, I am.

10    Q.  Could you tell me if you have seen this document before?

11    A.  This is the -- this is my lease agreement.  It has my name

12    on it.

13    Q.  Is this the lease agreement you signed with Anita Last

14    Name Unknown?

15    A.  Well, I didn't sign this copy, but I did sign a agreement

16    of this nature, yes.

17    Q.  What do you mean by that?

18    A.  Well, because I'm looking at -- I'm going through here and

19    looking at it, and the signature block on the last page of

20    this lease agreement looks like a carbon copy, because that's

21    not the way I make my Rs.

22    Q.  Mr. Merrill, just -- just to be -- you're not asserting

23    this document is a fraud, a fraudulent document, are you?

24    A.  No, but at the same time, I just don't understand.  It

25    looks like somebody just scratched over with a carbon copy of
```

1    this.

2    Q.   Is it possible this is a copy of a copy of a copy?

3    A.   It's possible.

4    Q.   All right.

5    A.   We'll go with that.

6    Q.   All right.  So in reviewing this lease -- you testified

7    earlier that you couldn't understand most of the lease.  What

8    part of this document could you understand?

9    A.   Well, if I'm looking at this particular part of the lease

10   agreement, this is okay.  The parts that we could not

11   understand was the maintenance part of it, the, um, the --

12   it's just -- there was a section -- I couldn't really tell you

13   right now, without rereading the whole thing, what my sections

14   were 'cause I had made notes on -- and I don't have my notes

15   there.  And it's been over two years, so I couldn't tell you

16   the whole -- what parts of this contract -- today I couldn't

17   tell you which -- what was the actual, without having to

18   reread the whole contract.  And I -- I haven't looked at this

19   contract since I signed it.

20   Q.   Did you know that there was going to be a weekly or

21   monthly payment amount?

22   A.   Yes.  My monthly payment amount was supposed to have been

23   $948 a week for four weeks, grand totaling of $3600 a month.

24   Q.   You already testified you knew there was some sort of

25   deposit you had to put down.

16-cv-02242-KLM                    Merrill - Direct                    I - 43

1    A.  The -- the deposit that we had to put down through CFI was

2    a $2,000 deposit, what they called equipment deposit.  That

3    was for the communication device that I was telling you about.

4    We actually had -- we, the drivers, had to pay out of pocket

5    for that before anything else could be started with that

6    truck.

7    Q.  Let's -- let's chat about that for just a moment.  So what

8    do you mean by you had to pay for this equipment deposit to

9    CFI before anything else could be started?

10   A.  Well, in order to communicate to the company in Joplin, of

11   course, you have to have this communication device.  When you

12   get a Pathway truck, it's not in those trucks.  Okay.  We, as

13   drivers, have to come out of pocket before we can even move

14   the truck.  I mean, before you can get dispatched or your

15   first movement load, you have to make sure that you can

16   communicate with your bosses.

17   Q.  Are you referring to the Qualcomm unit?

18   A.  Communication device, Qualcomm.  Because nowadays I

19   believe they have what they call PeopleNet.  So there's so

20   many different types of communications devices, so I'd rather

21   just call it a communication device from this point.

22   Q.  Doesn't bother me.

23   A.  Okay.

24   Q.  Where was the communication device installed into your --

25   the Pathway truck that you were --

Julie H. Thomas, RMR, CRR                              (303)296-3056

1    A.   It was --

2    Q.   -- leasing?

3    A.   In my -- well, in the truck that I had, it was located on

4    the passenger side by the firewall, was where the mounting

5    was.

6    Q.   I'm sorry.  My question was too specific.  I mean in what

7    shop?  Where was the shop where somebody actually --

8    A.   It was done at the CFI -- CFI in Joplin, their terminal

9    there has a maintenance shop, and that's where it was done.

10   Q.   So CFI maintenance personnel put that into --

11   A.   Yes.

12   Q.   -- the Pathway truck?

13   A.   Yes.

14   Q.   What else did they do to the Pathway truck?

15   A.   Well, do their pretrip inspect -- they did a

16   certification, see if it was legal on the road.  They would do

17   your maintenance or pretty much whatever you wanted done there

18   at the time.  But then, of course, they would charge you for

19   that, you know, for whatever you did.

20   Q.   Did -- before we move on, I want to take care of this.

21        MR. CRONE:  Plaintiffs would move to admit this

22   lease, Exhibit 50.  And sort of harkening back to what

23   Mr. Wiletsky had mentioned about us using an exemplar lease,

24   we'd also like to just use this as the exemplar lease for all

25   the other Plaintiffs.  Just sort of forecasting that for you,

1    but I'll be quiet so Mr. Wiletsky --

2            THE COURT:  Any objection?

3            MR. WILETSKY:  We have no objection to the admission,

4    and we have no objection to using it with the other

5    Plaintiffs.  We, as Defendants, have one other one that we may

6    use with some of the Defendants [sic], but no objection.

7            THE COURT:  Thank you.  Exhibit 50 is received.

8        (Plaintiffs' Exhibit 50 received.)

9    BY MR. CRONE:

10   Q.   Okay.  So you were talking about CFI employees inspecting

11   the truck.

12   A.   Yes.

13   Q.   And so that occurred in Joplin, Missouri?

14   A.   Yes.

15   Q.   What else did they do to the Pathway truck?

16   A.   Well, put the equipment in, whatever they were doing in

17   the garage.  I mean, we're not standing over top of them when

18   they're doing these items.  I don't know what they would be

19   doing with it.  All I know is that they did my inspection, got

20   the truck ready to go on the road, put the Qual- --

21   communications, and they would -- oh, they would put their

22   name plates.  They put their name on the truck, as in it said

23   Con-Way Truckload on the door frame, and we run their ICC --

24   ICC numbers.

25   Q.   And let's back up just a tad.  How did the truck get from

1   the dealership in Joplin to CFI's -- what do you call it? --

2   maintenance yard in Joplin?

3   A.   Well, somewhere either the drivers -- my truck, the one

4   that I handled, was driven -- the only way that we could test

5   drive it, and that was our only test drive, was from where it

6   was parked to the Joplin yard, because there was no plates on

7   it, there's no insurance, there's nothing temporary so we can

8   move and go check this vehicle out.  You got it from Point A

9   to Point B.  You don't have that much -- it was only a little

10  over two miles to get back to the yard, and that's all you

11  were able to test drive the vehicle.  You couldn't put a load

12  on it 'cause you're not -- there's no plates, there's no

13  insurance, there's no liability on this thing, on this piece

14  of equipment, until you got it back into the Joplin CFI yard.

15  Q.   So did you sign the lease before you moved it or after you

16  moved it from the --

17  A.   I signed it before.  Because that's the only way they

18  would give you the keys.  You had to sign your lease before

19  you got your truck.  So you weren't allowed to inspect this --

20  this piece of equipment until you were -- until you had it

21  back at the Joplin yard.

22  Q.   Okay.  So you sign your lease.

23  A.   Yes.

24  Q.   You drive the truck over to the CFI yard.

25  A.   Yes.

1    Q.  They do this inspection and put their logos on it.

2    A.  Yes.

3    Q.  Then what happens?

4    A.  Then you have to let it be put on the board and be ready

5    for a load, I mean, if you -- if you're lucky to get one.

6    Q.  How long did the process take from the time you showed

7    up --

8    A.  From the day --

9    Q.  Hold on, Mr. Merrill.  I just want to make sure we are

10   clear.

11           From the time you showed up on Day One and you first

12   called Matthew Harris and had some sort of conversation until

13   the time the truck had the logos on it and you were ready to

14   go, how long was that process?

15   A.  I don't know what the average.  I could tell you about my

16   truck, the truck that I had.

17   Q.  Oh, I'm only asking about your truck now.

18   A.  It took seven days.

19   Q.  Seven days.

20   A.  Seven days.

21   Q.  And so it sounded to me like on Day One you had some

22   questions, and you had a phone call with Mr. Harris.  Correct?

23   A.  Yes.

24   Q.  On Day Two you looked at the lease, and you tried to get

25   in touch with Matthew Harris; correct?

Julie H. Thomas, RMR, CRR                                (303)296-3056

1    A.   Yes.

2    Q.   And then what happened on Day Three through Seven?

3    A.   Working on the truck and making sure that it's ready to

4    go.  Because, I mean -- I didn't really communicate that much

5    after -- I -- after I signed the lease agreement, I didn't

6    communicate very much with Matthew unless I had a problem with

7    the truck.

8    Q.   What day did you sign the lease agreement?

9    A.   Well, let's take a --

10   Q.   Well, no, I don't mean actual date.  Day One, Day Two, Day

11   Three, in the seven-day process.

12   A.   Oh, it was at Day One.  Excuse me, my correction.  Day

13   Two, because Day One we had to give up the -- because we

14   couldn't get -- you know, I went over, looked at the truck,

15   came back, signed the agreement.  That was Day Two.  Then they

16   would give us the keys, and we could go and get the truck.

17   Q.   So Day Three through Seven is when CFI is doing all these

18   things you talked about --

19   A.   Correct.

20   Q.   -- the inspection and the logos.

21   A.   Yes.

22   Q.   What are you doing during that time?

23   A.   Sitting there in the yard, sitting underneath a -- 'cause

24   we're not allowed to -- you know, while -- if your truck was

25   in the shop or not in the shop and ready to go, you are not

1    allowed to go anywhere pretty much.  I had no money, I had

2    nothing, so we stayed there on site at the CFI yard.  We

3    didn't go anywhere.

4    Q.  Okay.

5    A.  Where we sleep, we slept in the bunkhouse at the CFI yard.

6    I can't say what others have done, but this is what I did.

7    Q.  Okay.  And so at the end of Day Seven, the truck is ready

8    to drive; is that correct?

9    A.  Yes, is ready to drive.

10   Q.  And you hesitated a moment there.  Why did you hesitate?

11   A.  Because you could be ready to drive, but you didn't get

12   your load, or you have to go -- once the truck is ready to

13   drive, you'd be put on the board.  The board is where we all

14   sit and wait for our load.  And I didn't move for the load --

15   with a load for another four days.  So the truck was ready to

16   drive, but I couldn't move because there was no freight to

17   move for an additional four days.

18   Q.  During the inspection, so we are talking about Day Three

19   through Seven when the inspection is happening, the logos are

20   being put on, that sort of thing, was there anything wrong

21   with the truck?

22   A.  I couldn't tell.  I really couldn't tell if there was

23   anything wrong with the truck.  Mechanically and DOT ready,

24   according to the CFI standard or whatever they did, they said

25   it was DOT ready, but I couldn't tell because we are not

1    allowed to take it out and drive it around and find out what's

2    going on.

3    Q.   What does DOT ready mean?

4    A.   Department of Transportation, DOT regulations, we're

5    governed by, uh, is what we, as drivers, have to follow in

6    order to -- they have -- they give a basic standard, and then

7    we have to follow it.  If the truck is on a -- if it meets

8    this basic standard, then it is able to be put on the road

9    safely.

10   Q.   Okay.  And that's helpful, thank you.  And what's that

11   basic standard?  Do you know?

12   A.   I do not know.  I mean, I'm not -- we can look it up.  I

13   mean, it's under C.F.R. 49 of the -- on the codes, but --

14   Q.   Well --

15   A.   -- I'm not going to sit here and try to figure it all out.

16   Q.   Let me just ask you.  We'll simplify it.  What was your

17   understanding of the condition of the truck when it came out

18   of the CFI shop?

19   A.   According to -- after I got out, it was DOT ready to --

20   ready to roll, and it was supposed to be ready to operate

21   safely on the road.  That's all that was -- that's all that

22   sticker says.  Just that.  There's no promises of grandeurs of

23   a million -- a brand-new truck painted in gold and, you know.

24   There's nothing -- you're not going to get that.  Sorry, you

25   know.  But at the same time it has to meet a certain

1   requirement before it was safe -- it could be put on the road

2   safely so you can move freight.

3   Q.   Okay.

4   A.   And if there's other prob- -- then that's why, to me, what

5   I liked about my lease agreement was the warranty that -- that

6   was supposed to be on -- on the truck because it covered -- if

7   there was a malfunction, it was --

8   Q.   Let's --

9   A.   -- promised to me that it was going to be fixed.

10  Q.   Let's back up because I haven't heard about the warranty

11  yet.  Where did the warranty -- let me write this down.  I

12  think this is important, Frank.

13         MR. WILETSKY:  Just object, Your Honor, to the

14  characterizations of what's important and what's not.

15         THE COURT:  I agree.  I think, Mr. Crone, you have to

16  refrain from the comments about the evidence as it comes in.

17         MR. CRONE:  I -- I agree too, so I will stop doing

18  that.

19         THE COURT:  The objection is sustained.

20  BY MR. CRONE:

21  Q.   The warranty -- let's talk about the warranty.  I hadn't

22  heard about the warranty yet.  Where did the warranty come

23  from?

24  A.   The warranty is coming from Matthew Harris.  It was a

25  guaran- -- it was a promise in writing by Matthew Harris of

1    what -- what we're allowed -- what he would help cover for the

2    first hundred thousand miles of the truck.  That was my

3    incentive to purchase the truck.

4    Q.  So what -- so hold on.  So -- so how long was the warranty

5    supposed to last?

6    A.  One year, a hundred thousand miles.

7    Q.  If I write "100K miles," does that make sense to you,

8    Mr. Merrill?

9    A.  It makes sense to me because that's how you usually do it,

10   if you're writing it anyway.

11   Q.  What did you think it was supposed to cover?

12   A.  It was supposed to cover the engine blocks, the major

13   components of the motor and transmission, in order to help

14   keep that vehicle moving for at least the one year to help us

15   get under our feet.

16   Q.  So I want to summarize this.  Engine blocks, major

17   components of the motor, and transmission.

18   A.  He gave us a list.  Mr., um -- Mr. Harris gave us an

19   actual warranty list, and he -- it was listed of all the

20   components that were supposed to be covered under this

21   warranty.

22   Q.  And that list is in Exhibit 50?

23   A.  I don't know.

24   Q.  Well, let's take a look.  If you still have Exhibit 50 in

25   front of you --

1    A.  Yes, I do.

2    Q.  -- can you flip through it and see if you can find that

3    warranty?

4    A.  Exhibit 50?  Yes, it is.  It's actually in here.

5    Q.  What page are you on?

6    A.  It's Pathway -- 20.  In the lower right-hand corner it

7    says 20.

8         And, of course, it says this is the warranty services

9    that we -- we thought was supposed to be on this vehicle as,

10   you know -- these are the reasonings why I wanted to take the

11   opportunity to become a alleged owner-operator driver.  If you

12   are going to promise something, keep to it, and these are

13   the -- the nibbles and why we all want to become --

14   Q.  So this --

15   A.  -- to be embetterment.

16        MR. WILETSKY:  Objection, Your Honor, only to the

17   extent he is testifying about what other people want.

18   A.  I'm --

19        THE COURT:  Just a minute.  You have to wait for the

20   Court to rule.

21        The objection is sustained.

22        Go ahead, Mr. Crone.

23   BY MR. CRONE:

24   Q.  So, Mr. Merrill, what we're getting at here is just

25   what -- what you thought about the warranty.  Okay?  So -- so

1   is this warranty part of what --

2   A.  I wanted.

3   Q.  -- what you wanted?

4   A.  Yes.

5   Q.  And why did you want it?

6   A.  Because this way it gave me some sort of securement about

7   purchasing a piece of equipment that I wasn't able to check

8   out a hundred percent.

9   Q.  So this warranty provided you --

10  A.  Peace of securement.

11  Q.  Securement.

12  A.  Yes.

13  Q.  Again, just to try to nail this down, you said you thought

14  it covered engines and what else?

15  A.  I'm sorry?

16  Q.  The coverage for the warranty, you said you thought it

17  would cover the engine and what else?

18  A.  What was listed on the -- what's listed on this

19  warranty -- everything that's listed here, such as some

20  smaller items and the major components.  So, I mean, I'm not

21  going to list them all, but this is what really caught my

22  attention and why I said go ahead.  That's why I purchased or

23  tried to purchase the vehicle.

24  Q.  Well, at the time you signed this lease agreement --

25  A.  Right.  At the time I signed the lease.

1    Q.  -- yeah, what did you think it covered?  Did you actually

2    read this, or did you have a general understanding?  That's

3    what I'm getting at.  What did you think it covered at the

4    time?

5    A.  The warranty was to cover the vehicle.  That's why I

6    signed the lease.  This is -- this is, you know, this is like,

7    okay, hey, this guy is going to help us keep these trucks up

8    and working, you know, while we're trying -- while we're

9    trying to get under our feet.  I mean, that's -- to me it was

10   pretty cool, you know, nice, nice gesture to do.

11   Q.  So --

12   A.  Didn't happen, though.

13   Q.  Oh.

14   A.  Sorry.

15   Q.  So you thought it covered the vehicle as described at

16   page 20 here of Exhibit 50?

17   A.  Correct.

18   Q.  So if I write "page 20 Exhibit 50" --

19   A.  I'll know what you are talking about, yes.

20   Q.  Okay.  Okay.  Mr. Merrill -- well, you don't have anywhere

21   to set it.  I was going to say let's set it aside.  Leave it

22   where it is.

23          So you testified you waited for four days to be

24   dispatched?

25   A.  Yes.

 1   Q.  And then you were, and then what happened?

 2   A.  The nightmare happened.  Excuse my language, but --

 3   Q.  Let's just start on the first day.  Let's just start on

 4   the first day when you were dispatched.  What did that workday

 5   look like?

 6   A.  The workday started off with getting the load, getting the

 7   trailer, having to go back into the shop, going -- because

 8   there was problems with the trailer that day.  Um, while doing

 9   our pretrip inspections, there was a lot of issues with the

10   load.  And then I found out that I blew an airbag on the truck

11   that, unfortunately, wasn't covered, so that shut me down

12   immediately.  I have to get that fixed up.  It just -- it was

13   just bad luck that day, um, just started off bad.  So, okay,

14   airbags is an essential -- an average thing that we, as

15   drivers, have to replace.  Let's go get it fixed; let's get

16   this done; let's get -- get ready for the movement.

17          I was dispatched at 8 o'clock in the morning, give or

18   take, and by the time I was ready to go on the road, it was

19   already 5 o'clock in the afternoon, and I hadn't even done any

20   driving yet, and I have to get this load down to Point B and

21   still stay within my driving hours.  In this case, Point B, if

22   I -- I have to look at my -- my statement to find out exactly

23   where I left, but I believe it was down to Laredo, Texas.  I

24   believe that was my first run.  And so Laredo, Texas, is about

25   900 miles.  So I still have to drive all this in order to get

1   this load on time for the next day morning.  It's -- you're --

2   it's not -- it's not a 9-to-5 job.  I mean, you have to put

3   some hours in, and you're not always logging them down.

4   You're just trying to get the stuff done, fixing the airbags,

5   getting -- like I said, again, I reiterated the airbag in this

6   particular case because that's what blew out on me.

7            Um, so any rate, our first morning and ready to roll,

8   it was -- I couldn't even complete the job because my 14-hour

9   day was up before I even got going.

10  Q.  So on this day, Mr. Merrill, that you receive your first

11  dispatch, you are now an owner-operator.  You are no longer a

12  company driver.  Is that correct?

13  A.  I -- I felt that I was supposed to be.  Now, you're

14  supposed to have -- you're still doing everything that you do

15  as a company driver, everything, but then as an owner-operator

16  you're supposed to be able to take care of your own finances,

17  you're supposed to be able to take care of, um -- everything

18  that you would expect the company to do is now on the burden

19  of you as a driver.

20  Q.  Let's zero in on starting from that day, the day you were

21  first dispatched as an owner-operator, let's zero in on what

22  your job duties were.  So if you recall, just a few minutes

23  ago I asked you about what your job duties were as a company

24  driver, and we created this list.  Do you remember that?

25  A.  Yes, I do.

1   Q.  Okay.  So let's run through this list again.  When you

2   became an owner-operator -- can you see it on your screen

3   there?

4   A.  Yes, sir.

5   Q.  Number 1, you said you had to move freight from Point A to

6   Point B as a company driver.  Was that true as an

7   owner-operator?

8   A.  Yes.

9   Q.  Number 2, you had to maintain the trailer as a company

10  driver.  Is that true as an owner-operator?

11  A.  Yes, sir.

12  Q.  Number 3, you had to secure the load.  Is that the same as

13  an owner-operator?

14  A.  Yes, sir.

15  Q.  Number 4, you had to complete pretrip inspections.

16  A.  Still.

17  Q.  Is that the same as a --

18  A.  Yes.  And everything -- yes, sir.

19  Q.  I think you know where we are going.  We are going to run

20  down the list anyway.

21          On number 5, you said you had to communicate to your

22  bosses as a company driver.  Did you have to do that as an

23  owner-operator?

24  A.  Yes.  You still have to communicate.

25  Q.  Number 6, you had to babysit the load if there was a

1   breakdown.  Is that the same when you are an owner-operator?

2   A.  Yes, sir.

3   Q.  Number 7, you had to fuel.

4   A.  That's part of your tripping, yes.

5   Q.  And so these prim- -- are these the same primary -- back

6   up.  I don't want to catch an objection from Mr. Wiletsky

7   because it would be a good one.

8          Are your duties as an owner-operator the same as your

9   duties when you were a company driver?

10  A.  They are.  They are the exact same.  What is -- the

11  difference is, of course, the fuel is coming out of my pocket

12  price instead of the company paying for the price of the fuel.

13  Any breakdowns, instead of the company paying for it, I am --

14  I am held liable for it.

15  Q.  So that's -- that's the next question I was going to ask.

16  So you anticipated that question.

17  A.  Oh, I'm sorry.

18  Q.  I was going to ask you what the difference is, and you

19  just said the difference is the fuel you have to pay for --

20  A.  Right.

21  Q.  -- maintenance has to come --

22  A.  Correct.

23  Q.  -- out of your pocket.  Anything else?

24  A.  Everything that has to deal -- deal with running the --

25  your -- if you're supposed to be a business -- as an

1    owner-operator, you are supposed to have a business within

2    your business, and we weren't being treated that way.  But at

3    any rate, so -- as a -- as a owner -- we were treated the same

4    way if you did your company job or an owner-operator.  It

5    didn't much matter.  It just seems like it just -- to me it

6    seemed like I just went into another company truck.  It just

7    means all the liability came onto me.

8    Q.  And by that you mean you had to pay for the fuel --

9    A.  Yes, I had to pay for --

10   Q.  -- you had to pay for the maintenance --

11   A.  -- all the damages and anything that had to do with the

12   truck.

13   Q.  Now, Mr. Merrill, I want you to think about your time as

14   an owner-operator.  So let's leave your company driver days

15   behind you.  So we are talking about from that Day Seven or

16   Eight, whatever it was, when you went down the road, and now

17   you are an owner-operator.  Okay.  And I want you to describe

18   for me what an average Frank Merrill day consists of.

19   A.  An average Frank Merrill day as an owner?

20   Q.  I'm going to help you out.  You wake up.  What's the first

21   thing you do?  Let's start at the beginning, an average Frank

22   Merrill workday.

23   A.  An average Frank Merrill workday or average day, you get

24   up in the morning.  Of course, you go take care of your

25   personal hygienes inside the truck stop or wherever you are

1   at.  Then you come back; you do your 72-point check of the

2   truck.

3   Q.  Hold on.  Let me stop you there.  Is this the pretrip

4   inspection you are talking about?

5   A.  Yes, 72 pretrip inspection.

6   Q.  Okay.  Can I write "PTI"?

7   A.  Yeah.

8   Q.  And that's a 72-point inspection.

9   A.  It -- that inspection, if -- if you know your equipment,

10  you can get your inspections down to about 15 to 20 minutes,

11  but if you're not used to your equipment, different trucks, it

12  can take up to two hours for this inspection.

13          So in this -- seeing how I have already ran the

14  equipment, it was taking me about 30 minutes to 45 minutes to

15  do an inspection, checking my oils, make sure my fan belts are

16  good, tires pressure, everything.  The same thing that we

17  would do -- again, this is what we have to do by standard, by

18  the -- by -- we're regulated, of course.  This is our DOT

19  standard.  So you do that --

20  Q.  Okay.  And let me --

21  A.  -- and then --

22  Q.  Let me keep you focused in here just for the sake of time.

23  You do this pretrip inspection.  What do you do next on an

24  average Frank Merrill workday?

25  A.  Well, you get ready -- then you get ready to roll out.

1   You fuel your truck.  You get yourself prepped and ready to

2   roll.

3   Q.  So you fuel.

4   A.  Fuel.

5   Q.  Okay.  Then what's next?

6   A.  Clean your windows, get ready.  And then you engage

7   yourself, and you start driving down the road and doing what

8   you need to do.

9   Q.  So, number 4, after you clean the windows, you drive.

10  A.  Well, you have to get on the highway.  You --

11  Q.  You have to drive.

12  A.  You --

13  Q.  And then what comes next in an average Frank Merrill day?

14  A.  You get to your final destination, depending on how many

15  miles it is.  If it's more than a one-day trip, you find

16  yourself a parking spot.  You -- you have to have a lunch

17  break in there, which is regulated.  And then after your lunch

18  break, then you drive yourself some more until either --

19  Q.  Frank --

20  A.  -- up to --

21  Q.  Frank --

22  A.  -- up to 11 hours a day driving.

23  Q.  Mr. Merrill, let's slow down.  You arrive at a

24  destination.  What do you do then?

25  A.  Arrive at a destination.  You have to check in.  Get out

1    of the truck, you have to walk in, check in with your

2    customers.  You have to then sit and wait.  If the loading

3    docs or unloading docs are full, you have to sit and wait in

4    your truck or in a holding area where -- based on the company

5    that you deliver to.  Then you back up your truck, you open

6    your doors, you get yourself geared up to be unloaded or

7    loaded, depending --

8    Q.  So let me stop --

9    A.  -- depends what you are doing.

10   Q.  Let me stop you there.  So then unloaded or loaded, as the

11   case may be.

12   A.  Yes.

13   Q.  Then what?

14   A.  And then you just, again, you sit and wait.  It could take

15   you anywhere from an hour to five hours waiting at some of the

16   loading docs.  If you're lucky.  Sometimes even longer.

17   Q.  What are you doing while you are waiting?

18   A.  Well, you're sitting in their -- you have to sit -- you

19   are not allowed to sleep.  You are not allowed to be in your

20   truck in some places, so you're sitting in a little chair

21   similar to this or a folded chair.

22   Q.  So you are waiting --

23   A.  Outside of your truck you have to --

24   Q.  So you are waiting at what?  What's that called?

25   A.  The customers'.  Over at your destinations.

1    Q.   And then what happens?

2    A.   Depending on how long you sit there, if you run out of

3    time, which, okay, we're allowed up to 14 hours a day, so if

4    we run out of time, then we have to try to find a place to

5    park, you know, at a truck stop.  Or if the customer or

6    client's, um, kind enough, they have already had what they

7    call a holding lot or a lot put aside so that you can get some

8    rest there before you have to go back again and start your day

9    over again.

10   Q.   So you find a place to park, which you have just testified

11   might be at a truck stop, or they might have a spot for you, a

12   holding lot.

13   A.   Correct.

14   Q.   Then what do you do?

15   A.   You get your 10 hours sleep and turn around and do the

16   whole program again the next day.

17   Q.   So when you say 10 hours of sleep, that -- then your

18   workday ends?

19   A.   My workday ends at 10 hours.

20   Q.   Do you see the chart -- the list we just created,

21   Mr. Merrill?

22   A.   It looks like pretty much a full day's schedule right

23   there.

24   Q.   And how long does it take, in an average Frank Merrill

25   workday, to get from number 1 to number 10, which says

1   "workday ends"?

2   A.   On an average day, this takes 14 hours.  A day.

3            THE COURT:  Mr. Crone, if you are at a good stopping

4   point, would you please let me know, and we will take our

5   morning break.

6            MR. CRONE:  I'm at a good stopping point right now.

7            THE COURT:  Okay.  Thank you.

8            MR. CRONE:  You're welcome.

9            THE COURT:  We will take a short break.  We will

10  reconvene at 10:45.  And, Mr. Merrill, you may step down.

11           THE WITNESS:  Thank you.

12           THE COURT:  Thank you.

13      (Proceedings recessed 10:32 a.m. to 10:48 a.m.)

14           THE COURT:  Thank you.  Please be seated.

15      Mr. Merrill, you can come back on the witness stand,

16  please.

17           THE WITNESS:  This time I will bring this with me.

18           THE COURT:  Thank you.  You are still under oath.

19           Whenever you are ready, Mr. Crone.

20           MR. CRONE:  Thank you, Your Honor.  During the break,

21  I was speaking with Mr. Wiletsky, and believe it or not, I

22  think we are kind of on schedule, to the extent that makes the

23  Court feel any better.  It makes me feel better.

24  BY MR. CRONE:

25  Q.   Okay.  So, Mr. Merrill, when we left off before the break,

1    we are talking about an average Frank Merrill workday.  Do you

2    recall that?

3    A.  Yes, sir.

4    Q.  Okay.  Next question that I want to ask you is:  In the

5    course of an average Frank Merrill workday, who was

6    instructing you to do what?  Okay.  So the question is:  Who

7    was your boss?  I'm going to write this down.

8           THE COURT:  Mr. Crone, what time frame are you

9    referring to?

10           MR. CRONE:  Oh, thank you.  Good question.

11   BY MR. CRONE:

12   Q.  While you're -- while you were an owner-operator, so we

13   are still living past that Day Seven or Eight.  You have gone

14   down the road.  That's the time frame we're in.

15   A.  I was under the impression I was supposed to be my own

16   boss, but I was still getting dispatching and everything else

17   like a company driver through CFI/Con-Way.

18   Q.  Okay.  So let's create our list.  This is becoming habit

19   now.  CFI dispatched you.

20   A.  CFI dispatched me.

21   Q.  What else did CFI tell you to do in the course of an

22   average Frank Merrill workday?

23   A.  They're the ones that regulate the -- other than federal

24   government -- regulates those 72-point inspections.  You --

25   Q.  So hold on.  Let me stop you there so we're clear.

1    Pretrip inspections?

2    A.   Pretrip inspections, PTIs.

3    Q.   Okay.   What else?

4    A.   Getting your dispatches, which is your movement of your

5    load.   Ensuring your safety of your cargo.   Pretty much

6    everything that we've stated earlier, but CFI was still

7    controlling the truck.

8    Q.   So ensure the safety of the cargo.   CFI controlled the

9    truck.   What do you mean by that exactly?

10   A.   Everything that we did, which we were supposed to be able

11   to do on our own as in picking load assignments, CFI was still

12   regulating us on what loads we could take.

13          MR. WILETSKY:   Your Honor, I would just object again.

14   To the extent the witness is saying "we," if he's saying that

15   as shorthand for him, I don't have an objection, but to the

16   extent he is implying that this was applicable to other

17   drivers, I would object as to lack of foundation.

18          THE COURT:   The objection is sustained.   And,

19   Mr. Crone, if you could emphasize with Mr. Merrill that he

20   really is only at this point competent to testify about his

21   own experience and not the experience of other drivers.

22          MR. CRONE:   I will.   I will take care of that right

23   now.

24          THE COURT:   Thank you.

25   BY MR. CRONE:

1   Q.  So when I'm asking you these questions, Mr. Merrill, I'm

2   asking about your experience, who told you what to do, who

3   told you where to be dispatched.  And I understand you are

4   using "we," okay, and to the extent possible, please say --

5   A.  "I."

6   Q.  -- "I" or "me."

7   A.  Yes, sir.

8   Q.  Let's keep the record clear.

9            THE WITNESS:  Yes, ma'am.

10  BY MR. CRONE:

11  Q.  So, Mr. Merrill, you said CFI told you to ensure the

12  safety of the cargo, and then you said they controlled the

13  operation of the truck.  And then I asked you what do you mean

14  by that, and that's where we were, if you could pick up again.

15  A.  Okay.  For my loads I was only authorized to move, uh --

16  say I got dispatched under a load.  It was a load that I did

17  not wish to take.  I could not refuse that because if I did,

18  the consequences of -- for every action there is a equal

19  consequence.  I may be sitting for a couple days before I get

20  another load, or there might be that I would get another load

21  that would pay -- be unproductive for the movement of that

22  truck, meaning less miles.

23  Q.  So I want to break this down a little, just linger in what

24  has become number 4 on the list here.  You said you couldn't

25  refuse a load from CFI.

1    A.   No.

2    Q.   Explain that a bit more to me why you couldn't.

3    A.   As an owner-operator, you are authorized that you could do

4    and refuse a load, meaning that you -- you have the right to

5    give up cargo and movement.  But again, like I said, under CFI

6    rules, if you gave up that load, you may be sitting.  So you

7    have really no choice but to take what they give you.

8    Q.   If you refused a load -- first of all, did you ever refuse

9    a load?

10   A.   No, I did not, 'cause I knew what was going on.

11   Q.   Under your relationship with CFI, if you refused a load,

12   could you go pick up a load from someone else, some other

13   carrier?

14   A.   No.  Oh, no.

15   Q.   And why not?

16   A.   Because you are contracted, and you are locked into that

17   company.  You can't go out -- if -- it's like you're a lawyer

18   for a law firm, but you can't go work outside of your law

19   firm.  Can you?

20   Q.   I --

21   A.   It's unethical.

22   Q.   I'd love to have that discussion with you, but I see where

23   you're going.

24   A.   I get what you're -- it's just we're tied to that carrier

25   because they are paying our base plates; they are paying

1  everything for us.  We are tied to that carrier until the

2  end -- until whenever time that we're released for -- for any

3  reason.

4  Q.  So "CFI loads only" --

5  A.  Yes.

6  Q.  -- as shorthand.

7      Anything else CFI tell you to do in the course of an

8  average Frank Merrill workday?

9  A.  Well, they don't tell me when to go to bed because when

10 I'm tired, I go to bed myself, you know.  That's -- sorry.

11 Pretty much everything else they have to -- they have to

12 regulate you by either -- if you're running late, they are

13 going to be on the phone saying how come you're running late,

14 or they want to know what's going on.  Obviously, it's

15 their -- their company, their -- it's their customer's product

16 that we're hauling.  They want to make sure that it's going to

17 be from Point A to Point B safely, as secure as I want it to

18 be.  So they're -- they have their foot in that truck more --

19 better than I do on my accelerator at times.  They are the

20 ones controlling that truck, not myself.

21 Q.  Now I want to take you back to the time in which you were

22 a company driver for CFI just for a moment, and I want to go

23 down this list we created, and I want to find out who was

24 telling you to do these things while you were a company driver

25 for CFI.  Start with number 1.  Did CFI also dispatch you?

 1   A.  Yes.

 2   Q.  Did CFI also tell you you have to do a pretrip inspection?

 3   A.  Yes.

 4   Q.  Did CFI also tell you you had to ensure the safety of the

 5   cargo?

 6   A.  Yes.

 7   Q.  Did CFI say you -- well, this one's a little -- this one's

 8   a little different, isn't it?  Did you have the theoretical

 9   right to refuse a load as a company driver?

10   A.  Yes, you did actually.  Even as a company driver, you had

11   the right to refuse a load.

12   Q.  And --

13   A.  But you had to have a certain -- a particular reason.

14   Q.  Yeah.  And for what reasons?

15   A.  If you were going home.  Uh, if you had an emergency.   If

16   your truck was broken down in the shop, uh, just to name a

17   few.  But, yes, you had -- you had a valid right to refuse

18   loads if you were a company driver.

19   Q.  And could you only move CFI loads when you were a company

20   driver?

21   A.  Yes.

22   Q.  Did Pathway tell you to do anything in the course of an

23   average Frank Merrill workday?

24   A.  They didn't tell me what to do, but he sure -- in my -- my

25   opinion, he sure had his foot in a lot of the things that I

1  did do with that truck.

2  Q.  How so?

3  A.  If I was running late or we had gotten a phone call to --

4  if I was running late or behind, he would actually step in and

5  say, hey, what's going on, why are you behind?  Or if I stayed

6  home too long --

7  Q.  By "he" who are you referring to?

8  A.  Matthew Harris, Pathway Leasing.

9  Q.  So Matthew Harris called you to ask why you were running

10  late?

11  A.  If you -- if you stayed home too long.  His concerns were

12  making sure the -- I would believe -- I would believe --

13        MR. WILETSKY:  Object, Your Honor, to speculation

14  about Mr. Harris's supposed concerns.

15        THE COURT:  Sustained.  He may answer to the extent

16  it was told to him by Mr. Harris, but otherwise he may not

17  express --

18        MR. CRONE:  And that makes perfect sense.

19        THE COURT:  -- his understanding.

20  BY MR. CRONE:

21  Q.  So just your understanding of what was told.  Don't guess

22  about what you think was in Matt Harris's head.

23  A.  I don't want to be in that head.

24        MR. WILETSKY:  Object, Your Honor.  Move to strike.

25        MR. CRONE:  No, no --

