IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 16-cv-02242-KLM

FRANKLIN MERRILL, et al.,

    Plaintiffs,

v.

PATHWAY LEASING LLC, a Colorado limited liability company,
MATTHEW HARRIS, an individual,

    Defendants.
_____

**ORDER**
_____

**ENTERED BY MAGISTRATE JUDGE KRISTEN L. MIX**

    This matter is before the Court on Plaintiffs' **Motion for Reconsideration of Court's Order Dated October 5, 2017 [Dkt. 164]** [#298][1] (the "Motion"). Former Defendants XPO Logistics Truckload, Inc., Transforce, Inc., and Con-way Truckoad, Inc. (collectively, "XPO") and current Defendants Pathway Leasing LLC and Matthew Harris (collectively, the "Pathway Defendants") filed Responses [#299, #300] in opposition to the Motion [#298], and Plaintiffs filed a Reply [#302]. The Court held a hearing on the Motion [#298] on February 21, 2019, *see* [#304], and ordered limited supplemental briefing. As a result, XPO filed a Supplemental Response [#310], and Plaintiffs filed a Supplemental Reply [#317]. The Court also permitted a Second Supplemental Response [#324] from XPO to address a new argument raised by Plaintiffs in their Supplemental Reply [#317]. The Court

---

[1] "[#298]" is an example of the convention the Court uses to identify the docket number assigned to a specific paper by the Court's case management and electronic case filing system (CM/ECF). This convention is used throughout this Order.

-1-

has reviewed the pertinent briefs, the entire case file, and the applicable law, and is sufficiently advised in the premises. For the reasons set forth below, the Motion [#298] is **GRANTED in part**.

## I. Background

On January 10, 2017, XPO filed a Motion to Dismiss and Compel Individual Arbitrations [#94] (the "Motion to Compel"). On October 5, 2017, the Court granted the Motion to Compel to the extent that Plaintiffs were "compelled to submit their individual claims against these three Defendants to arbitration pursuant to the arbitration provision of the Agreement." *Order* [#164] at 10. The claims against XPO were thus dismissed without prejudice. *Id.* at 11. At that time, the Court noted:

> Typically, claims that are sent to arbitration are stayed. *See, e.g.*, *Urbanic v. Travelers Ins.*, No. 10-cv-02368-WYD-MJW, 2011 WL 1743412, at *10 (D. Colo. May 6, 2011). However, the Court is aware of no authority that mandates a stay. Here, Defendants have moved to dismiss Claims One and Five in order to compel arbitration and Plaintiffs have not raised any arguments in the alternative that the claims should be stayed.

*Id.* at 11 n.5. On January 17, 2019, Plaintiffs filed the present Motion [#298], asking the Court to reconsider its prior Order [#164] on the basis of the United States Supreme Court opinion in *New Prime Inc. v. Oliveira*, 139 S. Ct. 532 (2019), issued on January 15, 2019.

## II. Legal Standard

A motion for reconsideration "is an extreme remedy to be granted in rare circumstances." *Brumark Corp. v. Samson Res. Corp.*, 57 F.3d 941, 944 (10th Cir. 1995). It is well-established in the Tenth Circuit that grounds for a motion to reconsider are limited to the following: "(1) an intervening change in the controlling law; (2) new evidence previously unavailable; and (3) the need to correct clear error or prevent manifest injustice."

*Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000) (citing *Brumark*, 57 F.3d at 948). Therefore, a motion to reconsider is "appropriate [only] where the court has misapprehended the facts, a party's position, or the controlling law." *Id.* Here, Plaintiffs base their Motion [#298] on the first ground, i.e., an intervening change in the controlling law.

### III. Analysis

"The Federal Arbitration Act [("FAA")] requires courts to enforce private arbitration agreements." *New Prime, Inc.*, 139 S. Ct. at 536. "But like most laws, this one bears its qualifications." *Id.* "Among other things, [9 U.S.C.] § 1 says that 'nothing herein' may be used to compel arbitration in disputes involving the 'contracts of employment' of certain transportation workers." *Id.* "While a court's authority under the Arbitration Act to compel arbitration may be considerable, it isn't unconditional." *Id.* at 537. "If two parties agree to arbitrate future disputes between them and one side later seeks to evade the deal, [9 U.S.C.] §§ 3 and 4 of the Act often require a court to stay litigation and compel arbitration 'accord[ing to] the terms of the parties' agreement." *Id.* "But this authority doesn't extend to all private contracts, no matter how emphatically they may express a preference for arbitration." *Id.* "Instead, antecedent statutory provisions limit the scope of the court's powers under §§ 3 and 4." *Id.* "Section 2 provides that the Act applies only when the parties' agreement to arbitrate is set forth as a 'written provision in any maritime transaction or a contract evidencing a transaction involving commerce.'" *Id.* "And § 1 helps define § 2's terms." *Id.* "Most relevant for our purposes, § 1 warns that 'nothing' in the Act 'shall apply' to 'contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce.'" *Id.* "[T]o invoke its statutory powers