```
 1              THE COURT:  Sustained.
 2              MR. CRONE:  I was going to say, no argument to the
 3    contrary.
 4    BY MR. CRONE:
 5    Q.  So let's really stick -- stick to this.  You said
 6    Mr. Harris would sometimes call you because you were running
 7    late or something.
 8    A.  Yes.
 9    Q.  Okay.  Anything else?
10    A.  If you sat too long in an area, he would -- he would call
11    to find out what was going on with either the truck or you.
12    Q.  So he'd call about time sitting.
13    A.  Yes.
14    Q.  Anything else Pathway tell you you could do or not do?
15    A.  No.
16    Q.  Who assisted you with your maintenance?
17    A.  I'm sorry?
18    Q.  Who assisted you with maintenance issues?
19    A.  Me, myself, and I.  My wallet.  Well, clarify that.  All
20    maintenance done on that truck to a certain point came out of
21    my wallet or my funds.  I had no assistance from CFI and/or
22    Pathway to pay that bill.  That was my bill.
23    Q.  Let's back up.  I'm not talking about paying the bills.
24    I'm talking about getting the maintenance done.  Did anybody
25    assist you in getting --
```

1   A.   No.

2   Q.   -- the maintenance done?

3   A.   I had to do the maintenance.

4   Q.   Okay.  What about who -- and by "who" I mean which carrier

5   company, be it CFI or anybody else.  Who told you who you

6   could or could not drive for?

7   A.   Who I could or could not drive for?

8   Q.   Correct.

9            MR. WILETSKY:  Just object to leading, Your Honor.

10           THE COURT:  Overruled.

11           You may answer.

12   A.   Well, let's -- because actually, in reality, as long as we

13   were assigned to CFI, we couldn't drive for anybody.  So if --

14   if you're talking about if we wanted to move the truck to

15   another company?

16   BY MR. CRONE:

17   Q.   That's exactly the question I'm asking.  Who would you

18   ask?

19   A.   Well, the only one that would have control over that was

20   Matthew Harris because of the fact that we're -- we -- we only

21   could take our trucks to where he said that we could take them

22   to.

23           MR. WILETSKY:  Same objection as earlier, Your Honor.

24   The references to "we," I just want to make clear that the

25   witness lacks foundation to talk about any other driver's

1    experiences.

2           THE COURT:  Well, the objection as to lack of

3    foundation is sustained.  I think, Mr. Crone, you have to lay

4    some foundation as to the basis for your witness's testimony

5    about what Mr. Harris said they could or could not do with

6    respect to their trucks.

7           MR. CRONE:  And I agree, Your Honor.  I think I'm

8    getting a bit ahead of myself, worried about time.

9    BY MR. CRONE:

10   Q.  So let's just back up a bit.  Okay.  You are leasing a

11   Pathway truck --

12   A.  Yes.

13   Q.  -- at this time; correct?

14           You are driving that truck for CFI; is that correct?

15   A.  Yes.

16   Q.  Okay.  Why are you driving that truck for CFI?

17   A.  Trying to embetter myself in order to -- to make money.

18   Q.  Who told you you could or could not drive that truck for

19   CFI?

20   A.  Nobody says I couldn't drive it for CFI, but there was --

21   I mean, 'cause that's where we picked the truck up from was

22   over off -- in Joplin for CFI.

23   Q.  After you picked the truck up, you are driving for CFI,

24   and you have a Pathway truck.

25   A.  Yes.

1   Q.  Did you ever want to move the truck to a different

2   company?

3   A.  Yes, I did.  I wanted to move the truck a couple of times.

4   Q.  Can you remember the first time you wanted to move it?

5   A.  It was for -- just 'cause I wasn't getting any miles or

6   anything like that with this truck.  So I had called Matthew

7   Harris on the phone and asked him if it was possible that I

8   could move the truck to another carrier.  He says that he had

9   other -- he told me that he had it -- other places that I

10  could move to, but he would recommend -- and he forced,

11  basically -- not forced.  Excuse me.  He advised me to stay

12  with CFI at that time.  That's exactly what he did with my

13  truck.

14          The second time that I confronted Matthew Harris

15  about being able to move my vehicle in order to make a better

16  life for myself and better money for the truck, advancements,

17  I was flat-right told no because they -- he did not have a

18  contract or my payroll -- my payroll could not be sent to him.

19  So, therefore, I was not allowed to take my truck and the

20  company -- I mean, the company that I was looking for that

21  paid good money was PAM.

22  Q.  What was the name of that?

23  A.  PAM.  And they're located out of El Paso, Texas.

24  Q.  So let's break that down a little.  So you asked

25  Mr. Harris to switch the truck to PAM?

1   A.  Yes.

2   Q.  And you said he told you no?

3   A.  Yes.

4   Q.  And why?  What was the reason given to you?

5   A.  He didn't really give a clear reason why other than

6   that -- oh, 'cause there was no -- 'cause PAM refused to send

7   my payroll to him.

8   Q.  Okay.  The first time you asked to move the truck --

9   A.  Yes.

10  Q.  -- you had testified that Mr. Harris had a list of

11  companies.

12  A.  Yes.

13  Q.  Could you have picked any company off that list and moved

14  to one of those companies?

15  A.  I don't know.  I didn't do it, so I --

16  Q.  But --

17  A.  -- I can't say yes or no on it.

18  Q.  Was PAM on that list?

19  A.  No.

20  Q.  So Matthew Harris told you you could not drive for PAM.

21  A.  Correct.

22  Q.  Okay.  Mr. Merrill, I want to move to a different topic.

23  What I want to ask you about now are the unpaid wages you

24  allege are due to you in this case.  So in order to do that we

25  have to pull up a few exhibits.  I'm going to try to make this

1    easy for you.

2            Could you open up Plaintiffs' Exhibit No. 136.

3    A.  Okay.  I'm at page 136.

4    Q.  Once you're at page 136, if you could go to page 46 inside

5    that exhibit.

6    A.  Almost there, sir.

7            Okay.

8    Q.  Have you seen this document before?

9    A.  Yes, I have.

10   Q.  Okay.  What is this document?

11   A.  It is the wage damage calculation that was -- that we went

12   over.

13   Q.  I want to ask you a few straightforward questions about

14   how these numbers were calculated.

15   A.  Okay.

16   Q.  So, first, if you could look at the top of the page,

17   there's a column entitled Carrier Payment.  Do you see that

18   column?

19   A.  Yes.

20           MR. WILETSKY:  Your Honor, I would just object to the

21   extent we are getting into the substance of the exhibit before

22   there's been any request to admit it.  I don't think that's

23   appropriate, and we do have an objection to admissibility.

24           THE COURT:  All right.  And I agree with

25   Mr. Wiletsky.  The Court will not allow the witness to testify

1    about the substance of an exhibit that has not been previously

2    admitted into evidence.  So to the extent that you need to ask

3    foundational questions in order to get it admitted, you may do

4    that, but I will not allow him to, for example, testify about

5    the content without an admission.

6           MR. CRONE:  And that's understood.  I think I was

7    anticipating a further objection to these, and I was trying to

8    undercut that.

9    BY MR. CRONE:

10   Q.  Let's move back in time.  Mr. Merrill, you testified

11   you've seen this document before.

12   A.  Yes.

13   Q.  You have reviewed this document before?

14   A.  Yes, I have.

15   Q.  Did you prepare these calculations?

16   A.  Yes.

17   Q.  Did you review these calculations to make sure they're

18   accurate?

19   A.  Yes, I have.

20          MR. CRONE:  Your Honor, at this time Plaintiffs would

21   move to admit this page 46 of Exhibit 136.

22          THE COURT:  Any objection?

23          MR. WILETSKY:  We do object, Your Honor.  And I'd ask

24   the ability to voir dire the witness.

25          THE COURT:  You may voir dire.

1    MR. WILETSKY:  Thank you.  Do you want me to do that

2  from here or from the podium?

3    THE COURT:  As long as you speak into a microphone,

4  either way.  You may be seated there, or you may stand at the

5  podium.

6    MR. WILETSKY:  Okay.

7                    **VOIR DIRE EXAMINATION**

8  BY MR. WILETSKY:

9  Q.  Mr. Merrill --

10  A.  Yes.

11  Q.  -- you testified that you created these calculations?

12  A.  The calculations are my calculations, but the form itself

13  was done by John Crone's office.

14  Q.  When you say you created the calculations, what exactly do

15  you mean by that?

16  A.  Meaning I gave the -- my statements from my carrier gave

17  up some of the information, with the help of Matthew Harris's

18  turning in his paperwork to the lawyers, to get the numbers to

19  associate to put this graph together.

20  Q.  Okay.  So you provided underlying documents and

21  information to your counsel; correct?

22  A.  That's right, yes.

23  Q.  But you didn't actually do the calculations yourself;

24  correct?

25  A.  I was assisting him in the calculations, yes.

1   Q.  By providing information?

2   A.  Yes.

3   Q.  Okay.  And the first time you saw this document was the

4   day of your deposition or the day before your deposition; is

5   that correct?

6   A.  It was two days before my deposition.

7   Q.  Okay.

8   A.  Because I testified on my deposition that we had a meeting

9   and that's when we went over it.

10  Q.  Right.  And the -- when you testified in your deposition,

11  you I believe stated that you had been given that document and

12  the calculations in it by your counsel.  Correct?

13  A.  The calculations were there, but they were still my

14  numbers.

15  Q.  Right.  And when you say they're your numbers, what

16  numbers are you referring to?

17  A.  From my statements from CFI's -- my -- my settlement

18  statements versus the amount of income that was received at

19  the end of the statement from Pathway Leasing.

20  Q.  Okay.  So you are not saying that you actually gave your

21  counsel any of the actual numbers that are in this document;

22  correct?  In other words, you gave your counsel documents;

23  correct?

24  A.  I gave him the documents to let -- that had these numbers

25  on it, yes.

1    Q.  And exactly what documents did you give your counsel that

2    had those numbers?

3    A.  I think I already answered this, but I said I gave him my

4    statements from the carrier, which gave us our net income for

5    one line, and then you've got your -- your disbursement came

6    off the paperwork that Matthew Harris provided, my statements

7    and how much money I did receive.

8    Q.  Okay.  And exact --

9    A.  As you calculate those together, then you become -- you

10   come up with your unpaid wages at minimum wage.

11   Q.  And who picked out the weeks for the statements that you

12   would provide?

13   A.  I didn't know what -- what weeks to be picked out.  That

14   was also advised on counsel.

15   Q.  Okay.  And who reviewed the remittance statements from

16   Pathway that showed what exactly you had received for each of

17   those weeks?

18   A.  Well, they had a copy, and I had a copy of it.  So what do

19   you mean?  We both reviewed them.

20   Q.  Okay.  But in terms of reviewing it to do the actual

21   calculations in this document, is that something you did or

22   your counsel did?

23   A.  My counsel did.

24   Q.  Okay.  And the --

25              MR. CRONE:  Your Honor, if I might object, and maybe

1  we can help this along.  This is going to end with Frank

2  Merrill saying he provided various information about the hours

3  worked, and all the things you have just heard, and that he

4  reviewed it line by line and adopted this calculation as his

5  own.  That is where we are going to end up here.  If that's

6  improper, may we just jump to that?

7          THE COURT:  Well, I'm going to allow Mr. Wiletsky to

8  complete his voir dire.  You should have laid all the

9  foundation that you wanted to lay prior to Mr. Wiletsky

10 beginning his voir dire, prior to offering the exhibit into

11 evidence.  You say where this is going to end up, but you

12 haven't asked that question yet about reviewing and adopting

13 these calculations.  So I will give you a little leeway to do

14 that after Mr. Wiletsky is done with his voir dire, but in the

15 future you should be aware that you need to lay the foundation

16 in its entirety before offering the exhibit into evidence

17 because then I'll permit Mr. Wiletsky to voir dire if he

18 wishes to do so.

19         MR. CRONE:  I appreciate that, Your Honor.

20         THE COURT:  All right.  So the objection is

21 overruled.

22         Go ahead, Mr. Wiletsky.

23         MR. WILETSKY:  Thank you, Your Honor.

24 BY MR. WILETSKY:

25 Q.  And, Mr. Merrill, at the time you gave the settlement

1    statements to Mr. Crone, I believe you said you gave just

2    whatever settlement statements you had.  You didn't pick out

3    particular weeks.  Correct?

4    A.  Correct.

5    Q.  Okay.  And those settlement statements actually show where

6    you drove to, where you drove from, the miles driven, things

7    like that; correct?

8    A.  It shows everything that's done with the truck, yes.

9    Q.  Okay.  But you didn't do any analysis of those records

10   before just giving them to Mr. Crone to determine, for

11   example, where you might have driven or how many miles you

12   might have driven on a particular week; correct?

13   A.  Correct.

14   Q.  And those, uh, records, the settlement statements also

15   would show any advances that you might have taken; is that

16   correct?

17   A.  Yes, but also with that advances were misleading because

18   we have to take our fuel out, too.  Fuel -- fuel is marked as

19   advances, and we need to move the truck.

20   Q.  Right, I understand, but --

21   A.  So --

22   Q.  -- is that something you analyzed before you gave that

23   information to Mr. Crone?

24   A.  No, I didn't break it all down what was what, but we

25   just -- advances are fuel.

1   Q.  And did you look at any other records in order to assist

2   in preparing these calculations?

3   A.  I looked at the -- like I told you, I looked at the

4   statements that Mr. Harris gave us, 'cause the driver

5   disbursements are what was paid to me through Mr. Harris.

6   Q.  Okay.  And when you say you looked at that, are you saying

7   that you simply were aware that remittance statements from

8   Pathway had been produced in the case and were available to

9   your counsel?

10  A.  No.  What I'm saying is I looked at it because I'm the one

11  who received that little bit of money.  I'm the one that

12  helped the counsel with that part of it.

13  Q.  Okay.  And in what way did you help counsel with respect

14  to the remittance statements as it pertains to these

15  calculations?

16  A.  The remittance were -- how I helped my counsel was I

17  gave -- turned in, also, all my bank statements, which you

18  received as well.  So that, therefore, the remittance is what

19  I received, so in order to justify what I did receive from --

20  from Mr. Harris was direct deposited into my account, so

21  that's why I turned in all that, all the documents there.

22  Q.  And --

23  A.  So in order to do the actual write-up and finding out,

24  again, as you asked earlier, yes, counsel assisted me in doing

25  this.

1   Q.  Well, counsel assisted you, or you assisted counsel?

2   A.  I assisted -- excuse me.  I assisted my counsel.

3   Q.  Because your counsel is the one who actually did the

4   calculations; correct?

5   A.  Correct.

6          MR. WILETSKY:  Okay.  Your Honor, I would object to

7   the admissibility of this exhibit.  The fact that Plaintiff

8   may have, after the fact, gone through and done some due

9   diligence on these does not change the fact that counsel,

10  Plaintiffs' counsel, is the one who prepared this document.

11  And so my view is that he can't lay an adequate foundation for

12  the admissibility of this exhibit.

13         THE COURT:  Well, I'm going to allow Mr. Crone to ask

14  the question he indicated he was going to ask prior to my

15  ruling.

16         Mr. Crone.

17         MR. CRONE:  Thank you, Your Honor.

18                   **DIRECT EXAMINATION  (Resumed)**

19  BY MR. CRONE:

20  Q.  Mr. Merrill, in looking at page 46 of this exhibit,

21  there's a lot of weeks at issue there.  Do you see that?

22  A.  Yes, sir.

23  Q.  Did you review each week at issue for the accuracy of the

24  calculations?

25  A.  Yes, sir.  We did review it.

16-cv-02242-KLM                 Merrill - Direct                    I - 87

1   Q.  And so you -- so let's just start at the top.  You

2   reviewed August --

3           THE COURT:  No, no.  We are not going to start at the

4   top and go one by one.  He already answered the question he

5   reviewed every week for accuracy.  Do you have another

6   question with respect to adopting the entirety of the exhibit?

7           MR. CRONE:  I do.

8   BY MR. CRONE:

9   Q.  Did you adopt these calculations as your own?

10  A.  I do adopt them as my own.

11  Q.  You are confident these numbers are accurate?

12  A.  Yes, I am.

13  Q.  Because you have reviewed every line in this chart?

14  A.  Yes.

15          THE COURT:  All right.  That's enough.  Thank you.

16  The objection is overruled.  The accuracy of the information

17  in Exhibit 136, page 46, is not seriously disputed.  The fact

18  that this chart was prepared by counsel with information

19  supplied by the Plaintiff does not render it inaccurate.  It's

20  also admissible under Rule 1006 as a summary of voluminous

21  documents, et cetera.

22          To the extent that the Defendant wishes to challenge

23  the accuracy of the information provided in Exhibit [sic] 46,

24  the Court may order the proponent, which in this case is the

25  Plaintiff, to produce the underlying documents in court, and

1    the Court will order the proponent, the Plaintiff, to produce

2    the underlying documents to the extent that the Defendant

3    wishes to examine them to verify the accuracy of Exhibit 136,

4    page 46.  Nevertheless, the exhibit is admitted.

5            Go ahead.

6        (Plaintiffs' Exhibit 136:46 received.)

7            MR. WILETSKY:  Your Honor, I'm sorry.  Can I ask one

8    quick clarification?

9            THE COURT:  You may.

10           MR. WILETSKY:  Is the exhibit admitted in total or

11   just this page?

12           THE COURT:  Just page 46.

13           MR. WILETSKY:  Thank you.

14           MR. CRONE:  And so, Your Honor, maybe we ought to

15   just jump to this part, too, because I think we will see

16   another dispute down the road.  When the FLSA Plaintiffs

17   are -- when the last FLSA Plaintiff is through testifying, we

18   will seek to admit the entire exhibit, and I just want to

19   alert the Court to that.  The reason we will do so is that

20   this is a collective action, and they are testifying

21   representatively, and there's got to be some way to produce

22   evidence of damages for the collective.  I can just leave it

23   at that for now, just to forecast.

24           THE COURT:  We will cross that bridge when we get

25   there.

1    BY MR. CRONE:

2    Q.   Okay.  So, Mr. Merrill, if you could turn back to page 46,

3    the second column is entitled Carrier Payment.  What is a

4    carrier payment?

5    A.   A carrier payment is the amount of net pay that you

6    receive for the truck from CFI.

7    Q.   Where does the carrier payment go?

8    A.   It goes to Matthew Harris over at Pathway Leasing.

9    Q.   The next column is entitled Driver Disbursement.  What is

10   a driver disbursement?

11   A.   Driver disbursement pay is the amount that Matthew Harris

12   paid me after -- after whatever he did with the extra money.

13   Q.   The next column is entitled Unpaid Minimum Wage, and then

14   in parentheses it says at 70 hours.

15           So I want to back up for just a minute and put the

16   chart back up in which we created an average Frank Merrill

17   day.  Do you recall that?

18   A.   Yes, sir.

19   Q.   Did you supply the number 70 hours -- excuse me -- to be

20   used in calculating the figures in this chart?

21   A.   I supplied my hours.  So 70 hours is what is regulated to

22   it, so yes, I did do 70 hours.

23   Q.   And is that because -- is that because an average Frank

24   Merrill day takes 14 hours?

25           MR. WILETSKY:  Objection to leading.

1            THE COURT:  Sustained.  For purposes of --

2    A.  It --

3            THE COURT:  Just a minute, Mr. Merrill.

4            THE WITNESS:  Yes, ma'am.

5            THE COURT:  You cannot talk when I'm talking.

6            For purposes of explaining the 70 hours, the record

7    already reflects that this Plaintiff testified that his

8    average workday was 14 hours a day.  14 times 5 is 70.  The

9    Court understands that this is an average estimate by the

10   Plaintiff of a workweek at 70 hours a week.  So that part does

11   not need to be further established.

12           MR. CRONE:  I appreciate that, Your Honor.

13           THE COURT:  Go ahead.

14   BY MR. CRONE:

15   Q.  So then how did you calculate the unpaid minimum wage in

16   that column?

17   A.  Well, according to what I understand, the minimum wage is

18   $7.25 an hour.  Based on my disbursement, if I took this

19   number and -- well, let's go back this way.  70 hours times

20   7.25 should equal out to $507.50.  So that on my average work

21   time based on 70 hours is $507.50.  Taking the unpaid wages

22   that I received -- the amount that I did receive -- excuse

23   me -- of the two -- let's go with line 1, just as a prime

24   example here for short.  It was -- I got paid $293.56.  If I

25   take that 507.50 minusing that number, that should give me

1    what I -- my unpaid wages.  In this case it was $213.94.

2    Q.  The last column says Statutory Liquidated Damages.  How

3    did you calculate that column?

4    A.  How I under -- with the advisements from you, my lawyer,

5    your -- it was the double amount of paid wages, of the minimum

6    wage, times two.  So -- that I lost.  Excuse me.  So in this

7    case it's $213.94 times 2 would come out to $427.88.

8    Q.  Okay.  Thank you, Mr. Merrill.  What I want to do is I

9    want to look at just one of these dates in a bit more detail.

10   A.  Okay.

11   Q.  Okay.  And I'm going to point you to a date so you can

12   explain to us in a bit more detail how this actually works.

13   So if you could find Exhibit 52 in the notebooks in front of

14   you.  The hope is that they are all in different notebooks and

15   so you will end up with three notebooks in front of you.

16   A.  Okay.

17            Okay.  Page 73?

18   Q.  Page 73 of Exhibit 52.  Are you there?

19   A.  Yes, sir.

20   Q.  Have you seen this document before?

21   A.  Yes, sir.  It is my owner -- it is the owner settlement

22   statement detail where we concluded the numbers from -- for

23   the first carrier payments.

24   Q.  Okay.  When would you have received this document?

25   A.  We receive it three days after disbursement of -- of

1   revenue.  So basically what it is is that the revenue was sent

2   out, and then we -- we would receive it either by e-mail or by

3   mail at home.  Seeing how mine came to my home, it took three

4   days for it to be delivered to my home for the end of the

5   week.  So in this case being August 21st, I wouldn't get it

6   until August 24th to my home.  So that's when the first time I

7   saw this.

8   Q.  So the first time you saw it would have been about

9   August 24th, 2015.

10  A.  Yes.  And actually I was -- it was received to my home, so

11  with me staying out on the road as long as I have, I relied

12  on, of course, my spouse to get the accurate -- or to open it

13  up and read it.

14  Q.  I understand.  And then you -- I think you testified, so I

15  want to be clear.  This statement came from CFI?

16  A.  Yes, sir.  These statements come from CFI/Con-Way.

17          MR. CRONE:  Your Honor, at this time Plaintiffs would

18  like to admit page 73 -- it's actually two pages.

19  BY MR. CRONE:

20  Q.  So, Frank, can you look at page 74 very quickly?  Is that

21  the second page to this settlement statement dated

22  August 21st, 2015?

23  A.  Yes, it is the second page.  So it would be 73 and 74 are

24  together.

25          MR. CRONE:  So Plaintiffs would like to admit pages

1    73 through 74 of Exhibit 52.

2         THE COURT:  Any objection to pages 73 and 74?

3         MR. WILETSKY:  No objection.  And, frankly, to the

4    extent Plaintiff wants to admit the entire exhibit, I don't

5    have an objection to this exhibit.

6         MR. CRONE:  Plaintiffs will go ahead and seek

7    admission of the entire exhibit.

8         THE COURT:  All right.  Thank you.  Exhibit 52 is

9    admitted.

10        (Plaintiffs' Exhibit 52 received.)

11   BY MR. CRONE:

12   Q.  When you look at this settlement statement, what does it

13   show you?

14   A.  It's pretty clear and tells you what it shows you.  It

15   says Approved Miles.  It tells you where you started your trip

16   for the -- your beginning trip for the week.  Now, this is

17   only a week's travel.  Okay.  So in this case it shows

18   Bentonville [sic], Illinois, where I started my travel, and by

19   the time I was done, I was in Dallas, Dallas, Texas.

20        And then, of course, after that it shows the

21   integrity [sic] dispatch, and then you just go down and it

22   says here again for the advances.

23        Now, if you look at these advances, it shows for

24   $712.93, but if you are looking at that advances, that advance

25   listing is all gas, gasoline and diesel exhaust fluid that we

1    were supposed to -- we need to run the truck.  So it's still

2    added in -- we -- that money was already taken out of me by

3    CFI.  So, I mean, we never saw that money to get with.

4              Then if you are looking down at it even further, it

5    tells you that, of course, we have an antitheft device, the

6    alarm system.  We had to pay on the -- there's a security

7    deposit for the $54.30 for the communication device.

8    Q.  So it shows you where you drove.

9    A.  Yes.

10   Q.  It shows you how many miles you drove.

11   A.  Yes.

12   Q.  And it shows you all the fuel or the cost of all the

13   fuel --

14   A.  Yes.

15   Q.  -- that it took you to get --

16   A.  Yes.

17   Q.  In looking at this settlement statement, does it help you

18   determine whether or not you drove the hours you say you drove

19   in the chart on page 46?

20   A.  No, it doesn't.  I mean, this is a good -- accurate of

21   what a Frank Merrill day is or a week is, but it doesn't

22   include if I have a breakdown; it doesn't include the pretrip

23   inspections; it doesn't include, you know, when we actually

24   took a break or if we -- or if we were on the clock.  But it

25   does give a good representative of how many miles I drove for

1   that week, but it doesn't add in all the extra non -- you

2   know, pretrips and things like that that we're mandated to do.

3   Q.  Are there any other documents out there that might help

4   you figure out what you were doing this week?

5   A.  Well, if I had a problem with the truck, my truck

6   maintenance log would help me, if I had a breakdown that

7   particular week.

8   Q.  Let me pause you there and ask you to turn to Exhibit 82.

9   A.  Excuse me.  Okay.  82.

10  Q.  Once you're at Exhibit 82, could you turn to page 218,

11  please.

12  A.  I'm sorry.  What page was that?

13  Q.  218, please.

14          MR. WILETSKY:  Hey, John.

15          MR. CRONE:  Yes.

16      (Counsel consult.)

17          MR. WILETSKY:  Sorry, Your Honor.  Bear with us.

18          THE COURT:  Whenever you are ready, Mr. Crone.

19  BY MR. CRONE:

20  Q.  Are you at page 218?

21  A.  Yes, sir, I'm on 218.

22  Q.  Okay.  Have you seen the document at page 218 before?

23  A.  That's my truck repair when I had to replace the hub fan

24  on the truck down in Laredo, Texas.

25          MR. WILETSKY:  Your Honor, I would just object to the

1    extent he is testifying substantively to an exhibit that

2    hasn't been admitted.

3              THE COURT:  Right, and --

4              MR. CRONE:  I am just asking if he saw it.  I

5    understand he went a little farther.

6              THE COURT:  I understand.

7              It would be really helpful, Mr. Merrill, if you would

8    just focus on the question and only answer the question asked.

9              THE WITNESS:  Yes, ma'am.

10             THE COURT:  So if he asks have you seen this before,

11   the answer is either yes or no --

12             THE WITNESS:  Yes, ma'am.

13             THE COURT:  -- pretty simple, or you don't remember.

14             THE WITNESS:  Yes, ma'am.

15             THE COURT:  Okay.

16             MR. CRONE:  Thank you for the guidance.

17             THE COURT:  You're welcome.

18   BY MR. CRONE:

19   Q.  When do you recall seeing this document?

20   A.  On August 14, 2016, when my truck threw a hub fan.

21   Q.  Just when -- just when did you see the document?

22   A.  When I signed it back in 2016.

23   Q.  And who gave you this document?

24   A.  French Ellison, the mechanic shop in Laredo, Texas.

25             MR. CRONE:  Your Honor, at this time Plaintiffs would

1    seek admission of Plaintiffs' Exhibit 82, page 218, for the

2    purpose of showing, um, just the date, um, of when this repair

3    occurred that's reflected in the document -- I know we haven't

4    gotten that far, but just so you know we just want to

5    establish the date that these events occurred, not the truth

6    of whether or not it was actually a hub fan broken or

7    anything.

8            THE COURT:  All right.  Well, and I'll allow you to

9    make your objection in a moment, Mr. Wiletsky.

10           MR. WILETSKY:  Sure.

11           THE COURT:  But let me point a couple of things out.

12   First of all, page 218 at the top right-hand corner says page

13   1.  Page 219 says page 2.  It appears to me that these are

14   copies of the work order invoice that go together.  Are you

15   seeking admission only of page 1 or of both page 1 and page 2?

16           MR. CRONE:  We could seek both, but we are really

17   just establishing that date, so I focused on page 1.  I am not

18   against admitting the complete document for the same purpose.

19           THE COURT:  All right.  My second question is that

20   your client testified that he first saw this when he signed

21   it, but neither page 218 or 219 appears to have a signature.

22   Could you please clarify that testimony?

23           MR. CRONE:  I will.

24   BY MR. CRONE:

25   Q.  Mr. Merrill, what did you mean when you signed it?

1    A.   What I mean by when I signed it is over at French

2    Ellison's before they did the work on you, they have a

3    secondary form where you have to presign before they do any

4    work and before they give you the original billing, which is

5    this one.  So the -- what I meant by signing is the

6    presignature to give the mechanics the authorization to work

7    on the truck.

8    Q.   So let's explore that just a tad more just to make -- when

9    you sign that, are you then handed some document?

10   A.   We are handed a work order.

11   Q.   And the work order describes the work that's going to be

12   done?

13   A.   That's correct.

14   Q.   And then when the work is done, are you handed --

15   A.   This is the bill that I have to pay -- the amount that I

16   would have to pay.

17            THE COURT:  All right.  Thank you.  And, again,

18   Exhibit 82, page 218 and 219, has been offered.  Any

19   objection, Mr. Wiletsky?

20            MR. WILETSKY:  Yes, Your Honor.  This is hearsay.  It

21   is being offered to prove the truth of the matter asserted.

22   It's being offered to prove that maintenance was done on

23   August 14th, 2015, or at least an invoice was provided on that

24   date.  I don't believe that Mr. Merrill is capable of

25   providing adequate foundation.  It's not his business record.

1    Nor can he testify as to its authenticity.  He didn't create

2    it.

3              THE COURT:  Response, Mr. Crone?

4              MR. CRONE:  Yeah, I would just respond that -- it's

5    not his business record.  He didn't create it.  This receipt

6    was given to him, and he's testified that it was given to him

7    in conjunction with repairs that were done that he does

8    recall.  And it's being offered for the purpose of showing

9    that in this week during these dates maintenance was -- was

10   done to the truck.  I think Mr. Merrill has shown he's more

11   than competent to testify that that occurred.  Like I say, we

12   don't really care what the maintenance was exactly, just that

13   it occurred.

14             THE COURT:  Well, the objection is sustained.  This

15   is not properly qualified as a business record, which would

16   make it an exception to the hearsay rule.  This fine-line

17   drawing between offering for the truth of the matter and not

18   offering for the truth of the matter is something that the

19   Court is simply not going to allow.  This document stands for

20   the -- several truths:  number one, that maintenance occurred

21   on this date; number two, what type of maintenance it was;

22   number three, how much it cost; number four, how much the

23   witness paid.  All of those truths are inexorably wrapped up

24   into this document.  So the fact that you may only be offering

25   it for one point, that maintenance occurred, is nevertheless

1    for the truth of the information contained in the document.

2    And it, therefore, has to be qualified as not hearsay under

3    Rule 802 or some other exception in order to be admissible.

4    It has not been so qualified, and, therefore, the objection is

5    sustained.

6           MR. CRONE:  That is appreciated.  Thank you, Your

7    Honor.

8    BY MR. CRONE:

9    Q.  Mr. Merrill, during -- so let's set this exhibit aside,

10   and let's find Exhibit 136 again.  And we are at page 46, if

11   you recall.

12   A.  Okay.  I'm here.

13   Q.  Thank you.  So the weeks at issue start at August 21st,

14   2015 --

15   A.  Yes.

16   Q.  -- is that correct?  And they end at July 15, 2016; is

17   that correct?

18   A.  Yes, sir.

19   Q.  So during that time period, August 21st of 2015 to

20   July 15, 2016, do you recall having any maintenance issues?

21   A.  There was a lot of maintenance issues with this truck.

22   But the biggest one that still is so fresh in my mind, that

23   is -- that is when the motor gave up on me.  Uh, it -- it was

24   a battle royal between the maintenance division of Pathway

25   Leasing and myself in order to get this vehicle fixed

1    correctly so it would be a safeguard and be able to move down

2    the road.  The motor -- it was still under warranty, proven to

3    be under warranty, of the hundred thousand miles.  And I went

4    back to the list that we had talked about earlier about

5    Mr. Harris's warranty listing.  I called him up on it.  He

6    said that he -- he -- that he defers to his maintenance

7    people, Bill and Jim.  I do not remember the name -- last

8    names, but his maintenance people are Bill and Jim at the

9    time.  So -- and so we went through three different

10   maintenance divisions:  Cummins, which it was a Cummins motor;

11   Kenworth, which was where I was told to take the vehicle; and

12   then we had also Rush Peterbilt, which is another Cummins

13   motor -- because the motor itself is -- the brand name is a

14   Cummins.  So we have to take it where they specialize in it.

15   Q.  Mr. Merrill, if I might interrupt.  Do you recall when

16   this item of maintenance occurred?

17   A.  That was in April -- it started April 14, 2016, and I did

18   not get the vehicle back until late April 29 -- no.  I can't

19   remember the -- I think I got it back on April 29th.  So it

20   was the whole month of April of 2016.

21   Q.  Do you recall any other maintenance issues with the truck

22   on --

23   A.  Well, there was a lot of other maintenance issues with the

24   truck.  The hub, again, like I was trying to explain, the hub

25   fan going out.  You had --

1   Q.  Let's stop there.  Let's stop there.  Do you recall when

2   that occurred?

3   A.  That was back in August of -- August of 2015.

4   Q.  Okay.  What's -- do you recall any other items of

5   maintenance occurring with the truck?

6   A.  There were so many of them, I can't remember all the

7   dates.  I've got them listed.  That's why I sent all the files

8   in so that this way you would have them.  Um, the biggest one,

9   again, was the engine block where the -- where we had to

10  rebuild the engine block, and I ended up having to foot the

11  bill over 7,000 on that one.

12  Q.  And that's the repair that you think happened in early

13  April 2016?

14  A.  That did happen.

15  Q.  Okay.  Mr. Merrill, I want to switch gears to what I hope

16  to be our last topic of testimony this morning.  Bear with me

17  a minute.  I'm going to get this book out of my way.

18          So, Mr. Merrill, do you recall discussing earlier in

19  your testimony, near the beginning, the -- the process by

20  which you signed the Pathway lease agreement?

21  A.  Yes.

22  Q.  And you discussed a little bit about what you thought you

23  were getting in the lease.

24  A.  Yes.

25  Q.  For example, I think you testified that you knew there

1    would be a lease payment.

2    A.   Yes.

3    Q.   Okay.  I want to -- I want to list what you thought you

4    were getting with the Pathway lease.  Okay?  So -- so I want

5    to start with number 1, with the lease payment.  What did you

6    think that was going to be?

7    A.   The lease payment should have been reasonable where I

8    could still make money at the end of it.

9    Q.   Did you know what the amount would be?

10   A.   Yes.  It was $948, is what my payment was suppose -- a

11   week, is what the payment was supposed to be.

12   Q.   Per week.

13   A.   Not to exceed $3600 a month.

14   Q.   So you were supposed to make less than four payments,

15   three payments if I'm --

16   A.   It was supposed to have been averaged about four payments.

17   Q.   Per month.

18   A.   Per month.

19   Q.   So these are weekly payments?

20   A.   Yes.

21   Q.   You also testified that you thought you were getting a

22   warranty with the truck.

23   A.   Yes, I did.

24   Q.   Did you think you were getting that warranty at the time

25   you signed the lease agreement?

 1   A.  Yes.

 2   Q.  And we have already discussed what you thought the terms

 3   of that warranty were.

 4   A.  Yes, we did.

 5   Q.  Okay.  What else did you think you were getting?

 6   A.  A safe, reliable truck.

 7   Q.  Anything else?

 8   A.  I thought I was getting a truck to become my own driver,

 9   independent driver.

10   Q.  We've used the term "owner-operator."

11   A.  Reduce to owner-operator to alleged, because we weren't

12   owner-operators, not when you are dealing with that.  I wasn't

13   an owner-operator.

14   Q.  Thank you.

15        MR. WILETSKY:  Objection, Your Honor, as to the

16   references to "we."

17        THE COURT:  Thank you.  Overruled.  The witness

18   corrected his testimony.

19   BY MR. CRONE:

20   Q.  Mr. Merrill, thank you for catching that.

21        When you signed the lease agreement, you thought you

22   were going to be an owner-operator?

23   A.  Yes.  That I had control of my money.

24   Q.  So you also thought you would control your money.  What do

25   you mean by that?

 1   A.  Meaning that I -- the money would come to me.  As an

 2   owner-operator, the money -- I should be able to dictate where

 3   the -- where the money goes, as a business owner.

 4   Q.  So "control your money."  Anything else?

 5   A.  No.

 6   Q.  Now I want to take you from the time that you signed the

 7   lease agreement to -- to the -- to the end of your

 8   relationship with Pathway Leasing and CFI.  Briefly, could you

 9   tell me how the relationship ended.

10   A.  Briefly, ended just like the -- I ended up going to the

11   shop again, ended up trying to get ahold of Matthew Harris and

12   of the maintenance crew, Bill.  Uh, the truck was not fixed

13   correctly from -- and I've had all these -- these other major

14   issues with the truck.  It came down to where it was going to

15   cost me $23,000 to fix the truck.  I didn't have the money.  I

16   asked Matthew to assist.  He refused.

17        So now I'm stuck with a truck that does not move and

18   is unsafe for the road.  I called -- and then there was rumor

19   that somewhere along the line Matthew --

20        MR. WILETSKY:  Object, Your Honor:  testimony about

21   rumors.

22        THE COURT:  Sustained.

23        MR. CRONE:  Agree.

24   BY MR. CRONE:

25   Q.  So, Mr. Merrill, let's shy away from rumor and just what