under §§ 3 and 4 to stay litigation and compel arbitration according to a contract's terms, a court must first know whether the contract itself falls within or beyond the boundaries of §§ 1 and 2." *Id.* "The parties' private agreement may be crystal clear and require arbitration of every question under the sun, but that does not necessarily mean the Act authorizes a court to stay litigation and send the parties to an arbitral forum." *Id.* at 537-38.

Both *New Prime* and the present case involve drivers working for an interstate trucking company. After *New Prime*, it appears indisputable that the Court was without authority *under the FAA* to order Plaintiffs and XPO to arbitration; indeed, neither party argues otherwise. *See generally Motion* [#298]; *Response* [#299, #300]. Ultimately, the Supreme Court held that (1) "a court should decide for itself whether § 1's 'contracts of employment' exclusion applies before ordering arbitration" and (2) the statutory phrase "contracts of employment" includes both employee-employer relationships as well as independent contractor relationships. *Id.* at 537, 543. These holdings call into question the Court's October 5, 2017 Order [#164] dismissing XPO pursuant to the FAA on the basis of the arbitration agreements between Plaintiffs and XPO. Applying the *New Prime* holdings here, the Court finds that, pursuant to § 1 of the FAA, Plaintiffs, as interstate truck drivers, may not be compelled to arbitration pursuant to the FAA regardless of their status as either employees or independent contractors. *See also id.* at 543-544 (holding that the interstate truck driver plaintiff's agreement with his company defendant fell within the § 1 exclusion).

Thus, Plaintiffs are correct that the Court was without authority to direct Plaintiffs and XPO to arbitration pursuant to the FAA. Indeed, XPO does not contend that the Court would have reached the same decision expressed in the October 5, 2017 Order *pursuant to the FAA* had the *New Prime* decision been available then. *See Response* [#299]; *Supp.*

*Response* [#310]; *see also Pathway's Response* [#300]. However, XPO argues why, regardless of *New Prime*, the same result is mandated, i.e., that XPO should be dismissed from this lawsuit in favor of arbitration.[2] The Court first addresses XPO's argument that the Court's Order [#164] is supported on the alternative basis that arbitration may be compelled under Missouri state law via the Missouri Uniform Arbitration Act ("MUAA"). *See Supp. Response* [#310] at 8-12.

**A.     Preemption**

The parties contest whether the FAA fully preempts the MUAA in this case. *Supp. Response* [#310] at 8-12; *Supp. Reply* [#317] at 1-5.

First, the Court notes that Plaintiffs argue that *New Prime* "clarified that federal policy in favor of enforcing valid arbitration contracts also embodies a policy of *not enforcing* arbitration agreements in the context of the FAA's Section One exclusions." *Supp. Reply* [#317] at 2 (emphasis in original). The Court disagrees with this assessment of *New Prime*. In fact, the Supreme Court explicitly stated in *New Prime* that it had "granted certiorari only to resolve existing confusion about the application of the Arbitration Act, *not to explore other potential avenues for reaching a destination it does not.*" 139 S. Ct. at 543 (emphasis added). In other words, the Supreme Court left open the possibility that a truck driver working for an interstate trucking company suing under the FLSA who had signed an arbitration agreement *could still be compelled to arbitration*, but merely held that the FAA did not provide the authority to do so. *See also id.* at 537 ("While a court's authority *under*

---

[2] XPO and Defendants also assert several arguments regarding why the Court should not reconsider its prior Order [#164] at all. *See Responses* [#299, #300]. The Court need not address these particular arguments, because, ultimately, the Court finds that the outcome of its prior Order [#164] was still essentially correct, albeit on an alternative basis.