```
 1   you know.  Okay.  And so --
 2   A.  I received a phone call from Matthew --
 3          THE COURT:  Wait a minute.  Wait a minute,
 4   Mr. Merrill.  You have to be responding to a question, and
 5   there isn't a question pending.  So let me ask Mr. Crone to
 6   direct a question to you.  Okay?
 7          THE WITNESS:  Yes, ma'am.
 8          MR. CRONE:  Thank you.
 9   BY MR. CRONE:
10   Q.  You were just testifying that there was a large repair
11   bill, and --
12   A.  Yes.
13   Q.  -- you said it was about $23,000, and you couldn't afford
14   to pay it.
15   A.  Correct.
16   Q.  What then happened?
17   A.  I tried to get ahold -- I got ahold of Mr. Harris.  Due --
18   and with his maintenance crew, Bill.  They refused to assist
19   me any longer on this truck because of the fact that I refused
20   to get a, um, warran- -- an extended warranty.  Well, most of
21   the damages that started the issue were still under -- I
22   believed to be the hundred-thousand-mile warranty packet
23   because I hadn't -- I did not have that vehicle for a year.
24   So -- and, therefore, it come to the point where Matthew and I
25   talked on the phone, I could not pay for it, next thing I know
```

1   that Con-Way/CFI pulled a contract, vehicle is dead in the

2   water in my driveway, Matthew Harris can't -- and Bill had the

3   vehicle towed off my property.  That's the last thing I know

4   of that truck, and that was June 29th, 2016.

5   Q.  That was the end of your relationship with --

6   A.  That was the end of my relationship.

7   Q.  With Pathway Leasing?

8   A.  Yes.

9   Q.  And CFI?

10  A.  No.  Uh, are you talking about the -- my money?  Well,

11  there was a money issue that dragged on until September.

12  Q.  I suppose I should have been more clear with the question.

13          You weren't driving for CFI after that.

14  A.  No, that was it.

15  Q.  But they were holding some money that they needed to get

16  back to you.

17  A.  Yes.

18          MR. WILETSKY:  Objection to relevance, Your Honor.

19          MR. CRONE:  Your Honor, I was just clearing up that

20  last bit.

21          MR. WILETSKY:  That's fine.

22          THE COURT:  All right.

23          MR. WILETSKY:  Withdrawn.

24          THE COURT:  Thank you.

25  BY MR. CRONE:

1    Q.  So now I want to go back to this chart we created about

2    what you thought you were getting with the Pathway lease.

3    Number 1 says you thought you were going to pay 948 per week,

4    and you thought you were going to do -- make four payments per

5    month.  Did that happen?

6    A.  No.  They were making five payments.

7    Q.  Okay.  And when did this occur?

8    A.  Right out of the gate.  Excuse my language.  Right from

9    the start of the contract.

10   Q.  Second, you said you thought you were getting a warranty.

11   And you had already testified what you thought that warranty

12   would cover.  Did the warranty cover what you thought it was

13   going to cover?

14   A.  No, it didn't cover anything that was supposed to be

15   covered.

16   Q.  And how do you know that?

17   A.  It's hearsay, so I'm not going to say.

18   Q.  Well, you have testified about the --

19   A.  Well, the documents themselves that were --

20   Q.  We're not going to look at the documents.  You testified

21   about the maintenance, the engine block repair and those

22   things.  Do you recall that?

23   A.  Yes.

24   Q.  Is that what you are alleging should have been covered

25   under the warranty?

1   A.  Yes.

2   Q.  And it was not?

3          MR. WILETSKY:  Object, Your Honor.

4   A.  No, it was not.

5          MR. WILETSKY:  Object to this whole line of

6   questioning.

7          THE COURT:  Well, the questions are leading.  And I

8   know, Mr. Crone, what you are struggling with, but I'm going

9   to have to ask you not to lead.

10          And, Mr. Merrill, of course, you don't need to say

11   that you think things are hearsay.  Just leave that part to

12   the lawyers.  You answer the question as best you can.  All

13   right?

14          THE WITNESS:  Yes, ma'am.

15          THE COURT:  Go ahead, Mr. Crone.

16          MR. CRONE:  Thank you, Your Honor.

17   BY MR. CRONE:

18   Q.  And we're almost to the end, Mr. Merrill, so bear with me

19   just a couple more minutes here.

20          You said you thought you were getting a safe,

21   reliable truck.  Did you get a safe, reliable truck?

22   A.  Safe, yes.  Reliable, no.  Because the minimum safety by

23   DOT, it was -- by DOT safety regulations, yes, it was safe.

24   Reliable, no.  It was a --

25   BY MR. CRONE:

```
        16-cv-02242-KLM            Merrill - Direct                  I - 110
```

1    Q.  You said --

2    A.  It was not reliable.

3    Q.  Thank you.  You said you thought you would be an

4    owner-operator.  Were you an owner-operator?

5    A.  In my opinion --

6            MR. WILETSKY:  Objection, Your Honor:  calls for a

7    legal conclusion that goes to the heart of this case.

8            THE COURT:  Sustained.  I think you can rephrase it,

9    because what I wrote down is that he said he thought he could

10   become an independent driver.  You may want to ask the

11   question that way.

12           MR. CRONE:  I appreciate that.

13   BY MR. CRONE:

14   Q.  So let's fix our chart.  You said you thought you would be

15   an independent driver.  Were you an independent driver?

16   A.  Personally, I feel no.

17   Q.  And why not?

18   A.  You're still reg- -- one, again, the biggest, I was

19   controlled by Pathway and by CFI on what I can and cannot do

20   with that vehicle.  As an independent driver, owner-operator,

21   I should have been able to do what I wanted within the

22   guidelines of what -- like within safety guidelines and, of

23   course, some of the, um, company that I'm signed on to, their

24   rules.  But I was being regulated how to run the truck.  I was

25   regulated where I could go with the truck as in I can't -- if

1   I -- prime example.  Like PAM.  I wanted to go to PAM.  It was

2   paying to the truck.  Business opportunity was there.  I was

3   denied.  That is control.  That's telling me I can't do

4   something.  If I'm -- if I'm supposed to be an owner-operator,

5   independent driver, I should have been able to go there with

6   no problems, sign the paper and said, see you.  But instead I

7   was told, and I was controlled.

8   Q.  Thank you, Mr. Merrill.

9       Last question.  Number 5, you said you thought you

10  were going to be able to control your money.  Were you able to

11  control your money?

12  A.  No.  CFI took my money, it went to Pathway, and then all

13  of a sudden I'm only getting a small stipends of the money.

14  Prime example, in March, if you -- I made a lot of money, over

15  $4,000, proven, on record or -- and I -- at the end of it, I

16  only got $429 for the whole month.  Where did the -- where did

17  it go?  I know maintenance.  That was after maintenance and

18  all the repairs.  It was still over 4 grand of money.  I only

19  got $400 of it, give or take on the ends.  That's not control.

20  I'm not controlling my money.  Somebody took that money on me.

21  I should have been able to control that.  I should have been

22  able to put and say, okay, well, this month we're going to

23  give you X amount of money as long as I make my bills.  I

24  wasn't even making my bills.  How is that control to me?  I

25  wasn't in control of my money.  Somebody else was controlling

1    my money for me.  And that's my answer.

2              MR. CRONE:  Thank you, Mr. Merrill.  And if the Court

3    will indulge me just 30 seconds to make sure the people

4    smarter than I say I didn't forget anything, we will be done.

5              THE COURT:  You may.

6              MR. CRONE:  Your Honor, for now Plaintiffs have no

7    further questions for Mr. Merrill.

8              THE COURT:  All right.  Thank you, Mr. Merrill.  You

9    may step down.

10             We are going to take our lunch break now.

11             THE WITNESS:  Okay.

12             THE COURT:  Counsel, we will be in recess until

13   1:15 p.m.  I do have another hearing at 12:00 p.m., but it

14   shouldn't take longer than a half an hour at the most.  I'd

15   like to see these counsel back here at 1:15 p.m. to resume the

16   trial, and we will start with cross-examination of

17   Mr. Merrill.

18             I will get to housekeeping in just a moment.  I also

19   would like to see all counsel, only counsel, for the parties

20   in this case in my chambers immediately after I leave the

21   bench.

22             Mr. Wiletsky, something with respect to housekeeping?

23             MR. WILETSKY:  Yeah, there's one housekeeping matter,

24   Your Honor.  With respect to Exhibit 136, page 46 was admitted

25   over objection.

1             THE COURT:  Yes.

2             MR. WILETSKY:  What we didn't talk about and what was

3    not discussed at all was the second half of that document.

4    And so we would just ask to reconsider and to exclude all of

5    the information that's on the bottom half, starting with

6    "Damages sought pursuant to state law claims," and then "Other

7    Damages as Part of Claim for Unpaid Wages," which I think on

8    that one is just pure relevance, in addition to there's no

9    testimony supporting it.

10            MR. CRONE:  And I think Mr. Wiletsky is correct.  I

11   think we got wrapped up in the minimum wages.  What I would

12   ask is if on redirect I could just take a couple of minutes to

13   run through the second half of that exhibit.

14            THE COURT:  All right.  Well, to the extent that the

15   exhibit has been admitted, it is admitted in the top half

16   only, which is the chart and information that Mr. Franklin

17   testified about on direct examination.  So as it stands right

18   now, the top half of Exhibit 46 [sic] is admitted.  And,

19   frankly, Counsel, if we get to the point where I have to have

20   you resubmit this only in the form with the information on the

21   top as page 46, I will do that, but for the time being -- this

22   is a trial to the Court -- I am ignoring the lower half of

23   Exhibit 136.  Exhibit 136, page 46, top half only.

24        (Plaintiffs' Exhibit 136:46* received.)

25            MR. CRONE:  Thank you, Your Honor.

1           THE COURT:  Okay.  We are at recess.  And Counsel for

2    the parties, please come through this door to my chambers.

3        (Proceedings recessed 11:58 a.m. to 1:18 p.m.)

4           THE COURT:  Thank you.  Please be seated.

5           All right.  Good afternoon.  We are back on the

6    record in 16-cv-02242.  Any housekeeping matters we need to

7    address before we resume Mr. Merrill's cross-examination?

8           MR. CRONE:  Not from Plaintiffs, Your Honor.  Thank

9    you.

10          THE COURT:  Thank you.

11          MR. WILETSKY:  No, Your Honor.  Thank you.

12          THE COURT:  Mr. Merrill, if you would come forward

13   and go ahead and take the witness stand.  And you're still

14   under oath.

15          Whenever you're ready, Mr. Wiletsky.

16          MR. WILETSKY:  Thank you.

17                        **CROSS-EXAMINATION**

18   BY MR. WILETSKY:

19   Q.  Just let me know when you're ready, Mr. Merrill.  Okay.

20          Mr. Merrill, I want to talk to you about when you

21   became an owner-operator for CFI.  You had been a company

22   driver for CFI, I think you said, either for 10 or 11 years.

23   Is that right?

24   A.  A little over 11 years.

25   Q.  And before you decided to make the switch to become an

1    owner-operator, you talked to other owner-operators throughout

2    the company; is that right?

3    A.   Yes, sir.

4    Q.   And some of them were leasing trucks through Pathway; is

5    that right?

6    A.   Yes, sir.

7    Q.   And some were leasing through other companies, including

8    Liberty?

9    A.   Knew the -- didn't know the name of the companies, but

10   yes, sir.

11   Q.   And some of the folks that you had talked to who were

12   owner-operators had just bought their own trucks; is that

13   right?

14   A.   Yes.

15   Q.   And before leasing from Pathway, you checked out two or

16   three other leasing companies; is that right?

17   A.   That's what I said in my statement, yes.

18   Q.   And that's accurate; correct?

19   A.   Yes, that's accurate.

20   Q.   And you applied with -- applied for a lease with Penske;

21   is that right?

22   A.   Penske, yes, sir.  But the reason why it didn't work out

23   for Penske is because they weren't going to allow the holes to

24   be drilled or the communications devices to be put into

25   vehicles.  So, therefore, Penske was not going to allow us to

1   rent.

2   Q.  Okay.  And as I recall, but correct me if I'm wrong, you

3   applied for Penske in approximately January of 2015.  Is that

4   right?

5   A.  Uh, approximately.  I believe that's it, yes.

6   Q.  And you leased the truck with Pathway in July 2015; is

7   that right?

8   A.  Yes.

9   Q.  Okay.  So about a six-month --

10  A.  Yes.

11  Q.  -- difference there where you were looking into these

12  different options; is that right?

13  A.  Yes, that's correct.

14  Q.  Had you been looking into it before you applied with

15  Penske?

16  A.  Uh, not -- no.  'Cause I was more being content being a

17  company driver.

18  Q.  I want to direct your attention, if we could pull up

19  Exhibit 50 -- and you can either look in your book or we'll

20  pull it up on the screen.

21  A.  Book, please.

22  Q.  You want the book?  Either way.  Whatever you're more

23  comfortable with.  Just tell me when you're there.

24  A.  Excuse me.  Okay.

25  Q.  Okay.  And this is your equipment lease agreement with

1   Pathway; right?

2   A.  That's correct.

3   Q.  And it looks like those are your initials on the bottom

4   right-hand portion of each of the pages of the actual lease

5   agreement.  Is that right?

6   A.  Yes, sir.

7   Q.  And if you look at the very last page of that document,

8   tell me when you're there.

9   A.  You said the last page?

10  Q.  The last page.  It says Pathway 00024 on it.

11  A.  Okay.

12  Q.  That's the truck acceptance form; right?

13  A.  That is correct.

14  Q.  Okay.

15          MR. WILETSKY:  And if we could blow up that middle

16  portion right there.  Thank you.  Just so I can see it.  Thank

17  you.

18  BY MR. WILETSKY:

19  Q.  You initialed on each of those lines; correct?

20  A.  Yes, sir.

21  Q.  And with respect to the last line, it says, "I acknowledge

22  and accept delivery of the Truck and understand and agree that

23  all repairs and maintenance on the Truck are my financial

24  responsibility."  Is that correct?

25  A.  That is correct.

1  Q.  Okay.  And there's a note written just to the right of

2  those sentences.  Do you see that?

3  A.  Yes, sir.

4  Q.  And is that your handwriting?

5  A.  It is my printing, yes.

6  Q.  Okay.  And can you read what that says?

7  A.  It says, "Front bumper damaged, crack in hood on left

8  side, driver's" -- no -- "driver mirror frame bent."

9        Basically indicating what was already done to this

10  vehicle.  And I had asked, I believe, Mr. Harris that if this

11  vehicle was in an accident, and I -- 'cause I made those notes

12  on that as well.

13  Q.  So it was important for you to note that so that it was

14  clear on the lease; is that right?

15  A.  That's correct.

16  Q.  You never received an employee manual or handbook from

17  Pathway; correct?

18  A.  No, CFI sponsored those.

19  Q.  I'm sorry?

20  A.  CFI sponsored those manuals.

21  Q.  Okay.  And you never received any training from Pathway on

22  how to drive a truck; is that right?

23  A.  That's correct.

24  Q.  And you didn't talk to anyone at Pathway about your

25  contract hauling agreement that you entered into with XPO on

1  becoming an owner-operator; is that correct?

2  A.  That's correct.

3  Q.  Pathway did not establish any type of work schedule for

4  you; is that right?

5  A.  That's correct.

6  Q.  And Pathway wasn't involved in setting any routes that you

7  could or could not drive when you were an owner-operator;

8  correct?

9  A.  Correct.

10  Q.  Pathway didn't set any rules or requirements for you

11  regarding how to load or secure cargo; is that right?

12  A.  That's correct.

13  Q.  That's the driver's responsibility?

14  A.  Exactly, that's the driver's no matter --

15  Q.  Pathway didn't set any rules or requirements for you

16  regarding taking meal breaks; right?

17  A.  No.  That's regulated by the government.

18  Q.  Pathway didn't set any rules or requirements regarding

19  taking rest or sleeping breaks; correct?

20  A.  That's also regulated by the government, so correct.

21  Q.  Well, the government doesn't regulate where you take a

22  meal break; correct?

23  A.  No.

24  Q.  And the government, um, doesn't regulate where you take a

25  sleep break; correct?

16-cv-02242-KLM                    Merrill - Cross                        I - 120

1   A.  It's mandated depending on how many miles you've ran that

2   day.

3   Q.  Sure.

4   A.  So, yes, I guess you would say yes, they do.

5   Q.  Well, you're saying there's a maximum amount of driving

6   time before you have to take a sleep break.

7   A.  Exactly.  So wherever you fall in line with in your route,

8   if you run out of hours, you have to -- it's -- so I guess you

9   could say they do mandate where you're -- you're regulated

10  where you can stop, because you can't stop on the side of the

11  road.

12  Q.  Sure.

13  A.  So that means you would have to go to a truck stop or a

14  rest haven that's suitable for that truck to be put into.

15  Q.  Right, but Pathway never said, hey, if you take a rest

16  break, you need to stop at this particular truck stop or this

17  particular area; correct?

18  A.  No, sir.  No, sir.

19  Q.  And to the extent you were ever just tired, too tired to

20  keep driving, that was your responsibility.  If you knew you

21  couldn't drive safely, you would have to take a break.

22  A.  That is correct.

23  Q.  Pathway wasn't involved in that; correct?

24  A.  Correct.

25  Q.  And Pathway didn't set any rules or requirements regarding

16-cv-02242-KLM                Merrill - Cross                    I - 121

 1   loading and unloading at times requested by the actual
 2   shipper; is that right?
 3   A.   That's correct.
 4   Q.   And Pathway didn't set any rules or requirements for you
 5   in terms of picking up and completing deliveries on time; is
 6   that right?
 7   A.   That's correct.
 8   Q.   And Pathway didn't set any rules or requirements for you
 9   for accepting loads or assignments from XPO or, I'm sorry,
10   CFI; is that correct?
11   A.   I'm sorry, I'm not --
12   Q.   Sure.
13   A.   Not to be rude, just my hearing aid I think just going
14   bad.
15   Q.   That's okay.
16   A.   Thank you.
17   Q.   Is this better?
18   A.   Yes.
19   Q.   Okay.  I'll stay closer to the mic.
20   A.   Thank you.
21   Q.   Pathway did not set any rules or requirements for you for
22   accepting loads or assignments --
23   A.   No.
24   Q.   -- from CFI?
25   A.   No, they did not.

1   Q.  And Pathway didn't set any rules regarding your maximum or

2   minimum driving times; correct?

3   A.  That's correct.  Again, that's another federal guideline,

4   so . . .

5   Q.  And Pathway didn't set any rules or requirements for you

6   regarding what drivers can or cannot transport; is that right?

7   A.  Uh, no.  We weren't -- we had to get permission in order

8   to have somebody in our truck and to have permission from

9   Pathway if we were going to have somebody else drive that

10  truck.

11  Q.  Yeah, I was just asking about what you actually

12  transported, what you hauled.

13  A.  Oh, what I hauled, you're right.  You're correct then.

14  Q.  And Pathway never gave you any goods or freight to ship;

15  is that right?

16  A.  That's correct.

17  Q.  And the amount of your Pathway lease payment deductions

18  were fixed, meaning they didn't vary no matter how much or how

19  little you drove; correct?

20  A.  Correct.

21  Q.  You -- you talked a little bit about the Qualcomm system.

22  A.  Communication device.

23  Q.  I'll call -- yeah, thank you, the communication device,

24  whether it was Qualcomm or PeopleNet.

25  A.  Correct.

1   Q.  That Qualcomm system tracked how many miles you were

2   driving and where you were driving and things like that;

3   correct?

4   A.  Yes, sir.

5   Q.  And that also tracked whether you were in specific

6   categories, for example, drive time, on-duty drive time, or

7   on-duty not drive time, things like that.

8   A.  Yes, sir.

9   Q.  And there were also categories for sleeper berth or

10  off-duty time; correct?

11  A.  Correct, but sometimes what it is, drivers would put some

12  of their work time on the off-duty time in order to be able to

13  continue driving or make -- depending on the situation.

14  Again, if the truck's in the shop, we are not going to waste

15  all our time, so we may click on the off-duty line, which is

16  still part of our 14-hour workday.  We're still working doing

17  something for that truck.  So it's kind of misleading.  I

18  mean, I'm not the only driver -- and I'll say it -- I'm not

19  the only driver that would use my on-duty time, off-duty clock

20  time, just to save some time so we can keep on moving and

21  working.

22  Q.  Right.  And are you talking about if your truck is in the

23  shop for a short period of time?

24  A.  Short period of time.  Uh, if we're stuck on the side of

25  the road.  If we're over at, uh, a client's place sitting and

16-cv-02242-KLM                    Merrill - Cross                    I - 124

1    waiting, different -- just different -- we're still on duty.

2    We may just log it off-duty just because there's no movement

3    of the truck.

4    Q.  Sure.  But if your truck is in the shop for an extended

5    period of time, as you testified about earlier --

6    A.  Yes.

7    Q.  -- your Qualcomm wouldn't be running during that time; is

8    that correct?

9    A.  That's correct.

10   Q.  And Pathway didn't set any rules or requirements for you

11   on how to log your time; is that right?

12   A.  No.  The federal government does that.

13   Q.  And Pathway didn't set any rules on how to track your

14   time; correct?

15   A.  That's correct.

16   Q.  And those communication devices, whether it was Qualcomm

17   or PeopleNet -- I think it was the Qualcomm unit would produce

18   something called E-logs.  Is that right?

19   A.  Yes, sir.

20   Q.  And you never sent your E-logs to Pathway; is that

21   correct?

22   A.  I never received them from CFI.

23   Q.  Pathway never asked you for your E-logs; is that right?

24   A.  That's correct.

25   Q.  You testified earlier that in terms of turning down loads,

1  you didn't want to turn down a load because the next load

2  might be -- that might come up may be an unproductive one,

3  meaning you would have to sit.  Do you remember that?

4  A.  Yes, sir.

5  Q.  Did I get that right?

6  A.  Yes, sir.

7  Q.  Okay.  And when you say unproductive load, what do you

8  mean by an unproductive load?

9  A.  Well, prime example is if I have a 500-mile run here, I

10  decided, well, that's not enough miles.  My next nonproductive

11  load might only be 200 miles, so I just lost a lot of money

12  over here on this side.

13  Q.  Right.  Because, generally speaking, you want a load

14  that's going to be more miles, rather than less; correct?

15  A.  That's correct.

16  Q.  Because you make more money with more miles; correct?

17  A.  Makes -- yes.

18  Q.  I want, if you could, to take a look at, uh -- let's take

19  a look at Exhibit 52, if we could pull that up.  And you can

20  look at it in the book if you are more comfortable with that,

21  Mr. Merrill.

22  A.  Okay.

23  Q.  Just let me know when you're there.

24          Are you there?

25  A.  Yes, sir.  I just want to make sure we're on the right

16-cv-02242-KLM                    Merrill - Cross                    I - 126

1   page.

2   Q.  Absolutely.

3   A.  Exhibit 52, page 71 is the one I'm looking at.

4   Q.  Yes, yes, at least for now.

5          So these, you testified earlier -- we don't have to

6   go over that again -- are the -- these are the settlement

7   statements from CFI that show where you drove, um, advances

8   you took, things like that.  Correct?

9   A.  Correct.

10  Q.  And I believe you testified that you reviewed these to

11  determine whether the damage calculations were accurate.  Is

12  that right, or is that incorrect?

13  A.  That is correct.

14  Q.  Okay.  So take a look, um -- take a look, if you would, at

15  Bates number 110.

16  A.  110.

17  Q.  And just let me know when you're there.

18  A.  Okay.

19  Q.  Okay.  And before I ask you about that, let me direct your

20  attention to Exhibit 136, page 46.  And if you want, we can

21  pull that up on a split screen here so you don't have to have

22  two open, but if you are more comfortable looking at the hard

23  copy, that's fine.

24  A.  Again, I'm going back to --

25  Q.  Exhibit 136.

1    A.   Okay.

2    Q.   Page 46.

3    A.   Okay.  Yes, sir.

4    Q.   Okay.  So in that damage calculation it shows that for

5    April 29th, 2016, you received a payment from the carrier of

6    $97.50; correct?

7    A.   Yes, sir.

8    Q.   And you're claiming unpaid minimum wage for that period

9    of, if I follow it over correctly, of $410.

10   A.   Yes, sir.

11   Q.   Is that correct?

12   A.   Yes, sir.

13   Q.   Okay.  And so what your testimony is is that you worked

14   70 hours in the period leading up to that disbursement.

15   A.   Yes, sir.

16   Q.   Okay.  And you looked through everything carefully to make

17   sure that you did, in fact, uh --

18   A.   That's what -- sorry.

19   Q.   -- that these were accurate and that you had worked

20   approximately 70 hours during that period; correct?

21   A.   Yes, sir.

22   Q.   Okay.  If you look then at Exhibit 52, the page with Bates

23   number 110 at the bottom, that's your settlement statement for

24   April 29th, 2016; correct?

25   A.   Correct.

1   Q.  And that shows that you have zero miles driven in that

2   period; correct?

3   A.  Correct.

4   Q.  And that's because your truck had been in the shop since

5   approximately April 4th through April 29th; correct?

6   A.  Yes, sir.

7   Q.  So you had not driven any miles during that period;

8   correct?

9   A.  That's correct.

10  Q.  And, in fact, you hadn't driven any miles because your

11  truck was in the shop for that entire period from April 4th

12  through April 29th; correct?

13  A.  That is correct.

14  Q.  And were you with your truck in the shop for that entire

15  three-or-so-week period?

16  A.  Every day I had to get up in the morning and, starting at

17  8:00 a.m., and drive over to my truck and ensure that -- what

18  they were doing to the truck.  And we did that five days of

19  the week.  I live in El Paso.  This is where it is.  So I was

20  at home.  I am not claiming my home time against this truck.

21  But I did go over every day to ensure, to see when this truck

22  was going to get done, how it's progressing.  I even made

23  phone calls to Matthew Harris and Bill and Jim over in Pathway

24  in order to get authorizations and just the smaller details in

25  order to ensure that this truck is up and running correctly.

1    It took -- it took the 5 day, 14 hours.

2    Q.  Okay.  Did you track that time?

3    A.  Did I track it?  How do you want it tracked, sir?

4    Q.  I'm asking you if you tracked it in any way.  Did you keep

5    a log of every day that you went in to the shop to check on

6    how things were going?

7    A.  Yes, we did.  Excuse me.  Yes, I did.

8    Q.  So you wrote down those hours?

9    A.  I did, yes.

10   Q.  So where are those documents?

11   A.  They were turned in.  They were all turned in, documents

12   were turned in.

13   Q.  Turned in when?

14   A.  Turned in to -- they were -- I cannot say where they are

15   right now, but I do know where the original document -- my

16   journal book is.  It's at home.

17   Q.  And did you -- did you track the hours you spent on phone

18   calls during that week-long period leading up to April 29th?

19   A.  No, I did not track the phone calls 'cause you just -- I

20   can probably check my Verizon phone bill in order to see

21   what's going on with that.

22   Q.  And you weren't actually doing the work on the truck

23   yourself; correct?

24   A.  No, sir.  I'm not qualified.

25   Q.  So when you weren't on the phone or weren't in the shop

16-cv-02242-KLM                 Merrill - Cross                        I - 130

1   just checking on how things were going, you were at home in

2   El Paso; correct?

3   A.   Yes, sir.

4   Q.   If you could turn to the -- let's see.  It's Exhibit 52,

5   and it has Bates number 49 on it.

6   A.   Page 49?

7   Q.   Yep.

8   A.   49.  Okay.

9   Q.   Okay.  And so this is -- let me just make sure we're on

10  the same page.  This is for a settlement dated October 2nd,

11  2015.

12  A.   Yes, sir.

13  Q.   And it looks like on this -- for this settlement you had

14  one trip --

15  A.   Yes, sir.

16  Q.   -- on September 27th.  Correct?

17  A.   Yes, sir.

18  Q.   Of 427 miles; correct?

19  A.   That is correct, sir.

20  Q.   Okay.  And, again -- well, let me ask it -- let me ask

21  this way.  Your testimony is that on all of these weeks at

22  issue you drove the maximum allowed under the DOT regulations;

23  correct?

24  A.   No.  The question is did we work the 14 hours.

25  Q.   Did you --

16-cv-02242-KLM                Merrill - Cross                    I - 131

1    A.   Drive, it's no.

2    Q.   Okay.  So let me ask that a different way.  Your testimony

3    is that you worked 70 hours, which also happens to be the

4    maximum allotted under DOT regulations --

5    A.   Yes.

6    Q.   -- for each of these weeks; correct?

7    A.   That's correct.

8    Q.   And if you had some loads that were shorter loads, is it

9    safe to -- accurate to say that a shorter haul is going to

10   take less time than a longer haul?

11   A.   All depends on delivery date.

12   Q.   Okay.  So it might?

13   A.   While we're still connected to the truck and that load, I

14   am doing the responsibilities of that load, and we're still

15   required by -- no matter if it's 2 miles to 5,000 miles, if it

16   says -- if it takes two days to deliver it, I'm responsible

17   for that load for two days.

18   Q.   Okay.

19   A.   And, therefore, I'm still on the clock for that -- doing

20   my duties for each day.

21   Q.   Sure.  But if you could deliver a load in two days because

22   it was a 500-mile trip --

23   A.   Yes.

24   Q.   -- say, that's going to require less time than a load that

25   could be 2,000 or 1,000 miles that would be a four- or