*the Arbitration Act* to compel arbitration may be considerable, it isn't unconditional. . . . [T]his authority doesn't extend to *all* private contracts . . . ." (first emphasis added) (second emphasis in original)). In *Volt Information Sciences v. Board of Trustees of Leland Stanford University*, 489 U.S. 468, 472 (1989), the United States Supreme Court had previously ruled that "[w]here, as here, the parties have chosen in their agreement to abide by the state rules of arbitration, application of the FAA to prevent enforcement of those rules would actually be inimical to the policies underlying state and federal arbitration law." *Id.* at 472 (internal citations and quotation marks omitted). Nothing in *New Prime* overturns that prior decision. Thus, the Court finds that *New Prime* does *not*, as Plaintiffs contend, provide authority supporting an inverse "policy of *not enforcing* arbitration agreements in the context of the FAA's Section One exclusions." *Supp. Reply* [#317] at 2 (emphasis in original).

Therefore, the question becomes whether the Court's Order [#164] is supported by authority outside of the FAA. XPO contends that this authority exists through Plaintiffs' and XPO's agreements to submit to binding arbitration under the MUAA. *Supp. Response* [#310] at 4. The Court agrees that the relevant contract language is clear that Missouri's state arbitration laws shall apply to the parties' disputes (under certain circumstances not material to the present preemption analysis):

> This Agreement is made in the State of Missouri, and all disputes and matters arising out of or relating hereto, including any allegation of a tort, or breach of this Agreement, or of violations of the requirements of any applicable governmental authorities, whether local, state, federal or foreign, including but not limited to the federal leasing regulations (49 C.F.R. Part 376), shall be governed by Missouri law without regard to Missouri's conflicts of law provision, except to the extent that federal law supersedes Missouri law or otherwise applies. The Parties further agree to submit all claims or disputes where the aggregate amount in controversy exceeds $25,000 exclusively to binding arbitration pursuant to the Missouri Uniform Arbitration

Act, RSMo. chapter 435 and the procedures herein.

*See, e.g.*, [#58-2] at 13 ¶ 8.

Plaintiff cites to *Howard Fields & Associates v. Grand Wailea Company*, 848 F. Supp. 890, 892 (D. Haw. 1993), for the proposition that the MUAA is preempted in this context. However, *Howard Fields* is distinguishable from the present case on two important grounds. First, *Howard Fields* held that the consulting services contract at issue implicated interstate commerce and, unlike here, the FAA therefore did apply to the Court's resolution of the parties' arbitration dispute. 848 F. Supp. at 893-94. Second, the parties' state choice-of-law provision did not expressly encompass state arbitration rules. *Id.* at 894. In other words, unlike here, the arbitration provision did not expressly state that the state's choice-of-law provision mandated that arbitration proceed under the state's arbitration act. *Id.* Here, it is clear that the FAA does not directly apply *and* that the parties' expressly chose to proceed under the MUAA. *See, e.g.*, [#58-2] at 13 ¶ 8. *Todd Shipyards Corp. v. Cunard Line, Ltd.*, 943 F.2d 1056 (9th Cir. 1991), relied on by the *Howard Fields* court, is in accord. 848 F. Supp. at 894. The circuit court there noted that the Supreme Court had *not* held that "a state choice of law provision that does not expressly encompass state arbitration rules, does so by operation" and consequently simply "reaffirmed that arbitrability in cases subject to the federal act is governed by federal law." *Id.* (quoting and citing *Todd Shipyards*, 943 F.2d at 1062).

The Court finds that *Roberts v. Central Refrigerated Service*, 27 F. Supp. 3d 1256 (D. Utah 2014), presented a set of circumstances materially similar to those of the present case. The plaintiff there was employed as a company truck driver and sued under the FLSA on the basis of the company's alleged failure to fully compensate him for wages

earned, including the failure "to pay at least the minimum wage for orientation time, travel time, and training time." *Roberts*, 27 F. Supp. 3d at 1258. The court compellingly held that the FAA generally, and its § 1 exclusion provision specifically, did not preempt arbitration under the Utah Arbitration Act. *Id.* at 1263. As explained below, the Court finds that the *Roberts* court's analysis applies equally to the issue here.