```
1   five-day trip; correct?

2   A.  All depending on the situations and what happened that

3   day.

4   Q.  Okay.

5   A.  But yes.

6   Q.  So when you did these -- when you looked over these damage

7   calculations, did you look for the situations that you are

8   just describing as to when you were dropping off loads and

9   what the delivery times were?

10  A.  I cannot say yes or no on that.  I mean, on the weeks that

11  I'm claiming, yes, I did.

12  Q.  On the weeks you're claiming --

13  A.  Yes.

14  Q.  -- you believe you did?

15  A.  I believe I did.

16  Q.  Okay.  And how did you make that determination?

17  A.  Well, going through again with -- with the settlement

18  statements, uh, coinciding with my maintenance records that we

19  have for those dates.  So in this -- in this particular case

20  we only made -- I only made, uh, do-do-do-do -- I forgot.  It

21  was $97.  Well, I know I only did one run, so I go back to my

22  records in my maintenance to find out why.  Well, that

23  particular week, the closeout week, was the week that -- prior

24  to that that I had made arrangements to go to Joplin to put

25  the truck in the shop for an accident that occurred down in
```

16-cv-02242-KLM                    Merrill - Cross                    I - 133

1   Joplin, Missouri.  So that put me out the whole week or pretty

2   much the week in Joplin working with the truck on a daily

3   basis ensuring that the accident was taken care of.

4   Q.  Right.  And again --

5   A.  But -- and then -- and to include the trip equalling out

6   my 14 hours.

7   Q.  Okay.

8   A.  Or my 70 hours for the week.

9   Q.  So, again, when the truck is in the shop, you are counting

10  that time as time worked.

11  A.  Only when I'm away from home.

12  Q.  So even if you are not actually doing the work yourself,

13  if you are away from home and the truck is in the shop for

14  days on end, you believe that counts as time worked.

15  A.  According to the federal government it does 'cause that's

16  what we have to do, yes.

17  Q.  Well, I'm asking for your purposes --

18  A.  It's our job.

19  Q.  Sorry.  I'm asking for your purposes in coming up with the

20  70 hours --

21  A.  Yes.

22  Q.  -- yeah, you counted that time.

23  A.  Because I'm steadily busy working with the truck in order

24  to get it up and working.  I'm not turning the wrenches, but

25  we're standing there making sure that -- and we're talking

Julie H. Thomas, RMR, CRR                              (303)296-3056

16-cv-02242-KLM                 Merrill - Cross                    I - 134

 1   with mechanics.  We're doing all the administration things in

 2   order to ensure that we're taking care of these trucks.

 3   Q.  Okay.  If you could take a look at the settlement

 4   statement dated February 12 of 2016 that has a Bates number

 5   of 92 on it.

 6   A.  February -- I'm sorry?

 7   Q.  February 12th of 2016.  Just let me know when you're

 8   there.

 9   A.  Okay.  Well, what page is that on again?  I'm sorry.

10   Q.  It's on -- it has Bates number 92 at the bottom right.

11   And, actually, is that the one that's up on the screen?  Yeah,

12   it's up on the screen, if that's easier.

13   A.  We'll watch this one.  Okay.

14   Q.  You got it?

15   A.  Yes.

16   Q.  Okay.  So I want to talk to you about the advances because

17   you testified a little bit about those and the difference

18   between fuel advances and other advances.  Right?

19   A.  Okay.

20   Q.  So the, uh, the -- bear with me for one second.

21        So where it says Advances at the bottom, do you see

22   that?  There is that box --

23   A.  Yes, sir.

24   Q.  -- where it has Advances.

25   A.  Yes, sir.

1    Q.  And there's one advance that says CashA $100.  Do you see

2    that?

3    A.  Cash advance, cash advance of $100, yes, sir.

4    Q.  Right.  So that's -- that's a cash advance that you took

5    from XPO; correct?

6    A.  Yes, we took it out of the ATM just like the other two

7    ATMs of $160 and $200.

8    Q.  Right.

9    A.  But for particular reasons.  I would have to go back on my

10   receipts because I did not take that for personal gain.

11   Q.  But you don't have any receipts here today to show what

12   you used that $100 for; correct?

13   A.  No, sir.

14   Q.  And --

15   A.  For that particular day, I understand, that time frame in

16   February -- I did blow out two steer tires, so -- and we're --

17   we have to -- I have to pay for my own tires.  So during this

18   time frame is where -- and it's on a weekend.  Matthew Harris

19   and Bill and the Pathway group for the maintenance, we cannot

20   get to our escrow accounts.  We have to do something in order

21   to -- or I would have to do something in order to fix this

22   truck to get it moving again.  So in order to do so, I took

23   cash advances.

24   Q.  Okay.  But you don't have any receipts to show what you

25   actually used that money for; correct?

16-cv-02242-KLM                 Merrill - Cross                    I - 136

1    A.  That's correct.

2    Q.  And there's also, in that same box just a little bit

3    further down below, two entries that say ATMTr next to them.

4    One is for 200; one is for 160.  Do you see those?

5    A.  I just -- I just answered that question with the 100.

6    Q.  That's what I was just going to ask.  So that's the same

7    thing.  Those are cash advances.  Correct?

8    A.  Yes, they are all out of Joplin yard.

9    Q.  Okay.  So take a look back, then, at Exhibit 136, page 46,

10   and if you look at the line that shows February 12th, 2016.

11   Do you see that?

12   A.  Yes, sir.

13   Q.  Okay.  And that line shows zero dollars disbursed to you

14   as the driver; correct?

15   A.  That's correct.

16   Q.  But you had actually taken cash advances from XPO in the

17   amount of, what, $460; correct?

18   A.  Yes, sir.  If you're reading this correctly, yes.

19   Q.  And when you take the cash advance from XPO or CFI -- and

20   I'm sorry.  If I say XPO, you understand?

21   A.  Yes, sir.

22   Q.  Thank you.

23   A.  It's been changed, the company, so many times it's -- yes.

24   Q.  Right.  So when you take a cash advance, as you said, you

25   might use it for the truck, but there was no requirement of

16-cv-02242-KLM                    Merrill - Cross                    I - 137

1   what you used that money for.  You're getting cash.  Correct?

2   A.  Correct.

3   Q.  And you didn't go to Pathway -- or, I should say, Pathway

4   wasn't involved in those cash advances; correct?

5   A.  No, they didn't.

6   Q.  And then if you could look at the settlement statement in

7   Exhibit 52 dated March 25th, 2016.  It's at -- has a Bates

8   number of 104 at the bottom.

9   A.  Okay.

10  Q.  Are you there?

11  A.  I'm looking on the screen.  It's kind of blurry.

12          MR. WILETSKY:  Yeah.  Can we blow that up a little

13  bit?

14  BY MR. WILETSKY:

15  Q.  Is that better?

16  A.  Okay.

17  Q.  Okay.  So that settlement statement shows that you went

18  from El Paso to Laredo and back; correct?

19  A.  Yes, sir.

20  Q.  For a total of 1,212 miles.

21  A.  Yes, sir.

22  Q.  Okay.  And so what was it about that settlement statement

23  that shows that you worked 70 hours?

24  A.  Well, it doesn't show that I spent, uh, 8 1/2 hours on the

25  side of the road with a blown -- with a blown radiator hose.

Julie H. Thomas, RMR, CRR                           (303)296-3056

```
 1   It doesn't show that we had -- I had to sit and wait for

 2   the -- the incoming load to come in to be hooked to me in

 3   order to take it back to El Paso.  And it doesn't show that I

 4   went back into the shop.  That's what -- this is what's

 5   missing on this statement.

 6   Q.  Okay.  And so that's just all from your memory?

 7   A.  No.  We have here as well.  I just don't know what pages

 8   they are.

 9   Q.  Okay.

10   A.  All documents were turned in.

11   Q.  If you would take a look at the settlement statement for

12   May 13th of 2016, it's Bates number 112.  Are you there?

13   A.  Yes, sir.

14   Q.  Okay.  And this one, as before, shows some withdrawals,

15   cash withdrawals from the ATM; correct?

16   A.  Where?

17   Q.  If you look at the --

18   A.  I don't see cash withdrawal on this.

19   Q.  Sorry.  If you look down at the second advance box.

20   A.  Oh, you're talking about the 105.67 and the 100?

21   Q.  I'm talking about the -- yes, exactly.  Correct?

22   A.  Okay.

23   Q.  And you didn't include on Exhibit 136 for that particular

24   week those cash advances as income that came to you from CFI;

25   correct?
```

1   A.  No, I did not, but again, the ATM cash advances, we would

2   have receipts for maintenance.  Again, it's a weekend when

3   they were taken out.  May 6th.  May 6th, it was in Joplin.  We

4   were in the Joplin yard when this happened.

5   Q.  Okay.

6   A.  So I couldn't tell you if it was for maintenance costs or

7   if it was for -- that I took -- I took the money out.

8   90 percent of the time when I took money off these accounts, I

9   did not take a cash advance for my personal gain.  It was all

10  for truck, for truck gain.

11  Q.  But 10 percent of the time you were taking it out for

12  personal gain to use for personal expenses?

13  A.  Only -- and they're not listed here on your accounts

14  either.

15  Q.  What do you mean they're not listed?

16  A.  For the weeks that are missing here, if I had -- if I took

17  out money, we made the correction -- if you -- from my

18  deposition we have taken off three of them because I told you

19  they were incorrect.  We had it corrected, this, this chart,

20  from my deposition when -- when we made the line-outs on my

21  deposition.

22  Q.  And you believe you -- I'm sorry.  You believe you took

23  off certain weeks because you had not accounted for advances

24  for those weeks, or was there other reasons?

25  A.  I hadn't accounted for those weeks at all.  So if I

 1   couldn't account for them, then I was honest enough to say,

 2   well, I don't remember any of them.

 3          These weeks here, all the documentations are

 4   either -- they're probably in my maintenance records and they

 5   are accountable for.  It's just I don't know the page numbers

 6   to flip to and give you proof without a reasonable doubt where

 7   they're at.

 8   Q.   Okay.  Mr. Merrill, you stopped driving the truck as of

 9   June 29th, 2016; is that right?

10   A.   Yes.

11   Q.   And you didn't have possession of the truck after that

12   time; correct?

13   A.   June 26th to June 29th it was in my driveway, that's

14   correct.  June 29th was the last day.

15   Q.   And you have no information about what happened to that

16   truck after it was repossessed by Pathway; correct?

17   A.   Correct.

18   Q.   There were times, Mr. Merrill, when you contacted Pathway

19   and asked them to apply what would otherwise come to you as a

20   disbursement to your lease obligations; is that right?

21   A.   If -- yes.  And there's a reason.  'Cause, I mean, I'm

22   already in the hole.  A hundred dollars is not going to make

23   a -- make a whole bunch of difference, so I just told them to

24   go ahead and just -- you might as well just go ahead and keep

25   that hundred dollars.  I mean, I'm already, you know -- I was

1   frustrated and upset as it was that I wasn't getting a very

2   good paycheck, especially out of like -- example, the one you

3   just pulled up.  I did 3,896 miles.  That's a reasonable good

4   check to pay everybody up, and I should have gotten a good

5   settlement out of it.  Instead I only get what?  Even if you

6   add in the advances, I still didn't get minimum wage.

7   Q.  And how many times do you think you did that, calling in

8   and telling Pathway to apply a payment that would otherwise be

9   disbursed to you to your lease obligations?

10  A.  I don't remember how many times I've done it.  Once or

11  twice.  It may have -- the max, if I would think, would be

12  four times.

13  Q.  Okay.  And did you exclude those weeks where you had asked

14  for a payment -- an extra payment to be applied from these

15  calculations in Exhibit 136?

16  A.  If there was enough money in my calculations, I did not

17  add them into these.  I did not add them into these weeks.

18  These calculations are the actual shortage, are the shortage

19  weeks.

20  Q.  No, I'm asking whether for weeks in which you told Pathway

21  don't disburse funds to me, did you include those weeks or

22  exclude them from these calculations in Exhibit 136?

23  A.  I excluded -- I excluded them from these calculations.

24  Q.  How did you go about excluding them?

25  A.  To ensure -- just knowing what month.  I have to look at

1   my records again to find out which month I actually requested

2   them to just go ahead and keep the extra hundred dollars or

3   whatever else.  I mean --

4   Q.  What records would you look at --

5   A.  I don't remember everything.  It's been over two years.

6   Q.  I understand.  What records do you believe you looked at

7   that would show you definitively that the -- you excluded the

8   weeks where you asked Pathway to apply money that would

9   otherwise be disbursed to you to your lease payment?

10  A.  It would be in my journal notes.

11  Q.  In your journal notes?

12  A.  In my journal notes that -- I don't have them here.  If

13  any -- and I don't know -- I've -- I've filed them things, and

14  I don't recall a lot of them right now.  So to exclude -- it

15  wouldn't do me any good.  I'd like to go . . . go ahead.

16  Q.  Okay.  And, Mr. Merrill, you did not successfully complete

17  the lease with Pathway; correct?

18  A.  That's correct.

19  Q.  And Pathway notified you that you still owed it money for

20  defaulting on the lease; correct?

21  A.  No.

22  Q.  Never notified you?

23  A.  I haven't been notified anything like that yet.

24  Q.  Have you ever paid Pathway for the amount that you owed it

25  on the lease after you -- after the default?

16-cv-02242-KLM              Merrill - Redirect                    I - 143

1    A.   No.

2              MR. WILETSKY:  Just one second, Your Honor.

3              Thank you.  Nothing further.

4              THE COURT:  Thank you.

5              Is there redirect examination, Mr. Crone?

6              MR. CRONE:  There is just briefly, Your Honor.

7                        **REDIRECT EXAMINATION**

8    BY MR. CRONE:

9    Q.   Mr. Merrill, you testified that on the weekend you

10   couldn't access maintenance funds.

11   A.   That's correct.

12   Q.   Why is that?

13   A.   Because their maintenance -- the maintenance accounts that

14   we have through C -- Pathway Leasing were not accessible to us

15   on the weekend because they only run a 9-to-5 operation over

16   there.

17   Q.   Could you turn back to Exhibit 52.  I hope it's still in

18   front of you there.  Page 92.

19   A.   Page 92, you said, sir?

20   Q.   Page 92, yes.  So it's February 2nd, 2016.  You and

21   Mr. Wiletsky just went over it a bit.

22   A.   Yes, I know.  I closed the book.  I'm sorry.

23   Q.   That's okay.

24             MR. WILETSKY:  John, what's the settlement date?

25             MR. CRONE:  It's February 2nd, 2016.  It should be

16-cv-02242-KLM              Merrill - Redirect                    I - 144

 1  page 92 --

 2              MR. WILETSKY:  No.

 3              MR. CRONE:  -- of Exhibit 52.

 4              MR. WILETSKY:  February 12th is 92.

 5              THE WITNESS:  February 12th.

 6              MR. CRONE:  Yeah, page 92.

 7              MR. WILETSKY:  February 12th?

 8              MR. CRONE:  Yes.

 9              MR. WILETSKY:  Okay.

10  BY MR. CRONE:

11  Q.  I'm sorry, Mr. Merrill.  Are you with us?

12  A.  Yes, sir.

13  Q.  Do you still have Exhibit 136 open?

14  A.  Page 46?

15  Q.  Yeah, page 46.

16  A.  Yes, sir.

17  Q.  Your calculations.  Can you look at the line item for

18  February 12th?

19  A.  The line item -- I'm sorry?

20  Q.  The row for February 12th, 2016.

21  A.  Okay.

22  Q.  On Exhibit 136.

23  A.  February 12th is $1,698.62.

24  Q.  How much did you get paid?  What's the driver

25  disbursement?

Julie H. Thomas, RMR, CRR                          (303)296-3056

1    A.  I got paid nothing.

2    Q.  And can you turn back to Exhibit 52 --

3    A.  Okay.

4    Q.  -- page 92.  How many miles did you drive that week?

5    A.  2,744 miles.

6    Q.  How many cities did you visit that week?

7    A.  How many cities?  One, two, three, four, five, six --

8    one -- four, uh -- eight cities.

9    Q.  And you took a couple of cash advances, and you testified

10   those were for some sort of maintenance item with tires or

11   something like that; is that correct?

12   A.  Yes, sir.

13   Q.  So at the end of that week you received zero dollars?

14   A.  Zero.

15   Q.  Thank you.  Give me just one second.

16           MR. CRONE:  Your Honor, Plaintiffs have nothing

17   further for Mr. Merrill.  Thank you.

18           THE COURT:  All right.  Thank you.

19           Thank you, Mr. Merrill.  You may step down.

20           THE WITNESS:  Yes, ma'am.  Thank you.

21           THE COURT:  And let's have Plaintiff call its next

22   witness, please.

23           MR. CRONE:  Your Honor, Plaintiffs call Becky Austin.

24           THE COURT:  Miss Austin, if you could come forward.

25           MR. MERRILL:  It may take a second, Your Honor.

1            THE COURT:  Sure.  Take your time.

2            THE WITNESS:  How are you, ma'am?

3            THE COURT:  I'm well.  Thank you.

4       (The witness was sworn.)

5            THE COURT:  All right.  Thank you.  Please be seated

6    when you can, and speak into the microphone.

7            MR. CRONE:  Your Honor, if the Court is ready.

8            THE COURT:  Yes, I'm ready when you are, Mr. Crone.

9       **BECKY AUSTIN, A PLAINTIFF HEREIN, DIRECT EXAMINATION**

10   BY MR. CRONE:

11   Q.  Miss Austin, good afternoon.

12   A.  Good afternoon.

13   Q.  Miss Austin, where are you from?

14   A.  Texas, Hemphill.

15   Q.  Hemphill?

16   A.  Hemphill, Texas.

17   Q.  What sort of big city is that near?

18   A.  It is not a big city at all.  It's -- no.

19   Q.  That I gather.  What's the nearest big city to Hemphill?

20   A.  90 miles, 80 to 90 miles away would be either Beaumont,

21   Texas, or Shreveport, Texas -- Shreveport, Louisiana.  I'm

22   sorry.

23   Q.  Shreveport, Louisiana?

24   A.  Right.

25   Q.  And, Miss Austin, are you currently employed?

16-cv-02242-KLM                 Austin - Direct                        I - 147

1    A.  Yes, sir.

2    Q.  And what do you do?

3    A.  I professionally drive a truck for CFI.

4    Q.  Okay.  Do you have a Pathway lease currently?

5    A.  Yes, sir.

6    Q.  And do you recall approximately when you entered into the

7    Pathway lease?

8    A.  Which one?

9    Q.  Good question.  The one that pertains to the truck you are

10   driving today.

11   A.  Sometime in September.  I'm not sure of the correct date,

12   but it's somewhere around the 15th through the 25th, I'm

13   pretty sure.

14   Q.  Okay.  And so because you asked "which one," I take it

15   there's a prior Pathway lease.

16   A.  Yes, sir.

17   Q.  Do you recall when you entered into the prior Pathway

18   lease?

19   A.  First part of October.  I'm not for sure correct date.

20   Q.  Do you know what year?

21   A.  2015.

22   Q.  And were you a company driver prior to signing the Pathway

23   lease, a company driver for CFI?

24   A.  Yes, sir.

25   Q.  How long were you a company driver for CFI?

Julie H. Thomas, RMR, CRR                                    (303)296-3056

1   A.  I started with, actually, Con-Way in 2010.

2   Q.  Okay.

3   A.  And so that was 2015.  Five years with Con-Way/XPO.

4   Q.  And how did you learn about the Pathway Leasing trucks?

5   A.  Through the onboard recorder, uh -- I'm sorry.  I call it

6   onboard recorder.  The Qualcomm, PeopleNet.  We got messages

7   about it to call a certain number in Joplin, and it was Susi

8   Killinger and -- I'm not for sure about Anita's last name.

9   And talked to her, and that's how I got ahold of Pathway.

10  Q.  So you were driving along the road somewhere, and a

11  message came through on this Qualcomm or PeopleNet device?

12  A.  Oh, yes, not just once.  Several times.  Maybe every other

13  month or so.

14  Q.  Okay.

15         THE COURT:  Could you clarify, Mr. Crone, for the

16  record, whether these are audible messages or they are written

17  messages.

18         MR. CRONE:  I'll ask the question so -- I understand

19  that.

20  BY MR. CRONE:

21  Q.  Are these like text messages on a screen --

22  A.  Yes, sir.

23  Q.  -- I think?

24  A.  All of our onboard recorders are all text.

25  Q.  Okay.

1          THE COURT:  Thank you.

2          MR. CRONE:  No problem.

3    BY MR. CRONE:

4    Q.  Do you recall about how many messages like that you

5    received before you responded to one?

6    A.  Almost a full five years' worth.

7    Q.  Okay.  And eventually you did respond to one.  What

8    happened after you responded?

9    A.  I spoke with Miss Killinger, and we spoke for a little

10   while, and then she gave me Pathway's phone number.

11   Q.  All right.  Then what did you do next?

12   A.  Me and her hung up the phone, and I went back to thinking

13   about it and spoke to an owner-operator that has several

14   trucks, that has nothing to do with this, just to get his take

15   on whether I was going to be -- if I could start my own

16   business and how to start my own business, and then also with

17   my landlord which is, uh, kind of like a -- I would speak with

18   him to kind of get am I going to be able to do this with the

19   monies that I have, you know, am I going to make it, just

20   getting ideas.

21   Q.  So you kicked the idea around with a couple people you

22   knew.

23   A.  Yes, sir.

24   Q.  Is that -- okay.  And then what happened after that?

25   A.  Uh, actually before I even went to Pathway, I had broke

16-cv-02242-KLM                     Austin - Direct                     I - 150

1   down in a company truck in Carlisle, Pennsylvania, and they

2   sent me to Kenworth to have my truck fixed, and I sat there

3   for three days.

4   Q.   And I don't mean to interrupt.  Just to be clear, we are

5   talking about CFI sent you?

6   A.   Right.

7   Q.   I'm sorry.  Go ahead.

8   A.   Yeah, but that's -- I came within little seconds of

9   buying -- purchasing a brand-new truck, and I figured since I

10  was as old as I am, it wouldn't be a good thing.  So I just

11  let it go for a little while.  Then I called Susi back and

12  asked her for Pathway's number, and that's how this came

13  about.

14  Q.   Okay.  And then you called Pathway, I take it.

15  A.   Yes, sir.

16  Q.   Who did you talk to at Pathway?

17  A.   With Matthew Harris.

18  Q.   Okay.  What did you-all talk about?

19  A.   Getting a truck, what it was going to cost me.  That was,

20  uh -- I was at home at the time, and any time I make phone

21  calls like that I have my landlord listen in with me so that

22  way he can touch me on the shoulder and say, no, don't do that

23  or, you know, 'cause I'm not -- anyway, that's how -- when I

24  called him that day, we spoke about me getting a truck, what

25  it was going to cost me to get the truck, and him checking my,

16-cv-02242-KLM                    Austin - Direct                    I - 151

1   um, uh, credit scores.

2   Q.  And what was it going to cost you to get the truck?

3   A.  $1500 --

4   Q.  Okay.

5   A.  -- deposit.

6   Q.  And then what happened next?

7   A.  We spoke about what kind of truck I wanted, and at that

8   point in time he did not have one.  And I'm going to say a

9   week to two weeks later he finally called back and said that

10  he had one.

11  Q.  And where was that truck?

12  A.  At Peterbilt in Joplin.

13  Q.  Did you then go to Joplin?

14  A.  Yes.

15  Q.  Okay.  And did you -- or I'll -- what happened once you

16  arrived in Joplin?

17  A.  I went to the hotel first off, 'cause it was going to be a

18  few days, and went over to Peterbilt.  They would not let me

19  drive the truck.  I got to check it out right there, but they

20  would not let me drive the truck.  Told me if I was going to

21  take the truck to the yard, I had to sign the acceptance form

22  that they have at Peterbilt.

23          MR. WILETSKY:  Object, Your Honor:  hearsay.

24          THE COURT:  Sustained, unless you can establish that

25  it's someone connected with the Defendant who told her that.