"While the FAA preempts application of state laws which render arbitration agreements unenforceable, it does not follow, however, that the federal law has preclusive effect in a case where the parties have chosen in their arbitration agreement to abide by state rules." *Volt Info. Scis.*, 489 U.S. at 472. "There is no federal policy favoring arbitration under a certain set of procedural rules; the federal policy is simply to ensure the enforceability, according to their terms, of private agreements to arbitrate." *Id.* at 476. "Interpreting a choice-of-law clause to make applicable state rules governing the conduct of arbitration—rules which are manifestly designed to encourage resort to the arbitral process—simply does not offend the rule of liberal construction . . . , nor does it offend any other policy embodied in the FAA." *Id.*

> In recognition of Congress' principal purpose of ensuring that private arbitration agreements are enforced according to their terms, [the United States Supreme Court has] held that the FAA preempts state laws which require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration. But it does not follow that the FAA prevents the enforcement of agreements to arbitrate under different rules than those set forth in the Act itself.
>
> Indeed, such a result would be quite inimical to the FAA's primary purpose of ensuring that private agreements to arbitrate are enforced according to their terms. Arbitration under the Act is a matter of consent, not coercion, and parties are generally free to structure their arbitration agreements as they see fit. Just as they may limit by contract the issues which they will arbitrate, so too may they specify by contract the rules under which that arbitration will be conducted.

*Id.* at 478-79.  Importantly here, "[t]he effect of § 1 of the FAA is to leave the arbitration of disputes in the excluded categories as if the FAA had never been enacted."  *Roberts*, 27 F. Supp. 3d at 1260 (citing *Mason–Dixon Lines, Inc. v. Int'l Bhd. of Teamsters*, 443 F.2d 807, 809 (3d Cir.1971)).  "There is no language in the FAA that explicitly preempts the enforcement of state arbitration statutes."  *Roberts*, 27 F. Supp. 3d at 1260 (quoting *Palcko v. Airborne Express, Inc.*, 372 F.3d 588, 595 (3d Cir. 2004)).

Here, Plaintiffs and XPO agreed to follow Missouri's arbitration law.  "Thus, allowing application of the FAA's § 1 exemption to prevent enforcement of the very state laws that the parties contracted for would indeed offend the policies underlying state and federal arbitration law."  *Roberts*, 27 F. Supp. 3d at 1262.  The underlying purpose of the FAA was to "overrule the judiciary's longstanding refusal to enforce agreements to arbitrate," and to "place such agreements upon the same footing as other contracts."  *Volt*, 489 U.S. at 474 (citations omitted).  There is no federal policy favoring arbitration under any particular set of procedural rules; rather, if anything, there is a federal policy to ensure the enforceability of private arbitration agreements pursuant to their terms.  *Roberts*, 27 F. Supp. 3d at 1263 (citing *Volt*, 489 U.S. at 476).

Here, as in *Roberts*, "[t]he parties are free to negotiate the terms of arbitration and the arbitration agreement here states that the laws of [Missouri] will apply to any dispute that arises or is related to [Plaintiffs'] employment with [XPO]."  27 F. Supp. 3d at 1263; *see, e.g.*, [#58-2] at 13 ¶ 8.  Here, as in *Roberts*, Plaintiffs "in effect ask[ ] the court to declare that the FAA forbids application of the very laws that the parties contracted to govern their agreement."  27 F. Supp. 3d at 1263; *Supp. Reply* [#317] at 3-5.  As summarized by the *Roberts* court:

> *Volt* does not support such a result. The FAA contains no express preemptive provision, nor does it reflect a congressional intent to occupy the entire field of arbitration. As *Volt* states, the FAA's passage was motivated by a congressional desire to enforce agreements into which parties had entered. Thus, the Supreme Court has recognized that the FAA does not require parties to arbitrate when they have not agreed to do so. Furthermore, it does not prevent parties who do agree to arbitrate from excluding certain claims from the scope of their arbitration agreement or from electing that the agreement be governed by state rather than federal law. It simply requires courts to enforce privately negotiated agreements to arbitrate, like other contracts, in accordance with their terms.
>
> Congress has not shown a clear intention to fill the entire field of arbitration here. Thus, the FAA's § 1 exemption does not preempt either application of the [state] Arbitration Act or enforcement of the arbitration agreement between [the defendant] and [the plaintiff]. Because [the plaintiff] and [the defendant] agreed for [state] law to govern their arbitration agreement, the court will not prevent them from abiding by the terms of their agreement. [State] law controls the enforcement of the arbitration agreement, which the court is required to enforce, and the [state Arbitration] Act should be applied to its enforcement.