```
 1              THE WITNESS:  Her name is Amy.
 2              MR. CRONE:  And we're not going to be able to
 3    establish that.
 4    BY MR. CRONE:
 5    Q.  So let me -- let me ask you -- let me ask this a slightly
 6    different way.  Okay.  When you got to Joplin, you then went
 7    to this Peterbilt dealership to look at the truck; is that
 8    correct?
 9    A.  Yes, sir.
10    Q.  Were you able to test drive the truck before you
11    eventually leased the truck?
12    A.  No, sir.
13    Q.  Okay.  So after you looked at the truck at the dealership,
14    what did you then have to do?
15    A.  Sign the acceptance form at the Peterbilt saying that I
16    checked the truck out and that I drove it.
17    Q.  Who gave you the acceptance form?
18    A.  From Peterbilt it was a lady named Amy.  I do not know her
19    last name.  She is the, uh, the writer over there.  She's the
20    one that takes all the information on your truck and gives it
21    to the people that are going to work on it.
22    Q.  When did you sign the lease agreement?
23    A.  A week later.
24    Q.  And where did you sign that agreement?
25    A.  Up at Joplin.
```

1    Q.  I'm sorry.

2    A.  I'm sorry.  At CFI.

3    Q.  Okay.  And where at CFI?

4    A.  The hauling agreement, I signed it upstairs through

5    finance.  And then Matthew's lease, I signed it downstairs in

6    front of Susi Killinger.

7    Q.  Did this happen the same day?

8    A.  Uh, no.

9    Q.  How many days apart?

10   A.  Probably two days.

11   Q.  Who gave you the Pathway lease agreement?

12   A.  Susi Killinger.

13   Q.  Were you able to review that agreement?

14   A.  No, sir.

15   Q.  Why not?

16   A.  I was told that I couldn't leave the building with it.

17          MR. WILETSKY:  Objection, Your Honor:  hearsay.

18          MR. CRONE:  I'll ask it a slightly different way.

19   BY MR. CRONE:

20   Q.  After you were handed the lease agreement, what did you do

21   with the lease agreement?

22   A.  I was not handed the lease agreement.  It was laid out on

23   her desk, page after page, to where the signatures were just

24   there, and that's how I signed the lease and was told that I

25   could just read the lease as I'm moving in --

```
    16-cv-02242-KLM              Austin - Direct                    I - 154
```

 1              MR. WILETSKY:  Objection, Your Honor:  hearsay.

 2              MR. CRONE:  I'll -- I'll get to this a different way.

 3              THE COURT:  Sustained.

 4    BY MR. CRONE:

 5    Q.  Did you -- did you read the lease agreement before

 6    signing?

 7    A.  No, sir.

 8    Q.  Did you try to read it before signing it?

 9    A.  No, sir.

10    Q.  Why did you not try to read it before signing?

11    A.  I asked, and they told me -- again, I'll stop.

12              MR. WILETSKY:  Same objection, Your Honor.

13              MR. CRONE:  No, that's okay.  We're --

14    BY MR. CRONE:

15    Q.  Eventually you signed the lease agreement.

16    A.  Yes, sir.

17    Q.  Okay.  Then what happened?

18    A.  I went and started moving into the truck, got it numbered,

19    put the Qualcomm or PeopleNet onboard recorder in it, chains

20    on it, and proceeded to put gear in it.

21    Q.  Who put -- who installed the Qualcomm and these --

22    A.  CFI maintenance.

23    Q.  Did they also do any sort of inspection to the truck?

24    A.  Yes, sir.

25    Q.  Did they put their logos on the truck?

1    A.  Yes, sir.

2    Q.  After all that was done, what happened next?

3    A.  Actually, I ended up in the shop the same day.

4    Q.  And how did that happen?

5    A.  The truck started overheating and what have you, and so it

6    ended up in Freightliner that same day.

7    Q.  And were they able to repair the problem?

8    A.  We thought they did.

9    Q.  And I take it that that repair didn't work.

10   A.  No, sir, it did not.

11   Q.  And so --

12        MR. WILETSKY:  Your Honor, I'm sorry to interrupt.  I

13   just want to object to the relevance only because Miss Austin

14   does not have any state law claims.  She is an opt-in

15   plaintiff, and so testimony about the repairs and what

16   happened with this truck and that it was replaced with another

17   truck does not seem relevant to the Fair Labor Standard Act

18   claims at issue.

19        THE COURT:  Response?

20        MR. CRONE:  And, Your Honor, I will agree it's a

21   little circuitous, but this goes to joint employment.  This

22   goes to -- so what Miss Austin I think is about to testify to

23   is that she had to get into the second Pathway lease and again

24   she had to work through the same individuals and that sort of

25   thing.

1          THE COURT:  All right.  I'll allow it.  Overruled.

2          Go ahead.

3    BY MR. CRONE:

4    Q.  Let's just get there a little faster.  How about that?

5          So is this event what led to a second Pathway lease?

6    A.  Yes, sir.

7    Q.  Explain how that happened.

8    A.  After -- I think I ran maybe three trips in that truck.  I

9    was in the shop pretty much the whole time that I had it, and

10   the last -- when I turned the truck back in was in Salt Lake

11   City, Utah.  It was supposed to be sent over to Detroit over

12   there.  I do not know the address.  And it was supposed to all

13   be set up when I got there.  When I got there, the service

14   writer had no clue that I was going to be there.  So I pulled

15   it out in the parking lot, called a cab, turned the keys in,

16   and I left.

17   Q.  And then you eventually signed another Pathway lease.  So

18   then how did that happen?

19   A.  While I was sitting in Utah at the hotel, Mr. Matt

20   Harris called me bright and early Monday morning and was very

21   upset that I turned that truck in like I did.  I had already

22   had that truck a month and didn't make money.  I was spending

23   more money in hotels.  So he -- again, my landlord was there.

24   He come picked me up, and, uh, he heard everything that was

25   going on.  Matt demanded that I be back in, uh, Joplin at CFI

1   to pick up another truck that had over 600,000 miles on it,

2   and I told him, no, I was not taking a truck with that many

3   miles on it.

4   Q.  So then what did -- what did you do?

5   A.  You could hear him typing, because after he said that and

6   was demanding, I told him that I had -- I -- I said, let me

7   throw these three little words at you, Uniform Commercial

8   Code.  And when I said that, you could hear him typing, and he

9   come up with the Peterbilt that I have now.

10  Q.  And where did you have to go pick up this Peterbilt you

11  have now?

12  A.  At Peterbilt in Joplin.

13  Q.  So did you go through the same experience we just

14  described?

15  A.  Yes, sir.

16  Q.  Or, excuse me, that you just described.

17  A.  Yes, sir.

18  Q.  Okay.  And then at some point that truck was ready to

19  drive; correct?

20  A.  The day I went and checked it out at Peterbilt, I demanded

21  to drive it.  I took another driver with me so he could also

22  drive it, so that way I make sure there was nothing wrong with

23  the truck.  It had a shimmy.  I took it back.  I had the

24  service writer, which has a CDL, drive the truck to show her

25  what was going on with the front end.  And she tried to tell

1    me that it was, uh -- that's what Peterbilts do.  And I said,

2    no, I've been driving trucks too long, so just go back to the

3    shop, and we'll just leave the truck there.

4    Q.  And then what happened with the truck?

5    A.  I left.  She called me about an hour later saying that

6    they were going to have the front end fixed and brand-new

7    tires on it because the tires were bad.

8    Q.  Was the truck eventually put into a condition where you

9    could drive away and start being dispatched by CFI?

10   A.  Yes, sir.

11   Q.  When did that occur?

12   A.  I was there at least a week to week and a half.

13   Q.  Okay.  And at some point you drive down the road because

14   CFI dispatched you.

15   A.  Yes, sir.

16   Q.  Okay.  So you were a company driver for CFI for about,

17   what, five years, did you say?

18   A.  Yes, sir, five years.

19   Q.  So I want to -- I want to talk about what your job duties

20   were as a company driver.  So this is before everything we

21   just talked about, while you were a company driver for CFI.

22   What was your primary job duty?

23   A.  My primary job is to drive the truck, but it's also to

24   take care of every bit of freight that I haul and the

25   trailers, tires, uh, air, air hoses, air lines; underneath the

1    trailer; sweeping the trailer out; putting chains on if

2    needed, which I try not to do that; doing a pretrip, 72-point

3    pretrip.  That's lights, windows, wipers, brakes.

4    Q.  You can talk faster than I can write, so let's back up

5    here.  You drove the truck.  You took care of the freight.

6    You had to sweep the trailer.  Why did you have to sweep the

7    trailer?

8    A.  It's -- some of our customers if there is anything inside

9    that trailer, they will not load you.

10   Q.  Okay.

11   A.  So it doesn't matter actually where you're at; you have to

12   clean the trailer.

13   Q.  Okay.  And then you had to also do the pretrip inspection?

14   A.  Yes, sir.

15   Q.  What else did you have to do as a company driver?

16   A.  You have to check the oil.  You've got to check your

17   brakes.  You've got to keep your windshield wipers good.  Your

18   windows are clean.  Make sure you have all your permits; make

19   sure they're all in date.

20   Q.  Anything else?

21   A.  There's, uh -- you -- there's so much more.  I mean, I

22   could go on all day.

23   Q.  I believe you could.  A couple more -- few more things

24   come to mind, or no?

25   A.  Well, on the trailers you have got to make sure there's no

1   holes, that the cross-members underneath them are not cracked

2   or broken.  That right there in itself can kill any

3   four-wheeler or anybody driving that truck.  You have to

4   secure your load.  And when I say secure your load, I mean

5   getting up in the trailer, putting the straps in the trailer

6   for the load so it won't shift.  You have to do paperwork for

7   that load.  You have to seal that load.

8   Q.   What kind of paperwork are you talking about?

9   A.   It's -- when you get loaded, you have, uh, bills of laden.

10   Each one of these bills of laden has how many pieces, what it

11   is.  If it's HazMat, it tells you the numbers for HazMat.

12   You've got to know what those HazMat is.  You have to call

13   that in; that's part of your job.  You have to know what

14   placards go on there if it's HazMat.  You need to know how

15   many -- let's say it's barrels.  You've got to know how many

16   is on there.  You have to have your numbers right.  Your

17   placards got to be right because if your placards don't mix --

18   I mean match, that's a very expensive fine.

19   Q.   Thank you, Miss --

20   A.   Yeah.

21   Q.   Thank you, Miss.  I'll stop you there --

22   A.   Okay.

23   Q.   -- just because I do believe you could go on all day, but

24   we don't have all day.

25            So now let's take you back to the time where you

16-cv-02242-KLM                    Austin - Direct                         I - 161

1    drove out with a second truck, and you explained that whole

2    leasing process.  And I asked you at some point you were

3    dispatched by CFI, and now you are driving down the road as

4    a -- as a -- what did you call yourself, an owner-operator or

5    something else?

6    A.  No, I was still a company driver more or less.

7    Q.  What did CFI call you?

8    A.  They don't.  They -- I don't talk to anybody at CFI.  I

9    get my orders over the onboard recorder.

10   Q.  Okay.  You've got a Pathway lease at this time; correct?

11   A.  Yes, sir.

12   Q.  Okay.  I want to talk about your job duties now, now that

13   you have driven away, CFI has dispatched you, and you have a

14   Pathway lease.  Focus on that time period forward.  And we

15   have made a list already, so we are going to try to be a bit

16   efficient here.

17          After you drive away with your Pathway lease and CFI

18   is dispatching you, did you still have to drive the truck?

19   A.  Did I myself drive the truck?

20   Q.  Yes.

21   A.  Yes, sir.

22   Q.  I'm going to follow down the list on the screen there if

23   it helps.  Did you still have to take care of the freight?

24   A.  Yes, sir.

25   Q.  Did you still have to sweep the trailer?

Julie H. Thomas, RMR, CRR                                    (303)296-3056

1    A.  Yes, sir.

2    Q.  Did you still have to do a pretrip inspection?

3    A.  Yes, sir.

4    Q.  Did it still comprise 72 points?

5    A.  Yes, sir.

6    Q.  Did you still have to check the oil and the brakes?

7    A.  Yes, sir.

8    Q.  Did you still have to check the windshield wiper?

9    A.  Yes, sir.

10   Q.  Or the windshield and the wipers.  I'm sorry.  Was that --

11   A.  Yes, sir.

12   Q.  Do you still have to ensure you have the proper permits?

13   A.  Yes, sir.

14   Q.  Do you still have to make sure there were no holes in the

15   trailer?

16   A.  Yes, sir.

17   Q.  Do you still have to secure the load with straps?

18   A.  Yes, sir.

19   Q.  And did you still have to complete the same type of

20   paperwork?

21   A.  Yes, sir.

22   Q.  Were you doing the same job then as when you were a

23   company driver?

24   A.  Yes, sir.

25   Q.  Okay.  Miss Austin, you have got a variety of notebooks in

16-cv-02242-KLM                    Austin - Direct                    I - 163

1    front of you.  I'd like you to find the one that has

2    Exhibit 106 in it.

3    A.   One what?

4    Q.   106.  So Exhibit 106.

5    A.   Okay.  These say Frank Merrill on them.

6    Q.   I'm sorry.  What was that, Becky?

7    A.   I use Frank Merrill's?

8    Q.   Oh, Frank Merrill is the name of the case.

9    A.   Okay.

10   Q.   So there's a variety of different pieces of paper in

11   there.  They're not all Frank's.

12   A.   Okay.  And what am I looking for here?

13   Q.   You are looking for Exhibit No. 106.

14   A.   106.

15        Yes, sir.

16   Q.   Have you seen this document before?

17   A.   Yes, sir.

18   Q.   What is this document?

19   A.   This is -- because I was sick in, uh, the last part of --

20   August, September -- August, I had pneumonia so bad that I had

21   to be carried to the Indian clinic in an ambulance and --

22   because I couldn't breathe.  I felt like my heart was -- I

23   mean, I felt like my chest was fixing to explode.  And I was

24   there all night long.  And then this here is after he released

25   me to drive my truck to the house only --

1   Q.  By "he," you mean the doctor?

2   A.  My doctor.

3   Q.  Okay.

4   A.  Or the doctor.  Uh, this here is for Lenise.  I had spoke

5   with Lenise about --

6   Q.  Let me --

7   A.  -- not being able to go --

8   Q.  Let me pause.  Who is Lenise?

9   A.  Lenise Ruff with Pathway Leasing.

10  Q.  And I'm sorry.  So you sent this to Lenise for what

11  purpose?

12  A.  Because I was not able to go back to work at that point in

13  time because I still could not breathe.

14  Q.  And what did Lenise tell you?

15  A.  That she was -- would see how many more medical skips -- I

16  would have to let her know how many more medical skips that I

17  would need.

18          MR. CRONE:  Your Honor, at this time Plaintiffs would

19  move for the admission of Plaintiffs' Exhibit 106.  It's

20  two -- the entire e-mail string, which is two pages.

21          THE COURT:  Any objection to 106?

22          MR. WILETSKY:  No, Your Honor.

23          THE COURT:  106 is admitted.

24      (Plaintiffs' Exhibit 106 received.)

25  BY MR. CRONE:

1   Q.  You mentioned that Lenise mentioned a medical skip.  What

2   is that?

3   A.  Actually, I didn't even know we had them until she had

4   mentioned that.

5   Q.  And so --

6   A.  I would imagine it's the same thing as a maintenance skip

7   type thing.

8   Q.  What's a maintenance skip?

9   A.  Um, if you're down for maintenance, uh, it's a 62.50 a

10  week type thing.  And what it does, it just moves your weekly

11  payment out to the end of the lease, makes your lease longer.

12  Q.  So you are not paying a lease payment in the weeks that

13  you are taking off due to the illness?

14  A.  I don't understand.

15  Q.  Well, so let me just read.  If you look at the top of the

16  exhibit.  The second sentence, this is from Lenise to you, it

17  says, "Once you get back out with your first load, if you

18  don't mind giving me a call, we can look at how many medical

19  skips we need to add to get you back to current."

20       Does that mean you are not paying the lease payments

21  during the skips?

22  A.  Yes, sir.

23  Q.  Okay.  If you could turn down a couple of pages to

24  Exhibit 108.  Or a couple of tabs, I should say, to

25  Exhibit 108.

1   A.   Okay.

2   Q.   Have you seen this document before?

3   A.   Many times.

4   Q.   And what is this?

5   A.   This is a -- they want my odometer reading.

6   Q.   And who is "they"?

7   A.   Pathway.

8          MR. CRONE:  Your Honor, at this time Plaintiffs would

9   move for admission of Plaintiffs' Exhibit 108.

10         THE COURT:  Any objection to 108?

11         MR. WILETSKY:  No objection.

12         THE COURT:  108 is admitted.

13     (Plaintiffs' Exhibit 108 received.)

14  BY MR. CRONE:

15  Q.   And so here down at the bottom of that exhibit, Becky,

16  where it says, "Dear Becky," do you see where I'm at?

17  A.   Yes, sir.

18  Q.   It says, "It is that time again for an odometer reading!"

19  What is Pathway referring to here?

20  A.   They want the mileage off of my big truck.

21  Q.   And do you know what the purpose for that request is?

22  A.   It's for overmileage so they can charge us.

23  Q.   Can you explain that a bit more?

24  A.   At the company we are allowed 11,000 miles a month.

25  That's 33, uh -- in a three-month period that's 33,000 miles.

16-cv-02242-KLM                    Austin - Direct                    I - 167

1    His lease only allows us 30,000.

2    Q.  Okay.  So hold on.  When you said "at the company," you

3    are talking about CFI?

4    A.  CFI.

5    Q.  And if you -- so what do you mean allowed 33,000 miles in

6    a month?

7    A.  We can get more than 33,000 miles a month.  We -- we --

8    as -- each driver per month there's more or less a set goal

9    for that driver, 11,000 miles a month.  And then anything

10   after 11,000 we get a 3-cent-a-mile bonus for each mile driven

11   after 11,000.

12   Q.  So CFI pays you a bonus if you go over some amount of

13   miles in a month.

14   A.  Yes, sir.

15   Q.  Okay.  And here you just testified that Pathway charges

16   you some amount if you go over so many miles in a month.  Can

17   you explain that a bit more for me?

18   A.  I'm not quite for sure how his -- how this works with

19   Pathway.  All I know is each time these bonuses have came

20   around, it -- what I get on a bonus doesn't usually cover what

21   I'm charged for the overmileage at Pathway.

22   Q.  Okay.  And so is this e-mail exchange an example of this

23   mileage reporting that you would have to do every so often to

24   Pathway?

25   A.  Yes, sir, every three months.

Julie H. Thomas, RMR, CRR                              (303)296-3056

16-cv-02242-KLM                 Austin - Direct                    I - 168

1    Q.  Every three months?

2    A.  Yes, sir.

3    Q.  Okay.  Thank you.  Could you turn one tab over to

4    Exhibit 109.

5    A.  109?

6    Q.  Yes, please.

7            Have you seen this document before?

8    A.  Yes, sir, I have.

9    Q.  What is this document?

10   A.  This is the overmileage payment that I told her to take

11   out all in one check, and --

12           MR. CRONE:  Before you get into that, let me just ask

13   the Court if we could admit this exhibit, Plaintiffs' 109,

14   into evidence.

15           THE COURT:  Any objection to 109?

16           MR. WILETSKY:  No objection.

17           THE COURT:  109 is admitted.

18       (Plaintiffs' Exhibit 109 received.)

19   BY MR. CRONE:

20   Q.  Okay.  Miss Austin, please continue.  You were explaining

21   what this communication was about.

22   A.  I had spoke with -- well, not spoke with her, but I gave

23   her an e-mail, Lenise Ruff, about I had overmileage through

24   them on this Pathway.  And it was, uh -- I don't remember what

25   my check was that week, but I told her to take it out on this

16-cv-02242-KLM                    Austin - Direct                    I - 169

1    week here, which is the 13th of October.  I told her I wanted

2    it all taken out of one check.

3    Q.  And why is that?

4    A.  Because I don't like, uh -- I don't want them splitting it

5    up in between two or three checks.

6    Q.  Any -- excuse me.  Any particular reason why?

7    A.  It makes your next check and your next check shorter if

8    they do it that way.  I'm all about money.

9    Q.  I think we all are, to some degree.

10           So have you -- have you ever asked Pathway Leasing to

11   take additional money to cover the lease payments?

12   A.  Yes, sir.

13   Q.  And can you recall why you did that?

14   A.  It was either because I was going home or I got a good

15   check coming that week and my truck was in the shop.

16   Q.  So by "going home" meaning you weren't going to be driving

17   the following week?

18   A.  Yes, sir.

19   Q.  Okay.  And then, obviously, if your truck is in the shop,

20   you're not driving that -- when the truck is in the shop

21   either.

22   A.  Right, correct.

23   Q.  Yeah.  Any other reason why you would ask them to take an

24   additional lease payment?

25   A.  For that purpose right there is to -- it was either in the

1   shop or I am fixing to go home.

2   Q.  How did they actually get the lease payment?  Did you mail

3   them a check?  How did that work?

4   A.  No, sir.  CFI sends my paycheck straight to Pathway.  I

5   never see it.  All I see is the check stub.

6   Q.  Have you ever talked to Mr. Harris -- by that I mean

7   Defendant Matthew Harris.  Have you ever talked to Mr. Harris

8   on the phone?

9   A.  Yes.

10  Q.  Can you recall what about?

11  A.  Um, probably Frank Merrill was one of them, and a couple

12  of them was about the other truck.

13  Q.  And let's focus in on the Frank Merrill conversation.

14  What was that about?

15  A.  Me and Frank Merrill had got into it.  And, uh, he was

16  trying to get me to get into this case, and I told him no.

17  And then I called Matthew Harris, but that was only after I

18  had spoke with my DM, my driver manager, and she -- she had

19  spoke with somebody up there and told me to, so I did.  And

20  then I --

21          MR. WILETSKY:  Object, Your Honor, to that portion as

22  hearsay.

23          MR. CRONE:  That --

24          THE COURT:  Unless the driver manager is somebody who

25  worked for Defendant.

```
 1              MR. CRONE:  No.  And so --
 2              THE COURT:  Sustained.
 3              MR. CRONE:  Yeah.
 4   BY MR. CRONE:
 5   Q.  So let's leave out the part about talking to the driver
 6   manager.
 7   A.  Okay.
 8   Q.  So let's back up, and if you can -- you were talking about
 9   how you came to talk to Matt Harris on the phone about the
10   Frank -- this lawsuit.
11   A.  Yes, sir.
12   Q.  Can you pick it up there?
13   A.  I forgot where I was at.  I had told him what was going
14   on, and then I hung the phone up from that, and then months
15   later I got another phone call from him about this lawsuit.
16   Q.  Hold on.  Let's -- from Mr. Harris?
17   A.  Yes, sir.
18   Q.  Okay.  And I'm sorry, carry on.  Go ahead.  I'm sorry.
19   A.  That phone call was telling -- advising me that I could
20   not get into this lawsuit and that I was not allowed --
21              MR. WILETSKY:  Object, Your Honor, to the relevance
22   of this.  She does not have a retaliation claim.
23              MR. CRONE:  So this actually goes to joint
24   employment.  If you will give me just a second here, the
25   effect of the phone call, um, is not FLSA retaliation.
```

1   It's -- I don't want to testify for her, but it's -- it's

2   going to be an effect on her working conditions.

3            THE COURT:  All right.  I will allow it with that

4   condition, but if that testimony doesn't materialize, I will

5   strike it.

6            MR. CRONE:  That's fine.

7            THE COURT:  Overruled.

8            Go ahead.

9   A.  At that point in time I was told that I couldn't speak

10  with anybody and that if I did join this lawsuit, I would be

11  taking off for depositions, and I would be taking off for

12  court.  Immediately after that, my miles had dropped from

13  anywhere from 3600 to 4,000 miles a week down to 16- to maybe

14  2,000 a week.

15  BY MR. CRONE:

16  Q.  So you are talking about the miles that CFI dispatched

17  you.

18  A.  Yes.

19  Q.  Okay.  At some point did the miles that CFI dispatched you

20  go back up?

21  A.  Yes, sir.

22  Q.  When was that?

23  A.  The day after the deposition.

24  Q.  And that's the deposition that Matt Harris took of you

25  here in Denver?

1   A.  Yes, sir.

2          MR. WILETSKY:  I have the same objection.  I would

3   move to strike all that testimony, Your Honor.  It's

4   completely irrelevant.

5          THE COURT:  Mr. Crone.

6          MR. CRONE:  Well, I was about to ask why she -- why

7   that occurred, and I think the answer to that question would

8   determine the relevance.

9          THE COURT:  I just want to make sure I understand.

10  You are going to ask the witness to tell you why her miles

11  dropped off after the conversation with Mr. Harris about her

12  needing to participate in depositions and why they were raised

13  again after her deposition?  I assume you could lay a

14  foundation for why she would know.

15         MR. CRONE:  Well, if she knows, yeah.  Why, if she

16  knows.

17         THE COURT:  All right.  I'll overrule it for now, but

18  I will welcome the objection again if it doesn't materialize.

19         Go ahead.

20  BY MR. CRONE:

21  Q.  Do you know why that occurred?

22  A.  No, sir.

23  Q.  Okay.

24         MR. WILETSKY:  Then, Your Honor, I would move to

25  strike that entire colloquy.

Julie H. Thomas, RMR, CRR                              (303)296-3056

1           THE COURT:  Mr. Crone, I'm having a hard time seeing

2     the connection between this testimony and the joint employer

3     notion.

4           MR. CRONE:  I was -- I was trying to -- trying to tie

5     a loop, um, between Mr. Harris's communication with CFI on

6     miles, how many miles the drivers are given, and I clearly

7     failed at tying that loop.  That was to be the connection.

8           THE COURT:  All right.  Thank you.  The motion is

9     granted.  Testimony is stricken.

10          MR. CRONE:  Your Honor, would the Court be against --

11    it's about 2:38.  Would the Court be -- so we are about to get

12    into the damages testimony, which will be the end.  Would the

13    Court be against taking our quick midafternoon break now?

14          THE COURT:  Any objection to that, Mr. Wiletsky?

15          MR. WILETSKY:  No, Your Honor.

16          THE COURT:  All right.  That's fine.  We will take

17    our afternoon break now.  We will reconvene at, let's say, 5

18    minutes to 3:00 p.m., and we are in recess.  Thank you.

19          MR. CRONE:  Thank you.

20       (Proceedings recessed 2:39 p.m. to 2:56 p.m.)

21          THE COURT:  Thank you.  Please be seated.

22          All right.  Miss Austin, you can take the stand

23    again.

24          THE WITNESS:  Thank you, ma'am.

25          THE COURT:  You're welcome.

```
 1              And whenever you are ready, Mr. Crone.

 2              MR. CRONE:  Thank you, Your Honor.

 3   BY MR. CRONE:

 4   Q.  Miss Austin, what I'd like to turn to next is what an

 5   average workday for Becky Austin looks like after you took the

 6   Pathway truck, the second Pathway truck, and you started

 7   driving down the road being dispatched by CFI.  Okay?

 8              What is -- in an average workday, what is the first

 9   thing that you do?

10   A.  It's a PTI after you -- after you hook to your trailer,

11   you want to do a pretrip, which that's what a PTI is, tractor

12   and trailer.  Make sure that the load is secured, there's no

13   cracks or broken undercarriage, the brake lines are --

14   Q.  Miss Austin, is this all part of the inspection?  Is

15   that --

16   A.  Yes, sir.

17   Q.  Okay.  Thank you.  Please go on.

18   A.  Make sure your brake lines, your electrical lines, brake

19   canisters, anything that has to do with safety on that needs

20   to be done.  It can take anywhere from 8 minutes, it depends

21   on how good the trailer is, to 20, 25 minutes.