27 F. Supp. 3d at 1263 (citing *Volt*, 489 U.S. at 477-78) (internal quotation marks and citations omitted).

Following *New Prime*, it is clear that Plaintiffs here fall within the FAA exclusion, *see New Prime, Inc.*, 139 S. Ct. at 536, but there is no clear authority preventing the Court from upholding the parties' agreement to arbitrate pursuant to the MUAA. Accordingly, the Court finds that the MUAA is not preempted by the FAA. *See Roberts*, 27 F. Supp. 3d at 1263

**B.    $25,000 Arbitration Threshold**

Plaintiffs previously raised the argument that the $25,000 amount in controversy requirement in the Agreement's arbitration provision is not met, and again raise that argument here. *Order* [#164] at 8; *Supp. Reply* [#317] at 7. The Court previously held:

> Disputes about procedural prerequisites for arbitration are presumed to be for arbitrators to decide rather than the Court. Conditions that dictate when the contractual duty to arbitrate arises, not whether there is a contractual duty to arbitrate at all, are procedural in nature. While the parties disagree about

the exact function of the amount in controversy requirement included in the arbitration provision, both parties refer to it as a trigger for arbitration. This language, as well as the text and structure of the provision, make it clear that the $25,000 amount in controversy requirement is a condition precedent to arbitration. Therefore, the Court finds that the amount in controversy prerequisite is procedural in nature and for an arbitrator to decide.

*Order* [#164] at 8-9 (internal citations and quotation marks omitted).

Plaintiffs do not explicitly ask the Court to reconsider its prior ruling, but essentially that is what they have done. *See Supp. Reply* [#317] at 7. To reiterate, grounds for a motion to reconsider are limited to the following: "(1) an intervening change in the controlling law; (2) new evidence previously unavailable; and (3) the need to correct clear error or prevent manifest injustice." *Servants of Paraclete*, 204 F.3d at 1012. Under the present circumstances, there appears to be no ground on which the Court should, or even could, reconsider the relevant portion of its prior Order [#164]. Accordingly, the Court reiterates its prior holding that "the amount in controversy prerequisite is procedural in nature and for an arbitrator to decide." *Order* [#164] at 9.

**C.     Contracts of Adhesion**

Plaintiffs further argue that the parties' arbitration agreements are not enforceable because each is a contract of adhesion. *Supp. Reply* [#317] at 5-7. Missouri law controls issues relating to the contracts. *See, e.g.*, [#58-2] at 13 ¶ 8 ("This Agreement is made in the State of Missouri, and all disputes and matters arising out of or relating hereto, including any allegation of a tort, or breach of this Agreement, or of violations of the requirements of any applicable governmental authorities, . . . shall be governed by Missouri law without regard to Missouri's conflicts of law provision, except to the extent that federal law supersedes Missouri law or otherwise applies.").

Plaintiffs rely on *Eaton v. CMH Homes, Inc.*, 461 S.W.3d 426, 438-39 (Mo. 2015),

in support of their argument. *Supp. Reply* [#317] at 5-6. There, the plaintiff argued that "the arbitration agreement as a whole [was] unconscionable because of the contract's adhesive nature." *Eaton*, 461 S.W.3d at 438. The Missouri Supreme Court first noted that, "[u]nder Missouri law, however, the fact that a contract is one of adhesion does not necessarily make it invalid." *Id.* "An adhesion contract is a contract created by the stronger of the contracting parties and offered on a 'take this or nothing' basis." *Id.* "An adhesion contract's terms are imposed upon the weaker party who has no choice but to conform, and such terms unexpectedly or unconscionably limit the obligations and liability of the drafting party." *Id.* (internal quotation marks omitted).

The Missouri Supreme Court pointed out that "a court should not invalidate an arbitration agreement in a consumer contract simply because it is contained in a contract of adhesion or because the parties had unequal bargaining power, as these are hallmarks of modern consumer contracts generally." *Id.* "Because the bulk of contracts signed in this country are pre-printed, form contracts, any rule automatically invalidating such contracts would be completely unworkable." *Id.* (internal brackets and ellipsis omitted). Thus, "rather than automatically invalidating contracts simply because they are contracts of adhesion, a court should look at the terms of the contract to determine whether they are rendered unfair by the contract's take-it-or-leave-it nature . . . ." *Id.*

> In determining whether to enforce the terms of a contract of adhesion, courts have looked not only to the take-it-or-leave-it nature or the standardized form of the document, but also to the subject matter of the contract, the parties' relative bargaining positions, the degree of economic compulsion motivating the "adhering" party, and the public interests affected by the contract.

*Id.* (quoting *Woods v. QC Fin. Servs., Inc.*, 280 S.W.3d 90, 97 (Mo. App. 2008)).