22   Q.  What do you do next?

23   A.  You hook up, you do your paperwork, put it in on the

24   onboard recorder.  You put -- you answer -- they have a --

25   it's a -- how do -- I don't really -- you return their deal.
```

1    What it is, it's -- it wants to know what town you are in,

2    what city you are in, how many containers are on the truck,

3    um, the weight, whether it's bonded, whether it's not bonded,

4    whether it's HazMat, whether it's not HazMat.

5    Q.  Are you doing this through the device we have been talking

6    about, sometimes referred to as a Qualcomm, or I called it a

7    text message looking device?  Is that how you are doing this?

8    A.  Yes, sir.  Everything is recorded, onboard recorder.

9    Q.  So for number 3 can I just write "Qualcomm report"?

10   A.  Yes, sir.

11   Q.  What do you do next?

12   A.  From that point on you make sure that the load is locked

13   up.  You have to have a padlock on it.  Then you --

14   Q.  Make sure load is locked.

15   A.  You send in your form saying that you're loaded or whether

16   you're -- whether you're loading or unloading, you still send

17   in that form.  It's basically the same thing just reversed.

18   Q.  So depending on whether being loaded or unloaded.

19   A.  Yes, sir.

20   Q.  Okay.

21   A.  And then if you are loaded, you wait for your dispatch so

22   you know what time you are supposed to be there at your

23   customer to offload.  Say you're loaded, so you're going to go

24   offload.  How many miles it is.  Uh, your appointment times,

25   of course.  And it shows -- the very first one is actually

1    showing you what time you are dispatched.  And then the line

2    below it usually shows what time you are supposed to be at

3    your customer for delivery.

4    Q.  Then what do you do next?

5    A.  Once you -- you do -- of course, that's an ongoing thing

6    every day.  Say it's a 2,000-mile trip.  You are going to do

7    everything except for filling out the paperwork.  You do your

8    pretrip.  Every day I do a posttrip to make sure nothing got

9    cracked or broken, wash my windows, what have you.  And then

10   you get up and start all over until you get to that 2,000

11   miles --

12   Q.  Miss Austin, if I can, I'm just slightly confused.  I feel

13   like I missed a part that should have said you drove the truck

14   somewhere.  Can you back up?

15   A.  I did say I drove the truck.

16   Q.  Oh, did you?  I just didn't hear you.  We are on the list.

17   After you wait for dispatch, then you drive the truck.

18   A.  Yes, sir.

19   Q.  I apologize.  I'm sorry.  And then -- okay.  You drive the

20   truck, and then what happens?

21   A.  Uh, you drive it -- me, on my -- on a 2,000-mile trip, I

22   drive over 600 miles a day.  600 miles a day is close to

23   10 hours and 45 minutes.  That's at the speed of anywhere from

24   65 to 68 miles an hour.

25   Q.  Then when you get to where you're going to end your day is

1   what I'm getting at.  So after all of the driving, what --

2   A.  Would be a truck stop, and then you do your posttrip --

3   Q.  Posttrip.

4   A.  -- to make sure you have nothing cracked, broken, or doors

5   open or locks haven't come off.

6   Q.  Is this type of inspection similar to the pretrip, you are

7   just doing it now after you drove all day?

8   A.  Yes, sir.

9   Q.  And then what do you do?

10  A.  Go off duty or go to -- go to bed.

11  Q.  So then your day ends?

12  A.  Usually my day ends after I get stopped.  Usually about

13  16 hours after my day starts.

14  Q.  You anticipated my next question, which was how -- how

15  long does it take to get through an average Becky Austin

16  workday?

17  A.  14, and then after -- a lot of it after I get stopped

18  after 14, like cleaning my windows and -- I do my posttrips

19  off duty.  I make sure everything is correct in my truck while

20  I'm off duty after the 14 hours.

21  Q.  So it takes 14 hours to complete this, and then a bit more

22  because that's when you do your posttrip.  Is that what you

23  are saying?

24  A.  Yes, sir.

25  Q.  So if I say 14-plus, how long does the posttrip take?

16-cv-02242-KLM                 Austin - Direct                    I - 179

1    A.   It depends on what you are looking for.  You know, if

2    you -- if you're -- let's say you are going across I-20 in

3    Shreveport.  It's so rough out there, it can break parts,

4    rattle them off.  It can break your brake drums.  It can cause

5    air lines to come off.

6    Q.   But on average?

7    A.   15 minutes.

8    Q.   15 minutes.  Okay.  Plus 15 minutes.

9         Do you see that list we just made on the screen in

10   front of you, Miss Austin?

11   A.   Yes, sir.

12   Q.   Does that look accurate?

13   A.   Yes, sir.

14   Q.   Thank you.  Now I'd like you to turn to Exhibit 136.

15   A.   Okay.

16   Q.   And once you're at Exhibit 136, if you could turn to --

17   you're lucky because you're near the front -- could turn to

18   page 4, please.

19   A.   I'm there.

20   Q.   Okay.  Have you seen this document before?

21   A.   Yes, sir.

22   Q.   What is this document?

23   A.   This is Carrier Payment, which is the company that I work

24   for, first column --

25   Q.   Hold on.  Before you get into the details --

16-cv-02242-KLM                Austin - Direct                I - 180

```
 1   A.  It's a damages claim.

 2   Q.  Okay.  Thank you.  These are the minimum wages damages you

 3   are claiming in this lawsuit?

 4   A.  Yes, sir.

 5   Q.  Okay.  Now, how -- have you reviewed this document before?

 6   A.  Explain.

 7   Q.  Have you -- have you gone through this document line by

 8   line and looked at these entries?

 9   A.  Yes, sir.

10   Q.  Okay.  Have you done that more than once?

11   A.  Yes, sir.

12   Q.  Are you confident that the calculations inside of this

13   chart are accurate?

14   A.  Yes, sir.

15   Q.  Did my office assist you in preparing this document?

16   A.  You did prepare this document for me.

17   Q.  Did you adopt this document as your own after reviewing

18   it?

19   A.  Yes, sir.

20         MR. CRONE:  Your Honor, Plaintiffs would move to

21   admit Plaintiffs' Exhibit 134 [sic], page 4.

22         THE COURT:  Any objection to 134 -- 136, page 4?

23         MR. WILETSKY:  The same objection I made with respect

24   to Mr. Merrill's calculations, Your Honor.

25         THE COURT:  Thank you.  Overruled.  Page 4 of
```

1   Exhibit 136 is admitted.

2        (Plaintiffs' Exhibit 136:4 received.)

3   BY MR. CRONE:

4   Q.  So, Miss Austin, I'm going to ask you some questions now

5   about what these columns mean.  Okay.  So the second column

6   says Carrier Payment.  What's a carrier payment?

7   A.  That's the company I worked for, CFI.

8   Q.  And is this the money they paid you?

9   A.  This is the money they paid for the miles and the work

10  that I've done, yes.

11  Q.  And where did that money go?  Did it go to you?

12  A.  No, sir.

13  Q.  Do you know where it went?

14  A.  Yes, sir.  It went straight to Pathway Leasing.

15  Q.  Okay.  The next column says Driver Disbursement.  What is

16  that column, or what's a driver disbursement?

17  A.  The driver disbursement, what they've done over here on

18  the carrier payment, CFI, they've sent it straight to Pathway,

19  and this is what they disbursed me from the money that's in

20  the first column after payment.

21  Q.  Thank you.  The next column says Unpaid Minimum Wage (at

22  70 Hours).  How did you calculate those numbers?

23  A.  That's at the minimum wage, 7.25 an hour, doubles the

24  payment here, and then it ends up doubled over here on the

25  last column.

1   Q.  Do you know why it ends up doubled in the last column?

2   A.  I'm not quite for sure, no.  It's when -- what they do

3   here is what they sent me -- I'm going to take the first line,

4   which is 189.31, uh, from them, and then we calculated it at

5   7.25 an hour, I do believe.  And then at the statutory damage

6   is doubled, and it ends up at 636, should have been minimum

7   wage.

8   Q.  Okay.  Now, I want to take a look at -- give me just one

9   second.

10          Okay.  So, Miss Austin, I want to take a look at just

11  one of these weeks here so we can get a better idea of how

12  this works.  Okay.  So if you could turn to Exhibit 112, which

13  ought to be in a different notebook in front of you.

14  A.  Yes, sir.

15  Q.  Okay.  And once you are there, could you turn to page 111

16  of that exhibit.

17  A.  111?

18  Q.  Yes, please.

19  A.  I'm not finding a 111.

20  Q.  So in the bottom right corner you should see some little

21  Bates numbers, and if you flip a few pages into the exhibit,

22  you ought to see one that says page 111.

23          MR. CRONE:  Thank you, Miss Galera.

24          COURTROOM DEPUTY:  You're welcome.

25  BY MR. CRONE:

16-cv-02242-KLM                Austin - Direct                    I - 183

1    Q.  Miss Austin, have you seen this document before?

2    A.  Yes, sir.  It's my paycheck stub.

3    Q.  I was just going to ask you what it is.  And this is --

4    A.  It is my paycheck --

5    Q.  -- from CFI?

6    A.  Yes, sir.

7          MR. CRONE:  Okay.  Your Honor, Plaintiffs would move

8    to admit Exhibit 112.  And while we're at it, we might as well

9    move to admit the entire exhibit, not just this page.

10         THE COURT:  Any objection to Exhibit 112?

11         MR. WILETSKY:  No objection to 112, Your Honor.  I

12   just would note, I think we -- I will work with opposing

13   counsel.  We have a duplicative exhibit, and it may be more

14   complete, and so at some point we may just want to compare

15   those two --

16         MR. CRONE:  And potentially replace.

17         MR. WILETSKY:  -- and potentially replace some pages.

18   But no objection to the exhibit.

19         THE COURT:  Thank you.  Exhibit 112 is admitted.

20      (Plaintiffs' Exhibit 112 received.)

21         MR. CRONE:  Thank you.

22   BY MR. CRONE:

23   Q.  Okay.  What does this document show you, Miss Austin?

24   A.  Uh, shows me four trips -- or three trips.  I'm sorry.  It

25   shows me my load numbers.  It shows how much insurance they

Julie H. Thomas, RMR, CRR                        (303)296-3056

1    took out.  It shows all my fuel transactions, how many miles

2    or how much per mile.

3    Q.  And so it shows you what cities you drove to.

4    A.  Yes, sir.

5    Q.  Okay.  And then it shows you how many miles it took you to

6    drive to all those various cities; right?

7    A.  Right.

8    Q.  And then ultimately it shows you -- and it flows over onto

9    the next page.  It ultimately shows you how much money was

10   sent to Pathway Leasing; is that correct?

11   A.  Yes, sir.

12   Q.  Under Net Pay.

13        So how many miles did you drive in this week?

14   A.  2680.

15   Q.  Okay.  And this is for the settlement dated March 4th,

16   2016; correct?

17   A.  Yes, sir.

18   Q.  Okay.  Can you turn back to Exhibit No. 136?  That's your

19   damages calculation chart.

20   A.  I'm there.  Yes, sir.

21   Q.  Are you there?  Okay.  And so this week that we just

22   looked at, March 4th, the Con-Way settlement statement, this

23   is one of the lines on your damages calculation; correct?

24   A.  Yes, sir.

25   Q.  It's the second line?  Okay.  You can set that aside.

```
 1          And I don't think I'm going to have any more
 2     questions, but I'd like to check just very quickly with my
 3     table.
 4          MR. CRONE:  Your Honor, Plaintiffs have no more
 5     questions at this time for Miss Austin.
 6          THE COURT:  All right.  Thank you.
 7          MR. CRONE:  Thank you.
 8          THE COURT:  Cross-examination.
 9                       CROSS-EXAMINATION
10     BY MR. WILETSKY:
11     Q.  Good afternoon, Miss Austin.
12     A.  Good afternoon.
13     Q.  When you were a company driver for CFI or XPO, you didn't
14     have to pay for any truck repairs; correct?
15     A.  No, sir, I didn't, besides windshield wipers and wiper
16     fluid and what have you.
17     Q.  Right.  But if the truck broke down, that wasn't your
18     responsibility; correct?
19     A.  No, sir.  My responsibility was to call somebody and let
20     them know.
21     Q.  And you weren't responsible for paying for regular
22     maintenance to the truck as a company driver; correct?
23     A.  No, sir, I was not.
24     Q.  Okay.  And no matter how long you drove as a company
25     driver, you weren't earning anything toward ownership in that
```

1    truck; is that right?

2    A.   Correct.

3    Q.   What's forced dispatch?

4    A.   Forced dispatch --

5    Q.   Yeah.

6    A.   -- is, um, when you get a dispatch, you're not allowed to

7    turn it down.

8    Q.   And you were subject to forced dispatch as a company

9    driver; is that right?

10   A.   Yes, sir.

11   Q.   Before you signed the lease with Pathway, you talked to

12   other drivers, I believe you said, about becoming an

13   owner-operator.   Is that right?

14   A.   Yes, sir.

15   Q.   Did some due diligence?

16   A.   Excuse me?

17   Q.   Did some research by talking to other people?

18   A.   Mainly to one person that's been here -- out here for

19   years and years.

20   Q.   And the person you spoke with didn't have anything to do

21   with Pathway; is that right?

22   A.   Yes, sir, that's correct.

23   Q.   And I believe you testified, um, about the fact that

24   before you leased from Pathway, you came real close to

25   actually buying a truck on your own.   Is that right?

1   A.  Correct.

2   Q.  And if I remember correctly from your deposition, correct

3   me if I'm wrong, you were, uh -- you were about to put $80,000

4   down on -- was it a Kenworth?  Is that right?

5   A.  ICON 900, yes.

6   Q.  You had the keys in your hand?

7   A.  Yes, sir.

8   Q.  You were that close; is that right?

9   A.  Yes, sir.

10  Q.  But you didn't do it; correct?

11  A.  Correct.

12  Q.  You were concerned about that big of an investment;

13  correct?

14  A.  Correct.

15  Q.  You had a fairly high credit score at that point; is that

16  right?

17  A.  Yes, sir.

18  Q.  Including when you leased from Pathway?

19  A.  Correct.

20  Q.  And before leasing from Pathway, you looked into other

21  leasing options; correct?

22  A.  Correct.

23  Q.  You called Lone Mountain?

24  A.  Yes, sir.

25  Q.  Arrow?

1   A.  Uh, no.

2   Q.  You don't recall calling Arrow?

3   A.  I did not call Arrow, I don't believe.

4   Q.  Okay.  What about Bush?

5   A.  I didn't even know about Bush until after the Pathway

6   truck.

7   Q.  Do you remember being deposed in this case?

8   A.  Yes, sir.

9   Q.  And you swore to testify under oath in your deposition;

10  correct?

11  A.  As far as I know, yes.

12  Q.  Okay.  And do you remember being asked during your

13  deposition about calling other potential equipment lessors and

14  considering them?

15  A.  Yes, sir, but I don't remember Bush.

16  Q.  Okay.  I tell you what.  Why don't we pull up your

17  deposition and see if we can help --

18  A.  Okay.

19  Q.  -- refresh your recollection.

20       MR. WILETSKY:  If we could pull up page 12, which it

21  should be -- contain line 43 -- or page 43, lines 14 to 25.

22       MR. CRONE:  Your Honor, while Defendants are pulling

23  this up, Plaintiffs object to the relevance.

24       THE WITNESS:  What am I looking for?

25       THE COURT:  Just one moment.

```
 1           Mr. Wiletsky, any response to the objection?
 2           MR. WILETSKY:  The testimony has been that they had
 3   no option other than to get into Pathway and -- get into a
 4   Pathway truck and they were somehow, um -- you know, they
 5   didn't use the word "coerced," but something like that, they
 6   didn't have these options, and I believe this testimony is
 7   necessary to rebut that evidence.
 8           THE COURT:  All right.  The objection is overruled.
 9           And please remind the witness of what she's looking
10   for.
11           MR. WILETSKY:  I'm sorry?
12           THE COURT:  Remind the witness of what she should be
13   looking for.
14           MR. WILETSKY:  Oh, yes.  Thank you.
15           I tell you what.  We'll pull it up on the screen.
16   Page 43, lines 14 to 25.
17   BY MR. WILETSKY:
18   Q.  Do you see that on the screen, Miss Austin?
19   A.  Yes, sir.
20   Q.  Okay.  And it shows that you checked out Lone Mountain
21   first online.  Do you see that?
22   A.  Yes, sir.
23   Q.  And --
24   A.  I also see where I did say Bush.
25   Q.  Okay.  And you said Arrow; correct?
```

16-cv-02242-KLM                 Austin - Cross                       I - 190

 1   A.   Right.

 2   Q.   Does that help refresh your recollection --

 3   A.   Yes.

 4   Q.   -- that you considered those?

 5   A.   Yes, sir.

 6   Q.   Thank you.

 7            And when you talked to Mr. Harris about leasing a

 8   truck, you told him you were looking for a very specific

 9   truck; is that right?

10   A.   Correct.

11   Q.   And you, I believe, were looking for a Freightliner with

12   an APU on it, DD15, 13 speed.  Is that right?

13   A.   Correct.

14   Q.   So had you done some research beforehand to know what kind

15   of a truck you wanted?

16   A.   Correct.

17   Q.   And when you signed the equipment lease agreement, you

18   understood that that was a contract; is that right?

19   A.   Yes, sir.

20   Q.   And you never received an employee manual or handbook from

21   Pathway; is that right?

22   A.   No, sir.

23   Q.   Pathway didn't give you any training on how to drive a

24   truck; correct?

25   A.   Uh, no, sir.

16-cv-02242-KLM                 Austin - Cross                    I - 191

1   Q.  You didn't complete an IRS form -- the Form W-4 for
2   Pathway regarding the number of deductions or withholdings?
3   A.  No, sir.
4   Q.  You didn't submit an employment application to Pathway; is
5   that right?
6   A.  No, sir.
7   Q.  And Pathway did not ever establish a work schedule for
8   you?
9   A.  No, sir.
10  Q.  And Pathway didn't set any rules or hasn't set any rules
11  for you regarding the amount you can or can't drive; correct?
12  A.  Say that again, sir?
13  Q.  Pathway didn't set any rules for you regarding the amount
14  that you can or cannot drive?
15  A.  No, sir.
16  Q.  And you didn't report your daily, weekly, or monthly drive
17  times to Pathway; correct?
18  A.  As far as I know, I didn't.
19  Q.  Pathway never established any routes for you to drive;
20  correct?
21  A.  As far as I know.
22  Q.  And Pathway never established for you any rules or
23  requirements regarding how to load or secure cargo; correct?
24  A.  Correct.
25  Q.  And Pathway never set any rules or requirements for you

Julie H. Thomas, RMR, CRR                              (303)296-3056

1  regarding taking meal breaks; is that right?

2  A.  No, sir.

3  Q.  Rest breaks?

4  A.  No, sir.

5  Q.  Sleeping breaks?

6  A.  No, sir.

7  Q.  Pathway has never set any rules or requirements for you

8  regarding picking up and completing deliveries on time;

9  correct?

10 A.  Correct.

11 Q.  And Pathway does not set any rules or requirements for you

12 regarding accepting or declining loads from CFI or XPO;

13 correct?

14 A.  Correct.

15 Q.  And you have turned down loads after becoming an

16 owner-operator; is that right?

17 A.  Not many.

18 Q.  But you have done it; correct?

19 A.  One or two.

20 Q.  Pathway didn't dispatch you as an owner-operator; correct?

21 A.  I'm not for sure who dispatches me.  It comes on the

22 onboard recorder.

23 Q.  But you don't have any information suggesting that Pathway

24 is involved in that; correct?

25 A.  I have no information whether CFI or Pathway is involved

1    in that.

2    Q.   And with respect to your escrow maintenance account

3    maintained with Pathway, Pathway has never denied you the use

4    of funds in your escrow maintenance account; is that right?

5    A.   No, sir.

6    Q.   And you don't need Pathway's permission before making

7    repairs to the truck; correct?

8    A.   You're supposed to have, yes.

9    Q.   Okay.  Again, do you remember testifying about this in

10   your deposition, Miss Austin?

11   A.   Yes, I do.

12   Q.   Do you remember being asked this question in your

13   deposition?

14   A.   Yes, sir.

15   Q.   Okay.

16          MR. WILETSKY:  Why don't we pull up -- it's on pages

17   8 and 9 of the deposition transcript.  I'm looking for pages

18   28 and 29.  28:25 to 29:14.

19          THE WITNESS:  Can we make this a little bigger so I

20   can --

21          MR. WILETSKY:  We're trying.

22          THE WITNESS:  Okay.

23          MR. WILETSKY:  Can we pull up -- where is the

24   beginning of 28?  So it starts at 28:25.  Okay.

25   BY MR. WILETSKY:

16-cv-02242-KLM                    Austin - Cross                         I - 194

1    Q.  So, again, starting on line 25 you were asked:  "And after

2    you exhausted the funds in your maintenance escrow account,

3    did you continue, when necessary, to take the truck in for

4    repairs?"

5    A.  "Yes, sir."

6    Q.  And you answered:  "Yes, sir."

7           And then I asked:  "And, again, you weren't asking

8    for Pathway's permission before doing that; is that right?"

9    A.  Correct.

10   Q.  And your answer was:  "That's right."

11          Correct?

12   A.  That's right.  Correct.

13   Q.  So you weren't seeking Pathway's permission for repairs to

14   the truck; correct?

15   A.  Correct.

16   Q.  And you didn't talk to anyone at Pathway before you signed

17   the contract hauling agreement with XPO; correct?

18   A.  Excuse me?

19   Q.  You didn't have any conversations with anyone at Pathway

20   about the contract hauling agreement you signed with XPO;

21   correct?

22   A.  No, sir.

23   Q.  And you have your own company as an owner-operator,

24   Cherokee Nomad Express; correct?

25   A.  I had this company before I became a Pathway lessee.

Julie H. Thomas, RMR, CRR                              (303)296-3056

16-cv-02242-KLM                 Austin - Cross                    I - 195

1   Q.  And you still have that company; correct?

2   A.  Yes, sir.

3   Q.  And when you filed your taxes, you did so as an

4   independent contractor since you've been leasing a truck

5   through Pathway Leasing; correct?

6   A.  I'm not for sure how my CPA does it.  I have no clue about

7   taxes.  That's why I have a CPA.

8   Q.  Well, you don't think you're filing taxes as an employee;

9   is that right?

10  A.  Again, I'm not for sure how my CPA does that.

11          MR. WILETSKY:  Why don't we pull up the deposition.

12  It's page 25 of the document, and if we could look at pages

13  93:13 to 94:4.

14  BY MR. WILETSKY:

15  Q.  Okay.  So if you look at the top of 94, I asked:  "And

16  have you always, since you've been doing this as an

17  owner-operator, filed your taxes as an LLC?"

18          And your answer was:  "Yes, sir."

19  A.  "Yes, sir."

20  Q.  Is that right?

21  A.  Correct.

22  Q.  That testimony was accurate?

23  A.  Yes.

24  Q.  And Pathway's logo is not on the truck you lease from

25  Pathway; correct?

Julie H. Thomas, RMR, CRR                            (303)296-3056

1    A.   Correct.

2    Q.   And Pathway hasn't established for you any rules or

3    requirements for how to track your time as an owner-operator;

4    correct?

5    A.   Uh, correct.

6    Q.   And your lease payment didn't go up or down depending on

7    how much you drove.  It just stayed the same every week.

8    Correct?

9    A.   Correct.

10   Q.   Now, when you became an owner-operator, you were able to

11   put restrictions -- some restrictions on where you would

12   drive; is that right?

13   A.   Correct.

14   Q.   And you told XPO, for example, that you wouldn't drive in

15   the northeast; right?

16   A.   Correct.  I still won't go to the northeast.

17   Q.   And you wouldn't drive in Chicago; correct?

18   A.   Correct.  I still won't go.

19   Q.   And at one time you told them that you wouldn't haul

20   anything more than 42,000 pounds; correct?

21   A.   Correct, for the simple fact that when they weighed my

22   truck in from Peterbilt to the yard and they did the

23   inspection on it, we always have to weigh them, and when you

24   weigh them you give them the scale ticket from the yard.  So

25   that truck was only showing it weighed 18,500 pounds when, in

1   fact, it weighs 21,500 pounds.

2   Q.   And you could not put these types of restrictions on where

3   you would drive or the weight you would haul as a company

4   driver; correct?

5   A.   Correct.

6   Q.   And with respect to some of those restrictions, you put

7   them in place because you felt you couldn't make money driving

8   in the northeast or Chicago; is that right?

9   A.   Correct, still to this day.

10  Q.   Why is that?

11  A.   There's no freight.  And what freight is up there, I'm not

12  running 50 miles to drop another load when it takes way more

13  fuel -- it costs you more fuel to do something like that than

14  it does to run a 2,000-mile load.  And, in fact, even a

15  company driver running 50-mile loads costs the company fuel

16  like that.

17  Q.   Okay.  I want to direct your attention back to

18  Exhibit 136, page 4.  And we can pull that up on the screen,

19  too, if it's easier.

20          You testified about these calculations or a form of

21  these calculations at your deposition; is that right?

22  A.   Yes, sir.

23  Q.   And at that point you had seen these calculations for the

24  first time the morning of your deposition; correct?

25  A.   Correct.

16-cv-02242-KLM                Austin - Cross                      I - 198

1    Q.   Who came up with the 70-hour figure?

2    A.   That's what we work every week, and that's what we

3    calculated the hours at.

4    Q.   Okay.  So who came up with the 70-hour figure for this

5    exhibit with these damage calculations?

6    A.   Uh, John Crone's office.

7    Q.   And the 70 hours is the maximum allotted under the DOT

8    regulations; correct?

9    A.   Correct.

10   Q.   And you didn't actually do the calculations yourself;

11   correct?

12   A.   Correct.

13   Q.   If you could take a look at your settlement statements,

14   which -- trying to remember.  Oh, here they are.  Sorry.  It's

15   Exhibit 112.  And if you could go to -- and we'll put it up on

16   the screen as well if that's easier -- the settlement

17   statement for December 30, 2016.  It has the Bates number 187

18   at the bottom right.

19         Do you see it?

20   A.   Um --

21   Q.   On the screen?

22   A.   I see it on the screen, but I don't see a number of what

23   you are talking about.

24   Q.   Okay.

25         MR. WILETSKY:  So are we at -- hold on.  We're still

1    trying to pull up the right one.  We are looking for

2    December 30, 2016.  There we go.  So if we go one more page.

3    Okay.  And so if you could blow that up, make it easier for

4    Miss Austin to see, and for me as well.  Thank you.

5    BY MR. WILETSKY:

6    Q.  Okay.  Miss Austin, so this shows for 12/30/16 your

7    year-to-date gross on the truck you were leasing from Pathway

8    that you were earning for your services for CFI was just over

9    $112,000; is that right?

10   A.  Correct.

11   Q.  And from time to time, Miss Austin, you took time off from

12   driving; is that right?

13   A.  As everybody does.

14   Q.  Sure.  And I believe you testified previously at your

15   deposition, but again, tell me if I'm not remembering this

16   right, that every year around Christmas or New Year's you

17   would take time off.  Is that right?

18   A.  Absolutely.

19   Q.  And then sometimes you would take time off when your truck

20   was in the shop; is that right?

21   A.  While my truck is in the shop I don't consider it time

22   off.  I consider it I'm having to wait on my truck.  It's more

23   or less work because you got to make sure everything is done

24   on that truck and made done correctly.

25   Q.  Okay.  But you weren't physically making the repairs

1    yourself when the truck was in the shop; correct?

2    A.  No, sir.  I'm not a mechanic.

3    Q.  Okay.  So if a truck was down for a matter of days, let's

4    say, you weren't actually there physically working on that

5    truck for days; right?

6    A.  No, sir.

7    Q.  You weren't able to drive; correct?

8    A.  Not drive my truck, no.

9    Q.  Right.  And you weren't always with your truck when it was

10   in the shop; correct?

11   A.  No.  I was in a hotel.

12   Q.  And sometimes if your truck was in the shop near your

13   home, for example, in Shreveport you might be at home; is that

14   right?

15   A.  Correct.

16   Q.  Okay.  So let me go back for a second to Exhibit 136,

17   page 4.  In that exhibit there's one week where it looks like

18   you're showing that you worked 35 hours for that week.  Do you

19   see that?

20   A.  Correct.

21   Q.  And how is it that you -- well, let me strike that.  Are

22   you the one that came up with the 35-hour figure for that

23   week?

24   A.  No, sir.  That's, uh -- counsel did that.  Because I went

25   back through these, that week of 9/23/2016 I had just got over

16-cv-02242-KLM                    Austin - Cross                    I - 201

1    pneumonia, and I do believe I ran either four -- three or four

2    loads, and that's how they come up with that.  And that's, uh,

3    the hours that I worked that week.

4    Q.  Okay.  And that's a figure that your counsel came up with;

5    correct?

6    A.  Yes, sir.

7    Q.  And with respect to -- let's just say the week of

8    December 4th, 2015.  Do you see that week?  It's the very

9    first one.

10   A.  Yes, sir.

11          MR. WILETSKY:  Can we blow that up just a little bit

12   so it's a little easier for her to read on the screen?  Thank

13   you.

14          THE WITNESS:  Much better.

15   BY MR. WILETSKY:

16   Q.  Did you come up with the 70 hours for that week?

17   A.  Yes, sir.

18   Q.  And how did you calculate that for that week?

19   A.  A thousand -- 1,126 mile -- uh, the carrier payment, that

20   is I know at least 2500 miles.

21   Q.  Okay.  So if you drove 2500 miles at least, you believe

22   that was a 70-hour week?

23   A.  Yes.

24   Q.  Okay.  So for the carrier payment, um, let's say three,

25   four lines down for March 25th, 2016, that's $324.32.  Do you

Julie H. Thomas, RMR, CRR                              (303)296-3056

16-cv-02242-KLM                    Austin - Cross                        I - 202

1    see that?

2    A.   Which one are we looking at?

3    Q.   March 25th, 2016.

4    A.   March 25th my truck was in the shop with a blown engine.

5    Q.   Okay.  And was it in the shop on March 25th?

6    A.   Yes, sir, it was.  That was the last, uh, paycheck I got

7    from CFI before it blew up.

8    Q.   Okay.  What about was it in the shop on the 24th?

9    A.   Yes.

10   Q.   What about the 23rd?

11   A.   It was in the shop from 3/5 until 4/5 or 4/7 with a blown,

12   uh -- high rail fuel pressure pump blew up in it.

13   Q.   So approximately a month?

14   A.   Yes, sir.

15   Q.   Where was it in the shop?

16   A.   Shreveport, Bossier City.

17   Q.   How far is Shreveport from your home?

18   A.   Oh, about 80 to 90 miles.

19   Q.   So when your truck was in the shop for that period of

20   time, is it fair to say that you weren't sitting in a hotel

21   room, you were at home, other than maybe driving back and

22   forth to Shreveport?

23   A.   The first five days I was in a hotel.

24   Q.   Okay.

25   A.   Until I figured out that we weren't going to be able to

1  get it completely repaired, because at that point in time they

2  were having a -- what they call a monsoon in Louisiana, and

3  everything was literally flooded out a foot to foot and a half

4  where the workers couldn't even get in to the vehicles.  They

5  couldn't even get into their shop.

6  Q.  So after the first five days you just went home?

7  A.  Yes, sir.

8  Q.  And during that entire month period you weren't driving.

9  A.  No, sir.  I was waiting on my truck, spending money trying

10 to get it fixed.

11 Q.  And how did you come up -- well, strike that.

12      Do you believe that you were working 70 hours for

13 each of those weeks that the truck was in the shop during that

14 period?

15 A.  I would say I was because I was having to wait on my

16 truck, and I was spending money that I had already made that I

17 wasn't making.

18 Q.  Okay.  And how did you calculate the 70 hours for those

19 weeks while the truck was in the shop?

20 A.  I don't understand.

21 Q.  Well, you are claiming that you worked 70 hours a week

22 while the truck was in the shop; correct?

23 A.  Right.

24 Q.  How are you coming up with that 70-hour figure?

25 A.  By my paychecks and the deals that I worked.  And if you

1    look at this, it shows three weeks there that's not together.

2    What happened to the last week of March and the first week of

3    April?

4    Q.  I didn't put this together.  You would have to tell me.

5    A.  I know.  That's --

6    Q.  Do you know what happened?

7    A.  No, I don't.

8    Q.  Okay.  And so, again, can you tell me how you came up with

9    70 hours per week while your truck was in the shop and you

10   weren't driving?

11   A.  Well, again, these weeks aren't on there.  These are --

12   these weeks that are on here, yes, I worked 70 hours.  This

13   one here was because I was sick.

14   Q.  Okay.  So tell me, again, what period of time was your

15   truck in the shop?

16   A.  I do believe it was 3/5 of '16 through -- 3/5 or 3/7 of

17   '16 through 4 -- 4/5 or 4/7.

18   Q.  Okay.  So from 3/5 to 4/7 of '16 you weren't driving;

19   correct?

20   A.  Correct.

21   Q.  So for the week at issue that is listed on this Exhibit

22   136 at page 4, March 25th, 2016 -- do you see that?

23   A.  Yes, sir.

24   Q.  Okay.  You weren't driving during that time; correct?

25   A.  That was my last paycheck before where I got put in the

16-cv-02242-KLM                Austin - Cross                    I - 205

1   shop.  That's what I drove before I went to the shop.

2   Q.  Right, but I'm just asking you weren't driving -- you

3   weren't driving during that week --

4   A.  No, sir, I was not.

5   Q.  -- preceding 3/25; correct?

6   A.  No, sir.

7   Q.  Okay.  And your truck had been in the shop by that point

8   for at least a couple of weeks; correct?

9   A.  I do believe so, yes.

10  Q.  Okay.  So for those two weeks, do you believe that you

11  worked 70 hours each week?

12  A.  I believe I did, waiting on my truck.

13  Q.  Okay.  So --

14  A.  That's part of the job, making sure that that truck is

15  getting done.  You have to stay on the phone with these

16  people.

17  Q.  So how do you come up with the 70 hours for each of those

18  weeks?

19  A.  And I know I'm fixing to be asked.  Calling, making sure,

20  talking to these people, talking to Pathway, getting Pathway

21  to do their job so I can get my truck back.

22  Q.  Did you track any of that time?  Did you write it down?

23  A.  No, sir.

24  Q.  Pathway never told you how fast or slow to drive; is that

25  right?

1   A.  No, sir.

2   Q.  Pathway never told you when to put chains on the truck; is

3   that right?

4   A.  I don't chain at all.  No, sir.

5   Q.  Do you believe that Mr. Merrill ever sabotaged your truck?

6   A.  At one time I did, yes.

7   Q.  And why did you believe that?

8   A.  Because there was, uh -- me and him were in the truck, and

9   there was fuses moved, and it ended up in, uh, um, Peterbilt

10  in Joplin for four days after I had it towed.

11  Q.  When you say "fuses moved," those fuses were moved by

12  Mr. Merrill; correct?

13  A.  I think so, yes.

14  Q.  Well, you were sitting right there; right?

15  A.  Yes, sir.

16  Q.  And you saw him move the fuses; correct?

17  A.  Well, I did not see him move the fuses, no.

18  Q.  But you believe that he intentionally sabotaged your

19  truck; is that right?

20  A.  I believe he moved the fuses out of my truck.

21  Q.  And you believe he did that because he wanted a load that

22  had been assigned to you; is that right?

23  A.  That's what I was told.

24  Q.  And that's what you believed; is that right?

25  A.  At that time, yes.

1           MR. WILETSKY:  One -- one second, Your Honor.

2           Nothing further, Your Honor.

3           THE COURT:  Thank you.

4           MR. WILETSKY:  Thank you.

5           THE COURT:  Any redirect, Mr. Crone?

6           MR. CRONE:  Just a bit, Your Honor.  Thank you.

7                        **REDIRECT EXAMINATION**

8    BY MR. CRONE:

9    Q.  Miss Austin, let's start -- let's start where Mr. Wiletsky

10   left off --

11   A.  Okay.

12   Q.  -- and let's move backwards.

13          You and Mr. Merrill didn't get along too well back

14   then, did you?

15   A.  No, sir, we did not.

16   Q.  And why is that?

17   A.  Well, we -- we have had cross words, you know, over this

18   lawsuit.  Didn't want to join it; kept telling him I didn't

19   want to join it.  And at that point in time he did have some

20   fuses in his hand.  They could have been put back in the

21   same -- in different spots than what they were supposed to

22   have been.

23   Q.  And so you thought, back then, Mr. Merrill might have

24   messed around with your fuses?

25   A.  Yes, sir.

1    Q.   Okay.  What's your relationship like with Mr. Merrill now?

2    A.   We're mutual.  There's -- we're fine.

3    Q.   Okay.  Miss Austin, if you could look at Exhibit 136.

4    A.   Which one?

5    Q.   136, page 4, so those are your damages calculations.

6    A.   You said 136?

7    Q.   Exhibit 136 and page 4.

8    A.   Yes, sir.

9    Q.   Do you recall Mr. Wiletsky asking you a variety of

10   questions about calculating your work time when you were down

11   for maintenance?

12   A.   Yes, sir.

13   Q.   The question I have for you is:  When you're down for

14   maintenance, do you consider that to be work time?

15   A.   Yes, I do.

16   Q.   If you're down for maintenance, you can't go drive for

17   some other carrier, for example, Interstate or Cargill.

18   A.   No, sir, I cannot.

19   Q.   So you are waiting until you can drive again for CFI and

20   Pathway?

21   A.   Yes, sir.

22   Q.   Can you take a look at the entry -- it's about midway

23   down.  September 23rd, 2016.  There's a little star by the

24   number there, and then if you look below, it says, "These

25   values were calculated for a 35 Hour workweek during this

1    period."

2    A.  Yes, sir.

3    Q.  Do you remember how you got to that 35-hour number?

4    A.  That was because I only ran three, uh -- I'm not sure

5    about the miles, but it was, uh, three trips, and it was

6    toward the end of the week when I come back out from having

7    pneumonia so bad.

8    Q.  So you thought you worked about a half a week?

9    A.  Yes, sir.

10   Q.  Can you look at your settlement statements.  Yours are

11   Exhibit 112.

12   A.  First page or --

13   Q.  Let's look at, um -- actually, I'm looking for the one --

14          MR. CRONE:  Mark, would you mind?  I was looking for

15   the one that was December 30th, 2016, and I think this is the

16   exhibit, Mr. Wiletsky, that you had mentioned we don't have

17   the same complete exhibit.

18          THE COURT:  Page 186?

19          MR. WILETSKY:  186 and 187.

20          MR. CRONE:  Is it 186?  Thank you.

21   BY MR. CRONE:

22   Q.  So let's go to page 186.  And actually page 187 once

23   you're that far, because I want to direct you to the same line

24   item that Mr. Wiletsky directed you to.  It says tractor

25   year-to-date gross $112,873.86.  Do you see that?

16-cv-02242-KLM                Austin - Redirect                I - 210

1   A.   Yes, sir.

2   Q.   And so is the amount -- so is it your understanding that

3   that's the amount the truck grossed for 2016?

4   A.   That's what the truck grossed.   That's not what I grossed.

5   Q.   Is the number that the truck grossed different from the

6   number that Becky Austin netted?

7   A.   Yes.

8   Q.   So let me direct your attention back to Exhibit 136.   And

9   this is your damages calculation.   I want to pick -- I want to

10  pick a random date in 2016.   Let's take a look at

11  December 2nd, 2016.   So you're near the end of the year 2016.

12  Do you see that?   Do you see that, that row?

13  A.   December the 2nd?

14  Q.   Yeah, December the 2nd, 2016.

15  A.   There's not a December 2nd -- yeah, there is.   I'm sorry.

16  Q.   That's fine.

17  A.   I'm sorry.

18  Q.   That's okay.   What was your driver disbursement for the

19  week of December 2nd, 2016?

20  A.   $1,221.80.

21  Q.   I'm sorry.   The net to you, the Driver Disbursement

22  column.

23  A.   Oh, that's what the driver disbursement was on 12/2.   You

24  mean carrier payment?

25  Q.   What did you get?   How much went to your bank account?

1    A.  How much went into my bank account?

2    Q.  Yes.

3    A.  $284.30.

4    Q.  How many hours did you work that week?

5    A.  I'm going to say a good 70.

6    Q.  Okay.  Keeping your attention focused on this chart, the

7    damage calculation, so Exhibit 136, page 4, Becky Austin

8    Minimum Wage Damages Calculation, you testified that my office

9    put together the, uh, the 70 hours figure.

10   A.  Yes, sir.

11   Q.  Okay.  Does the 70 hours figure represent the Becky Austin

12   average day chart that we looked at or that we created earlier

13   today?

14            MR. WILETSKY:  Objection, Your Honor:  leading.

15            THE COURT:  Overruled.

16            You may answer it yes or no.

17   BY MR. CRONE:

18   Q.  If you need me to put the chart back up, I can put the

19   chart back up.

20   A.  I'm sitting here looking at -- no.  That is my 70 -- that

21   is a 70-hour workweek for me.  That's an every day deal.

22   Q.  What I'm asking is the 70 hours in this chart, that

23   represents hours you worked?

24   A.  Yes.

25   Q.  Okay.  Now, my office put pen to paper and created this

1   chart; right?

2   A.  Correct.

3   Q.  And then you reviewed the chart; correct?

4   A.  Correct.

5   Q.  And it's accurate?

6   A.  Correct.

7          MR. WILETSKY:  Objection, Your Honor:  leading.

8   BY MR. CRONE:

9   Q.  And you adopted the chart?

10         THE COURT:  Wait a minute.  The objection is

11  sustained.  We have crossed over the line to truly leading at

12  this point.

13  BY MR. CRONE:

14  Q.  I'm sorry, Miss Austin.  I got a bit excited.  Let me calm

15  down and back it up just a tad.

16         My office then actually created the chart, actually

17  typed this chart out.  Is that -- is that your understanding?

18  A.  Correct.

19  Q.  And then you -- did you then review the chart?

20  A.  Yes, I went back through it and check stubs and hotel

21  receipts and what have you, yes.

22  Q.  And you are satisfied with the chart -- excuse me.

23         You are satisfied with the chart's accuracy?

24  A.  Yes, sir.

25  Q.  Okay.  Thank you.

1        Mr. Wiletsky asked you a question about weight

2   restrictions on the trailer, and then you started to testify

3   about weights being different, the numbers being different.

4   And I didn't get to hear the rest of what you were trying to

5   say.  Can you explain that?

6   A.  Yes, sir.  It wasn't actually on the trailer, but it was

7   when the trailer is hooked up to the truck.  When I first

8   get -- when you first get the Pathway truck, you drive it from

9   Peterbilt over to CFI there in Joplin.  You go through the

10  inspection bay.  They go completely through the truck, uh,

11  making sure the tire is -- tires are right, uh, everything is

12  right on it, correct.  And then they put their inspection

13  sticker on it.  You drive it out of that building around to

14  where we've got two scales in the yard there.  They're side by

15  side, and they have readouts over here to your right.  So you

16  put your drives on it, I mean, your steers on it, which is

17  your very front tires.  You write that down.  That's, uh --

18  let's say it's 11,500 on that.  And then you pull the rest of

19  the truck, all four or eight tires in the back, and you pull

20  that up on that scale, and you see what that weighs.  And you

21  add them two together, and that's what that truck weighs.  But

22  when there is no chains, no gear, no fuel, no DEF on that

23  truck, that truck is going to weigh up to anywhere 2500 pounds

24  less than what it would normally weigh once you get your

25  icebox put in, your microwave put in it, your clothes put it

1   in it.  If you carry a dog, like I do, your dog and all that

2   stuff.  That adds all that weight.  Plus you put your fuel in

3   it and you put your DEF in it, and that's where your

4   2500 pounds comes out.  Then it says you have to carry -- if I

5   remember my lease correctly, you have to carry forty-five

6   five.  Well, with my truck the way it weighs, I cannot carry

7   forty-five five.  I can carry forty-five two, and I have no

8   problem carrying that, but I can't go over that.

9   Q.  And that's to account for that difference in the dog and

10  the refrigerator and et cetera?

11  A.  Yes, sir.

12  Q.  Do you file your income taxes every year?

13  A.  My CPA does.

14  Q.  Do you have any idea how income taxes work?

15  A.  No, sir, I do not.  I'm not real good with math.

16  Q.  Mr. Wiletsky asked you a question about repairs, and then

17  he showed you a bit of your deposition transcript.  Do you

18  recall that?

19  A.  Yes, sir.

20  Q.  In the deposition transcript it said you can go pull your

21  truck into a shop and get it repaired wherever you want;

22  correct?

23  A.  That is what I said.

24  Q.  How do you get the money to make the repair?

25  A.  Because my, uh, maintenance account through Pathway is

1   depleted because of all the repairs beforehand, I don't ask

2   anymore.  I take my truck to a shop that is half the price of

3   Peterbilt's or Kenworth's or Freightliner's, and I get the job

4   done now, that morning, that day, and I'm out.  And if I can't

5   get it done that day, they put it back together for me so I

6   can sleep in it that night so I don't have to pay for a hotel.

7   Q.  You say you don't ask anymore.  When you used to ask, who

8   did you ask?

9   A.  I had to call Jim and Bill at Pathway Leasing.

10  Q.  Do you know what Jim and Bill's positions are at Pathway,

11  by chance?

12  A.  They are, from what I was under the understanding, um,

13  maintenance.  You'd call up there and tell them -- I'm not

14  sure what their title is.  You would call up there and tell

15  them exactly what -- or try to tell them what was going on

16  with your truck, and at that point in time they would tell

17  you, well, don't worry about it, or take it to the shop, or

18  what have you.

19  Q.  We're nearing the end here.  Mr. Wiletsky asked you about

20  turning down loads, and I believe you said you did that once

21  or twice.

22  A.  Yes, sir.

23  Q.  Do you recall why you did that?

24  A.  It was probably going to the northeast or to Chicago.

25  Q.  And are these -- I believe you testified these are the

1    loads where you can't make money.

2    A.  Yes, sir.

3    Q.  Mr. Wiletsky at the beginning asked you a string of

4    questions about what Pathway didn't tell you to do.  So if I

5    remember correctly, Pathway didn't tell you to drive -- they

6    didn't dispatch you, and they didn't tell you to go to a

7    certain city.  They didn't tell you where to take breaks.  Do

8    you remember all of those questions?

9    A.  Yes, sir.

10   Q.  Who did tell you to do all of those types of things?

11   A.  Again, I have no clue where that comes from besides that

12   little box, onboard recorder.

13   Q.  The little box?

14   A.  There's no names.  There's no -- it doesn't say.  It just

15   says trips and destinations, times, and basically there's your

16   information.

17   Q.  And that little box is, um -- that's Con-Way's box; right?

18   I think you testified they put that in the truck.

19   A.  Yes, sir.  CFI puts it in there for $2,000.

20   Q.  Okay.  I think we're done.  Give me just one second, if

21   you will.

22        MR. CRONE:  Your Honor, Plaintiffs have no further

23   questions for Miss Austin.

24        THE COURT:  Thank you.

25        Thank you, Miss Austin.  You may step down.