Plaintiffs argue the following in connection with their assertion that the parties'

agreements are contracts of adhesion:

> Former XPO Defendants' arbitration agreement . . . reserves the right to "seek[] replevin or other in rem relief to recover its property from any other jurisdiction." In other words, Former XPO Defendants reserved the right to repossess their property from Plaintiffs in court, while Plaintiffs are required to arbitrate "all disputes and matters arising out of or relating hereto." Therefore, there is no difference between the unconscionability of the provision in *Eaton* and the provision at issue here, except that this arbitration agreement strays even farther into the realm of unconscionability through unexpected limitations on the drafting party's obligations and liabilities.
>
> Here, the drafting party (Former XPO Defendants) required Plaintiffs to arbitrate any issue in which the aggregate value of the dispute exceeds $25,000, but any dispute where the aggregate value is less than $25,000 must be litigated in court. Through this provision, Former XPO Defendants have effectively insulated themselves from ever fairly resolving a dispute so long as the provision is enforced. If a dispute is valued at less than $25,000, the economics of civil litigation make it unlikely that the holder of this dispute could ever successfully litigate the claim with legal representation. While the truck driver could attempt to proceed *pro se*, this would seem an unlikely path to success given that Former XPO Defendants would be represented by Ogletree Deakins or the like.
>
> Conversely, if the dispute is over $25,000 but subject to binding, private arbitration, i.e., an expensive dispute resolution method, then it is highly unlikely that any individual in an economic position similar to Plaintiffs could ever afford to proceed through arbitration. Former XPO Defendants crafted a devious arbitration agreement which obtains one-sided and advantageous results; however, because this provision is contained within a contract of adhesion, it is not enforceable under Missouri law. The provision is unconscionable and unreasonably restricts the obligations of the drafter while heaping all detriment onto each individual Plaintiff.

*Supp. Reply* [#317] at 6-7 (internal citations omitted).

The Court first notes that the *Eaton* court did not find that the agreement to arbitrate was part of an adhesion contract and, instead, explicitly held that the differences in arbitration rights did not make the agreement invalid: "The Court, therefore, rejects Mr. Eaton's argument that his agreement to arbitrate was invalid solely based on the fact that the arbitration clause required Mr. Eaton to arbitrate all claims but gave [the defendant] the

right to bring suit in court 'to foreclose upon any collateral, to obtain a monetary judgment or to enforce the security agreement.'" 461 S.W. 3d at 429. The Court did, though, clarify "that a lack of mutuality of the obligation to arbitrate is one of the relevant factors a court will consider, along with the other terms of the contract, in determining whether the agreement to arbitrate otherwise is unconscionable." *Id.* However, "as long as the contract as a whole meets the consideration requirement, an arbitration clause in the contract will not be invalidated for a lack of mutuality of the obligation to arbitrate . . . ." *Id.* at 433. This is true *regardless of whether the included arbitration clause itself was one-sided*." *Id.* at 434 (quoting *State ex rel. Vincent v. Schneider*, 194 S.W.3d 853, 858 (Mo. 2006)) (emphasis added).

Here, there has been no showing, or even any argument, by Plaintiffs that each contract as a whole fails to meet the consideration requirement. *See also Supp. Response* [#310] at 7-8 (outlining XPO's argument that consideration supports the contracts). The mere lack of mutuality does not render the agreement to arbitrate invalid in the absence of a failure to meet the consideration requirement, and thus Plaintiff's argument does not provide any legitimate basis on which to invalidate the parties' contracts as contracts of adhesion. *See Eaton*, 461 S.W.3d at 434, 438-39.

## IV. Conclusion

In short, Plaintiffs are correct that their claims against XPO cannot be compelled to arbitration pursuant to the FAA. However, the Court is not convinced that *New Prime* precludes the Court from dismissing those claims in favor of arbitration pursuant to the MUAA. Accordingly,

IT IS HEREBY **ORDERED** that the Motion [#298] is **GRANTED in part**. Thus,

IT IS FURTHER **ORDERED** that the Court's prior Order [#164] is **VACATED** only to the extent inconsistent with this Order.

IT IS FURTHER **ORDERED** that former Defendants XPO, TransForce, and Con-Way remain **dismissed** so that Plaintiffs may submit their individual FLSA claims against these three entities pursuant to the arbitration provision of the Agreement and the MUAA. *See, e.g.*, *Spencer v. XPO Logistics*, No. 17-14084, 2018 WL 6830349, at *4 (E.D. Mich. Dec. 28, 2018) (dismissing action where parties had voluntarily agreed to arbitrate claims in another jurisdiction).

Dated: April 29, 2019

BY THE COURT:

Kristen L. Mix
United States Magistrate Judge