```
 1              THE WITNESS:  Thank you.
 2              THE COURT:  Is Plaintiff ready to call its next
 3   witness?
 4              MR. CRONE:  So, Your Honor, what Plaintiffs were
 5   hoping to do -- so we had planned with the Defendants and we
 6   had hoped that we would get through these two witnesses today,
 7   which we now have.  And Plaintiffs will -- I was hoping, and I
 8   thought it was a little bit of a pipe dream, but it turns out
 9   it's not, to play one of the live deposition clips.  So what
10   I'd like to do is just meet for a second here, figure out
11   which one fits with the time we have, and play that.
12              THE COURT:  That would be fine.  You will confirm
13   with Mr. Wiletsky about what you are going to show before you
14   do that.
15              MR. CRONE:  Yeah.
16              THE COURT:  Thank you.
17              Mr. Wiletsky?
18              MR. WILETSKY:  I guess the only question is -- well,
19   we will look at it and see if we can resolve our objections.
20   If we have any objections, I would just ask for an opportunity
21   to raise those before we show it, but my hunch is --
22              THE COURT:  Yeah, what I'd like you to do is I'd like
23   you to work it out so the playing of the deposition can be
24   stopped for the making of objections orally so it doesn't
25   continue to play while I'm trying to rule on an objection.  So
```

1    if you can work that out in advance, it would be helpful.

2              MR. CRONE:  That's easy enough.

3              THE COURT:  Thank you.  Go ahead.

4        (Counsel consult.)

5              MR. CRONE:  Okay.  Your Honor, here's what we have

6    figured out.  We have found a -- I want to get this -- okay.

7    We have found a deposition cut that ought to cover just the

8    amount of time we have left.  There are two objections, I

9    believe, that Mr. Wiletsky will lodge.  He will just let me

10   know to pause it, and then we can go from there.

11             THE COURT:  Thank you.  And the name of the witness,

12   please.

13             MR. CRONE:  This is Melinda Creed.

14             THE COURT:  Thank you.

15             MR. CRONE:  So, Your Honor, we had -- when we tested

16   this, we had the audio issue, but Miss Galera knows exactly --

17             COURTROOM DEPUTY:  Do you need help?

18             MR. CRONE:  Yeah, because I think what happened was

19   the same --

20             Your Honor, my apologies.  I thought we had sorted

21   this out.

22        **(VIDEO TESTIMONY OF MELINDA CREED, Plaintiffs'**

23        **Witness, presented to The Court.)**

24             THE COURT:  Mr. Crone, could I interrupt you for one

25   moment, if you could stop it.

16-cv-02242-KLM                    Creed - Depo                        I - 219

1        (Video paused.)

2              MR. CRONE:  You can.

3              THE COURT:  I think it will be important for you to

4    play the part of the deposition where she tells me what her

5    title is and who she works for.  You may have skipped ahead a

6    little bit.  I don't think I caught either of that

7    information, and for purposes of making a record it's

8    important.

9              MR. CRONE:  I thought we had that right at the

10   beginning, and if we did not --

11             THE COURT:  She said something about managing fleets

12   or managing individuals, but it was not clear for whom.  For

13   example, does she work for Pathway, or does she work for

14   somebody else?  And exactly what her title was was skipped.

15             MR. CRONE:  Correct.

16             MR. WILETSKY:  To the extent --

17             THE COURT:  Maybe you can stipulate to that.

18             MR. WILETSKY:  That's what I was just going to say.

19             MR. CRONE:  I think we can stipulate that she works

20   for CFI.

21             MR. WILETSKY:  She does.  She works for CFI.  I don't

22   remember what her specific title was, but to the extent that's

23   not in this clip, my suggestion would be, just for time, that

24   we can submit that through stipulation after the fact.

25             THE COURT:  That's fine.  Half the battle is figuring

Julie H. Thomas, RMR, CRR                          (303)296-3056

```
 1   out who she works for, so that's important.  Thank you.

 2           MR. CRONE:  Thank you.

 3           THE COURT:  Go ahead.

 4       (Video played.)

 5       (Video paused.)

 6           MR. WILETSKY:  That's one of the objections, Your

 7   Honor, to calling for speculation as to what Mr. Harris may or

 8   may not be curious about.

 9           MR. CRONE:  And so, Your Honor, the question was

10   phrased in terms of is Mr. Harris curious about this.  I think

11   the -- excuse me.  It's probably imprecisely worded.  The

12   question in the context, as you have just heard, is what is

13   Mr. Harris telling you about turnover.  That's really what I

14   was asking with that question.

15           THE COURT:  All right.  I'll allow it.  Overruled.

16       (Video played.)

17       (Video paused.)

18           MR. CRONE:  Your Honor, I want to pause here just

19   briefly because we are going to ask to enter the e-mail she

20   was looking at, but I just want to let it play, and we will

21   pull up the exhibit for you.

22           THE COURT:  All right.  Thank you.

23       (Video played.)

24           MR. WILETSKY:  Can you pause this?  Sorry.

25       (Video paused.)
```

1        MR. WILETSKY:  So we had an objection to this line of

2   questioning about drivers in California.  It has absolutely no

3   relevance whatsoever to the claims in this case.  It's

4   questions about California-specific issues and, I think,

5   potentially other litigation in California.  Just absolutely

6   no relevance and it's, in my view, overly prejudicial.

7        THE COURT:  Mr. Crone?

8        MR. CRONE:  It's prejudicial, no doubt, but not

9   overly.  This is -- the questions here are asking about XPO

10  Logistics lawsuits in California that have to do with

11  misclassified drivers and her knowledge.  They are the same

12  company.  So one of the issues in this case is did these

13  Defendants act willfully.  If they had prior knowledge of

14  misclassification and these issues and entered into this

15  independent contractor relationship, that would be evidence of

16  willfulness.

17       THE COURT:  Thank you.  I will allow it.  Objection

18  overruled.

19     (Video played.)

20     (Video stopped.)

21       MR. CRONE:  Okay.  Thank you, Your Honor.  And so the

22  e-mail that was referenced in the deposition cut is

23  Plaintiffs' Exhibit No. 114, and at this time Plaintiffs would

24  seek to admit that e-mail into evidence.

25       MR. WILETSKY:  Your Honor, I don't have it in front

1   of me.  I'm not sure if you do yet either.  I will tell you

2   that I think I know what the e-mail is.  It's Mr. Crone's

3   e-mail, and we would object to it on the grounds that it's

4   hearsay.  Regardless of what the witness may have testified

5   to, the document itself is still hearsay.  It's an e-mail

6   written by Mr. Crone.

7           And we would further object to the relevance of this

8   because there's been no foundation or evidence established as

9   to the relevance of the actual document.  This obviously

10  pertains to Mr. Jurcak, but the problem is there's been no

11  evidence not only with Pathway having any involvement, but, in

12  fact, he bought out from Pathway.  He had no relationship with

13  Pathway at this time.

14          MR. CRONE:  So, Your Honor, if I may, the Defendants

15  raised a similar argument to this in their summary judgment

16  briefing.  The Court had already noted that when Miss Creed

17  reviewed this e-mail, she adopted this e-mail, the events

18  described in this e-mail, said it was accurate.  The Court

19  accepted it for the purposes of deciding the summary judgment

20  briefs.  And Mr. Jurcak is the only Plaintiff with a viable

21  retaliation claim.  So this -- the events described in the

22  e-mail are directly relevant to his retaliation claim.

23          Now, he is going to testify out of order, there's no

24  question about that, because we have sort of cooperated I

25  think to work witnesses around and that sort of thing to make

1    sure that we have time to get this done in seven days.  So I

2    understand that point, but as to admissibility, it's simply a

3    document that Miss Creed reviewed in that deposition and said,

4    yes, this e-mail is accurate, apart from the legal

5    conclusions.

6         THE COURT:  Well, this e-mail refers to, for example,

7    statements of Mr. Jurcak.  "Larry Jurcak inquired about

8    driving for CFI."  That's hearsay.

9         MR. CRONE:  Oh, he's a party.

10        THE COURT:  But it's not offered as an admission

11   against a party opponent, which is the only time that it would

12   be not hearsay for purposes of the rule.  Further, it's not a

13   business record.  And, further, Miss Creed testified that the

14   events that are set forth here are essentially correct, so I'm

15   not sure why you think you need the e-mail in evidence.

16        MR. CRONE:  Um, because -- I mean, so why we need --

17   why we are requesting to have the e-mail in evidence is that

18   it certainly doesn't hurt to have more evidence of the

19   retaliation, but the Court's point is well taken.  The

20   deposition is in evidence, and Mr. Jurcak will also testify.

21        THE COURT:  Yeah.  The objection is sustained.  114

22   is refused.

23        MR. CRONE:  Thank you, Your Honor.  And with that, I

24   believe we are out of time for the day.

25        THE COURT:  All right.  Well, let's do --

```
 1            MR. WILETSKY:  Your Honor -- I'm sorry, Your Honor.

 2    I just wanted -- one housekeeping matter.

 3            THE COURT:  Yes.

 4            MR. WILETSKY:  I had asked Mr. Crone to play some of

 5    the counterdesignations.  I don't know if he did or not.  It

 6    doesn't matter to me.  We are happy to just submit it after

 7    the fact.  I don't believe Mr. Crone has an objection to that.

 8            MR. CRONE:  We have no objections to their

 9    counterdesignations.

10            THE COURT:  Of the testimony of Miss Creed?

11            MR. WILETSKY:  Yeah, counterdesignations for

12    Miss Creed, correct.

13            THE COURT:  And you intend to submit those in writing

14    and not play that for the Court?

15            MR. WILETSKY:  That's correct, Your Honor.  We

16    actually, I think, already submitted it with our designations,

17    but we can resubmit it separately during the trial if that

18    would be easier to keep it straight.

19            THE COURT:  All right.  Well, I'm not in the habit of

20    accepting written deposition testimony as an exhibit at trial.

21    I'd much prefer to hear the testimony live.  So we can either

22    play it now if it's easy to locate on the transcript that

23    Mr. Crone was working from, or you can offer it in your case

24    in chief, whichever you would prefer.

25            MR. WILETSKY:  Yeah, I didn't know that we were going
```

1    to be playing those portions, so I'm not prepared to play that

2    right now.

3              THE COURT:  All right.

4              MR. CRONE:  I think I can help.  Do we have the

5    full -- so we have the full video.  If you don't mind sort of

6    figuring out the time and whatever to play it so we can just

7    get it done now, we are happy to --

8              THE COURT:  Are you able to do that now or not?

9              MR. WILETSKY:  If we can line up the video with the

10   page numbers, we only have -- I think we only have two

11   counterdesignations.

12             THE COURT:  We have sufficient time.  Generally I

13   like to go through 5:00 p.m.  I especially like to go through

14   5:00 p.m. in a case where counsel are pressing me for more

15   time.

16             MR. WILETSKY:  Absolutely, Your Honor.  And, Your

17   Honor, if --

18             MR. CRONE:  I'm sorry.

19             MR. WILETSKY:  If we don't have it, I'm fine with

20   starting with their next witness and then picking up tomorrow.

21   That's fine by us.

22             MR. CRONE:  And, Your Honor, I misspoke.  We brought

23   just our designated cuts, and so we don't have the full video.

24             THE COURT:  All right.  Okay.  Well, that's fine for

25   today, Counsel, but one of the housekeeping issues I wanted to

1    raise is we are basically wasting 20 minutes here.  I know it

2    may not seem like a big deal to you, but we have already had a

3    thorough discussion about the time that the Court has

4    available for the trial, and I have told you, and I intend to

5    stick to it, that I am not conducting trial on Thursday of

6    this week.  It is my strong preference not to conduct trial on

7    Friday of this week either.  And I want you to use every

8    available moment of time so that we can get the case tried in

9    the three days of this week plus four days of next week that

10   are available.  I understand that you have concerns about

11   that, and we are going to continue to revisit this topic as

12   the trial unfolds, but not using all the available time is of

13   serious concern to me.  And, frankly, we could go as late as

14   6:00 p.m. because I have notified the courtroom deputies that

15   we may be in trial later during the days that are available in

16   order to make sure that the trial gets completed by the end of

17   next week.

18          So please take that into account in your planning,

19   and plan to use as much of the available time up to 6:00 p.m.

20   as we possibly can.  And I will ask you to start doing that as

21   of tomorrow.

22          All right.  Mr. Crone?

23          MR. CRONE:  And, Your Honor, Plaintiffs apologize.  I

24   thought you had noted the court day ended at 4:30.  We are not

25   out of witnesses.  We can call another if we want to keep

1   going today.  I just thought in our pretrial conference we

2   said 9:00 to 4:30.  So we had planned on -- I was --

3            THE COURT:  I didn't say that.  I don't know if

4   somebody else did, but that's not what I said.

5            MR. CRONE:  And that's fine.  If that's my

6   misunderstanding, that's my fault.

7            THE COURT:  All right.  Let's call your next witness

8   then.

9            MR. CRONE:  Okay.  Thank you.

10           THE COURT:  Let's keep moving.

11           MR. CRONE:  Your Honor, the Court will call Rodney

12  Lacy, and I will just have to shuffle some papers.

13           THE COURT:  All right.  Mr. Lacy.

14           MR. CRONE:  Rodney Lacy, yes.

15           THE COURT:  Sir, if you would come forward and stand

16  here in front of the witness stand and raise your right hand.

17       (The witness was sworn.)

18           THE COURT:  Thank you.  Please be seated, and make

19  sure you speak into the microphone.

20           THE WITNESS:  Okay.

21      **RODNEY LACY, A PLAINTIFF HEREIN, DIRECT EXAMINATION**

22  BY MR. CRONE:

23  Q.  Mr. Lacy, how are you?

24  A.  Uh, I'm doing just fine.

25  Q.  Thanks for bearing with us.  Apologize for the time.  I

```
 1   know I told you tomorrow morning, but we can -- we can talk

 2   just as easy with the rest of -- or with at least some of the

 3   time this afternoon.

 4            Mr. Lacy, where are you from?

 5   A.  Uh, Alabama.

 6   Q.  Where at in Alabama?

 7   A.  Huntsville, Alabama.  I reside in Birmingham, Alabama,

 8   now, but I've lived most of my life in Huntsville, Alabama,

 9   the Huntsville area.

10   Q.  So you grew up mostly in Huntsville.  You're now living in

11   Birmingham, Alabama?

12   A.  Well, I grew up in -- born and raised in New Market,

13   Alabama.  Moved to Meridianville.  So it's all within the -- I

14   just say Huntsville because that's a well-known city.

15   Everybody know where that's at.  You might not know where New

16   Market is or Meridianville, but everybody know where

17   Huntsville is.

18   Q.  Okay.  Thank you.

19            Are you currently employed?

20   A.  Yes, sir.

21   Q.  What is it that you do?

22   A.  I am a independent contractor with Mercer Transportation.

23   Q.  Is Mercer Transportation a carrier company like CFI?

24   A.  Uh, yeah, they do the same line of work as far as, uh,

25   picking up freight and delivering freight, but it's a
```

16-cv-02242-KLM                    Lacy - Direct                        I - 229

1    different ball game as far as the contract goes, as far as how

2    they operate as opposed to how CFI/Con-Way/XPO operated.

3    Q.   And how long have you been driving for Mercer?

4    A.   Uh, a year and half.  Five months, I guess, a year and

5    five months, six months.

6    Q.   Who did you drive for before Mercer?

7    A.   I was hired on with Con-Way at the time.

8    Q.   And were you an owner-operator or a company driver for

9    Con-Way?

10   A.   I started out as a company driver with -- with Con-Way.

11   Q.   And when did you start as a company driver with Con-Way?

12   A.   Man, I don't know the exact date when I got started.  I

13   been with them for about seven, I think, seven, eight years.

14   So I'm not sure of the exact date that I started working for

15   Con-Way.

16   Q.   And that's okay.  Do you think you were a company driver

17   for seven to eight years or seven to eight years total?

18   A.   No, no.  I was a company driver for, I think, almost four

19   years, and then -- four years, and the last three years I

20   think I was a -- was supposed to be a independent contractor.

21   Q.   So at some point you switched to what was supposed to be

22   an independent contractor.

23   A.   Right.

24   Q.   And then you did that for about three years or so?  Is

25   that what you are saying?

1   A.  I did it until I got the -- got the, uh -- until I got the

2   truck paid off.  And after that, you know, things started --

3   it got real, real shady.  You know, it was shady from the

4   beginning.  As far as, uh, I was concerned, the way they even

5   came -- the way it all became about was shady.  So I had to do

6   what I had to do, man, to get through this contract, but when

7   I got through with the -- with the contract, miles got to

8   looking shady, I had to pay someone to keep me moving just

9   to -- just to be able to eat, man, so I said -- I felt like

10  there was something else going on because of this lawsuit I

11  had joined, so I had to make a move, man, and go somewhere

12  else so I could survive.

13  Q.  When you are talking about the contract, are you talking

14  about getting done with the Pathway contract?

15  A.  Yeah, man, the contract, yeah, they -- yeah, that I kind

16  of got forced into signing, yeah.

17  Q.  So when your lease was ended, you then owned the truck?

18  A.  That's when I owned the truck.  That's when you are

19  considered a owner-operator is when you have the title.  If

20  you don't have the title to your vehicle, you are not a

21  owner-operator.

22  Q.  Then you took your truck and you started to drive for

23  Mercer and --

24  A.  Right.  Yes, sir.

25  Q.  And that brings us up to current.  That brings us up to

1   the present.

2   A.  Yes, sir.

3   Q.  Okay.  So I want to zero in on that time period when you

4   were a company driver for CFI and then you became an

5   owner-operator or, you said, supposed owner-operator.  How did

6   that happen?

7   A.  How did I become a owner-operator --

8   Q.  Yes.

9   A.  -- contracting with Con-Way?

10  Q.  That's correct, yes.

11  A.  I got a phone call, man.  The dispatcher called me.

12  'Cause I didn't know anything about the division, you know,

13  'cause I was doing my thing as a company driver.  So Drew was

14  the dispatcher at the time.

15  Q.  Let me interrupt you.  Drew is a dispatcher that works for

16  CFI?

17  A.  CFI/Con-Way/XPO, yeah.  He was my -- I guess my supervisor

18  when I was a company driver.

19  Q.  So I didn't mean to interrupt.  So he called you, and then

20  what happened?

21  A.  Right, and asked me to -- asked me to be a --

22          MR. WILETSKY:  We just object to hearsay, Your Honor.

23          MR. CRONE:  And that's okay.  I'm going to rephrase

24  that question.

25          THE COURT:  He worked for the -- oh, he worked for

1   XPO.

2          MR. CRONE:  Yeah, that's right.

3          THE COURT:  Okay.  Go on.  Sustained.

4   BY MR. CRONE:

5   Q.  So how did you learn of -- of the opportunity to lease a

6   Pathway truck?

7   A.  Fleet manager.

8   Q.  Okay.  And the fleet manager works at CFI?

9   A.  Right.

10  Q.  Okay.  After you learned of this opportunity, what

11  happened next?

12  A.  As far as moving, the process moving on?

13  Q.  Yeah, absolutely.

14  A.  Well, you know, then he turned me on to I guess my, um --

15  Eric, which was the owner-operator dis- -- I mean, the person

16  of the contractors.  He was the dispatcher for the

17  contractors.  He got me in touch with Connie, Barbara, and TJ

18  and all of them and then eventually to Matt Harris.  Right?

19  And it went on from there as far as --

20  Q.  So this individual put you in touch with Connie, Barbara,

21  and TJ, you said.  Those are CFI employees?

22  A.  Right.

23  Q.  And then they got you in touch with Matthew Harris?

24  A.  Right.

25  Q.  And that's the Defendant sitting in the room here?

1   A.  Yeah, right there.

2   Q.  Okay.  So how did you then contact or, I should -- did you

3   then contact Mr. Harris?

4   A.  Uh, well, they contacted him for me.  You understand?

5   They did all that right there for me.  But I talked to him.

6   It was a little later.  And he told, you know, about when it

7   got on into it, when it got close to getting ready to sign the

8   paperwork, of where to go pick the truck up.  You know, they

9   handled pretty much everything for the dude -- for him until

10  it got close to getting ready to signing the contract and

11  going to get the truck.

12          Now, but I might add now, I was told by Eric, okay --

13          MR. WILETSKY:  Objection, Your Honor:  hearsay.

14          MR. CRONE:  And I will cut you off there, Mr. --

15  A.  -- Eric --

16          THE COURT:  You can't talk when the lawyers are

17  talking or I'm talking.

18          So there was just an objection to hearsay.  Let me

19  hear the response.

20          MR. CRONE:  The response is I'm going to cut Mr. Lacy

21  off there, and we are going to move on with a different

22  question.

23          THE COURT:  All right.

24  BY MR. CRONE:

25  Q.  Okay.  So you spoke with Mr. Harris about leasing the

16-cv-02242-KLM                Lacy - Direct                    I - 234

1    truck at some point, you said.  And how long after Connie,

2    Barbara, and TJ contacted Pathway for you, how long after that

3    did you actually speak to Mr. Harris?

4    A.   Probably a couple days or, uh -- not that day.  Maybe the

5    following day.  It moved pretty fast.

6    Q.   Okay.  When you did talk to Mr. Harris, what did you talk

7    to him about?

8    A.   He was telling me where to pick up the truck at and take

9    the truck to Joplin, drive, you know -- I only had a choice to

10   pick between four trucks, and they was in Dallas.  He told me

11   that I couldn't test drive the truck, couldn't do any of those

12   things.  I had to, uh, sign the contract that afternoon.  In

13   fact, they faxed me the contract, uh, at the dealership.

14   Q.   Let me pause you.  You said you're in Dallas now?

15   A.   Well, that -- yeah, I was -- Con-Way has a terminal that

16   was in Dallas, and since I was in Dallas, they -- he had four

17   trucks in Dallas.  I guess he do business with somebody --

18   with the dealership in Dallas.  So when I was in Dallas, they

19   pay for me a taxi, Uber or whoever, from Dallas terminal to go

20   look at these four trucks.

21   Q.   Who paid for that taxi?

22   A.   Matt paid for that.  Matt or Con-Way.  It wasn't me, you

23   know.  They paid for that.

24   Q.   So, anyway, so then you get to this dealership in

25   Dallas --

1    A.   Right.

2    Q.   -- and there are four trucks there.

3    A.   Yeah, that was the only trucks I could look at, those four

4    trucks.

5    Q.   Then what happened?

6    A.   Then I go out there and look at them and -- I mean, since

7    you can't test drive them, I just looked and said, I'll take

8    this one.  What else can you do?  You know what I mean?  If

9    you can't test drive them or anything and see how the truck is

10   going to operate or function, so the only thing you can do is

11   look at the truck and pick out the one you think is -- is

12   going to be the -- be good for you.  I mean, that's all you

13   can do.

14   Q.   And then you had said that Matt told you to drive that

15   truck to Joplin?

16   A.   Right.  Yeah, I had to drive from there to Joplin.  And I

17   guess that was supposed to be, I guess, the, uh, test drive,

18   but, you know -- I had to drive that night from -- at

19   5 o'clock to like -- I think I got there like 1 o'clock in the

20   morning.  I couldn't stop or do anything like that.  I had to

21   drive the truck directly straight to Joplin.  Okay.  And I had

22   some issues, you know what I'm saying, when I got to Joplin

23   about the truck.  I had some issues.

24   Q.   Before we talk about that, had you signed the lease yet

25   when you left Dallas?

1   A.  Well, I didn't have a choice in signing the lease, you

2   know.  It wasn't, uh -- it was like I didn't have a choice.  I

3   couldn't go back to being a company driver.  Once I committed

4   to being a owner -- or, quote, owner-operator, right, I

5   couldn't go back.  If I wanted to, if I didn't agree with the

6   contract, I couldn't go back to being a company driver.  And

7   so that's where the problem began right there, right at the

8   beginning.  What do you mean I can't -- I can't get out of

9   this, man?  What if -- what if there's something here I don't

10  like?  Because I didn't have ample amount of time to review

11  this.  You know what I'm saying?

12  Q.  That's what I was going to ask you.

13  A.  So if I don't -- if I don't want this, you telling me I

14  can't get out of this?  What if the truck ain't no good?

15  Y'all telling me I can't go back?

16  Q.  And, Mr. Lacy, let me interrupt you there because you

17  brought up a point I was going to ask you about.  How did you

18  then -- how did the lease get put in your hand?

19  A.  Man, it was faxed, uh -- like I say, it was late in the

20  afternoon.  It was after 4:00.  I don't know if it was the

21  custodian that gave me the contract or who it was that gave me

22  the contract, but when I had questions about the contract,

23  he -- I ain't got nothing to do with that, I'm just giving you

24  the paperwork, and he left the office.

25  Q.  And did you have questions about the contract?

1    A.  Yeah, I had questions.  First of all, I wanted to -- I

2    wanted to -- my first thing was if this -- if there's a

3    problem with this truck, man, and now y'all are telling me

4    that I can't get out of the contract, you know, because I have

5    already committed to it, okay, and now -- now from that --

6    from that point right there when I can't get out of a

7    contract --

8           MR. WILETSKY:  Just object, Your Honor, to hearsay --

9    A.  -- what choice do I have?

10          MR. WILETSKY:  -- the hearsay about not getting out

11   of the contract.  I don't know who he -- what statement, who

12   he is attributing that to, but I don't think it's Pathway.

13          THE COURT:  Yeah, I think you need to establish in

14   order to admit that statement that there was a Pathway

15   employee who was telling him he couldn't get out of the

16   contract.

17          MR. CRONE:  I am going to circle back to that.  I

18   think right now he's testified to his understanding of it.  We

19   just haven't gotten there yet.

20   BY MR. CRONE:

21   Q.  So, Mr. Lacy, let's finish up on this topic real quick of

22   who gave you and how did you review the contract, and then we

23   will get to that question that was just brought up.

24          So somebody at the dealership handed you the

25   contract.  You said you had questions about it.  Did you call

1   anybody about the questions?

2   A.   I called Connie and Barbara and them and asked them

3   questions about if I wanted to get out of this, how could I

4   get out of it.  Because I don't have time, or what if the

5   truck is not -- is not sufficient, you understand, how can I

6   get out of this?  And they said -- and that's when Connie and

7   Barbara put me back with Eric, and Eric told me, Eric --

8                MR. WILETSKY:  Same objection, Your Honor:  hearsay.

9                THE COURT:  Sustained.

10  BY MR. CRONE:

11  Q.   Okay.  And we'll do the same thing we did last time.  We

12  will cut your testimony off there.  And I want to ask you,

13  uh -- let's -- let's hit that one point that was brought up

14  now so we don't forget.

15               You testified that it was your understanding that

16  once you went over to the owner-operator side, you couldn't go

17  back to being a company driver.

18  A.   Correct.

19  Q.   How did you come to learn that information?

20  A.   Um --

21               MR. WILETSKY:  Same objection:  hearsay.

22               THE COURT:  The answer may not call for hearsay.

23  It's overruled.

24               You may answer.

25  A.   Phone call, and they told me -- it was a phone call.

1    BY MR. CRONE:

2    Q.  With who?  With who?

3    A.  Eric Lynch.

4            MR. WILETSKY:  Same objection, Your Honor.

5            THE COURT:  Sustained.  It is stricken.

6    BY MR. CRONE:

7    Q.  Is that the only way you ever learned that once you went

8    over to the owner-operator side, you couldn't go back to being

9    a company driver?

10   A.  I talked to TJ about it and --

11   Q.  Okay.  Mr. Lacy, I'm going to ask you to turn to

12   Plaintiffs' Exhibit 50.  So that is in one of the notebooks in

13   front of you there.

14   A.  What?  Exhibit what?

15   Q.  50.

16   A.  50?

17   Q.  Yeah, five zero.

18           Are you at -- are you at Exhibit 50, Mr. Lacy?

19   A.  Yes, sir.

20   Q.  Okay.  This is Franklin Merrill's Pathway Leasing

21   agreement.  Is the lease agreement you signed the same as this

22   except different name, different truck, and that sort of

23   thing?  Is the language otherwise the same in the lease

24   agreement?

25   A.  Yes, it is.

16-cv-02242-KLM                    Lacy - Direct                    I - 240

1   Q.   Okay.  Now, so you did eventually sign this lease

2   agreement, you said, in Dallas.  And how did you actually sign

3   it?  You told us someone handed you the contract, and you

4   reviewed it.  You had questions.  You told us what happened

5   there.  How did you actually sign the contract?

6   A.   They had to highlight it for me to sign it, initial, and

7   fax it back.

8   Q.   Who had it highlighted?  The people --

9   A.   Pathway.  Con-Way or whoever sent it to me.  I didn't know

10  if it come from Matt Harris, I didn't know if it came from

11  Con-Way, but they -- they faxed it to me, and it was

12  highlighted to where I needed to initial it and where I needed

13  to sign.

14  Q.   Were you able to understand -- when you reviewed it, and

15  you had questions, I know that, but were you able to

16  understand any of the lease agreement?

17  A.   Well, it really didn't matter.  No, I didn't.  Because

18  once they told me I couldn't go back to being a company

19  driver, other than be fired, I mean, or quit or go somewhere

20  else, what's the point?

21        MR. WILETSKY:  Object, Your Honor, to that same

22  hearsay.

23        THE COURT:  Sustained, and stricken.

24  BY MR. CRONE:

25  Q.   So let me ask the question again much more simply and

1    directly.  I know you testified you had some questions about

2    the lease agreement.  Did you -- were you able to understand

3    any of the lease agreement when you reviewed it?

4    A.  No, sir.  I didn't have an ample amount of time to even --

5    to check it out and --

6    Q.  Let's stop there on that.  Thank you.

7              Okay.  Now, after you signed the lease, were you able

8    to then get in the truck and drive away, or what happened?

9    A.  Right.  Drove to Joplin.

10   Q.  Okay.

11   A.  Straight to Joplin that night.

12   Q.  And once you arrived in Joplin, what happened?

13   A.  The next -- the following day, um -- I mean, the following

14   day it went through the inspection bay, right, to get it

15   inspected, and there was a problem then.  Okay.  All eight

16   drive tires was dry rotted.  All eight airbags -- there were

17   four, five -- six airbags was dry rotted.  I didn't have a

18   chance to put any weight on it because the airbags were dry

19   rotted, so I knew if some weight would get on, they were going

20   to pop.  You understand?  But I never had a chance.  So that's

21   when TJ and I had our first confrontation because I got a

22   issue with the truck right off the rip, and then I told TJ I

23   need --

24             MR. WILETSKY:  Objection:  hearsay, Your Honor.

25   A.  -- eight new tires --

16-cv-02242-KLM                    Lacy - Direct                        I - 242

1           MR. WILETSKY:  Objection to hearsay, both in terms of

2    what he said to TJ and what TJ may have said to him.

3           THE COURT:  Sustained.

4           You may not testify about what TJ said to you.

5           It is stricken.  Go ahead, Mr. Crone.

6    BY MR. CRONE:

7    Q.  Mr. Lacy, just -- just explain to me what problems you had

8    with the truck when it went into the inspection bay.

9    A.  Okay, yeah.  It needed eight -- all eight tires was dry

10   rotted.  When I say dry rotted, they had separation around the

11   thread.  Okay.  And me and the guy at the inspection bay had

12   words, and that's when he called TJ, because I told him I did

13   not want this truck.

14   Q.  Hold on, Mr. Lacy.  Let me stop you there.  Can you just

15   list for me the problems that you had with the truck in the

16   inspection bay?  Don't talk about who you told anything to or

17   anything like that.

18   A.  Yeah.  The tires, eight drive -- the eight drive tires was

19   dry rotted.  The six airbags was dry rotted.  And those was

20   what I could visually see.

21   Q.  Did you relay any of these problems or concerns about

22   these problems to Mr. Harris?

23   A.  Yes, I told Mr. Harris, and I told TJ also.

24   Q.  Okay.  I'm only concerned with what you told Mr. Harris.

25   A.  Right.  I told him about the, uh --

1    Q.   When did you tell him about these problems?

2    A.   Right then.

3    Q.   And then what did he say to you?

4    A.   He -- he said that it wasn't a DOT violation and he wasn't

5    going to pay for it.

6    Q.   So who ended up having to pay for it?

7    A.   Rodney Lacy.  On down the road, you know, because on down

8    the road I end up paying for everything.  So I had to drive it

9    like it was, but later on when it started -- all the tires

10   started popping and the airbags started popping, I had to come

11   out of my pocket for something that I've already complained

12   about from Day One.

13   Q.   Did -- how long did it take to get the truck out of the

14   inspection bay?

15   A.   About a week.

16   Q.   And did CFI also put their logos on the truck during that

17   time?

18   A.   Yes.

19   Q.   Now, when it came out of the inspection bay after the week

20   it took to go through, did you then start driving immediately?

21   Were you dispatched immediately?

22   A.   Uh, yeah, I got a load within a week, yes, sir.

23   Q.   And so at that point you're driving down the road, and now

24   you are in a Pathway truck, and you -- that has CFI logos on

25   it, and you are being dispatched by a CFI dispatcher.

16-cv-02242-KLM                    Lacy - Direct                    I - 244

1    A.  Yes, sir.

2    Q.  Okay.  I want to take a moment and ask you what your job

3    duties were as a company driver.  So before all of that

4    happened, for the few years -- I think you testified three or

5    four years you were a company driver before you signed the

6    Pathway lease.  I want to know what your job duties were.  So

7    what was your main duty as a -- job duty as a company driver?

8    A.  Pick up freight and haul freight, get it Point A to

9    Point B safely.

10   Q.  "Pick up freight, Point A to B safely."

11           What else did you have to do as a company driver?

12   A.  Uh, you know, like I say, check out the -- have to do

13   safety checkpoints on the PM, is what they call it.

14   Q.  I'm sorry.  What's it called?

15   A.  I had to do the DOT inspection on the trailer, truck and

16   trailer, every morning.

17   Q.  So you called it a safety inspection?

18   A.  Yeah, it's a safety checkpoint, I guess, for the DOT

19   offices make you do a 15-minute pretrip.  That's a pretrip

20   that you got to do on the tractor every morning and the

21   trailer, as far as the company requires that.

22   Q.  Okay.  And that's --

23   A.  DOT just want you to show the 15 minutes.  The company

24   requires for you to do it.

25   Q.  And that safety inspection that the company requires is on

16-cv-02242-KLM                    Lacy - Direct                        I - 245

1   the tractor and trailer?

2   A.  Right.

3   Q.  What else did you have to do as a company driver for CFI?

4   A.  Once I checked it out and everything was good, I started

5   driving.  Uh, when I go to the shipyard to receive it, to get

6   loaded, I'm responsible for making sure that that load was

7   secure.

8   Q.  Okay.  So "secure load."

9   A.  And that I had the proper seals on it for that load.  Make

10  sure that --

11  Q.  I'm sorry.  What?  Proper seals?

12  A.  I had to make sure that I had a seal for that load, a seal

13  to put on that load.

14  Q.  What's a seal?

15  A.  That's what you put on the back of the trailer, uh, so

16  that the, uh -- they -- so that the people won't know that you

17  tried to steal their freight.  So they put a seal on it with

18  they -- with they numbers and stuff on it, and that has to

19  stay intact from there to Point B.

20  Q.  Okay.

21  A.  You know --

22  Q.  What else did you have to do as a company driver?

23  A.  Well, you got to deal with DOT and go through all weigh

24  station.  You're responsible --

25  Q.  So "weigh stations."

Julie H. Thomas, RMR, CRR                              (303)296-3056

1          Anything else?

2  A.  You're responsible for all tickets you get.  As a company

3  driver, as far as if the trailer is overweight, they're not

4  going to help you pay the ticket.  That's all on you because

5  you supposed to get the truck weighed if it needs to be

6  weighed.

7  Q.  So these tickets come from law enforcement of some sort?

8  A.  Yeah.  You've got to stop at a weigh station or

9  inspection.  Whenever they want to pull you in, they can do a

10  full inspection on you, or they could just weigh your tractor

11  and your trailer and tell you to ease on down the road.  Well,

12  you are responsible for making sure that you don't have a

13  truck or trailer on the interstate with faulty equipment.

14  Q.  What else did you have to do as a company driver?

15  A.  Well, you have to -- you have to, um, keep up with the

16  load.  You're under that load 24 hours until you -- you're

17  under that load until you get it to the destination.  So

18  whatever occurs throughout the night, you got to get up and

19  handle it.  You know what I'm saying?  If somebody breaks into

20  it, you got to call the police and get a report of everything

21  to clear yourself.

22          When you get close to the end of the day or at the

23  truck stop, you have to do another pretrip, another

24  inspection.

25  Q.  Hold on.  Before that, the end of the -- another pretrip,

1    you are saying you have to watch the load.  Is that what you

2    are saying?

3    A.  Well, you're responsible for the load throughout the

4    night.

5    Q.  Okay.

6    A.  You know, just because you're not on a 10-hour -- just

7    because you may be taking your, quote/unquote, 10-hour break,

8    you're still responsible for that freight.

9    Q.  Okay.  So put "responsible for load."

10   A.  Right.

11   Q.  And then you said when you get to the end of the day, you

12   have to do another pretrip inspection.

13   A.  Right, if it's safe to do so, but, yeah, they want you to

14   do it.

15   Q.  And is that the same type of inspection that you had

16   mentioned at the beginning that you called a safety

17   inspection?

18   A.  Yeah, that's a pretrip, safety inspection.  Yeah, you have

19   to -- same thing.

20   Q.  So these are interchangeable words in your mind, "pretrip"

21   or "safety inspection"?

22   A.  Yeah, it's a safety -- yeah, it's an inspection of the

23   tractor and the trailer to make sure that you don't have any

24   blown tires or all of the lights are still working, just what

25   you can visually see at night to keep the police from pulling

1   you over.

2   Q.  Okay.  Anything else you had to do as a company driver?

3   A.  Yeah, what they tell me to do.  You know, they tell me

4   where to -- send me a message where to pick up freight and

5   where to go.  As a company driver, could not refuse freight, I

6   couldn't.  You know, you had to go wherever they told you to

7   go.

8   Q.  So if I write, um, "receive dispatch," is that what you

9   are getting at?

10  A.  Yes, sir, dispatch will dispatch you the load, and you

11  have to -- as a company driver, you have to, uh, go and get

12  it.

13  Q.  Now I want to take you back forward in time to after you

14  picked up the truck in Dallas, and you signed the lease.  You

15  got it to Joplin.  You went through the inspection bay.

16  Whatever problems, uh, you identified, you identified them.

17  Now you are driving down the road.  And now you're a -- what

18  are you now?  I mean, are you a -- are you a CFI driver,

19  owner-operator?  What do you call yourself at this point?

20  A.  What did I call myself?

21  Q.  Yes.

22  A.  A driver, still like being -- a glorified company driver.

23  Q.  Okay.  So when you are now driving down the road as a

24  glorified company driver --

25  A.  Right.

 1   Q.  -- I want to ask you did you have to -- looking back at

 2   this chart, did you have to pick up freight, move it from

 3   Point A to Point B safely?

 4   A.  Yes.

 5   Q.  Did you have to do the safety inspection of the tractor

 6   and trailer?

 7   A.  Correct.

 8   Q.  Did you have to secure the load?

 9   A.  True.

10   Q.  Did you have to make sure there was a proper seal on the

11   load?

12   A.  Right.

13   Q.  Did you have to go into the weigh stations?

14   A.  Right.

15   Q.  Did you have to pay tickets if you got them?

16   A.  Right.

17   Q.  Were you still responsible for the load?

18   A.  You're responsible for the load until you get it -- yes.

19   Q.  At the end of the day where you called it a pretrip

20   inspection or safety inspection, did you still have to do

21   that?

22   A.  Yes, sir.

23   Q.  Did you still have to receive your dispatcher's

24   instructions?

25   A.  Yes, sir.

16-cv-02242-KLM                  Lacy - Direct                      I - 250

1    Q.  So my question is:  Were you doing the same thing as a

2    glorified company driver as you were as a company driver?

3    A.  It was no different.

4           MR. WILETSKY:  Objection, Your Honor:  leading.

5    A.  Exact same thing.

6           THE COURT:  Overruled.  He can answer yes or no.

7           Go ahead.

8           THE WITNESS:  Yes, ma'am, I was.

9           Yes, sir.

10   BY MR. CRONE:

11   Q.  Okay.  So, Mr. Lacy, next I want to ask you about these --

12   these job duties that we just looked at on the screen, but I

13   want to know specifically who was telling you to do each, each

14   duty.

15   A.  Well, as the company driver, that's what they -- that's

16   what they rules and regulations are.  That's what Con-Way

17   requires you to do.

18   Q.  Let me narrow this in.  So when you are a glorified

19   company driver now --

20   A.  Right.

21   Q.  -- those are your words, who is telling you to pick up

22   freight and move it from Point A to Point B safely?

23   A.  Con-Way or CFI.

24   Q.  I was going to ask you -- I will write "CFI" if that makes

25   sense to you.

1          Who is telling you to do the -- I want to knock out

2     number 2 and number 8 at the same time -- these safety

3     inspections, slash, pretrip inspections?

4     A.  Well, CFI.  Well, DOT on that too.

5     Q.  So that is a -- I think you testified earlier that the

6     company tells you to do it, and the DOT says you've got to do

7     15 minutes or something like that.  Can you explain that?

8     A.  You have to show 15 minutes pretrip every morning.

9     Q.  "DOT 15 minutes."

10          Who is telling you to secure the load, number 3

11    there?

12    A.  Uh, that -- the company tells you you have to make sure

13    the load is secure.

14    Q.  Who is telling you to make sure you have a proper seal?

15    A.  Uh, that's part of -- I guess would be DOT probably maybe,

16    that you got to have a seal or a lock on the back of it, but

17    Con-Way requires you to have a seal or lock on it also.

18    Q.  So CFI requires it, and you think maybe it's part of a DOT

19    regulation?

20    A.  You have to have it secure, yeah, with a seal on it.

21    Q.  Who's telling you to go into the weigh stations?

22    A.  DOT.

23    Q.  Who's telling you you've got to pay a ticket if you get

24    one?

25    A.  Con-Way/CFI.

16-cv-02242-KLM                    Lacy - Direct                    I - 252

1   Q.  Who's telling you that you are responsible for the load

2   while you're driving it?

3   A.  CFI.

4   Q.  And I think the answer to number 9 is probably clear, but

5   who's telling you you have to receive the dispatch?

6   A.  CFI.

7   Q.  Now, my question is -- and we are still in -- let's

8   cross -- let's add to this so we don't confuse you.

9            We are talking about when you are a glorified company

10  driver, so after you signed the lease.  What is Pathway, if

11  anything, what is Pathway telling you to do?

12  A.  As far as?

13  Q.  As far as anything related to the job you're doing.

14  A.  They didn't tell me to do none of these things right here.

15  They didn't tell me to, uh, to do what's set before me.

16  Q.  That, I do understand.  Are they telling you to do

17  anything else?

18  A.  No.

19  Q.  Are they telling you you can't do anything else?

20  A.  No.

21  Q.  Did you ever ask Pathway to switch carriers?

22  A.  Yeah.

23  Q.  So, in other words, to drive -- instead of driving for

24  CFI, someone else?

25  A.  Yes, I did.

Julie H. Thomas, RMR, CRR                              (303)296-3056

16-cv-02242-KLM                  Lacy - Direct                    I - 253

1    Q.  Who did you ask at Pathway?

2    A.  I asked TJ that.

3    Q.  You asked TJ.  Did you ask anyone at Pathway?

4    A.  I asked Matt Harris.

5    Q.  What did Mr. Harris tell you?

6    A.  He said you can only go to, uh -- at the time I wanted to

7    go to Landstar.  I couldn't go to Landstar because Landstar

8    was going to pay me my money, and then I would have to

9    disburse the money to him.  They was not going to take my

10   check and send it to him.  So I couldn't go to Landstar.  So

11   it was only one or two other companies that I could go to.

12   And I just said, man, I'm just going to grind it out here.

13   I'm just going to stay here 'cause I just don't like changing

14   jobs.  So I couldn't go to but maybe one or two companies, and

15   I didn't like either -- well, I didn't like one of them at the

16   time.

17        I ended up going to the other one, which is where I'm

18   at now, after the contract and everything was over, but I

19   didn't want to make that move and -- it would have been a

20   lateral movement.  'Cause they're taking my money, what

21   difference does it make?  I want to have complete control over

22   my money.  So I wanted to get out of the situation and go

23   somewhere where I have complete control of my money.

24   Q.  So Pathway told you you couldn't go to Landstar because

25   Landstar wouldn't send the money directly to them?

1   A.  Right.  I had to go where Matt Harris told me to go, man.

2   I couldn't go where I wanted to go.  He told me these are the

3   places you can go to, period.  I mean, that's -- what can I

4   say?  It's his truck.

5   Q.  So on this list I want to add "Pathway told you who you

6   could drive for."

7   A.  Matt Harris told me who I could drive for, yes, sir.

8   Q.  And who paid you?

9   A.  Con-Way.  Well, they sent my money to him, to Pathway, and

10  he will take whatever he wanted to take and send me the rest.

11  Q.  By "he" you mean Matthew Harris?

12  A.  I mean Pathway Leasing.  Con-Way would send -- Con-Way

13  would take my check and give it to Pathway Leasing, and I

14  didn't agree to 'cause it's my money, and he would take what

15  he wanted to take, truck payment, whatever else he felt like I

16  owed him, and then he would send me the rest of my money to

17  me.  And I'm -- I still had a real hard time with that.  First

18  of all, I couldn't get out of the contract.  Now you're taking

19  my money and giving it to this man.  I don't know this dude.

20  Why are you giving this man my money?

21  Q.  So I want to -- I just want to be clear what -- what you

22  testified to there.  Pathway paid you then.

23  A.  Pathway gave me my money.

24  Q.  "Pathway gave you your money."

25  A.  I couldn't figure out why Con-Way was giving this man my

1    money.

2    Q.   If there was maintenance needed on the truck, how did you

3    get the maintenance done?

4    A.   Rodney Lacy had to pay for the maintenance.

5    Q.   Did you give money to Pathway to set aside for

6    maintenance?

7    A.   $250 a week was set aside for maintenance for the truck.

8    So if the truck had any issues, that money was set aside

9    strictly for the truck, was what I was told.

10   Q.   Okay.  And if you wanted to access that money, how would

11   you get it?

12   A.   I would have to ask them for the money.  I would have to

13   call Jim and ask Jim for money that I put aside for the truck.

14   And they would give me the money if I needed the money, but I

15   would have to repay the money back.  I had to repay my own

16   money back.

17   Q.   And Jim's an individual at Pathway?

18   A.   On the behalf of Pathway.  So if I needed money to, uh --

19   to, um, get the truck fixed, I would have to call -- I didn't

20   have assets to just get the money and fix the truck.  I would

21   have to call Jim and get permission from Jim or Matt to get

22   the money to fix the truck.  Right?  In some cases, some --

23   you might have to sign -- I might have to sign a -- an

24   agreement that I'm going to pay back this here.  You

25   understand that?

1    Q.   Into this maintenance account?

2    A.   Right, I have to -- you're going to have to pay back that

3    money.  I couldn't understand.  Why am I paying back something

4    that's my money that I got saved up?  It's supposed to be for

5    my truck.  If I got this money set aside strictly to fix the

6    truck, I thought that's what the money was for.  I didn't

7    think I would have to pay back myself, but it wasn't my truck.

8    So that just throwed me off.  I mean, I save up the money, and

9    I got to pay back the money?

10   Q.   So -- so you would have to ask Pathway for your

11   maintenance money.  Is that --

12   A.   Yeah.  That's exactly right.  I didn't have access to it.

13   Q.   And what you are saying is if you used it, you then had to

14   repay it back into this fund?

15   A.   You're going to, yes, sir.

16   Q.   Okay.  So the chart that's in front of you, Mr. Lacy, is,

17   um -- we had started with this chart and listing out your job

18   duties, and then I've added here which company told you -- or

19   which entity, CFI or Pathway, told you what you could do or

20   not do.  Are we missing anything on this chart?

21   A.   Yeah, I didn't have any -- I had very little say-so.  I

22   didn't have a lot of say-so or control over anything.  So we

23   missing out me, who is supposed to be the independent

24   contract -- owner-operator.

25   Q.   So the person without control is Rodney Lacy.

16-cv-02242-KLM                    Lacy - Direct                        I - 257

1   A.   Right.

2   Q.   Are we missing anything else on this chart?

3   A.   That's about cover -- that's about it, I think.

4   Q.   Okay.

5   A.   That I can think of.

6          THE COURT:  All right.  Mr. Crone, we are going to

7   wrap up soon.  So when you are at a convenient stopping point,

8   please let me know.

9          MR. CRONE:  This is a great time to stop.

10         THE COURT:  All right.  Then we will close the

11  proceedings for today.

12         Thank you --

13         THE WITNESS:  Yes, ma'am.  Thank you.

14         THE COURT:  -- Mr. Lacy.  You may step down.

15         And we will resume again tomorrow morning at

16  9:00 a.m. with Mr. Lacy's testimony.  Anything further we need

17  to address today from a housekeeping standpoint from

18  Plaintiff?

19         MR. CRONE:  Not from Plaintiffs' perspective.  And

20  thank you for letting us continue here.

21         THE COURT:  You're welcome.

22         Anything else from the Defendant?

23         MR. WILETSKY:  No.  Thank you, Your Honor.

24         THE COURT:  Thank you.  We are in recess.

25      (Proceedings recessed 5:24 p.m.,

Julie H. Thomas, RMR, CRR                              (303)296-3056

1        June 25, 2018.)

2

3                      REPORTER'S CERTIFICATE

4           I, JULIE H. THOMAS, Official Court Reporter for the
United States District Court for the District of Colorado, a
Registered Merit Reporter and Certified Realtime Reporter,

5    CA CSR No. 9162, do hereby certify that I reported by machine
shorthand the proceedings contained herein at the time and

6    place aforementioned and that the foregoing pages constitute a
full, true and correct transcript.

7           Dated this 30th day of July, 2018.

8                    _____/s/ Julie H. Thomas_____
                Official Court Reporter

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25