IN THE UNITED STATES DISTRICT COURT<br>
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:16-cv-02242-KLM

FRANKLIN MERRILL, *et al.*, all individuals,

      Plaintiffs,

v.

PATHWAY LEASING LLC, a Colorado limited liability company,
MATTHEW HARRIS, an individual,

      Defendants.

---

<h1 style="text-align:center">DEFENDANTS' THIRD AMENDED<br>
PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW</h1>

---

# TABLE OF CONTENTS

FINDINGS OF FACT ........................................................................................................... 1

I.  CASE BACKGROUND ............................................................................................ 1

   A.  The Parties. .......................................................................................................... 1

   B.  The Relationships Among Plaintiffs, XPO, And Pathway. ............................... 2

   C.  Claims, Counterclaims, And Procedural History ............................................... 3

II.  FACTS RELEVANT TO COUNT I: THE FLSA MINIMUM WAGE CLAIM ............... 5

   A.  Whether Pathway and XPO Are Joint Employers Under the Department of Labor's

   Four-Factor Test ........................................................................................................ 5

      1.  Pathway did not exercise hiring and firing authority. ........................................ 5

         a.  Pathway had no authority to determine whether XPO would contract with a
             driver for hauling services. ........................................................................... 5

         b.  Pathway  had no role in XPO's process for terminating its hauling contracts
             with Plaintiffs or other drivers. .................................................................... 7

      2.  Pathway did not exercise a substantial degree of control over Plaintiffs' work

      schedules or conditions of employment. .................................................................. 8

         a.  Plaintiffs could and did switch carriers, but Pathway could not require them
             to switch. ........................................................................................................ 8

         b.  Plaintiffs set their own schedules and controlled the performance of their
             contracts with XPO. ..................................................................................... 11

         c.  XPO outfitted the trucks. ............................................................................ 13

         d.  Pathway and XPO coordinated with respect to clerical matters and certain
             drivers who were at risk of default. ............................................................ 13

         e.  Plaintiffs were responsible for their equipment, insurance, and repairs. ..... 16

      3.  Pathway did not determine rates or method of payment. ................................... 17

      4.  Pathway did not maintain employment records. ............................................... 20

i

B.  Additional Facts That May Be Relevant To Court's Joint Employer Analysis............21

    1.    Degree of permanence of the relationship.......................................................21

    2.    Lack of shared management/ownership or common control. ...........................22

    3.    Lack of a single work premises. .......................................................................24

C.  Facts Relating To Whether Plaintiffs Were Independent Contractors.........................25

    1.    Degree of control..............................................................................................25

    2.    Opportunity for profit or loss. ..........................................................................26

    3.    Workers' investment in the business..................................................................28

    4.    Permanence of the working relationship. ..........................................................29

    5.    Degree of skill required.....................................................................................29

    6.    Drivers' work was not an integral part of Pathway's business. .........................29

D.  Facts Relating To Damages Under The FLSA. ...........................................................29

    1.    XPO's settlement statements and logs. ............................................................29

    2.    Plaintiffs' damages calculations.......................................................................30

    3.    The alleged "average" workday and 70-hour workweek. ................................31

    4.    Several Plaintiffs took pay advances.................................................................33

    5.    Plaintiffs' trucks were sometimes down for repairs..........................................34

    6.    Miscellaneous damages issues. ........................................................................36

III.    FACTS RELEVANT TO COUNTS II - IV: STATE LAW CLAIMS..............................37

IV.    FACTS RELEVANT TO COUNT V: RETALIATION (JURCAK) .................................39

V.    FACTS RELEVANT TO PATHWAY'S COUNTERCLAIMS .......................................39

CONCLUSIONS OF LAW ...........................................................................................................40

I.    JURISDICTION ..............................................................................................................40

II.    COUNT I:  PLAINTIFFS' FLSA MINIMUM WAGE CLAIM .......................................40

ii

A. The DOL Joint Employer Test Applies. ........................................................................ 41

B. The DOL Four-Factor Test. .......................................................................................... 43

C. Pathway is Not a Joint Employer Under the DOL Four-Factor Test. ........................... 44

    1. The first DOL factor weighs against joint employment. .................................... 45

    2. The second DOL factor weighs against joint employment. ............................... 46

    3. The third DOL factor weighs against joint employment. ................................... 50

    4. The fourth DOL factor weighs against joint employment. ................................ 51

D. Pathway Is Not A Joint Employer Under The *Hall-Salinas* Test. ............................... 52

    1. Three of the *Hall-Salinas* factors are substantially similar to the DOL test and already weigh against joint employment. ........................................................................... 53

    2. The remaining *Hall-Salinas* factors weigh against joint employment. .............. 54

E. Plaintiffs Were Independent Contractors. ..................................................................... 57

F. Plaintiffs Failed To Prove FLSA Damages ................................................................. 63

    1. Plaintiffs did not work 70 hours every week. .................................................... 64

    2. Plaintiffs who testified about damages. ............................................................ 66

        a. Franklin Merrill .......................................................................................... 66

        b. Anthony Dennis ......................................................................................... 69

        c. Rodney Lacy .............................................................................................. 69

    3. Plaintiffs who did not specifically testify about damages. ................................ 70

G. Scope Of Damages – No Evidence Of Willfulness. ...................................................... 70

H. Plaintiffs Are Not Entitled To Liquidated Damages. .................................................... 71

I. Defendant Matthew Harris Is Not Individually Liable. ................................................. 72

III. COUNTS II, III, AND IV: PLAINTIFFS' STATE-LAW CLAIMS ................................ 73

A. The Rescission Claim Fails. ......................................................................................... 73

B.  The Unjust Enrichment And Quantum Meruit Claims Fail.........................................78

IV.     COUNT V: PLAINTIFF LARRY JURCAK'S FLSA RETALIATION CLAIM..............80

V.      PATHWAY'S COUNTERCLAIMS ..................................................................................81

PROPOSED ORDER OF JUDGMENT.......................................................................................83

CERTIFICATE OF SERVICE .....................................................................................................85

Pursuant to the Court's April 17, 2020 Order [#347],[1] Defendants Pathway Leasing LLC ("Pathway") and Matthew Harris ("Harris") respectfully submit their Third Amended Proposed Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

### I.    CASE BACKGROUND

####      A.    The Parties.

1.      Plaintiffs Franklin Merrill, Anthony Glover, Keith Herring, Anthony Dennis, Larry Jurcak, Sami Nasr, Ronald Dennis, Rodney Lacy, James Newberry, Tami Potirala, Craig Williams, Zigmund Gutowski, Joseph Horion, Eric Ard, and Tim Hollingsworth are over-the-road, long-haul truck drivers who leased trucks from Pathway and performed freight-carrying services for carriers.  Joint Proposed Stipulations of Fact ("Stip.") [#258-1] at ¶¶ 1, 19-20.  The claims of six Plaintiffs identified in the Fourth Amended Complaint have been dismissed from the case.  *See* Orders [#222] (Brent Lee, and Jennifer and Robert Thomas); [#172] (Lonnie Fails); and [#178] (Lora Lee and Jesse Fisher).

2.      Pathway is a Colorado limited liability company, with its principal place of business located in Lone Tree, Colorado.  Stip. [#258-1] at ¶¶ 17; Trial Transcript Volume ("Vol.") I, 6:2-6.[2]

3.      Defendant Harris is Pathway's principal member.  Stip. [#258-1] at ¶ 18.

4.      Former Defendant XPO Logistics Truckload, Inc., f/k/a Con-way Truckload, Inc. ("XPO") is a carrier for which Plaintiffs performed freight-carrying services during the relevant

---

[1] "[#347]" is an example of the convention that Defendants use throughout this filing to identify the docket number assigned to a specific entry in the Court's CM/ECF system.

[2] The trial transcripts were filed on ECF on August 10, 2018: Vol. I [#276]; Vol. II [#277]; Vol. III [#278]; Vol. IV [#279]; Vol. V [#280]; Vol. VI [#281]; Vol. VII [#282].

time period.[3]  Order [#242] at 2.  The Court dismissed without prejudice Plaintiffs' claims against

XPO.  Order [#164] at 11; *see also* [#326] (Court reconsidered prior Order, but held that XPO's

dismissal was proper).

> ### B.      The Relationships Among Plaintiffs, XPO, And Pathway.

5.      XPO's customers pay XPO to carry freight across the country.  Thomas J. Hunt

Preservation Deposition Transcript, June 28, 2018 ("Hunt Preservation Dep."), [#284-1] at 45:13-

19.  XPO classified Plaintiffs as independent contractors.  *Id.*, 82:19-83:3; Vol. V, 849:5-9.

6.      As of June 2017, XPO employed approximately 2400 company drivers

(employees) and contracted with roughly 540 independent-contractor drivers ("owner-operators").

Transcript of 30(b)(6) Deposition of XPO (Thomas J. Hunt), June 28, 2017 ("XPO Dep."), [#265-

9] at 39:20-25.

7.      In May 2013, XPO and Pathway entered into a "Carrier Agreement," under which

Pathway implements a leasing and service program customized to meet XPO's interests.  *See*

Trial Exhibit ("Tr. Ex.") 127.

8.      Among other things, the Carrier Agreement requires the following: (1) Pathway

must consider XPO's reasonable preferences as to which types of trucks to lease; (2) Pathway

must hold open any proposed lease financing for 30 days from the date on which Pathway notifies

XPO of approval of the financing; (3) XPO must notify Pathway of any driver's request to change

from a solo to a team operation; (4) XPO must notify Pathway if any driver's insurance coverage

changes or lapses or if any driver declares bankruptcy; (5) XPO must use its reasonable best

efforts to assist Pathway in locating the trucks if any driver defaults on payments or terminates a

---

[3] XPO is a Missouri corporation, now known as Contract Freighters, Inc., and sometimes
referenced by witnesses as "CFI."  For ease of reference, XPO Logistics Truckload, Inc., Con-
way Truckload, Inc., and Contract Freights, Inc. are all referred to as "XPO."

lease early; and (6) XPO must enter into its own independent contractor agreements with Pathway clients. Tr. Ex. 127 at 1-2.

9.    Each Plaintiff executed an "Equipment Lease Agreement" with Pathway that governs the terms and conditions of their leases with Pathway. *See* Tr. Ex. 50; Vol. I, 5:12-24. The leases state that each Plaintiff (or "Lessee") "will be entering into an independent contractor operating agreement . . . in which Lessee shall act as an independent contractor providing Carrier with certain transportation services. . . ." Tr. Ex. 50 at 2, ¶ 13(a).

10.    Each Plaintiff executed a separate "Contractor Hauling Agreement" with XPO defining the terms and conditions of their freight hauling services for XPO. *See* Tr. Ex. 128 (form used until December 31, 2015) and Tr. Ex. 129 (form used after December 31, 2015); Vol. III, 436:1-24. In these agreements, each Plaintiff agreed, among other things, to take full responsibility for subcontracting with or employing their own drivers:

> CONTRACTOR [Plaintiff] hereby assumes full control and responsibility for the selection, training, hiring, setting of grooming and dress standards, disciplining, discharging, setting of hours, wages and salaries, providing for unemployment insurance, state and federal taxes, fringe benefits, workers' compensation, adjustment of grievances, all acts and omissions, and all other matters relating to or arising out of CONTRACTOR'S use or employment of drivers and laborers, and any and all other employees or agents of CONTRACTOR that CONTRACTOR may provide or use to perform any aspect of this Agreement.

Tr. Ex. 128 at 15, ¶ 32; Tr. Ex. 129 at 14, ¶ 32. In the more recent agreement, each Plaintiff also attested: "I am an independent contractor and not an employee, partner, agent, or engaged in a joint venture with [XPO] nor are any drivers or other workers that I supply." Tr. Ex. 128 at 28.

### C.    Claims, Counterclaims, And Procedural History.

11.    Plaintiffs sued defendants under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.* They claim that, for different weeks for each Plaintiff, Pathway failed to pay

each Plaintiff the statutorily required minimum wage for each hour worked.  Plaintiffs further allege that XPO misclassified them as independent contractors, that Pathway and XPO are their joint employers, and that Pathway and XPO are jointly and severally liable for any unpaid minimum wages under the FLSA.  Fourth Am. Compl. [#82] at 14.

12.    The Court conditionally certified Plaintiffs' FLSA claims.  Order [#115].  A number of individuals then filed their consents to "opt-in" to this case as plaintiffs.  *See, e.g.*, Consent Forms [#123-135, 137, 139-141, 143-146, 149-156, 158-162].  Later, however, the Court orally granted Defendants' Motion to Decertify [#275] and entered a written Order explaining its decision.  Order [#333].  The Court found that there were "numerous individualized factual considerations that must be analyzed in reaching the damages determination. . . ."  Order [#333] at 8.  Consequently, only the 15 named Plaintiffs are parties to this case, and they are pursuing their claims in their individual capacities.  The opt-in Plaintiffs' claims were dismissed without prejudice.  *Id.* at 11.

13.    Plaintiffs allege three additional claims against Pathway under Colorado common law, for rescission, unjust enrichment, and quantum meruit (the "state-law claims").  Fourth Am. Compl. [#82] at 21-24.  Plaintiffs never moved to certify their state-law claims as a class action under Rule 23(f).  Order [#215] at 1.

14.    Except for Plaintiff Larry Jurcak, the Court dismissed the Plaintiffs' FLSA retaliation claims on summary judgment.  Order [#242].

15.    Pathway asserts two counterclaims.  First, Pathway alleges breach of contract against eight Plaintiffs (Franklin Merrill, Anthony Glover, Keith Herring, Ronald Dennis, James Newberry, Tami Potirala, Zigmund Gutowski, and Joseph Horion).  Pathway claims they

breached their Equipment Lease Agreements by failing to make required lease payments to Pathway. *See* Defs. Answer to Fourth Am. Compl. and Counterclaims [#95] at 41-43.

16.     Second, Pathway asserts a setoff counterclaim against all Plaintiffs.  Pathway alleges that if Plaintiffs are entitled to any damages, the amounts must be set off by the amounts they still owe Pathway under their lease agreements.  *See id.*

17.     The Court held a bench trial on June 25-27 and July 2-6, 2019.  Each named Plaintiff testified, either in person or via videoconference.  Plaintiffs also elicited testimony from Pathway employees James Masloski and Lenise Ruff.  Mr. Harris testified on behalf of Defendants.  Both sides relied on deposition testimony of various witnesses.

## II.     FACTS RELEVANT TO COUNT I: THE FLSA MINIMUM WAGE CLAIM

### A.     Whether Pathway and XPO Are Joint Employers Under the Department of Labor's Four-Factor Test.

#### 1.     Pathway did not exercise hiring and firing authority.

##### a.     Pathway had no authority to determine whether XPO would contract with a driver for hauling services.

18.     Pathway developed its lease terms well before its carrier relationship with XPO began.  It uses the same lease template with all of its clients regardless of carrier.  Vol. V, 861:6-10, 862:4-19; Vol. VI, 1035:13-17.

19.     Pathway did not draft, prepare, or negotiate any of the terms of XPO's Contractor Hauling Agreements with the Plaintiffs or administer the contracts.  Hunt Preservation Dep. 17:22-18:3; Vol. V, 895:19-896:4.

20.     XPO and Pathway performed some due diligence prior to entering the Carrier Agreement, including exchanging copies of their respective lease and contractor agreements.  *See* Tr. Ex. 2 at 2.  Mr. Harris provided comments to the contractor agreement, but XPO rejected them; likewise, Pathway rejected many of XPO's recommendations with respect to the lease

agreement.  Vol. V, 860:14-25, 861:20-862:9.  Any changes Pathway made to the Equipment Lease Agreement applied to all of its clients, not just those contracted with XPO.  *Id.*, 862:10-19.

21.     Pathway has its own process for vetting lease applicants, including conducting credit checks.  *Id.*, 878:15-879:14.  Plaintiffs had varying credit scores ranging from poor to excellent; however, Pathway considered multiple factors when considering lease applicants.  *Id.*, 879:15-880:4; *see also* Vol. I, 187:15-17.  XPO had nothing to do with Pathway's independent process for vetting applicants. Vol. V, 881:7-19.  Mr. Harris testified that Pathway is not required to approve an applicant who learned of Pathway from XPO, and it has rejected many such applicants in the past.  *Id.*, 878:4-14.

22.     XPO likewise has an independent process for vetting owner-operators.  Hunt Preservation Dep. 23:3-21.  Before engaging owner-operators, XPO runs a "DAC report," which is a background check showing a driver's driving history, dates of employment, reasons for termination, moving violations, and similar data.  Vol. V, 882:1-6.  Pathway has never run a DAC report on any client, it had nothing to do with XPO's DAC reports, and it has never had access to any potential client's DAC report.  *Id.*, 882:7-13.

23.     Pathway had no authority over whether XPO would choose to contract with a Pathway client.  Hunt Preservation Dep. 23:22-24.3.

24.     Pathway did not regularly coordinate with XPO regarding driver recruitment, but on one occasion, it provided general program information and a flyer for XPO to share with potential new contractors.  Vol. V, 873:19-875:6.  While many of the Plaintiffs testified that they first learned of Pathway through messages sent over the onboard Qualcomm communications system maintained by XPO, Pathway had no role in preparing these messages and was not even aware of them.  *Id.*, 875:7-18.

25.     XPO's contractors lease from a wide variety of other leasing companies, including, among others, Lone Mountain, Arrow Truck Sales, Arkansas Equipment Leasing, Wholesale Truck and Finance, LRM, Cure Truck Leasing, Quality Truck Leasing, Bush Truck Leasing, Schneider Finance, One Leasing, and Mission Financial.  Deposition Transcript of Leslie "Susi" Killinger, Aug. 31, 2017, [#265-2] at 39:21-40:19; Hunt Preservation Dep. 10:13-17; Vol. V, 831:6-832:5 (Mr. Nasr was given names of multiple leasing companies by XPO and understood that he did not have to lease a truck through Pathway).  At the peak of XPO's independent contractor fleet of 550 total trucks, approximately 120 to 130 trucks (less than a quarter) were leased from Pathway.  Hunt Preservation Dep. 11:23-12:6.

26.     XPO maintained lists of available trucks and brochures from multiple leasing companies in addition to Pathway.  XPO Dep. 25:8-26:1, 110:2-24.

27.     XPO administers an orientation program for contractors.  Hunt Preservation Dep. 24:11-16.  Pathway has never been involved in XPO's orientation.  *Id*., 24:21-23; Vol. V, 890:13-891:6.

**b.     Pathway  had no role in XPO's process for terminating its hauling contracts with Plaintiffs or other drivers.**

28.     XPO alone had authority, both under the Contractor Hauling Agreement and in practice, to decide whether to stop using a contractor's services or to terminate a Contractor Hauling Agreement.  Hunt Preservation Dep. 18:4-15; Vol. VI, 942:2-4.

29.     For example, in the cases of Tami Potirala, Chris Beaupre, and Duane Van Der Kamp, XPO simply notified Pathway that it was going to terminate their agreements and did not ask for or require Pathway's consent.  Vol. VI, 942:5-944:24.

30.     If XPO terminated a contractor, his or her lease obligations with Pathway continued, and Pathway worked with the client to find an alternative carrier.  For example, after

7

XPO terminated their services, Pathway worked with Ms. Potirala and Mr. Beaupre to try to find them another carrier.  *Id.*  Mr. Beaupre successfully contracted with Ozark, another carrier, and remained a Pathway client, as did others whose contracts XPO terminated.  *Id.*

31.     Conversely, only Pathway had authority under the Equipment Lease Agreement to terminate a client's lease.  *See* Tr. Ex. 50 at 4, ¶ 18; Vol. VI, 940:3-8.

32.     If a driver completed their lease with Pathway and purchased the truck, their relationship with Pathway ended, but the driver could, and often did, continue driving for XPO. Hunt Preservation Dep. 19:4-20:16; *see also* Vol. II, 294:16-295:1, 295:24-296:12 (Mr. Lacy completed his lease obligations six months early); Vol. III, 447:5-448:23 (Mr. Ard continued to drive as a contractor for XPO for a year and a half after buying his Pathway vehicle with a private bank loan); Vol. IV, 583:2-20 (Mr. Dennis); Vol. V, 755:12-19 (Mr. Hollingsworth purchased his vehicle from Pathway and continued to drive as a contractor for XPO for a little over a month thereafter); *id.*, 828:21-829:6 (Mr. Nasr ended his relationship with Pathway by purchasing his vehicle but went on to serve as a contractor to another carrier).

33.     XPO had an unwritten rule that owner-operators who previously worked as XPO company drivers (*e.g.*, employees) could not return to company driver positions after taking on a lease.  Hunt Preservation Dep. 21:3-22:4.  XPO applied this rule to every contractor, regardless of which leasing company they used.  *Id.*  Pathway had no input, authority, or control over whether XPO applied this rule to the Plaintiffs.  *Id.*

        **2.**     **Pathway did not exercise a substantial degree of control over Plaintiffs' work schedules or conditions of employment.**

               **a.**     **Plaintiffs could and did switch carriers, but Pathway could not require them to switch.**

34.     Plaintiffs could switch carriers, subject to Pathway's approval, and several did so. Tr. Ex. 50 at 2, ¶ 13(a); Vol. V, 918:8-919:4; Tr. Ex. Z6 (Mr. Anthony Dennis and Mr. Herring switched carriers).  Over 57 Pathway clients switched carriers in 2017, and in 2018, by the time of trial, over 40 clients switched carriers.  Vol. VI, 967:1-11.

35.     Pathway did not require Plaintiffs to drive for any particular carrier.  Vol. V, 893:21-894:9, 920:16-922:9.  XPO could not prevent or prohibit an owner-operator from switching from one carrier to another.  Hunt Preservation Dep. 48:10-16.

36.     Before approving a carrier switch, Pathway sometimes required Plaintiffs to meet certain conditions.  Mr. Harris testified that he never told Plaintiffs or any other client that they could not switch to another carrier if those conditions were met.  Vol. VI, 1037:24-1038:15, 1042:5-18.  For example, if a client wanted to switch to a carrier that would not agree to remit funds to Pathway, Pathway required the client to be current on their lease obligations and sometimes to provide an additional advance payment, both of which mitigated the additional risk associated with collecting directly from a client. Vol. V, 919:17-920:2; Vol. VI, 1041:22-1042:18. Pathway approved carrier switches when clients met required conditions, *see*, *e.g.*, Vol. VI, 1042:19-25 (C. Beupre), and denied them when clients were unwilling to meet the conditions, *see, e.g.*, Vol. V, 922:10-923:13 (B. Johnson).

37.     Two Plaintiffs—Franklin Merrill and Rodney Lacy—testified that Pathway refused to allow them to switch carriers (PAM Transportation and Landstar, respectively) that would not agree to remit payment directly to Pathway.  Vol. I, 76:1-23, 252:21-253:16.

38.     Mr. Harris' testimony undermined Mr. Merrill's assertion.  He credibly testified that Pathway earlier approved a request by another client, Jonathon Brownell, who asked to switch from XPO to PAM Transportation in April 2016.  Vol. V, 920:16-921:9.  Pathway

approved that switch, even though Mr. Harris knew Mr. Brownell would likely earn less at PAM Transportation than he did at XPO.  *Id.* at 921:1-9.  Plaintiffs offered no contrary evidence.

39.     Mr. Lacy's trial testimony about asking to switch to Landstar was not credible, because it was directly contradicted by his sworn deposition testimony, in which he expressly denied ever requesting to switch carriers.  Vol. II, 296:22-298:19.  Mr. Harris also testified that Pathway has had clients contracted with Landstar for a while.[4]  Vol. V, 922:5-9.

40.     Although Plaintiffs could and did switch carriers from time to time, Pathway could not *require* a client to switch carriers.  Vol. V, 919:5-16.  At the time of trial, the freight market was very strong, meaning that some clients contracted with "percentage pay" carriers—*i.e.*, carriers who pay owner-operators based on a percentage of the load rather than on a per-mile basis.  Some of these clients did extremely well, with one client netting $6,400 in one week.  Vol. V, 849:10-852:11.  When clients earn more money, they are more likely to remain current with their lease obligations and achieve Pathway's and the client's goal of lease completion.  Vol. V, 878:15-24; 916:5-14.  Yet, Mr. Harris credibly testified, and Plaintiffs presented no contrary evidence, that Pathway cannot and does not force clients to switch to another carrier, even if Mr. Harris knows the client could earn more or do better at another carrier.  Vol. V, 852:18-853:5.  As noted above, Mr. Brownell switched to a different carrier, with Pathway's approval, even though he would make less money for that carrier, because he wanted to drive routes closer to his home.  Vol. V, 920:24-921:9.

---

[4] Mr. Ard also testified that he talked to Mr. Harris about switching carriers, and Mr. Harris told him about Landstar.  Vol. III, 441:4-8.  Inexplicably, Mr. Ard then claimed he was "under the impression" that he was not allowed to switch to Landstar.  *Id.* at 441:9-14.  Regardless, in his deposition, Mr. Ard admitted that he did not switch carriers because of the down time and lost revenue associated with the switch, not because of any restrictions imposed by Pathway.  *Id.* at 441:15-442:11.

> **b.    Plaintiffs set their own schedules and controlled the performance of their contracts with XPO.**

41.    XPO dispatched the Plaintiffs through an onboard communications system it installed and operated without Pathway's involvement.  *See*, *e.g.*, Hunt Preservation Dep. 27:2-13; 33:6-34:7; 44:2-8.  Pathway did not assign loads, set rules or restrictions on the kinds of goods they could transport, or set any rules for them regarding unloading or securing cargo or picking up and completing deliveries on time.  *See*, *e.g.*, Vol. I, 119:10-12, 120:25-121:25; Vol. II, 302:21-23, 303:12-19; Vol. III, 504:1-505:5.

42.    Plaintiffs could take time off without seeking permission from XPO or Pathway. Hunt Preservation Dep. 36:8-37:24; Vol. V, 833:4-8 (Mr. Nasr testified that the discretion to take time off for vacation was up to him, "like any other business owner").  Neither Pathway nor XPO established a work schedule for Plaintiffs.[5]  Vol. I, 119:3-5; Vol. II, 301:15-16; Vol. III, 503:20-21; Vol. IV, 614:25-615:5; Vol. V, 900:19-21.

43.    Plaintiffs had the discretion to decline loads from XPO and set their own restrictions on where they would drive, the weight of the freight, the routes they would travel, or other conditions, all without needing Pathway's permission.  Vol. II, 301:23-302:14 (Mr. Lacy would not drive in the mountains or haul freight over a certain weight because of the wear and tear on the truck); Vol. III, 502:2-23 (Mr. Williams turned down loads based on weight, mileage, and safety); Vol. IV, 613:13-22 (Mr. Anthony Dennis refused loads on the East Coast and chose routes in the South closer to home);[6] Vol. IV, 641:8-642:15 (Ms. Potirala turned down loads for

---

[5] Mr. Merrill is the only Plaintiff who testified that Mr. Harris would sometimes reach out to him if he was "running late," "stayed home too long," or sat too long in an area.  Vol. I, 71:22-72:8, 73:5-13.  Mr. Harris denied having such contacts with Mr. Merrill or any other Plaintiff.  Vol. V, 900:22-901:13.  None of the other 14 Plaintiffs corroborated Mr. Merrill's assertions.

[6] Mr. Dennis testified that if he refused a load or "restricted" himself, Mr. Harris called him, asked why, and told him he should not limit himself to certain areas.  Vol. IV, 626:13-21.

various reasons, including trip length and waiting times); Vol. V, 830:7-19, 833:20-835:21 (Mr.

Nasr declined "short runs," going to the Northeast, and certain areas in winter months; when he

was approached to return to XPO, he told XPO that "once you've been an owner-operator, you

can't have people telling you where to go, when to go, things like that," so he wanted to find

another truck to return as an owner-operator versus a company driver); Hunt Preservation Dep.

37:23-40:2; Jose Garcia Dep. Transcript, Jan. 4, 2018, [#265-6] at 134:24-135:2 ("And I say, 'I'm

glad I'm an owner. I work my own route.' Because that's part of the freedom. I can fuel where I

want because I pay for the fuel, and I can route myself where I want.").

44.     Mr. Nasr regularly turned down loads for economic reasons.  He testified that he

was "still in business" because he rejected loads that did not make economic sense, such as when

fuel costs were too high to earn a profit or when certain customers were known to make drivers

wait idle too long when delivering a load.  Vol. V, 835:2-836:4.

45.     Neither XPO nor Pathway dictated Plaintiffs' routes, refueling stops, or rest or

meal breaks.  Vol. I, 252:10-20; Vol. II, 302:24-303:8; Vol. IV, 615:25-616:9; Vol. V, 901:14-24.

Instead, Plaintiffs admitted that the routes they drove, where they stopped to refuel, and when

they took rest or meal breaks were dictated by the need to travel the shortest or fastest route or by

Department of Transportation ("DOT") regulations mandating rest periods and limiting daily

driving times.  Vol. I, 50:3-9, 244:14-16, 251:14-22; Vol. II, 314:18-20; Vol. III, 512:21-513:2;

Vol. IV, 618:25-619:12.

---

However, Mr. Dennis did not claim Mr. Harris or Pathway prevented him from declining loads or
having restrictions.  Vol. IV, 614:2-24.  Mr. Harris credibly testified that he discussed these issues
with Mr. Dennis because Mr. Dennis was concerned about not earning enough money, and Mr.
Harris pointed out options to increase his earning potential, but Mr. Harris could do no more than
provide Mr. Dennis with information.  Vol. V, 903:16-904:23.

46.     Plaintiffs had the option to enter either single-person or team leases.  Tr. Ex. 50 at

2, ¶ 13(c).  Mr. Hollingsworth elected to drive with a team.  Vol. VI, 938:16-23.  He hired his

own contractor, someone he knew "like a son."  Vol. V, 760:4-10.  Instead of paying a fixed

salary or hourly wage, Mr. Hollingsworth paid his contractor a percentage of his net profit after

fuel and lease expenses.  *Id*., 760:14-25.  Neither XPO nor Pathway could dictate whether

Plaintiffs drove solo, drove with a team, or hired their own employees or contractors.  Vol. III,

553:6-13; Vol. V, 846:11-847:10; Hunt Preservation Dep. 30:16-21.

### c.     XPO outfitted the trucks.

47.     To ensure compliance with DOT requirements, XPO, without Pathway's

involvement, inspected Plaintiffs' trucks before they could haul freight for XPO.  Hunt

Preservation Dep. 23:3-8, 12-17, 25:16-24; Vol. V, 889:19-890-4.

48.     Similarly, XPO, without Pathway's involvement, provided necessary equipment,

including the trailer attached to the truck and an onboard GPS, communications, and dispatch

system (formerly "Qualcomm" and currently "PeopleNet"), which tracked where and when

Plaintiffs drove.  Hunt Preservation Dep. 42:9-44:5; Vol. I, 154:15-155:1; Vol. IV, 661:1-4; Vol.

V, 896:5-11.  Pathway had no access to the communications and dispatch system and did not ask

for or review the logs produced by XPO's systems.  Hunt Preservation Dep. 44:6-8, 82:4-13; Vol.

I, 124:16-24.

### d.     Pathway and XPO coordinated with respect to clerical matters and certain drivers who were at risk of default.

49.     XPO analyzed the overall performance of its independent contractor fleet through

regular weekly, bi-weekly, and monthly meetings of its internal staff.  Pathway was not invited to

these meetings.  Hunt Preservation Dep. 44:9-23, 45:20-46:2.  Mr. Harris is the only Pathway

employee to have visited XPO's Joplin offices, and he did not do so regularly.  Vol. V, 890:22-

25; Vol. VI, 968:10-23.  Mr. Harris, along with other vendors, gave a presentation once at an XPO safety meeting.  Vol. V, 875:19-876:14.

50.     Pathway, however, did communicate with XPO and other carriers on clerical or administrative matters pertaining to certain clients, including some of the Plaintiffs.  For example, prospective clients sometimes asked Pathway to send the Equipment Lease Agreement to a business or a carrier, such as XPO, so that the business or carrier could print the agreement for the client. Vol. V, 769:2-18.  In these circumstances, the business or carrier printed the lease agreements, handed them to the prospective Pathway client, and sent the signed copies back to Pathway at the prospective client's request and direction.  *Id.*  XPO was not involved in substantive issues concerning the lease agreements and only facilitated the transmission of the lease.  *See*, *e.g.*, XPO Dep. 121:11-20.  Pathway never gave XPO any authority to negotiate its leases with clients or prospective clients, and XPO never did so.  Vol. V, 895:14-18.

51.     Approximately two years before the trial, Pathway began using "DocuSign," a software program that allows individuals to electronically sign documents.  Since then, Pathway has sent its Equipment Lease Agreements directly to the drivers' e-mail addresses to obtain their signatures, without any involvement from XPO or other carriers.  Vol. V, 768:18-769:1.

52.     Pathway and XPO exchanged other documentation related to the Equipment Lease Agreement and Contractor Hauling Agreement, such as insurance certificates.  Vol. V, 774:22-775:2.  XPO and Pathway also sometimes communicated about driver requests for reimbursement through the driver's escrow accounts with Pathway.  For example, XPO passed along its national tire pricing discounts to Plaintiffs; these discounts were available to all independent contractors contracted to XPO, not just those with Pathway leases.  Vol. V, 916:15-917:9; Hunt Preservation

Dep. 46:10-47:6.  Pathway released the client maintenance escrow funds, and clients then used the funds to pay for tires that XPO made available at discounted rates.  *Id.*

53.     Pathway and XPO also communicated from time to time about certain drivers who were struggling or "at risk" of defaulting on their Equipment Lease Agreements.  Vol. V, 905:21-906:21.  Only four Plaintiffs (Ronald Dennis, Larry Jurcak, Keith Herring, and Zigmund Gutowski) were part of these discussions.  *See* Tr. Exs. 13, 15, 16, 18, 23, 26, 35.  According to Mr. Hunt, such discussions were very common not just with Pathway but with any lease company.  Hunt Preservation Dep. 83:10-84:2.

54.     Pathway would reach out to XPO only if a client asked Pathway to talk to XPO about getting more miles or if Pathway was concerned that a client was in danger of defaulting on their lease obligations.  Vol. V, 906:7-21; Tr. Ex. 8; Tr. Ex. 46 (Jaime Parralles "said he wanted to talk to me because his miles are down").  In those communications, Pathway and XPO discussed issues that might impact the drivers' success or failure, *e.g.*, weather was slowing down shipping, a driver was dealing with a maintenance issue, or a driver was not achieving optimal fuel efficiency.  *See*, *e.g.*, Tr. Exs. 18, 23.

55.     Pathway and XPO did not and could not compel any performance changes by contractors.  *See*, *e.g.*, Tr. Exs. 8, 26.  They could suggest but not mandate ways of improving, such as suggesting drivers seek coaching services with a third party, American Trucking Business Services ("ATBS"), a company not affiliated with Pathway or XPO that provides accounting and other industry support services.  Tr. Ex. 26.

56.     Pathway and XPO had no control—such as through discipline—over when clients took time off, what loads they accepted or declined, how fast they drove (which could impact fuel efficiency), the weight of the freight they would haul, the geographic areas where they would

drive, or other self-imposed limitations.  Vol. V, 834:24-836:7, 899:13-900:18, 901:25-903:15, 908:6-909:7; Hunt Preservation Dep. 37:13-16, 46:7-9, 84:3-85:9.  Instead, Pathway shared information with certain clients about issues that might inhibit their opportunity to improve their net income.  Vol. V, 902:25-903:9.  Pathway also passed along to XPO that certain clients were complaining they were not driving enough miles and asked XPO to "give attention to that client." *Id.*, 907:17-908:5.  Pathway did not have the same information XPO had about the potential cause of a driver's struggles, so Mr. Harris was unable to have a complete discussion with XPO based on the limited information he received from a driver.  Vol. V, 907:17-908:23; *see also* Tr. Ex. 15 (Mr. Harris asked XPO for information "you may see from your end").

57.     Notably, even Mr. Nasr acknowledged that when he complained to Mr. Harris about not getting enough miles from XPO, Mr. Harris initially directed Mr. Nasr back to XPO. Vol. V, 839:8-22.  If things did not improve, then Mr. Harris would make a call, at which point Mr. Nasr said the miles would improve, but only temporarily.  *Id.*  Mr. Nasr described his frustration over Pathway's inability to affect a sustained change in XPO's dispatch process, explaining that it "would go back to the way it was again" after a matter of weeks.  *Id.*

### e.     Plaintiffs were responsible for their equipment, insurance, and repairs.

58.     Under their Pathway leases, Plaintiffs are responsible for insurance, repairs, maintenance, and accounting for excess mileage charges.  Tr. Ex. 50 at 2-4, ¶¶ 7, 13, 15.  The drivers maintain an escrow account with Pathway to pay for truck maintenance costs.  Vol. V, 913:21-914:15.  Pathway never declined to release escrow funds to any Plaintiff for truck maintenance purposes.  *Id.*, 915:4-7; Vol. I, 193:2-5.  Nor was there any evidence that XPO "controlled" those funds.

59.     Pathway charged Plaintiffs a quarterly excess mileage fee.  The purpose of the fee was to recoup Pathway's increased asset depreciation for heavy mileage periods. Vol. VI, 972:15-17.   XPO did not set the excess mileage fee, benefit from the fee, or take the fee into consideration when dispatching owner-operators. Hunt Preservation Dep. 47:7-21.

60.     In fact, XPO's interests were directly contrary to Pathway's in this respect, as the Court recognized at trial.  Vol. VII, 1114:22-1115:3.  XPO incentivized owner-operators to drive *over* a mileage cap by giving them a bonus each month they exceeded 11,000 miles, whereas Pathway charged clients for increased depreciation due to excess mileage.  Vol. I, 167:2-14; Vol. VI, 972:15-17, 973:2-15.

### 3.     Pathway did not determine rates or method of payment.

61.     Plaintiffs never completed an IRS Form W-4 regarding deductions or withholdings for Pathway, and there is no evidence that they did so for XPO.  Vol. V, 881:1-6.

62.     XPO has a separate settlement department within its payroll operations to handle independent contractor payments.  Hunt Preservation Dep. 26:3-28:12.

63.     Based on voluntary deductions specifically requested by the drivers, XPO sent the drivers "settlement statements" for each pay period, reflecting the net amounts XPO remitted to Pathway, including pay for miles driven less any driver-elected deductions for items such as insurance premiums, private accounting services, or advances.  *Id*., 51:25-60:5; *see, e.g.,* Tr. Ex. B1 (collection of settlement statements for Mr. Nasr).

64.     XPO maintained the logs and records necessary to determine how many miles a Plaintiff drove for each pay period.  Hunt Preservation Dep. 60:23-71:20 *and see* Tr. Ex. S (example of e-logs for Mr. Merrill).  Pathway had nothing to do with the logs.  *See supra* ¶ 48.

65.     Pathway played no role in the settlement process.  It had no control over how or when XPO calculated the settlements, was never notified about driver deductions (*e.g.*, advances), and did not know how many miles were driven by any driver for any settlement period.  Hunt Preservation Dep. 27:24-28:12; Vol. V, 864:5-18.

66.     Plaintiffs signed a payment direction letter authorizing XPO to remit payment through Pathway.  This ensured that Pathway collected lease payments.  Vol. V, 892:14-25. Pathway made only lease-specific deductions (rent, security deposit, federal heavy vehicle use tax, excess mileage charges, deposits to maintenance escrow accounts, and bookkeeping and tax return services) before distributing the net amounts to the drivers.  Tr. Ex. 50 at 21 (Bates-stamped PATHWAY 000023); Vol. V, 891:21-892:13.  When XPO remitted funds to Pathway, it included only a name, amount, and truck identification number.  Vol. V, 894:22-895:8.

67.     Approximately 20 Pathway clients paid Pathway directly without remitting payment through a carrier.  *Id.*, 893:21-24.  For example, Chris Beaupre paid Pathway directly through his checking account.  *Id.*, 893:25-894:9; Vol. VI, 966:18-22.

68.     The amounts of the lease-payment deductions are fixed; they do not vary depending on the amount Plaintiffs drive for XPO.  Vol. I, 122:17-20; Vol. V, 853:18-854:12.

69.     Pathway did not compensate Plaintiffs for the miles they drove for XPO.  Rather, Pathway disbursed amounts received from XPO, less lease payments and other amounts owed to Pathway in accordance with the lease terms.  Vol. V, 769:19-771:10.

70.     XPO permitted owner-operators to take a cash advance of $.10 per mile against pay due in the next pay period from XPO.  XPO deducted the advances during the next pay period.  Melinda Creed Dep. Transcript, Aug. 30, 2017 ("Creed Dep."), [#265-1] at 31:13-32:2.

71.     Pathway had no power to determine, monitor, or limit driver advances from XPO.[7] Vol. IV, 609:10-12; Vol. V, 837:20-838:4, 864:5-18.  XPO's advance policy, included in in its standard Contractor Hauling Agreement, applied to all owner-operators regardless of whether they leased from Pathway.  Creed Dep. 31:13-21; Hunt Preservation Dep. 17:12-17.

72.     XPO paid a fixed rate to contractors regardless of leasing company.  There was no special rate paid to Pathway clients.  Hunt Preservation Dep. 17:5-11.

73.     Since their relationship began, Pathway has provided XPO with market-based feedback on the economics of the owner-operator business, including information about rates that owner-operators would need to be paid in order to keep pace with the growing costs of truck ownership.  *See, e.g.,* Tr. Ex. 25.  Mr. Harris and Mr. Hunt discussed owner-operator rates as compared to lease and other costs, which could impact whether a client would be successful (*i.e.*, complete the Equipment Lease Agreement).  *Id.*  Mr. Harris testified that, from Pathway's perspective, an independent contractor program that does not work well for Pathway's clients is ultimately not in Pathway's business interest.  Vol. V, 858:7-21.

74.     The information that Pathway provided to XPO did not "set" rates of pay for owner-operators or even materially influence the rates that XPO actually offered to its contractors. Hunt Preservation Dep. 16:6-13, 16:21-17:4.  XPO set its own pay rates based on a comprehensive market analysis that Mr. Hunt conducted, using information collected from direct discussions with drivers and market research obtained through ATBS, which had pay rate and profit/loss data for more than 10,000 drivers.  *Id.*, 13:14-15:8.

---

[7] At the beginning of Pathway's relationship with XPO, Pathway suggested a weekly cap on the amount of personal advances that contractors could take from XPO.  Tr. Ex. 5 at 2.  XPO rejected Pathway's suggestion.  Vol. V, 863:15-864:4.

75.     According to Mr. Harris, although he provided XPO information about the minimum rates of pay that he believed contractors would need to receive in order to beat the industry average, XPO never implemented his suggestions. Vol. V, 859:24-860:25.

### 4.     Pathway did not maintain employment records.

76.     Plaintiffs never submitted employment applications to Pathway.  Vol. III, 503:8-10 (*e.g.*, Plaintiff Craig Williams); Vol. V, 880:20-25 (testimony of Mr. Harris).

77.     Plaintiffs never received from Pathway (1) an employee manual, handbook, or employment policies, (2) an employment agreement, or (3) any training.  Vol. I, 118:21-23; Vol. II, 301:9-14; Vol. III, 503:5-7, 11-12, 17-19; Vol. V, 891:7-14.

78.     XPO did not provide owner-operators with a company handbook or policies.  Hunt Preservation Dep. 28:13-29:1.

79.     XPO and Pathway did not develop any joint employment policies, share any joint inboxes or administrative resources, or conduct any joint training.  Vol. V, 786:22-787:21; 867:13-15, 21-22.

80.     Neither XPO nor Pathway maintained employment files for the Plaintiffs.  Vol. V, 867:23-25.

81.     Plaintiffs were responsible for obtaining their own worker's compensation or occupational accident insurance.  Vol. V, 889:10-12, 911:8-11.

82.     Pathway conferred with XPO to obtain the relevant insurance certificate from the drivers but had no involvement in identifying, electing, negotiating, pricing, or securing insurance coverage for the Plaintiffs.  Vol. V, 774:22-775:8, 911:8-11; Tr. Ex. 33.

83.     Pathway discussed with XPO, at a client's request, XPO's standard governing which of XPO's owner-operators (regardless of whether they leased a truck from Pathway) were

required to obtain workers' compensation insurance versus occupational/accident insurance.  Vol. V, 911:12-912:4.

84.     Plaintiffs maintained responsibility to obtain such insurance regardless of any advice or suggestions from Pathway or XPO.  Tr. Ex. 50 at 3, ¶ 15.

**B.     Additional Facts That May Be Relevant To Court's Joint Employer Analysis.**

**1.     Degree of permanence of the relationship.**

85.     Since 2015, as Pathway's business has grown and the freight market has adapted to changing economic conditions and the advent of new technologies, Pathway clients have contracted with an increasingly diverse pool of carriers.  Vol. V, 849:14-850:22.  Pathway supplies trucks to clients contracted with 30 different carriers, of which XPO is just one.  Vol. V, 849:10-13.  Consequently, the percentage of Pathway clients who contract with XPO has diminished substantially over time.  *Id.*, 855:4-22.

86.     XPO contracts with independent contractors from a similarly diverse pool.  It contracts with owner-operators who own their own trucks, as well as those who lease or obtain financing through a number of different entities.  *See supra* ¶ 25; Hunt Preservation Dep. 10:13-24, 11:8-22.  Even at its high-water mark during Mr. Hunt's tenure with XPO, Pathway clients constituted only one-third of XPO's owner-operator fleet.  *Id.*, 11:23-12:6.

87.     The Carrier Agreement permits either XPO or Pathway to terminate the parties' relationship with 120 days' notice.  Tr. Ex. 127 at 3.  At the same time, Pathway's leases provide for a fixed term.  Tr. Ex. Z6 (listing lease terms of all Plaintiffs).  Most leases run for approximately 36 months, but Plaintiffs had the option of completing them sooner by purchasing their trucks. Tr. Ex. 50 at 8 ("Option to Purchase").

88.     Seven of the 15 Plaintiffs (Eric Ard, Anthony Dennis, Ronald Dennis, Tim Hollingsworth, Larry Jurcak, Rodney Lacy, and Sami Nasr) and several other Pathway clients (including Andre Ellis, Paula Horion, Steven Kortman, Jaime Parrales, Eric Robertson, Eduardo Sustaita, Gerord Thomas, and Earnest Ward) successfully completed their leases and purchased their trucks from Pathway.  *See* Tr. Exs. C, G, K, W, Z, T1, H2, K2, M3, S3, S4, B5, V5, A6, H6.

89.     Once the drivers bought out their trucks, Pathway had no further interactions with XPO about them unless they sought to lease another truck from Pathway.  Approximately 20% of Pathway's clients returned to lease another truck from Pathway after completing a lease.  Vol. VI, 935:20-937:25.

90.     XPO's contractor agreements were also fixed for a period of three years and could be terminated by either party, with or without cause, by giving ten days' written notice.  *See* Tr. Ex. 128 at 14, ¶ 30.

91.     Plaintiffs did not depend on a continued Pathway-XPO relationship to drive. Plaintiffs whose contracts were terminated by XPO, or who asked to switch carriers, continued to lease from Pathway while driving for other carriers.  Vol. VI, 942:5-944:24.  Likewise, Plaintiffs who completed or bought out their leases continued to drive for XPO, even though they no longer had a relationship with Pathway.  *See supra* ¶ 32.

### 2.     Lack of shared management/ownership or common control.

92.     XPO played no role in Pathway's formation as a separate and independent business.  Vol. V, 848:16-18.

93.     Pathway and XPO share no common management.  They have no overlapping officers, directors, or employees.  Hunt Preservation Dep. 12:15-20.

94.     Pathway and XPO do not share common ownership.  *Id.*, 12:12-14; Vol. V, 853:10-17.

95.     The two companies are located in different states.  XPO's offices are in Missouri, and Pathway is based in Colorado.  Hunt Preservation Dep. 12:21-22; *see supra* ¶ 2; Stip. [#258-1] ¶ 19; Vol. V, 874:24-25.

96.     XPO and Pathway do not share or jointly allocate profits or losses.  Hunt Preservation Dep. 13:3-7.

97.     Pathway receives no compensation from XPO.  *Id.*, 13:11-13; Vol. VI, 965:17-966:10.  Pathway's only source of revenue is payments from clients who lease Pathway's equipment.  Vol. V, 848:8-13; Hunt Preservation Dep. 12:25-13:2.

98.     XPO and Pathway sometimes have contrary interests.  *See supra* ¶ 60.

99.     Plaintiffs note that Anita Stewart, an XPO recruiter who focuses on independent contractors, sent an email referring to Pathway as XPO's "newest partner in a joint venture to grow our independent contractor division."  Tr. Ex. 53.  But Pathway and XPO contractually disclaimed, among other things, any joint venture or partnership, any right to bind or commit one another, and any right to assume liabilities for one another.  Tr. Ex. 127 at 4, § 6(a).

100.     Several years ago, XPO allowed Pathway to park unleased trucks at XPO's Joplin facility for "a couple of weeks," until Pathway could sell, move, or lease them.  XPO Dep. 124:2-125:1.  Pathway had asked XPO to allow it to park its trucks there for longer periods of time, but XPO rejected that request.  *See* Tr. Ex. 5.

101.     Pathway purchased approximately 20 trucks from XPO between 2013 and 2014. Vol. V, 868:15-18.  These purchases comprised only 6% to 7% of Pathway's inventory at the time.  *Id.*, 868:15-869:3.  XPO gave Pathway information about these trucks so Pathway could

decide whether to buy them, but Pathway received no special discount from XPO as a result of their relationship, and if the parties could not agree on a price, XPO sold the trucks elsewhere. *Id*., 869:16-18; Hunt Preservation Dep. 48:1-9. When Pathway did purchase trucks from XPO, it did not automatically lease them to independent contractors driving for XPO as Plaintiffs contended at trial; rather, only two Pathway clients leased trucks previously purchased from XPO, and neither is contracted to drive with XPO. Vol. V, 868:15-869:3.

102. An XPO recruiter, Susi Killinger, once discussed XPO trucks with Pathway. Tr. Ex. 7. She sent a single email in which she stated, "I haven't decided what driver gets this." *Id*. Despite that email, which was not addressed in her testimony, Mr. Harris credibly testified that neither Ms. Killinger, nor anyone at XPO, had the authority to assign a Pathway truck to an owner-operator. Vol. VI, 982:4-14. Mr. Hunt corroborated Mr. Harris's testimony. Hunt Preservation Dep. 49:2-6.

### 3.      Lack of a single work premises.

103. Plaintiffs perform freight hauling services on roads throughout the United States. They do not work at a single office, location, or facility. Hunt Preservation Dep. 24:4-10.

104. The independent contractor recruitment, orientation, and on-boarding process occurs at XPO's Joplin, Missouri property. *Id*., 24:11-25:6; Vol. I, 25:10-14.

105. Plaintiffs picked up their trucks at various locations, such as Missouri, Texas, and South Carolina. Vol. I, 36:22-37:3, 234:6-13; Vol. III, 487:15-24, 544:10-11.

106. The initial outfitting of Plaintiffs' trucks and some maintenance work occurred at XPO's Joplin, Missouri maintenance shop. Hunt Preservation Dep. 25:16-25; Vol. I, 213:1-13; Vol. V, 889:19-890-4.

107.     Pathway had no say in or control over the equipment that XPO installed on the trucks in Joplin.  *See supra* ¶¶ 41, 48.

108.     When Plaintiffs' trucks required service on the road, the maintenance work was performed in shops that were not owned or controlled by Pathway or XPO, and Plaintiffs selected the repair shop.  Vol. V, 803:1-6, 18-23, 913:17-20.

### C.     Facts Relating To Whether Plaintiffs Were Independent Contractors.

#### 1.     Degree of control.

109.     Plaintiffs did not have to perform the work themselves; they could hire their own drivers or work as a "team."  Tr. Ex. 128 at 9.  At least one Plaintiff, Tim Hollingsworth, exercised that right.  *See supra* ¶ 46.

110.     Plaintiffs were responsible for "hiring, setting the wages, hours and working conditions and adjusting the grievances of, supervising, training, disciplining, and firing all drivers, driver's helpers, and other workers necessary for the performance of [Plaintiffs'] obligations" under the terms of their Contractor Hauling Agreements.  Tr. Ex. 128 at 4, ¶ 7A.

111.     Plaintiff Ronald Dennis and Pathway client Thomas Gerord initially drove as a team (Vol. II, 553:6-10); several others, including Steven Kortman, Joey Brown, and Melanie Brown, drove as a team with their spouses (*see* Tr. Ex. Z6).

112.     If drivers elected to drive as part of a team, they had the flexibility to drive more miles for more pay than they would be able to make as solo drivers.  *See* Tr. Ex. 45 (email from Matt Harris to comparing income potentials).

113.     Plaintiffs made their own business decisions as to whether to decline loads based on weight, fueling costs, and other considerations that affected their profitability.  *See supra* ¶ 43.

114.    Company drivers, by contrast, were subject to "forced dispatch," meaning that they cannot decline loads except for limited reasons such as illness.  Vol. I, 71:7-18; 248:2-12; Vol. III, 554:7-14; Hunt Preservation Dep. 31:15-32:8.  Plaintiffs acknowledged that as owner-operators, they were not subject to forced dispatch.  Vol. III, 436:20-24, 502:21-503:1; Hunt Preservation Dep. 32:9-22.  And unlike owner-operators, company drivers must follow XPO's specific fuel and routing program or risk having their pay deducted to cover fuel costs.  Hunt Preservation Dep. 35:17-37:12.

115.    As independent contractors, Plaintiffs were subject to no contractual or policy restrictions on when or how much time they took off.  Vol. V, 833:4-8, 899:18-20; Hunt Preservation Dep. 36:8-24.  Company drivers, meanwhile, must follow a "driver handbook" that does not apply to owner-operators, who are subject only to their Contractor Hauling Agreements. Hunt Preservation Dep. 28:13-29:1.

### 2.    Opportunity for profit or loss.

116.    Plaintiffs retained significant opportunity for profit or loss.  On the profit side, as set forth above, seven of the 15 Plaintiffs successfully completed their leases and could earn substantially more than their peers (in addition to owning a valuable asset).  *See supra* ¶ 88; Vol. II, 294:16-295:23 (Mr. Lacy is still driving the truck he purchased from Pathway in October 2015 after successfully completing his lease); Vol. III, 555:16-163:6 (R. Dennis owns and is still driving his truck); *id.*, 492:13-24 (Williams testified that he "made more money [as an] independent contractor than a company driver"); Vol. V, 759:17-24 (Mr. Hollingsworth is still driving and earning money from the truck he purchased from Pathway); *id*, 830:20-831:5 (Mr. Nasr testified that he hired drivers to drive one of his trucks when he first drove for XPO, and he "run[s his] truck as a business").

117.     Before deciding to become independent contractors, Plaintiffs and those who leased trucks from Pathway conducted, or had the opportunity to conduct, their own independent evaluations of (1) whether to lease or purchase their trucks and (2) whether to lease their trucks from Pathway or other leasing companies, including by calling other companies and comparing their terms.  Vol. V, 831:6-832:5 (Mr. Nasr received names of other leasing companies from XPO; he rejected one of the other companies because of the down payment required); Vol. I, 186:11-190:16 (Ms. Austin did "due diligence" by talking to other drivers and researching at least three other leasing companies).

118.     In some cases, Pathway provided the best economic lease option to prospective and existing independent contractors.  For instance, Ms. Austin testified that she had excellent credit and enough money to purchase a new truck.  Vol. I, 186:23-187:19.  But she ultimately decided she did not want to make an $80,000 down payment on a new truck and opted to lease from Pathway.  *Id*.

119.     As of June 2018, 38 drivers, or almost 20 percent of Pathway's lessees, were leasing their second truck from Pathway.  Vol. VI, 936:2-8.  This means the drivers completed their payments and other lease obligations for their first Pathway truck and then chose to lease another truck from Pathway.  *Id*., 936:9-937:4.  According to Mr. Harris and Mr. Hunt, lease completions are not very common in the truck leasing industry; in fact, many lease purchase programs have annualized repossession rates exceeding 100 percent.  Vol. V, 925:3-926:6; Hunt Preservation Dep. 19:4-13.  Yet for Pathway, approximately one out of every five clients is a repeat customer.  Vol. VI, 937:5-14.

120.     The basis and rates of pay of contractors as compared to company drivers differs significantly.  XPO pays independent contractors $.97 per mile plus a fuel surcharge.  Creed Dep.

21:23-22:2; Hunt Preservation Dep. 15:9-20, 53:17-54:2.  By contrast, XPO pays company drivers a per-mile rate that varies by their experience level and provides employee benefits and a potential safety bonus.  Creed Dep. 22:5-23:2.  Company drivers are paid bi-weekly, while contractors are paid weekly.  *Id.*, 20:4-7.

121.    Unlike company drivers, XPO pays solo independent contractors an additional $.03 per mile for trips once the driver exceeds 11,000 miles in a month.  XPO pays independent contractors driving in a team an additional $.06 per mile for trips after driving 18,000 miles in a month.  *Id.*, 32:17-33:4.

122.    Plaintiffs had to manage their fuel costs, fuel efficiency, regular maintenance and upkeep, and other variables in order to be profitable; company drivers, by contrast, did not have those concerns.  Hunt Preservation Dep. 37:23-40:2.

123.    Plaintiffs were also exposed to the risk of loss, either by turning down too many loads, taking off too much time, experiencing a mechanical problem, running fewer miles due to bad weather, or any number of other factors.  *See, e.g.*, Vol. V, 837:8-12 (Mr. Nasr testified that it is possible to spend more money on fuel in a week than what a driver would earn, if "you don't know what you are doing").

### 3.    Workers' investment in the business.

124.    Plaintiffs were responsible for truck payments, maintenance and repairs, fuel costs, workers compensation and business liability insurance, and tax and accounting services. Tr. Ex. 50 at 2-4, ¶¶ 7, 13, 15; Vol. II, 306:20-307:10 (Mr. Lacy explained that he had "invested too much money to turn around and give" the truck back to Pathway).  Plaintiffs were required to secure a lease or otherwise procure the equipment to perform their work for XPO. Hunt Preservation Dep. 11:8-19.

125.    Plaintiffs were responsible for paying their own business-related taxes, and at least one Plaintiff admitted at trial to retaining his own business records for this purpose.  *See* Tr. Ex. 50 at 5, ¶ 20; Vol. IV, 596:12-19 (Anthony Dennis).

126.    As independent contractors, Pathway clients have established and registered their own limited liability companies.  Vol. I, 194:23-195:2 (Ms. Austin operates Cherokee Nomad Express); Vol. IV, 687:19-21 (Mr. Horion testified: "I had my own business license and everything out of the State of Texas"); Vol. V, 833:9-19 (Nasr Transportation LLC).

### 4.    Permanence of the working relationship.

127.    *See supra* ¶¶ 85-91.

### 5.    Degree of skill required.

128.    Aside from driving a commercial truck, to be profitable, Plaintiffs needed business acumen and financial proficiency, as they controlled whether to drive solo or as a team, what loads to accept, what routes to take, how to manage their fuel efficiency, maintenance intervals and maintenance locations, and when to work.  *See supra* ¶¶ 41-46, 58-60.

### 6.    Drivers' work was not an integral part of Pathway's business.

129.    Plaintiffs performed freight hauling for XPO, a freight hauling carrier, but performed no work and provided no services for Pathway.

### D.    Facts Relating To Damages Under The FLSA.

130.    Plaintiffs were not compensated on an hourly basis, nor did XPO or Pathway track their compensable time.  Vol. V, 897:24-898:5; Vol. IV, 615:16-21; Vol. III, 505:9-17.

### 1.    XPO's settlement statements and logs.

131.    Plaintiffs did track their time, manually or through XPO's systems, to comply with various DOT regulations.  Hunt Preservation Dep. 51:25-60:5, 60:23-71:20; Tr. Exs. V1, V2.

132.    Plaintiffs' weekly settlement statements from XPO show where the driver drove to or from, the miles driven, the dates on which the miles were driven, fuel charges, advances taken by the driver, and other information.  *See*, *e.g.*, Tr. Exs. V1 (Van Der Kamp), Q4 (Horion).

133.    The settlement statements were issued every Friday, based on trips completed (including submission of pertinent paperwork by the driver) by the prior Tuesday at midnight. Hunt Preservation Dep. 26:10-27:1.

134.    XPO's electronic logs show various categories: "on-duty (driving)," "on-duty (not driving)," "off-duty," and "sleeper berth."  The "driving" category captures time the driver spends driving with a load.  The "on-duty (not driving)" category captures activities such as equipment inspections, paperwork, and loading/unloading.  The "off-duty" category tracks break time and time spent after the driver is done working for the day.  The "sleeper berth" category records time spent in a sleeping berth, although the driver need not be sleeping during that time. *See* Hunt Preservation Dep. 65:11-67:20; see also Tr. Ex. F (A. Dennis log).

135.    No one challenged the accuracy of the settlement statements or the logs.

136.    Some Plaintiffs admitted that they did not review their settlement statements or driver logs in calculating their damages.  Vol. III, 513:3-11 (Williams); 536:22-537:5 (Jurcak); 557:3-19 (R. Dennis).  Others acknowledged that the logs and settlement statements would be helpful in determining how much they worked.  Vol. III, 513:3-11 (Williams); 557:3-19 (R. Dennis); Vol. IV, 604:8-11 (A. Dennis), 650:24-651:9 (Potirala).

### 2.    Plaintiffs' damages calculations.

137.    Plaintiffs did not retain an expert to calculate damages; instead, Plaintiffs' counsel prepared the damages calculations.  Vol. III, 558:6-20 (R. Dennis testified that he knew the numbers in Trial Exhibit 136 were correct because "y'all let me know it was correct").

138.     Trial Exhibit 136 reflects the damages Plaintiffs seek under the FLSA and state law.  With respect to minimum-wage damages, Exhibit 136 contains separate weeks "at issue" for each Plaintiff.  The Court understands that the "Weeks at Issue" column represents the weeks in which Plaintiffs claim to have earned less than minimum wage; the "Carrier Payment" column represents the payment remitted from XPO to Pathway for that week, as reflected on the weekly settlement statements (*see, e.g.*, Tr. Ex. V1); the "Driver Disbursement" column reflects the amount disbursed to each Plaintiff for the week at issue after Pathway deducted amounts related to the Equipment Lease Agreement; the "Unpaid Min. Wage (at 70 Hours)" column reflects the difference between the amount Plaintiffs claim they should have received if they had worked 70 hours at $7.25 per hour ($507.50) and the amount disbursed to them; and the final column, "Statutory Liquidated Damages (70 hours)" doubles the amount of the alleged minimum wage owed.

### 3.     The alleged "average" workday and 70-hour workweek.

139.     Of the 15 Plaintiffs, only three—Franklin Merrill, Anthony Dennis, and Rodney Lacy—testified that their daily routine consisted of approximately 10- to 14-hour workdays: they could drive for up to 11 hours (including mandatory breaks), and the remaining three hours generally consisted of pre- and post-trip inspections, waiting for the truck to be loaded and unloaded, and things of that nature.[8]  Vol. I, 89:19-22, 127:13-15 (Merrill); Vol. II, 283:14-17, 313:3-315:22 (Lacy); Vol. IV, 603:11-604:22, 618:15-619:7, 621:1-17 (A. Dennis).  The remaining Plaintiffs offered limited testimony about their work hours, primarily through cross-examination.

---

[8] Plaintiffs' counsel stated at trial that Mr. Nasr would present additional evidence supporting his claim of having worked 70 hours for each week in question.  Vol. IV, 722:7-14.  He never did so.

140.    Some Plaintiffs acknowledged that the 70-hour figure was based on the maximum amount of time the Plaintiffs could "work" under a DOT regulation.[9]  Vol. I, 131:2-7 (Merrill); 198:4-12 (Austin); Vol. III, 512:25-513:2 (Williams); Vol. IV, 604:19-22 (A. Dennis). While Messrs. Merrill, Lacy, and Dennis consistently testified about a 14-hour day, no Plaintiff testified that he or she worked precisely five days each week to explain the 70-hour total.

141.    Some witnesses acknowledged that they had to drive a certain number of miles per day to use up the 11 hours available under DOT regulations.  Vol. I, 177:21-24 (Ms. Austin testified that "600 miles a day is close to 10 hours and 45 minutes"); Vol. IV, 619:8-620:3 (Anthony Dennis testified he did not have sufficient miles to drive 11 hours per day during his last three weeks as a Pathway client).  Mr. Dennis's settlement statements indicate that he had numerous weeks of driving around 1,000 miles or less long before he completed his lease agreement with Pathway.  *See, e.g.*, Tr. Ex. E at 3 (settlement statement dated 9/30/16: 550 miles), 5 (settlement statement dated 10/7/16: two trips totaling 534 miles), 13 (settlement statement dated 11/4/16: 100 miles), and 150 (settlement statement dated 7/22/16: 997 miles).  He also conceded on cross-examination that he might not have worked 70 hours every week.  Vol. IV, 604:2-7.

142.    Plaintiff Sami Nasr explained that when he worked a "short week," he had fewer loads or assignments to haul between the time the truck was released from a repair shop and the

---

[9] Importantly, the 70-hour figure is based on an 8-day, not a 7-day, cycle.  *See* 49 C.F.R. § 395.3(b)(2) ("No motor carrier shall permit or require a driver of a property-carrying commercial motor vehicle to drive, nor shall any driver drive a property-carrying commercial motor vehicle, regardless of the number of motor carriers using the driver's services, for any period after—Having been on duty 70 hours in any period of 8 consecutive days if the employing motor carrier operates commercial motor vehicles every day of the week.").

end of the settlement period.  Vol. V, 829:7-21.  If a Plaintiff drove fewer miles, then he or she would, as a result, have more downtime.

143.    Plaintiff Tami Potirala testified that she worked 70 hours "most" but not all weeks and that the only accurate way to determine how many hours she actually worked would be by looking at her driver logs in Exhibit C2.  Vol. IV, 650:24-651:8.

144.    Plaintiffs acknowledged that, at times, they took time off from work. Vol. IV, 604:12-18 (A. Dennis); Vol. IV, 642:23-643:5 (Ms. Potirala took time off once a month for several days at a time); *see also* Vol. I, 199:11-18 (Becky Austin).

145.    Ms. Potirala seeks minimum wage relief for a payment received on May 20, 2016, but she acknowledged that she was at home, not working, between May 12 and her first load on May 17, 2016.  Tr. Ex. 136 at 50, and Vol. IV, 650:11-20.

146.    Although Messrs. Merrill, Lacy, and Anthony Dennis did not testify that their 14-hour average work day included sleep or rest time, Plaintiffs made conflicting assertions regarding whether time spent sleeping or taking a break was compensable. Vol. I, 64:1-65:2 (Merrill testified that sleeping time was not included in a typical work day); Vol. II, 313:21-314:17 (Lacy testified that "DOT makes us stop the clock, but that don't mean you stop working, man."); Vol. III, 513:19-24 (Williams testified the only time he was not working is when his truck is broken or when he's "out of hours"); Vol. IV, 654:19-25 (Potirala testified "I'm always working even if I'm showing off-duty.").

### 4.    Several Plaintiffs took pay advances.

147.    Advances are reflected on each settlement statement.  *See, e.g.*, Tr. Ex. Q4 (Horion).  Cash advances are denoted with the words CashA, ATMTr, Voice, and similar terms. Vol. IV, 605:24-606:24; 624:21-625:12; 668:13-669:15.  Fuel advances are reflected separately in

each settlement statement.  *See, e.g.*, Tr. Ex. Q4.  The advances are then deducted from the total compensation, resulting in a reduced net amount disbursed to Pathway.  *Id.*; Vol. IV, 670:4-7.

148.    At times, advances taken in one period carried over to another pay period because of a negative balance, thereby impacting the net compensation a Plaintiff received for the following period.  Vol. IV, 609:16-610:10.

149.    Most Plaintiffs took cash advances from XPO, but those advances are not included in their damage calculations.  As this Court has already held, the amount of cash advances paid to each Plaintiff must be taken into account in assessing whether any Plaintiff is entitled to damages for unpaid minimum wages.  Order [#333] at 7-8.

150.    Some Plaintiffs acknowledged that they used the advances for personal reasons, such as buying meals and items needed during trips and sending money home to family.  Vol. IV, 590:22-591:10, 592:3-6, 607:6-608:20 (Anthony Dennis acknowledged that advances were used for "maintenance, meal[s], or to pay bills at home," such as a $446 advance for a personal car payment); Vol. IV, 691:14-24, 697:22-698:3 (Mr. Horion used advances for medicine, food, and money for his sister); Vol. V, 838:5-11 (Mr. Nasr took out $160 a week in advances to pay for food and other living expenses).

151.    Mr. Merrill claims to have used advances for maintenance or repairs on the truck. Vol. I, 135:15-136:1.  But he provided no records to substantiate that claim.

### 5.    Plaintiffs' trucks were sometimes down for repairs.

152.    Plaintiffs did not testify that truck repairs or maintenance were part of their "average work day," which was used to establish the 70-hour work week.  Nevertheless, the evidence showed that the trucks were in the shop from time to time for repairs or maintenance.

153.     Only three Plaintiffs—Franklin Merrill, Anthony Dennis, and Sami Nasr—introduced documentary evidence concerning repairs, and each admitted only one invoice.  Tr. Ex. 82 (218-219, showing repair to Merrill's vehicle on August 13, 2015); Vol. I, 95:5-11, 97:1-7; VI, 1052:9-18; Tr. Ex. 117 (130-133, showing a repair to A. Dennis's vehicle in July 2015); Vol. IV, 598:4-5; Tr. Ex. 123 (37-39, showing repair to Nasr's vehicle on or about May 19, 2016); Vol. V, 822:7-824:9.

154.     Mr. Merrill did not testify about the August 13, 2015 invoice, which was admitted near the end of the trial.  He did, however, testify that he did not drive during the month of April 2016 due to truck repairs.  Vol. I, 101:17-20, 128:1-13 (Merrill's truck was down for maintenance for all or most of April).  According to trial exhibit 136, Mr. Merrill is claiming damages for the period preceding the April 29, 2016 remittance from Pathway, though he did not drive any miles according to that settlement statement.  *See, e.g.*, Tr. Ex. R at #000110.

155.     Mr. Merrill provided similar testimony for the October 2, 2015 "pay period," though this time he claimed he "worked" 70 hours when his truck was in the shop because he was "away from home."  Vol. I, 130:4-19, 131:2-7, 132:16-133:11 (Merrill drove one day for 427 miles, and he claimed the truck was in the shop for a week in Joplin).

156.     Mr. Dennis testified that his truck was in the shop for a repair for nearly a week in July 2015.  Vol. IV, 598:16-22.  During that time, Mr. Dennis could not use the truck.  *Id.*  He did not claim that he was performing any other work for XPO, nor did he claim or suggest that he was prevented from using that time as he saw fit.  *Id.*

157.     Mr. Nasr testified his truck was in the shop for "two weeks," and he probably started driving again on May 27, which would "would have been a short week because of the repairs."  Vol. V, 824:2-9.

158.     Plaintiffs offered varying testimony about their time when the truck was down for repairs or maintenance.  Mr. Merrill claimed that time away from home counted as work, even if he was waiting for the truck to be repaired.  However, he testified that he was not claiming "home time," *i.e.*, time spent at home when the truck was being repaired, as damages.  Vol. I, 128:16-25, 129:1, 22-24 (Merrill is "not claiming [his] home time against this truck").[10]  Similarly, Ms. Potirala testified that when her truck was in the shop for two weeks, she could use the time as she wanted Vol. IV, 648:4-19.

159.     Rodney Lacy, on the other hand, claimed that he should have been compensated while his truck was being repaired or in the shop for maintenance.  Vol. II, 318:18-22 (Mr. Lacy contended that even if he was at home, he was "working" if his truck was in the shop because he was watching them work the entire time the truck was in the shop).  But neither he nor anyone else produced records (other than Messrs. Merrill, A. Dennis, and Nasr) showing when or for how long their trucks were down for maintenance or repairs, nor did they attempt to prove what they were doing during repairs or maintenance.

160.     No Plaintiffs testified that Pathway or XPO required them to call the repair shop or stay with the truck when it was being repaired.

### 6.     Miscellaneous damages issues.

161.     Mr. Merrill is claiming damages for two periods—July 8 and 16, 2016—even though he stopped driving the truck as of June 26 and gave up possession on June 29, 2016.  Vol. I, 140:8-14; Tr. Ex. 136 at 46.

---

[10] Merrill asserted he tracked his time, but he failed to produce any documents reflecting those hours.  *Id.* at 129:2-16.

162.    Mr. Merrill acknowledged that, at times, he asked Pathway to apply funds that would otherwise have been disbursed to him to his lease obligations.  Vol. I, 140:18-141:12. Although he claimed he had excluded any such weeks from his damage calculations, he was unable to articulate how he did so, other than to suggest he relied on a journal, which was not admitted into evidence.  *Id.*, 141:20-142:15.  Absent such documents, and given the Court's other concerns with Plaintiffs' damage calculations, the Court gives no credence to Mr. Merrill's testimony on this point.

### III.    FACTS RELEVANT TO COUNTS II - IV: STATE LAW CLAIMS

163.    Although not all of them chose to do so, Plaintiffs were able to review the Equipment Lease Agreements before signing them.  Vol. III, 501:2-12; Vol. IV, 601:24-602:4. Plaintiffs knew and understood that those Agreements constituted contracts.  Vol. I, 190:17-19; Vol. III, 439:21-440:4; Vol. IV, 602:5-9.

164.    The Equipment Lease Agreement states that Pathway made no representations or warranties regarding the condition or fitness of the leased trucks and makes clear that the lessee accepts the truck "AS IS, WHERE IS, AND WITH ALL FAULTS."  *See* Tr. Ex. 50 at 1, ¶ 2 and 5, ¶ 21.

165.    Plaintiffs agreed that, under the lease agreements, and subject to Pathway's limited service contracts, they would be solely responsible for covering the cost of truck repairs and maintenance during the lease term.  Tr. Ex. 50 at 2-3, ¶ 13(f) and 22 ("Truck Acceptance Form").

166.    The Equipment Lease Agreement contains a limited service contract for a defined period of time and/or mileage, which Plaintiffs referred to as a "warranty." Tr. Ex. 50 at 18-20. Regardless of how the parties characterized the provision, it set forth repairs that would be

covered by Pathway, and the terms and conditions governing Pathway's and the Plaintiffs'

obligations with respect to the repairs. *Id.*; Vol. III, 445:23-446:1.

167.    The Equipment Lease Agreements state that the agreements, "together with the

other documents maintained herein or executed contemporaneously herewith, constitute[] the

entire agreement of the parties and Lessor shall not be charged with any agreement or

representation not contained in a writing executed by it as provided in this section." Tr. Ex. 50 at

5, ¶ 26.

168.    Plaintiffs testified about what they "thought" they were getting when they leased a

truck from Pathway, but no Plaintiff testified about any alleged "promise" or misrepresentation

made by Pathway or Mr. Harris with respect to the truck or the lease. *See, e.g.*, Vol. I, 55:3-17

(Merrill described what he thought the "warranty" in the lease covered).

169.    Although Becky Austin is no longer a party, the Court notes she admitted that Mr.

Harris offered her a different truck, which she accepted, and payments for the first truck were

applied towards her lease for the second truck.  Vol. VI, 947:15-949:14.

170.    Several Plaintiffs claimed that they did not understand portions of the Equipment

Lease Agreement. *See, e.g.*, Vol. I, 39:20-40:16 (Merrill testified that he decided to take a day off

just to read the agreement and then signed it even though he did not understand "parts of it").

However, they did not specify which portions they did not understand.

171.    Pathway gave no verbal warranties or assurances to Plaintiffs about the condition

of their leased trucks.  Vol. VI, 961:19-962:4.

172.    Mr. Harris testified that, in his 16 years of industry experience, he could not

possibly predict what or when something might go wrong with any vehicle.  Vol. V, 872:18-

873:5.

173.    He also explained the importance of performing preventative maintenance to keep a truck in working condition and described the average costs of such upkeep.  *Id.*

174.    Mr. Hunt confirmed that there is "a direct correlation [between] how a tractor is maintained and driven as to its longevity and reliability over the course of time."  Hunt Preservation Dep. 49:7-14.  He explained that the required upkeep is "no different than your own personal vehicles" and that "[e]ven a new piece of equipment will start going downhill pretty quick if it's not taken care of properly."  *Id.*, 49:15-16; 50:1-3.  He added that, during the recent rollout of new government-mandated emissions standards on tractors, he frequently saw new trucks break down "in front of the lot on their first load out."  *Id.*, 50:4-21.

## IV.    FACTS RELEVANT TO COUNT V: RETALIATION (JURCAK)

175.    Mr. Jurcak completed his lease with Pathway as of March of 2016, after which he had no further relationship with Pathway. Vol. III, 536:6-17.

176.    Over a year later, in April 2017, Mr. Jurcak tried to become an owner-operator with XPO again, but was unsuccessful.  *Id.*, 533:13-16.  Melinda Creed, with XPO, testified briefly about Mr. Jurcak's failed attempt to become a contractor at XPO, but she did not explain why Mr. Jurcak did not contract with XPO again, nor was such evidence admitted during the trial. Creed Dep. [#293-2] 59:17-61:6. There is also no evidence that Pathway had any involvement in Mr. Jurcak's attempt in 2017 to contract with XPO.

## V.    FACTS RELEVANT TO PATHWAY'S COUNTERCLAIMS

177.    Several Plaintiffs defaulted on their lease obligations to Pathway, resulting in Pathway's repossession of their trucks. Vol. VI, 940:25-942:1; Tr. Ex. T6.

178.    The outstanding balances owed by each of these Plaintiffs is set forth in Trial Exhibit T6 (excluding Plaintiff Williams, who was released from his obligations as Mr. Harris

testified, Vol. VI, 941:10-23).  Vol. VI, 1032:7-1033:7 (explaining amounts set forth in various columns and why those were included in calculations).

179.    Plaintiffs who defaulted presented no evidence to contest the amount owed, nor did they dispute defaulting on the Equipment Lease Agreement.

# CONCLUSIONS OF LAW

## I.    JURISDICTION

1.    The Court has personal jurisdiction over the parties to this action.

2.    The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331(a) and supplemental jurisdiction over the state-law claims pursuant to 28 U.S.C. § 1367(a).

3.    Venue is proper pursuant to 28 U.S.C. § 1391(b).

## II.    COUNT I:  PLAINTIFFS' FLSA MINIMUM WAGE CLAIM

4.    Because the existence of an employer-employee relationship is a prerequisite to an FLSA claim, 29 U.S.C. §§ 201–219, a threshold question in this case is whether Defendants are a "joint employer," with XPO, of the Plaintiffs.  Order [#242] at 6.

5.    Additionally, even if Defendants were a joint employer and therefore subject to the FLSA, Plaintiffs must prove that they are employees, as opposed to independent contractors, and are thus protected by the FLSA's minimum wage provisions.  *Baker v. Flint Eng'g & Constr. Co.*, 137 F.3d 1436, 1440 (10th Cir. 1998).

6.    The Court thus will first analyze whether Pathway is a joint employer with XPO and then separately address whether Plaintiffs were appropriately classified as independent contractors rather than employees under the FLSA.  The Court will also address damages.

### A.     The DOL Joint Employer Test Applies.

7.     Whether an entity is an employer within the meaning of the FLSA is a legal question, with subsidiary findings considered issues of fact.  *Mason v. Fantasy, LLC*, 2015 WL 4512327, at *9 (D. Colo. July 27, 2015).  This a fact-intensive, individualized inquiry and, as a result, courts have reached different conclusions depending on the circumstances of the individual plaintiffs.  *Carpenter v. DIRECTV, LLC,* 2017 WL 4225797, at *4 (D. Colo. May 16, 2017).

8.     Effective March 16, 2020, the Department of Labor ("DOL") amended 20 C.F.R. Part 791 to clarify joint employer status.  *See* Joint Employer Status Under the Fair Labor Standards Act, 85 Fed. Reg. 2820, 2820 (Jan. 16, 2020) (codified at 20 C.F.R. pt. 791) ("new DOL rule").

9.     Though it was promulgated after this case was tried, the Court will apply the new DOL rule to this case.[11]  The Court has reviewed the parties briefs directed to this issue and finds that the new rule is "merely interpretive" because it: (1) clarifies or explains an existing law or regulation; (2) does not overrule controlling precedent; and (3) does not alter the parties' substantive rights or obligations.  *Farmers Telephone Co., Inc. v. F.C.C.*, 184 F.3d 1241, 1250 (10th Cir. 1999).

10.     Even if the new rule were substantive, it still would apply to this case under the five-factor balancing test in *Farmers*.[12]  These factors militate in favor of applying the new DOL rule to this case for the reasons stated by Defendants in their brief addressing this issue.

---

[11] *See Antelope Coal Company/Rio Tinto Energy America v. Goodin*, 743 F.3d 1331, 1341 (10th Cir. 2014) (applying new DOL rule issued the same day that oral appellate arguments occurred, even though the rule took effect one month after oral arguments).

[12] These factors are (1) "[w]hether the case is one of first impression;" (2) "[w]hether the new rule is an abrupt departure from well-established practice or merely an attempt to fill a void in an unsettled area of law;" (3) "[w]hether and to what extent the party against whom the new rule is applied relied on the former rule;" (4) "[w]hether and to what extent the retroactive order imposes

11.     In addition, the new rule is entitled to "*Chevron* deference."  *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842 (1984).  *Chevron* is applicable where, as here, an agency has promulgated a regulation to interpret a statute that it administers. *Big Horn Coal Co. v. Sadler*, 924 F.3d 1317, 1322–25 (10th Cir. 2019) (ruling that *Chevron*-deference was appropriate with respect to DOL's rule in administering black lung disease benefits statute); *see* 29 U.S.C. § 204 (authorizing the DOL to administer the FLSA through its Wage and Hour Division); *see also Coldwell v. Ritecorp Envtl. Prop. Sols.*, 2017 WL 1737715, at *4, n.2 (D. Colo. May 4, 2017) (applying *Chevron* deference to DOL's former joint employer rule).

12.     The *Chevron*-deference analysis proceeds in two steps.  *Chevron*, 467 U.S. at 842. First, if Congress has spoken "directly" to the "precise question at issue," the inquiry ends, and the Court must give effect to the express intent of Congress.  *Id.*  However, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court [in step two] is whether the agency's answer is based on a permissible construction of the statute."  *Id.* at 843.  For a construction to be permissible, the Court need not conclude it was the only one the agency could reasonably have adopted or that the Court would have rendered the same interpretation if the question arose initially in a judicial context.  *Keller Tank Servs. II, Inc. v. Comm'r of Internal Revenue*, 854 F.3d 1178, 1196 (10th Cir. 2017) (citing *Chevron*, 467 U.S. at 843 n.11).  The Court looks only to whether the implementing agency's construction is reasonable.  *Id.*

13.     Congress has never directly spoken to the issue of joint-employer status.  85 Fed. Reg. at 2825-29; *Coldwell,* 2017 WL 1737715, at *4, n.2.  Accordingly, the Court proceeds to the second *Chevron* step and considers whether the DOL's new joint employer rule is a reasonable

_____

a burden on a party;" and (5) "[w]hether and to what extent there is a statutory interest in applying a new rule despite reliance of a party on an old standard."  *Farmers*, 184 F.3d at 1251.

interpretation of the FLSA.  The Court finds that the new rule meets this standard, because it is grounded in a reasonable interpretation of the FLSA's textual provisions upon which the concept of joint employer status is derived.  *See* 85 Fed. Reg. at 2825-28 (explaining DOL's reasoning relating to the textual basis for joint employer liability under the FLSA).  Accordingly, it is entitled to *Chevron* deference.

14.     Therefore, the Court will apply the new DOL rule, codified at 20 C.F.R. § 791.2 to the joint employer question in this case.

## B.     The DOL Four-Factor Test.

15.     The new DOL rule provides that, where "the employee has an employer who suffers, permits, or otherwise employs the employee to work . . . , but another person simultaneously benefits from that work," they may be joint employers.  20 C.F.R. § 791.2(a)(1). However, "the other person is the employee's joint employer only if that person is acting directly or indirectly in the interest of the employer in relation to the employee." *Id.*

16.     Four factors are relevant to this determination: whether the putative joint employer (i) "[h]ires or fires the employee;" (ii) "[s]upervises and controls the employee's work schedule or conditions of employment to a substantial degree;" (iii) "[d]etermines the employee's rate and method of payment;" and (iv) "[m]aintains the employee's employment records." *Id.*

17.     "The potential joint employer must actually exercise—directly or indirectly—one or more of these indicia of control to be jointly liable under the [FLSA]." 20 C.F.R. § 791.2(a)(3)(i). Standing alone, "the ability, power, or reserved right to act in relation to the employee . . . does not demonstrate joint employer status without some actual exercise of control." *Id.*

18.     "No single factor is dispositive in determining joint employer status under the [FLSA]." *Id.* Rather, "[w]hether a person is a joint employer under the [FLSA] will depend on how all the facts in a particular case relate to these factors, and the appropriate weight to give each factor will vary depending on the circumstances of how that factor does or does not suggest control in the particular case." *Id.*

19.     "Whether the employee is economically dependent on the potential joint employer is not relevant for determining the potential joint employer's liability under the [FLSA]," and therefore "no factors should be used to assess economic dependence" such as "[w]hether the employee is in a specialty job or a job that otherwise requires special skill, initiative, judgment or foresight," "[w]hether the employee has the opportunity for profit or loss based on his or her managerial skill," "[w]hether the employee invests in equipment or materials required for work or the employment of helpers," or "[t]he number of contractual relationships, other than with the employer, that the potential joint employer has entered into to receive similar services." 20 C.F.R. § 791.2(c).

20.     Plaintiffs bear the burden of proving an employer-employee relationship under the FLSA by a preponderance of the evidence. *Robertson v. Bd. of Cty. Comm'rs of Cty. of Morgan*, 78 F. Supp. 2d 1142, 1150 (D. Colo. 1999) (*citing Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686–87 (1946)); *accord Perez v. Pinon Mgmt., Inc.*, 2014 WL 5596261, at *7 (D. Colo. Nov. 4, 2014); *Martinez-Mendoza v. Champion Int'l Corp.*, 340 F.3d 1200, 1209 (11th Cir. 2003) (plaintiff bears burden of establishing that an entity is a joint employer under the FLSA).

### C.     Pathway is Not a Joint Employer Under the DOL Four-Factor Test.

21.     The Court concludes that Plaintiffs failed to carry their burden on each of the four factors under the new DOL rule.

### 1.    The first DOL factor weighs against joint employment.

22.    The Court concludes that Pathway did not actually exercise, directly or indirectly, the power to hire or fire the Plaintiffs.

23.    XPO and Pathway had independent processes and authority to recruit, screen, contract with, or terminate a contract with a driver; XPO conducted an independent orientation process for independent contractors; and if XPO terminated a driver's services, which XPO could and did do without Pathway's input or involvement, the driver's lease obligations with Pathway remained in place.

24.    The fact that XPO and Pathway discussed marketing materials, or that XPO publicized Pathway and other truck leasing companies, does not suggest that Pathway had any indirect control over XPO's hiring of independent contractors or vice versa.

25.    Plaintiffs' reliance on an e-mail from an XPO recruiter referring to Pathway as "[o]ur newest partner in a joint venture to grow our Independent Contractor division," Tr. Ex. 53, is misplaced. That e-mail does not establish the three elements needed for a joint venture. *See Agland, Inc. v. Koch Truck Line, Inc.*, 757 P.2d 1138, 1138 (Colo. App. 1988) ("Three elements must be present to establish a joint venture: (1) a joint interest in property, (2) an express or implied agreement to share in the losses or profits of the venture, and (3) conduct showing cooperation in the venture.") (citation omitted). To the contrary, in the Carrier Agreement, Pathway and XPO specifically disclaimed, among other things, any joint venture or similar relationship. In any event, the email does not tip the scales in Plaintiffs' favor on this factor.

26.    Based on the evidence adduced at trial, and as set forth above, *see supra* Findings of Fact ¶¶ 18-33, this factor weighs in Pathway's favor.

**2.      The second DOL factor weighs against joint employment.**

27.      Pathway did not exercise directly or indirectly the power to supervise or control Plaintiffs' work schedules or conditions of employment to a substantial degree.  On the contrary, Plaintiffs could, and some did, switch carriers; neither XPO nor Pathway could require them to contract with a specific carrier.  Plaintiffs set their own schedules and established their own routes, subject to DOT regulations.  Plaintiffs had discretion to set restrictions on the areas where they drove, the loads they hauled, and/or the clients for which they would haul freight.  Plaintiffs could hire their own contractors.   And Plaintiffs were responsible for insurance, repairs, maintenance, and accounting for excess mileage charges.

28.      XPO outfitted the trucks and dispatched the Plaintiffs, without Pathway's involvement.

29.      Pathway and XPO exchanged emails and otherwise communicated about drivers who were struggling or who complained about their miles.  The emails include discussions about only four Plaintiffs (Ronald Dennis, Larry Jurcak, Keith Herring, and Zigmund Gutowski).  *See* Tr. Exs. 15, 16, 18, 23, 26, 35.  They discussed what might be causing drivers to be fuel inefficient or otherwise struggle.  *Id*.  Plaintiffs contend that these emails demonstrate that Pathway and XPO jointly directed, controlled, or supervised them.

30.      At first blush, these communications may seem to support joint-employer status under the second DOL factor.  Upon review of all the evidence, however, these communications do not support that conclusion, for several reasons.

31.      *First*, Pathway and XPO did not communicate about all of Pathway's clients who contracted with XPO.  Instead, Pathway and XPO communicated about a limited subset of drivers, *i.e.*, those who were struggling, were at risk of defaulting on Pathway's Equipment Lease

46

Agreement, or had complained to Mr. Harris about not being offered enough loads by XPO. These communications, about only four of 15 Plaintiffs, did not convert XPO and Pathway into joint employers for all Plaintiffs.  Nor would it be appropriate to find that the communications weigh in favor of joint-employer status as to the four Plaintiffs discussed in the emails, as the drivers who struggled changed over time.

32.     *Second*, and perhaps more important, a business partner or associate who makes suggestions to improve performance is not a "joint employer" under the FLSA.  *See Copantitla v. Fiskardo Estiatorio, Inc.*, 788 F. Supp. 2d 253, 313–14 (S.D.N.Y. 2011) (defendant who instructed plaintiffs about certain aspects of the work, such as how the employees could be better sellers and improve the décor of the restaurant, who was also "present at salary discussions" and met with managers about performance, and who was even perceived to have been a "boss," was not an employer of plaintiffs under FLSA).  Similarly, an equipment lessor who has no control over the "where, when and how" drivers perform freight hauling services for XPO does not have sufficient control to satisfy this first factor.  *See Berber v. Hutchison Tree Service*, 2018 WL 3869980, at *5 (E.D.N.C. Aug. 14, 2018) (defendant who merely informed plaintiff class members what "areas needed work" and provided inspections of work product was not a joint employer); *cf. Young v. Act Fast Delivery of W. Virginia, Inc.*, 2018 WL 279996, at *6 (S.D.W. Va. Jan. 3, 2018) (courier (Act Fast) and pharmaceutical sales and delivery company (Omnicare) were joint employers, particularly because "Omnicare controlled the where, when, and how Act Fast couriers made deliveries" and "Omnicare prepared the daily schedules for the Plaintiffs and determined what routes would be driven and the times deliveries were to occur.").

33.     Mr. Hunt and Mr. Harris credibly testified that while they could share information with drivers who were struggling, they could not force any drivers to change their behavior.

Specifically, even if a driver was taking too much time off, insisting on too many restrictions, or failing to drive at an optimal speed for fuel efficiency, neither XPO nor Pathway could require the driver to do anything differently.  XPO offered to "stack" certain struggling drivers, meaning to offer more loads or assignments, but XPO could not force drivers to accept those loads or assignments.  Pathway similarly could not require XPO to offer more loads to drivers, and some Plaintiffs acknowledged that while their loads might have increased for a short time after they complained to Mr. Harris, it did not last.  Pathway and XPO had no authority typical of an employer over an employee.

34.     *Third*, if communicating about an individual is tantamount to direction, supervision, or control, then virtually all equipment leasing companies would be converted into joint employers with any carrier or entity with which the lessee contracts, merely by virtue of emails or calls between the two about the lessee.  Such an interpretation would extend the joint employer test beyond the bounds of viability and commonsense.

35.     The issue ultimately is whether Pathway directly or indirectly exercised control over the Plaintiffs' schedules and working conditions "to a substantial degree".  20 C.F.R. § 791.2(a)(1).  The fact that Pathway and XPO coordinated as to administrative or clerical matters from time to time—such as faxing and/or printing the lease agreement and exchanging other necessary documentation—does not mean Pathway had a "substantial degree" of control.  Indeed, none of those tasks implicated the essential terms and conditions of the Plaintiffs' putative employment.

36.     Aside from the communications between Pathway and XPO, Plaintiffs assert that their inability to switch carriers is indicative of joint employment.  Yet, only two of the 15 Plaintiffs testified that they attempted to switch carriers and were denied.  Vol. I, 76:1-23

(Merrill), 252:21-253:16 (Lacy).  And Plaintiffs did not rebut Pathway's evidence that it regularly permitted its clients to switch carriers so long as they provided sufficient assurances that they would be able to comply with their lease obligations in the event of a switch.  Vol. V, 919:17-920:2; Vol. VI, 1041:22-1042:18.

37.    Moreover, multiple Plaintiffs did, in fact, switch carriers.  Mr. Harris testified about one client who switched to another carrier to be close to home, even though he would likely earn less money.  Vol. V, 920:24-921:9.  The fact that Pathway placed certain conditions on requests to switch to carriers that did not agree to remit funds to Pathway to mitigate the risk of a default—*e.g.*, requiring clients to be current on their lease obligations or to provide a larger security deposit—does not amount to the type of "control" that would convert Pathway and XPO into joint employers.  This is especially true given that there was no evidence XPO could prevent an owner-operator from switching from one carrier to another.  Hunt Preservation Dep. 48:10-16.

38.    *Finally*, some Plaintiffs asserted that Pathway controlled spending from their maintenance escrow accounts, but there was no evidence that XPO "controlled" those funds or that Pathway handled them in any way other than as contemplated by the Equipment Lease Agreement.  Pathway and XPO did coordinate from time to time on the release of the funds for certain items, such as for tires under XPO's discount program, or when responding to a driver's request to pay for such items via funds in the client's equipment escrow.  But Pathway and XPO did not jointly control those funds.

39.    Overall, Pathway did not directly or indirectly exercise a substantial degree of control over Plaintiffs' schedules or working conditions.  Pathway was removed from the dispatching, time-tracking, and other processes inherent to the freight hauling services performed by Plaintiffs.  Consequently, this factor weighs in favor of Pathway.

### 3.   The third DOL factor weighs against joint employment.

40.     Under the third DOL factor, the Court analyzes whether the putative joint employer exercises, directly or indirectly, the power to determine the employee's rate and method of payment.

41.     The evidence at trial showed some level of coordination between XPO and Pathway relating to pay disbursement but did not demonstrate that Pathway actually controlled the determination of Plaintiffs' rate or method of payment.  Vol. VII, 1111:12-22.

42.     XPO had exclusive authority over the following: the settlement process, Plaintiffs' pay rates, and determining amounts due to the Plaintiffs for miles driven less any voluntary deductions.  Pathway handled the payment disbursement process, providing amounts due to the Plaintiffs after allocating lease-specific deductions.

43.     In a somewhat analogous case, Magistrate Judge Wang concluded that a payroll company, which paid individuals as W-2 employees, handled workers' compensation, and referred to the workers as "co-employees," was not a joint employer.  *Coldwell v. Ritecorp Envtl. Prop. Sols.*, 2017 WL 1737715, at *8–9 (D. Colo. May 4, 2017).  *Coldwell* analyzed the circumstances under the four-factor economic realities test, which is substantially similar to the DOL's new joint employer rule test.  To suggest that an entity's ministerial role in disbursing payment earned through another entity turns the entity into a joint employer would be to elevate form over substance.  *See also In re Enterprise Rent-A-Car Wage & Hour Employment Practices Litig.*, 735 F. Supp. 2d 277, 339-343 (W.D. Pa. 2010) (applying a range of factors, court held that parent and subsidiary were not joint employers, even though parent company provided payroll and other administrative services to subsidiary); *Maddock v. KB Homes, Inc.*, 631 F. Supp. 2d 1226, 1234 (C.D. Cal. 2007) (same, applying economic realities test).

44.     The Court thus concludes that Pathway did not exercise, directly or indirectly, the power to set Plaintiffs' pay rates or methods of payment.

### 4.     The fourth DOL factor weighs against joint employment.

45.     Under the fourth DOL factor, the Court analyzes whether the putative joint employer maintains the employee's employment records.  Neither Pathway nor XPO performed these functions, nor any other functions typically performed by an employer, such as providing benefits, setting employment policies, administering training, or handling workers compensation or occupational liability insurance.

46.     The fact that Pathway received proof of insurance certificates from Plaintiffs through XPO and required that Plaintiffs enter into an independent contractor agreement with a carrier—not necessarily XPO—cannot be construed as exercising direct or indirect "control" over a function typically handled by an employer.  Pathway's involvement was ministerial.  It simply collected proof of insurance certificates.   As the DOL rule recognizes, "[e]xcept to the extent they reflect, relate to, or otherwise record that information, records maintained by the potential joint employer related to the employer's compliance with the contractual agreements . . .  do not make joint employer status more or less likely under the [FLSA] and are not considered employment records under this section."  20 C.F.R. § 791.2(a)(2).

47.     Importantly, "[s]atisfaction of the maintenance of employment records factor alone will not lead to a finding of joint employer status." *Id*.  Or, as other courts examining the question of joint employment under the FLSA have held, it is the nature and purpose of the putative employer's control that is most significant. *See Godlewska v. HDA*, 916 F. Supp. 2d 246, 260 (E.D.N.Y. 2013); *Jacobson v. Comcast Corp.*, 740 F. Supp. 2d 683, 690-91 (D. Md. 2010).

Confirming that insurance has been secured, and that the lessee has contracted with a carrier, is not the type of control that gives rise to an employment relationship.

48.     The Court thus concludes that Pathway did not maintain Plaintiffs' employment records.

49.     Under the totality of the circumstances, Pathway cannot be deemed to be a joint employer, because it did not have, directly or indirectly, sufficient control over the Plaintiffs' employment.  Pathway is an equipment lessor.  The fact that Pathway and XPO communicated or cooperated on discrete matters does not establish joint employment because, ultimately, Pathway had no control over Plaintiffs' performance of freight-hauling services, including customers, availability of loads, dispatching process, driving routes, fueling, logistics, vacation and personal time, rate of pay, and many other details.  Moreover, Pathway was just one of many other lessors who contracted with XPO's owner-operators.

> **D.     Pathway Is Not A Joint Employer Under The *Hall-Salinas* Test.**

50.     Alternatively, the Court concludes that Pathway is not a joint employer under the test set forth in *Hall v. DIRECTV, LLC*, 846 F.3d 757, 769-70 (4th Cir. 2017) and *Salinas v. Commercial Interiors, Inc.*, 848 F.3d 125, 132 (4th Cir. 2017).  Under the *Hall–Salinas* test, a court "must determine whether the defendants and one or more additional entities shared, agreed to allocate responsibility for, or otherwise codetermined the key terms and conditions of the plaintiff's work" by examining six non-exhaustive factors:

(1)     Whether, formally or as a matter of practice, the putative joint employers jointly determine, share, or allocate the ability to direct, control, or supervise the worker, whether by direct or indirect means;

(2)     Whether, formally or as a matter of practice, the putative joint employers

jointly determine, share, or allocate the power to—directly or indirectly—hire or fire the worker or modify the terms and conditions of the worker's employment;

(3)     The degree of permanency and duration of the relationship between the putative joint employers;

(4)     Whether through shared management or a direct or indirect ownership interest, one putative joint employer controls, is controlled by, or is under common control with the other putative joint employer;

(5)     Whether the work is performed on premises owned or controlled by one or more of the putative joint employers, independently or in connection with one another; and

(6)     Whether, formally or as a matter of practice, the putative joint employers jointly determine, share, or allocate responsibility over the functions ordinarily carried out by an employer, such as handling payroll, providing workers' compensation insurance, paying payroll taxes, or providing the facilities, equipment, tools, or materials necessary to complete the work.

*Hall*, 846 F.3d at 769–70.

> **1.     Three of the *Hall-Salinas* factors are substantially similar to the DOL test and already weigh against joint employment.**

51.     Three of the six *Hall–Salinas* factors are similar, although not identical, to the four factors in DOL's new rule.  *See* 85 Fed. Reg. at 2831; Order [#347] at 6-7.  The first *Hall–Salinas* factor ("[w]hether, formally or as a matter of practice, the putative joint employers jointly determine, share, or allocate the ability to direct, control, or supervise the worker, whether by direct or indirect means") is similar to the second DOL factor (whether the other person "[s]upervises and controls the employee's work schedule or conditions of employment to a substantial degree"). The second *Hall–Salinas* factor ("[w]hether, formally or as a matter of practice, the putative joint employers jointly determine, share, or allocate the power to—directly

or indirectly—hire or fire the worker or modify the terms and conditions of the worker's employment") is similar to the first DOL factor ("whether the other person "[h]ires or fires the employee"). The sixth *Hall–Salinas* factor ("[w]hether, formally or as a matter of practice, the putative joint employers jointly determine, share, or allocate responsibility over the functions ordinarily carried out by an employer, such as handling payroll; providing workers' compensation insurance; paying payroll taxes; or providing the facilities, equipment, tools, or materials necessary to complete the work") is similar to the third and fourth DOL factors (whether the other person "[d]etermines the employee's rate and method of payment" and "[m]aintains the employee's employment records"). The Court concludes, for the above-stated reasons, that these factors weigh against a determination of joint employment under the *Hall-Salinas* test. *See supra* Conclusions of Law ¶¶ 22-49.

52.     The Court examines the remaining third, fourth, and fifth *Hall–Salinas* factors below.

### 2.      The remaining *Hall-Salinas* factors weigh against joint employment.

53.     The third *Hall–Salinas* factor addresses the degree of permanency and the duration of the relationship between the putative joint employers. This factor weighs against joint employment.

54.     Pathway does not rely on XPO for its continued success, and vice versa. Pathway's clients always made up a small percentage of XPO's owner-operators, and as Pathway has grown, the number and overall percentage of clients contracted with XPO has diminished.

55.     Moreover, Plaintiffs did not depend on any permanent or continuing Pathway/XPO relationship. Some Plaintiffs whose contracts were terminated by XPO, or who asked to switch carriers, continued to lease from Pathway while driving for other carriers. Likewise, Plaintiffs

who completed or bought out their leases continued to drive for XPO though they no longer had a relationship with Pathway.  Based on this record, the Court concludes that the relationship between Pathway and XPO was insufficiently permanent to weigh in favor of joint employment.

56.     The fourth *Hall-Salinas* factor, whether one putative joint employer, through shared management or a direct or indirect ownership interest, controls, is controlled by, or is under common control with the other, weighs strongly against joint employment.

57.     Pathway and XPO have no common ownership or management; share no common phone, Internet, email, data storage, software, or other system; share no profits or losses; and receive no compensation from one another.  XPO's cost structure doesn't dictate Pathway's, and aspects of Pathway's and XPO's cost structure highlight their conflicting interests.  For example, Pathway charges an excess mileage fee whereas XPO rewards owner-operators with a bonus for driving in excess of a monthly mileage amount.

58.     Pathway's purchase of trucks from XPO and temporary parking of some trucks on XPO's property do not support common ownership or control.  The emails from Ms. Stewart (Tr. Ex. 53) and Ms. Killinger (Tr. Ex. 7) likewise do not establish any shared or common control among XPO and Pathway, especially given the other facts, which are undisputed, demonstrating that the two entities have always been separate and independent businesses.

59.     Plaintiffs also rely on various provisions of the Carrier Agreement in which Pathway and XPO agreed to, among other things: (1) consider XPO's reasonable preferences as to which types of trucks would be leased; (2) hold open any proposed lease financing for 30 days from the date on which Pathway notified XPO of approval of the financing; (3) notify Pathway of requests by any Plaintiffs to change from a solo to a team operation; (4) notify Pathway if any Plaintiff's insurance coverage changed or lapsed, and if any Plaintiff declared bankruptcy; and (5)

use reasonable efforts to assist Pathway in locating trucks if any Plaintiff defaulted on payments or terminated a lease early.  Tr. Ex. 127 at 2.  This arms-length business arrangement does not indicate that Pathway and XPO are under common control, or that one party controls the other.

60.     While the entities have a working relationship, neither XPO or Pathway, through shared management or a direct or indirect ownership interest, owns, controls, is controlled by, or is under common control with, each other.

61.     Finally, both sides acknowledge that the fifth factor is less applicable to over-the-road truck drivers, who do not work in a static, shared work location.  Plaintiffs point to evidence that the recruitment process, maintenance and selection of trucks, and branding of the trucks with XPO's logos, occurred on XPO's property in Joplin, Missouri.  Defendants, on the other hand, note that Pathway had no control over the activities on XPO's property, including the recruitment process, the maintenance activities, or the branding of the vehicles (which is mandated by DOT, not XPO or Pathway).  Based on this record, and given that the Plaintiffs are long-haul truck drivers, the Court concludes that the work was not performed on premises owned or controlled by XPO or Pathway, but that this factor has little weight.

62.     In sum, all six *Hall-Salinas* factors weigh against finding joint employment.

63.     The Court is mindful that, in determining the issue, no one factor is dispositive and, regardless of the factors applied, the overarching concern is whether the alleged employer possessed direct or indirect power to control significant aspects of the plaintiff's employment. *Dole v. Snell*, 875 F.2d 802, 805 (10th Cir. 1989); *Childress v. Ozark Delivery of Missouri L.L.C.*, 95 F. Supp. 3d 1130, 1139 (W.D. Mo. 2015).  The Court holds that Pathway did not possess such control.

64.     The Court thus concludes that, regardless of which test applies, Pathway was not a joint employer with XPO.

### E.     Plaintiffs Were Independent Contractors.

65.     Plaintiffs' FLSA claims fail for a separate and independent reason: They failed to establish that they were "employees" of either Pathway or XPO within the meaning of the FLSA. 29 U.S.C. § 203(e)(1) (defining employee as "any individual employed by an employer.").[13]

66.     The parties agree that the economic realities test applies in determining whether an individual is an employee, and thus, covered under the FLSA.  "[T]he economic realities of the relationship govern, and the focal point is whether the individual is economically dependent on the business to which he renders service . . . or is, as a matter of economic fact, in business for himself."  *Baker*, 137 F.3d at 1440 (internal quotation marks omitted).

67.     The Tenth Circuit has set out six factors to consider in applying the economic realities test: (1) the degree of control exerted by the alleged employer over the worker; (2) the worker's opportunity for profit or loss; (3) the worker's investment in the business; (4) the permanence of the working relationship; (5) the degree of skill required to perform the work; and (6) the extent to which the work is an integral part of the alleged employer's business.  *Id*.  The test is based on a "totality of the circumstances" and no one factor is dispositive.  *Johnson v. Unified Gov't of Wyandotte Cnty./Kansas City, Kan.*, 371 F.3d 723, 729 (10th Cir. 2004) (internal citation and quotation marks omitted).  Plaintiffs bear the initial burden of proving an employer-employee relationship.  *Robertson v. Bd. of Cty. Comm'rs of Cty. of Morgan*, 78 F. Supp. 2d 1142,

---

[13] Plaintiffs presented no evidence to support a finding that, absent a joint employment relationship, they were employed directly by Pathway or Matthew Harris.

1150 (D. Colo. 1999) (citing *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686–87

(1946)); *accord Perez v. Pinon Mgmt., Inc.*, 2014 WL 5596261, at *7 (D. Colo. Nov. 4, 2014).

68.     **As to the first *Baker* factor**, degree of control, Plaintiffs did not even have to

perform the work themselves.  They could hire their own drivers or work as a "team."  Some

Plaintiffs, such as Tim Hollingsworth, exercised that right, hiring independent contractors to do

the work.  When drivers are free to subcontract their freight-hauling duties, there are insufficient

indicia of control to justify finding an employment relationship.  *See*, *e.g.*, *Derolf v. Risinger*

*Bros. Transfer*, 259 F. Supp. 3d 876, 880 (C.D. Ill. 2017) ("The Court is unaware of any instances

where an employee can contract with a third party to perform the actual work of the employer.");

*Browning v. Ceva Freight, LLC*, 885 F. Supp. 2d 590, 601 (E.D.N.Y. 2012) ("[T]here is no doubt

that the Plaintiffs could hire their own additional workers to assist with their operations.  In fact,

several of the Plaintiffs did so. Thus, this freedom allowed them to further work at their own

convenience.").

69.     Further, Plaintiffs made their own business decisions whether to decline loads

based on weight, fueling costs, and other considerations that affected their profitability.  Plaintiffs

had discretion over the routes over which they transported goods, where and when they refueled,

when to take time off, etc.  Consequently, this factor weighs in favor of independent-contractor

status.  *See Mikhaylov v. Y & B Transp. Co.*, 2019 WL 1492907, at *5 (E.D.N.Y. Mar. 31, 2019)

(plaintiffs' driver logs indicated that they worked different hours and fractions of hours each day,

and that defendant otherwise had no authority to establish preset hours for the plaintiff drivers,

thus supporting a finding of independent contractor status).

70.     **As to the second *Baker* factor**, Plaintiffs retained significant opportunity for

profit or loss.  On the profit side, seven of 15 Plaintiffs successfully completed their leases, own

their own trucks, and earn substantially more than their peers (in addition to having ownership of a valuable asset).  Further, 20% of Pathway's clients leased a second truck after successfully completing their initial lease.  The fact that so many of Pathway's clients decided to expand their fleets by entering a new lease is strong evidence that Plaintiffs retained valuable profit potential in their contracting relationship.  During the leases, Plaintiffs could increase their profitability by driving as a team, by taking strategic advantage of which loads to accept or reject, and by maximizing their fuel efficiency.  Plaintiffs had to use independent judgment to determine whether or not a dispatch assignment offered by XPO would be profitable based on many factors such as traffic congestion, mountainous roads, fueling costs, equipment wear and tear, and other considerations.  Indeed, some Plaintiffs complained they were making too little (*i.e.*, incurring losses) whereas others (*e.g.*, Messrs. Nasr, A. Dennis, Williams, Lacy, and Ms. Potirala) indicated that they had to be judicious about accepting loads to ensure their profitability.  Company drivers could depend on a steady, biweekly paycheck, but Plaintiffs had varying income depending on the routes and miles they drove and the expenses they incurred.

71.     Plaintiffs were also exposed to the risk of loss, either by turning down too many loads, taking off too much time, experiencing a mechanical problem, running fewer miles due to bad weather, or any number of other factors.  Because Plaintiffs had substantial opportunity for profit or loss, the second factor weighs heavily in favor of independent contractor status.  *See Mikhaylov*, 2019 WL 1492907, at *5-6 (profit and loss factor weighed in favor of defendant carrier because, among other things, plaintiff drivers were able to increase their profitability by driving solo instead of with a partner, plaintiffs had the discretion to drive more or less hours in any given day, and plaintiffs could choose their own routes).

72.   **As to the third *Baker* factor**, a worker's investment in the business, Plaintiffs

made substantial investments in their commercial hauling businesses and took significant risks.

They had to secure a lease or otherwise procure the tractors necessary to perform their work.

They were responsible for lease payments, maintenance, repairs, fuel costs, workers

compensation and business liability insurance, and tax and accounting services.

73.   "In traditional employer-employee settings, employees are not asked to take such

risk upon themselves to ensure compensation*." Derolf*, 259 F. Supp. 3d at 883.  Courts have thus

held that where individuals make significant capital investments and assume substantial risk, they

are more likely to be independent contractors than employees.  *Carrell v. Sunland Constr., Inc.*,

998 F.2d 330, 333 (5th Cir. 1993) (welders were independent contractors partly because they

invested an average of $15,000 each for welding equipment); *Donovan v. Brandel*, 736 F.2d

1114, 1118-19 (6th Cir. 1984) ("The capital investment factor is most significant if it reveals that

the worker performs a specialized service that requires a tool or application which he has

mastered"); *Dole v. Snell*, 875 F.2d 802, 810 (10th Cir. 1989) ("[T]he 'investment' which must be

considered as a factor is the amount of large capital expenditures, such as risk capital and capital

investments, not negligible items, or labor itself.").  In light of Plaintiffs' substantial capital

investments to lease and maintain their trucks, and the attendant risks, this factor weighs in favor

of independent-contractor status.

74.   **As to the fourth *Baker* factor**, the permanence of the working relationship,

temporary relationships weigh against employment status.  *See*, *e.g.*, *Saleem v. Corp. Transp.

Grp., Ltd.*, 52 F. Supp. 3d 526, 542–43 (S.D.N.Y. 2014), *order clarified*, 2014 WL 7106442

(S.D.N.Y. Dec. 9, 2014), *aff'd sub nom. Saleem v. Corp. Transp. Grp., Ltd.*, 854 F.3d 131 (2d Cir.

2017).  Of particular importance here, the relevant agreements signed by Plaintiffs (the XPO

Contractor Hauling Agreement and the Pathway Equipment Lease Agreement) are fixed in duration.  The fact that the relationship is based on an agreement for a fixed term weighs against employee status.  *See Derolf,* 259 F. Supp. 3d at 883; *see also Baker*, 137 F.3d at 1442.

75.     In addition, drivers were free to take time off at their discretion, without seeking permission, and they were under no obligation to accept any dispatch opportunity.  Moreover, many drivers completed their leases and no longer even have relationships with Pathway.  Accordingly, the relationship was not permanent.  *Compare Saleem*, 52 F. Supp. 3d at 542 (drivers' ability to decline dispatches an important factor weighing against permanency of relationship) *with Doe v. Swift Transp. Co.*, 2017 WL 67521, 2017 U.S. Dist. LEXIS 2410 (D. Ariz. Jan. 5, 2017) (agreements at issue were not for a fixed term); *see also Mikhaylov*, 2019 WL 1492907, at *7 (plaintiff drivers were free to accept or decline any loads offered without penalty, and could work for other carriers, which weighed in favor of a finding of independent contractor status).

76.     **As to the fifth *Baker* factor**, the degree of skill required to perform the work, in a non-FLSA case, the Tenth Circuit explained that driving commercial trucks is a special skill.  *United States v. Berry*, 717 F.3d 823, 834 (10th Cir. 2013); *see also Mikhalylov*, 2019 WL 1492907, at *6 (parties and court agreed that over-the-road truck drivers were professionally trained and possessed valuable knowledge of DOT regulations and freight-handling skills, for purposes of the economic realities test).  But driving the truck is not the only skill at issue here.  To be profitable, Plaintiffs also needed business acumen, managerial skills, and financial proficiency, as they were much more like business owners than mere drivers, even when they drove the trucks themselves.  Indeed, three Plaintiffs (Messrs. Merrill, A. Dennis, and Nasr) relied on the business records exception to the hearsay rule to admit maintenance records they

maintained for their businesses.  They controlled whether to drive as a solo driver or as a team, what hauls to accept, what routes to take, how best to manage their fuel efficiency, and when to work.  Accordingly, this factor weighs in favor of independent-contractor status.

77.     **As to the sixth *Baker* factor**, the extent to which the work is an integral part of the alleged employer's business, Plaintiffs performed work (freight hauling) for XPO (a freight hauling carrier).  However, courts have found independent contractor status under the FLSA even where this factor weighs against the defendants.  *See Derolf*, 259 F. Supp. 3d at 883; *Saleem*, 52 F. Supp. 3d at 542–43 (S.D.N.Y. 2014).

78.     Even if Plaintiffs actually hauled freight for Pathway (which they did not), this factor would not weigh in favor of Plaintiffs because the work performed was easily interchangeable with work by other drivers.  *See Mikhalylov*, 2019 WL 1492907, at *8.  In other words, even though a driver's work may be an integral part of a particular carrier's business model, it is "equally important" for purposes of the economic realities test that the driver is "not indispensable" or interchangeable with other drivers.  *Id.*

79.     Plaintiffs contend that they are employees because, like company drivers, they had to deliver a load from point A to point B.  But that oversimplification ignores the factors discussed above.  While the act of hauling freight might be the same, as shown above, the differences between company drivers and owner-operators are significant.

80.     Based on the totality of the circumstances, and because the six factors overwhelmingly militate in Pathway's favor, the Court rules that Plaintiffs were not employees of Pathway or XPO.

###### F.      Plaintiffs Failed To Prove FLSA Damages

81.      Even if Plaintiffs had been successful in proving that Pathway is a joint employer

and that Plaintiffs were employees under the FLSA, they still would not be entitled to recover in

this case because they failed to produce evidence of the amount and extent of any unpaid work.

82.      "An employee who brings suit . . . for unpaid minimum wages or unpaid overtime

compensation . . . has the burden of proving that he performed work for which he was not

properly compensated."  *Anderson v. Mt. Clemons Pottery Co*., 328 U.S. 680, 686–87 (1946).  In

determining the proper standard of proof, the Supreme Court noted that employees seldom keep

their own records:

> The remedial nature of this statute and the great public policy which
> it embodies, however, militate against making that burden an
> impossible hurdle for the employee. Due regard must be given to
> the fact that it is the employer who has the duty under §11(c) of the
> Act to keep proper records of wages, hours and other conditions and
> practices of employment and who is in position to know and to
> produce the most probative facts concerning the nature and amount
> of work performed. Employees seldom keep such records
> themselves; even if they do, the records may be and frequently are
> untrustworthy.

*Id*. at 687.

83.      Thus, "[w]hen the employer has kept proper and accurate records the employee

may easily discharge his burden by securing the production of those records." *Id*.  "But where the

employer's records are inaccurate or inadequate and the employee cannot offer convincing

substitutes a more difficult problem arises." *Id*.  In that situation,

> [t]he solution ... is not to penalize the employee by denying him any
> recovery on the ground that he is unable to prove the precise extent
> of uncompensated work. Such a result would place a premium on
> an employer's failure to keep proper records in conformity with his
> statutory duty; it would allow the employer to keep the benefits of
> an employee's labors without paying due compensation as
> contemplated by the Fair Labor Standards Act.

*Id.*

84.     The Supreme Court concluded that "an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Id.*; *see also Handler v. Thrasher*, 191 F.2d 120, 122 (10th Cir. 1951). This burden is met even when the employee kept time records that were not accurate, if the employer knew or should have known that the employee was not reporting all hours worked. *See Murray v. Stuckeys, Inc.*, 939 F.2d 614, 617, 621 (8th Cir. 1991) (finding employer liable for overtime where it had discouraged plaintiffs from reporting overtime hours), *cert. denied*, 502 U.S. 1073 (1992).

85.     "The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." *Anderson*, 328 U.S. at 687–88. "If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate." *Id.* at 688; *see also Handler*, 191 F.2d at 122.

86.     Thus, to establish a *prima facie* wage claim, Plaintiffs must prove by a preponderance of the evidence (1) that they worked hours without receiving minimum wage, (2) the "amount and extent" of the work "as a matter of just and reasonable inference," and (3) that Pathway knew of the uncompensated minimum wage. *See Schneider v. Landvest Corp.*, 2006 WL 322590, at *21–22 (D. Colo. Feb. 9, 2006) (applied to overtime claims).

### 1.     Plaintiffs did not work 70 hours every week.

87.     Rather than hiring an expert or making the requisite effort to calculate how much they worked each week, Plaintiffs *assumed* that they all worked 70 hours each and every week.

Plaintiffs thus calculated their damages as follows: $7.25 (federal minimum wage) x 70 hours = $507.50; if they received less than that amount from Pathway for a week at issue, Plaintiffs' claimed they were entitled to the difference, plus liquidated damages.

88.      "However, the evidence presented at trial demonstrates the implausibility of th[e] proposition" that Plaintiffs worked 70 hours each and every week.  Order [#333] at 5.  At best, it appears the 70-hour figure is based on the maximum amount of time the Plaintiffs could "work" under DOT regulations.  Vol. I, 131:2-7 (Merrill); Vol. III, 512:25-513:2 (Williams); Vol. IV, 604:19-22 (A. Dennis).  And this maximum is for an 8-day cycle.  *See* 49 C.F.R. § 395.3(b)(2).

89.      As this Court previously recognized, the settlement statements, which were admitted into evidence based on the parties' stipulation, show wide variances in the number of miles Plaintiffs drove each week; in some weeks, Plaintiffs drove a few hundred miles, and in others, they drove over 3,000 miles.  *Id.* at 5-6; *compare* Vol. IV, 671:8-22 (Gutowski drove 1302 miles one week) *with id.*, 695:10-12 (Horion drove 504 miles another week), *and with* Vol. II, 321:20-322:6 (Lacy drove zero miles during a different week).  The Court must therefore individually analyze each Plaintiff's claim for damages, to the extent such an individualized inquiry is possible.

90.      Before analyzing the claims, however, the Court notes that Plaintiffs' damages calculations fail to specify the 7-day period that constitutes the workweek under the FLSA.  *See* 29 C.F.R. § 778.105 (an employee's workweek under the FLSA is a fixed and regularly recurring period of 168 hours – seven consecutive 24-hour periods).  XPO's settlement period was based on a 7-day period, but Plaintiffs were paid only for trips concluded and paperwork submitted within that period.  Hunt Preservation Dep. 26:10-27:1 (settlement statements were issued every Friday, based on trips completed (including submission of pertinent paperwork by the driver) by the prior

Tuesday at midnight).  In other words, a Plaintiff's compensation in one settlement period might reflect time spent delivering loads in a prior time period.

91.     Further, and as noted above, Plaintiffs appear to have relied on a 70-hour work week as a result of DOT regulations, but those regulations are based on an eight, not seven, day period.  *See* 49 C.F.R. § 395.3(b)(2).

92.     The failure to identify a specific work week is particularly troubling given that Plaintiffs calculations hinge on the number of hours they supposedly drove each week.  Even assuming the Court was able to resolve the work week issue, it nevertheless rejects Plaintiffs' damages claims.

### 2.     Plaintiffs who testified about damages.[14]

#### a.     Franklin Merrill

93.     Mr. Merrill's calculations suffer from a variety of flaws.  *First*, he provided insufficient evidence to justify an inference that he consistently worked 70 hours per week.  For example, for the August 21, 2015 "week" at issue, Tr. Ex. 136, at 46, Mr. Merrill received a driver disbursement of $293.56 (not counting advances, if any), resulting in $213.94 in alleged unpaid minimum wages, and $427.88 in alleged liquidated damages.[15]  However, the pertinent settlement statement shows that he drove only three days for that period: 10 miles on August 10, 1,366 miles on August 11, and 434 miles on August 14.  Tr. Ex. 52 at bates #000073.

---

[14] Plaintiffs claimed they were prejudiced by the Court's Order decertifying this case after trial because, in part, some of them "did not testify on FLSA matters. . . ."  [#333] at 9.  In response, the Court "provide[d] Plaintiffs with an opportunity to file a motion for a new trial pursuant to Fed. R. Civ. P. 59(a)," which the Court pointed out could be limited to taking additional testimony.  *Id.* at 11 & n.7.  Plaintiffs did not pursue that opportunity.

[15] Plaintiffs miscalculated the amount of alleged liquidated damages by claiming double the amount that might be authorized.  29 U.S.C. § 216(b) (if authorized, liquidated damages may be awarded in "an equal amount" to any unpaid minimum wage).

94.     Mr. Merrill's truck was being repaired on August 13, 2015 (Tr. Ex. 82, at Bates #000074-75), but the Court has no way of inferring how many compensable hours, if any, Mr. Merrill may have worked while the truck was being repaired.

95.     For certain other periods with low miles, Merrill never explained how he arrived at 70 hours given the low mileage.  *See, e.g.*, Tr. Ex. 52 at #000098 (for 3/4/16 settlement statement, Merrill drove one trip of 753 miles); *id.* at #000104 (for 3/25/16 settlement statement, Merrill drove two trips totaling 1,212 miles).

96.     For the October 2, 2015 "pay period," Mr. Merrill claimed he "worked" 70 hours when his truck was in the shop because he was "away from home."  Vol. I, 130:4-19, 131:2-7, 132:16-133:11 (drove one day for 427 miles, and he claimed the truck was in the shop for a week in Joplin).

97.     No evidence indicates that Mr. Merrill had to stay with or even near the truck while it was being repaired.  *See* 29 C.F.R. § 785.16 (differentiating between time a truck driver is "engaged to wait," which is compensable, versus time a truck driver is "waiting to be engaged," which is not compensable).  As this Court has previously noted, maintenance/repair time is not compensable for hours spent at home or elsewhere.  Order [#333] at 7; *see* DOL Opinion Letter, 2019 WL 3345452, at *1 (July 22, 2019) (employee truck driver is "waiting to be engaged" during periods when facts show that he is "completely relieved from duty" and the periods are "long enough to enable him to use the time effectively for his own purposes.").

98.     While a driver might validly claim compensation when waiting for a customer to unload freight after delivery or for roadside assistance when a truck breaks down, Plaintiffs should not be compensated for time when the truck sits in a repair shop for days or even weeks at a time.  *Cf. Wirtz v. Sullivan*, 326 F.2d 946, 948-49 (5th Cir. 1964) (the "waiting time of the

employees during breakdowns, *since the employees are required or requested [by the employer] to remain* [on the employer's premises], is working time for which the employees are entitled to compensation."); *see also Blum v. Great Lakes Carbon Corp.*, 418 F.2d 283, 287 n.6 (5th Cir. 1969) (discussing *Wirtz* and similar cases).

99.     *Second*, Mr. Merrill seeks compensation for periods during which he did not drive or even possess the truck.  Tr. Ex. 136 at 46 (seeking damages for April 29, 2016 disbursement, which does not appear to be a payment for services, according to Tr. Ex. R at #000110); Vol. I, 101:17-20, 128:1-13 (truck was down for maintenance for all or most of April); s*ee also* Vol. I, 140:8-14 (claiming damages for two periods—July 8 and 16, 2016—even though he stopped driving the truck as of June 26 and relinquished possession on June 29, 2016).

100.     *Third*, Mr. Merrill sometimes took advances on his pay, which were not included in his damages calculations.  *See, e.g.*, Vol. I, 138:23-139:1.

101.     Mr. Merrill claimed that any cash advances taken during the periods at issue were used for maintenance or repairs on the truck.  Vol. I, 139:1-140:7.  He claimed to have receipts for those advances, but he did not produce any at trial.  Regardless of whether the advances were used for truck repairs or maintenance, they still count as compensation.  *See, e.g.*, Tr. Ex. 52 at #000092 (showing $460 in cash advances); *id.* at #000112 (showing over $200 in cash advances).

102.     *Fourth*, Mr. Merrill acknowledged that, at times, he asked Pathway to apply funds that would otherwise have been disbursed to him to his lease obligations.  Vol. I, 140:18-141:12.  Although he claimed he excluded any such weeks from his damage calculations, he was unable to articulate how he did that, other than to suggest he relied on a journal, which was not admitted into evidence.  *Id.* at 141:20-142:15.  Given the other discrepancies noted above, the Court cannot credit Mr. Merrill's testimony.

103.     Because Merrill provided no other testimony that would allow the Court to reasonably infer how many compensable hours he worked in given weeks, the Court cannot attribute any damages to those periods of time.

### b.      Anthony Dennis

104.     Mr. Dennis' damages suffer from similar flaws.  He acknowledged he did not have sufficient miles to drive 11 hours per day during his last three weeks as a Pathway client. His settlement statements indicate that he had numerous weeks of driving around 1,000 miles or less long before he completed his lease agreement with Pathway.  He routinely took advances, including for a car payment.  And he failed to provide evidence to explain what work, if any, he was performing during low or no mileage periods, or while his truck was being repaired.

105.     Mr. Dennis also acknowledged what is undeniable: he sometimes took time off.

106.     As with Mr. Merrill, based on this record, the Court cannot credit Mr. Dennis's calculations, nor does the Court have a reasonable basis to infer the amount of compensable time he actually worked in any given week.

### c.      Rodney Lacy

107.     The Court reaches the same conclusions with respect to Mr. Lacy's claimed damages, *i.e.*, he failed to provide sufficient evidence to reasonably infer how much compensable work he performed on a given week.

108.     The Court also finds that Mr. Lacy lacked credibility.  It strains credulity to suggest, as Mr. Lacy did, that he stood over mechanics watching them repair his truck for hours or days at a time.

109.     Consequently, the Court concludes that Messrs. Merrill, Lacy, and Dennis failed to establish they are entitled to damages.

### 3. Plaintiffs who did not specifically testify about damages.

110.    The remaining Plaintiffs fare no better.  They did not testify about an "average day," so their only evidence to support their damages came in the form of the settlement statements and logs, and cross-examination.

111.    The flaws noted above apply equally to the remaining Plaintiffs.  The Court cannot infer that they each worked 70 hour-weeks, yet Plaintiffs offered no plausible basis to infer some other amount for each week at issue.

112.    As a result, the Court concludes that the remaining Plaintiffs similarly failed to meet their burden to establish damages.

### G. Scope Of Damages – No Evidence Of Willfulness.

113.    If the Court were to find in Plaintiffs' favor both on liability and damages, Plaintiffs still would be limited to a two-year look-back for failure to prove their allegation that Defendants knowingly, willfully, and recklessly violated the FLSA by misclassifying them as employees and failing to pay them minimum wage.  Fourth Am. Compl. [#82] at 19.

114.    The FLSA generally imposes a two-year statute of limitations unless the defendant's violations are shown to be willful, in which case a three-year period applies.  *Mumby v. Pure Energy Serv. (USA), Inc.*, 636 F.3d 1266, 1270 (10th Cir. 2011); 29 U.S.C. § 255(a).

115.    "To fall under the three-year limitation, the plaintiff must show that 'the employer either knew or showed reckless disregard for the matter of whether its conduct violated the statute.'" *Mumby*, 636 F.3d at 1270 (*quoting McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988). "Reckless disregard can be shown through 'action entailing an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" *Id.* (*quoting Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 68 (2007)); *see also Reich v. Monfort, Inc.*, 144 F.3d 1329, 1334

(10th Cir. 1998) (the standard for determining whether a violation of the FLSA is willful, knowing or reckless "is whether the employer 'knew or showed reckless disregard for the matter of whether its conduct was prohibited by the [FLSA]'") (*quoting McLaughlin*, 486 U.S. at 133).

116.    Here, Plaintiffs have not satisfied their burden to prove that Pathway evinced reckless disregard sufficient to justify a three-year limitation period under the FLSA.  The evidence shows that Pathway was an equipment lessor that retained no benefit whatsoever if Plaintiffs were not compensated sufficiently to cover their lease payments; in fact, Pathway was harmed if Plaintiffs were unable to make their lease payments.  Accordingly, if the Court had found liability and that damages were appropriate in this action, the Court would apply only a two-year limitations period to Plaintiffs' minimum wage claims.

### H.    Plaintiffs Are Not Entitled To Liquidated Damages.

117.    Generally, when an employer violates the FLSA, it is liable for both compensatory damages and "an additional equal amount as liquidated damages," essentially doubling the plaintiffs' damage award. 29 U.S.C. § 216(b).  The purpose behind liquidated damages in the FLSA context lies in "the reality that the retention of a workman's pay may well result in damages too obscure and difficult of proof for estimate other than by liquidated damages." *Renfro v. City of Emporia*, 948 F.2d 1529, 1540 (10th Cir.1991) (internal quotations marks omitted).

118.    "However, if the employer can establish that his conduct was both in good faith and based on a reasonable belief that his conduct was not in violation of the FLSA, the court may, in its discretion, award less or no liquidated damages."  *Mumby*, 636 F.3d at 1272 (citing 29 U.S.C. § 260).  While the reasonableness requirement is an objective standard, the good-faith inquiry is subjective, requiring an "honest intention to ascertain and follow the dictates" of the

[FLSA]. *Dep't of Labor v. City of Sapulpa*, 30 F.3d 1285, 1289 (10th Cir. 1994) (internal quotation marks omitted).

119.    The Court declines to award liquidated damages, because Pathway acted in good faith with an honest intention to ascertain and follow the FLSA's dictates. Pathway entered into agreements with both Plaintiffs and XPO in which all parties agreed that the Plaintiffs were independent contractors and not employees. As an equipment lessor with no economic incentive to see that Plaintiffs were paid any less than the minimum wage (and, in fact, with every incentive to see that Plaintiffs made enough to pay their leases), Pathway at all times intended to adhere to the FLSA and thus acted in good faith.

120.    Accordingly, the Court finds that Plaintiffs are not entitled to liquidated damages pursuant to 29 U.S.C. § 216(b).

## I.    Defendant Matthew Harris Is Not Individually Liable.

121.    Plaintiffs seek to hold Defendant Matthew Harris liable in his individual capacity. Fourth Am. Compl. [#82] at 1, 20-21.

122.    Aside from having failed to prove the requisite elements of their FLSA minimum-wage claim, Plaintiffs separately failed to meet their burden to prove that Harris is individually liable in this case, which requires a showing that he was "involved in the day-to-day operation or ha[d] some direct responsibility for the supervision of the employee." *Patel v. Wargo*, 803 F.2d 632, 638 (11th Cir. 1986).

123.    Only three of the 15 Plaintiffs testified about their "average work day" as an owner-operator contracted with XPO. Not one of them stated that they interacted with Mr. Harris as part of their average work day. Based on this record and the facts above, there is no evidence that Harris could be construed as a "joint employer" with XPO, that he had any involvement in

the day-to-day services that Plaintiffs provided to XPO, or that he had any direct responsibility for supervising the Plaintiffs.

124.    Defendant Harris thus is not individually liable to Plaintiffs.

## III.    COUNTS II, III, AND IV: PLAINTIFFS' STATE-LAW CLAIMS

125.    Plaintiffs additionally allege three causes of action under Colorado state law: (1) rescission of lease agreements, warranties and promissory notes; (2) unjust enrichment; and (3) quantum meruit.  Fourth Am. Compl. [# 82] at ¶¶ 71-86.

126.    As remedies for these claims, Plaintiffs seek disgorgement of all monies paid by Plaintiffs to Pathway under the lease agreements, warranties, and promissory notes entered into between Plaintiffs and Pathway, plus the return of all "benefits" otherwise conferred on Pathway by Plaintiffs.  *Id.*

### A.    The Rescission Claim Fails.

127.    To prove their individual claims of rescission based on Pathway's alleged material misrepresentations, each Plaintiff must prove the elements of fraud and deceit, including their right to rely upon the representations made, but need not prove that Defendants had knowledge of falsity of the representations or were utterly indifferent to their truth or falsity.[16]  *Bassford v. Cook*, 380 P.2d 907, 910 (Colo. 1963).

128.    The elements of fraudulent misrepresentation are (1) a knowing misrepresentation of material fact, (2) reliance on the material misrepresentation, (3) the right or justification to rely on the misrepresentation, and (4) reliance resulting in damages.  *Williams v. Boyle*, 72 P.3d 392, 399 (Colo. App. 2003).

---

[16] Plaintiffs concede that they must establish a material misrepresentation for their rescission claim.  Vol. VII, 1064:5-7, 1073:22-24.

129.     Plaintiffs Eric Ard, Anthony Dennis, Ronald Dennis, Tim Hollingsworth, Larry Jurcak, Rodney Lacy, and Sami Nasr are not entitled to rescission, because they satisfied the terms and conditions of their lease agreements and, therefore, there is no longer a contract to rescind.  *See Kaiser v. Market Square Discount Liquors, Inc.*, 992 P.2d 636, 642 (Colo. App. 1999) ("A party may not rescind a contract in part and affirm it in part, or rescind a contract but retain some benefit arising from it."); *Robinson v. Lynmar Racquet Club, Inc.*, 851 P.2d 274, 279 (Colo. App. 1993) ("The party seeking restitution must return the opposite party to the position it occupied prior to entering into the contract."); *Derma Pen, LLC v. 4EverYoung Ltd.*, 2014 WL 3817133, at *6 (D. Utah Aug. 4, 2014) ("If a contract is completely performed, there is no ground for rescission.").  In *Robinson*, the court ruled that a gym membership agreement could not be rescinded because the contract had previously been cancelled.  As a result, "there was no contract to rescind nor any obligations of which to be relieved."  *Robinson,* 852 P.2d at 279.  Moreover, the court noted that the plaintiff could not "restore to [defendant] her use of its facilities and services which she had received over the course of the contact.  Thus, she could not return [defendant] to its precontract status and rescission is barred by her inability to do so."  *Id.* (*citing Varady v. White,* 661 P.2d 284 (Colo. App. 1982)).

130.     Plaintiffs' reliance on *Jacobson v. XY, Inc.* to support their argument for rescission is misplaced.  2009 WL 4267950, at *1 (D. Colo. Nov. 20, 2009).  In *Jacobson*, rescission was appropriate because the ultimate ownership of the technology was never resolved until the court's own declaratory judgment on the subject.  Here, in contrast, Plaintiffs Ard, Anthony Dennis, Ronald Dennis, Tim Hollingsworth, Larry Jurcak, Rodney Lacy, and Sami Nasr received full title to their trucks from Pathway after satisfying the terms of their lease agreements.  There is no

dispute over the ownership of the trucks, and there is no longer a contract to rescind.  Thus, *Jacobson* is distinguishable and inapplicable to Plaintiffs' rescission claims.

131.    The remaining Plaintiffs did not demonstrate any knowing misrepresentations of material fact regarding the Equipment Lease Agreement or its terms.  Instead, Plaintiffs uniformly testified about "what they thought they were getting" through the Equipment Lease Agreement. The evidence shows that Pathway gave no verbal warranties or assurances to Plaintiffs about the condition of their leased trucks.  Vol. VI, 961:19-962:4.

132.    Even if Plaintiffs had identified any alleged material misrepresentations, they produced no evidence that they actually relied on any alleged false statements attributable to Pathway or Mr. Harris when deciding to enter into the Equipment Lease Agreements.

133.    Any alleged reliance on Pathway's pre-agreement statements would, in any event, be unreasonable to the extent such statements addressed topics covered in the Equipment Lease Agreement, such as the condition of trucks, the terms of settlement payments to Plaintiffs (including frequency), the terms of Plaintiffs' maintenance escrow accounts, the terms and limitations of Pathway's limited service contract, and circumstances that could result in increased weekly payment obligations.  *See, e.g.*, *U.S. Welding, Inc. v. Burroughs Corp.*, 640 F. Supp. 350, 350-53 (D. Colo. 1985) (claim for negligent misrepresentation is not valid where an integrated contract specifically disclaims prior representations and warranties); *Heidtman Steel Products, Inc. v. Compuware Corp.*, 164 F. Supp. 2d 931, 940 (N.D. Ohio 2001) (valid merger clause in the parties' agreement rendered the plaintiff's reliance on representations not included in the later agreement unreasonable); *Nowaczyk v. Matingas*, 146 F.R.D. 169, 173 (N.D. Ill. 1993) ("[T]he law does not recognize fraud based on misrepresentations inconsistent with the terms of the parties' express written agreement.").

134.     To the extent Plaintiffs rely on any alleged misrepresentations made *after*
Plaintiffs' entered into their lease agreements and ancillary agreements, those misrepresentations
cannot form the basis of a rescission claim, because Plaintiffs must have reasonably relied on the
material misrepresentations *before* entering into the lease agreements.  *See Duffield v. MPC*
*Pipelines Inc.*, 2017 WL 7311884, at *5 (D. Colo. Apr. 28, 2017) (distinguishing between
misrepresentation claims made before contract execution and those made during contract
performance); *Mosher v. Long Beach Mortgage Co.*, 2014 WL 287441, at *3 (D. Colo. Jan. 27,
2014) (party seeking rescission of a contract based on fraudulent inducement or concealment must
prove that they entered into the alleged contract relying on the assumption that the concealed or
undisclosed fact did not exist or that the defendant's falsely stated fact was true).

135.     Last, to the extent this claim is based on Plaintiffs' own misunderstandings of the
Equipment Lease Agreements' express terms and provisions, or their failure to read those
provisions (as opposed to any actual fraud or misrepresentation attributable to Defendants), those
allegations do not justify rescission.  *See Bivens v. Van Matre*, 270 P.2d 761, 763 (Colo. 1954) (if
a party enters into a contract with sufficient mental capacity to understand it and is not under the
influence of fraud or coercion, courts will not relieve him of the consequences of his act on the
sole ground that the bargain is, as to him, improvident, rash, foolish, or oppressive).

136.     Ultimately, parties are bound by a contract they sign.  *RHC, LLC v. Quizno's*
*Franchising, LLC*, 2005 WL 1799536, at *5 (D. Colo. July 19, 2005).  Although not all of them
chose to do so, Plaintiffs were able to review the Equipment Lease Agreements before signing
them. Vol. III, 501:2-12; Vol. IV, 601:24-602:4. They knew and understood that the Equipment
Lease Agreement constituted a contract.  Vol. I, 190:17-19; Vol III, 439:21-440:4; Vol. IV,
602:5-9.  The Equipment Lease Agreement states that Pathway made no representations or

warranties regarding the condition or fitness of the leased trucks and makes clear that the lessee accepts the truck "AS IS, WHERE IS, AND WITH ALL FAULTS." *See* Tr. Ex. 50 at 1, ¶ 2 and 5, ¶ 21.  Plaintiffs agreed that they would be solely responsible for covering the cost of truck repairs and maintenance during the lease term.  Tr. Ex. 50 at 2-3, ¶ 13(f) and 22 ("Truck Acceptance Form").  The Equipment Lease Agreement contains a limited service contract for a defined period and/or mileage, which Plaintiffs referred to as a "warranty."  Tr. Ex. 50 at 18-20. Regardless of how the parties characterized the provision, it set forth repairs that would be covered by Pathway, and the terms and conditions governing Pathway's and the Plaintiffs' repair obligations.  *Id.*; Vol. III, 445:23-446:1.

137.    Several Plaintiffs claimed that they did not understand portions of the Equipment Lease Agreement.  *See*, *e.g.*, Vol. I, 39:20-40:16.  But they did not specify which portions they did not understand, nor would it make a difference if they had done so.  A party is presumed to know the contents of a contract he signs and, absent fraud, is not relieved of the obligations in the contract.  *B & B Livery, Inc. v. Riehl*, 960 P.2d 134, 138 n. 5 (Colo. 1995); *Rasmussen v. Freehling*, 159 Colo. 414, 412 P.2d 217, 219 (Colo. 1996) (holding that a party is not permitted to claim she is not bound by terms of a contract she signed but failed to read); *Cordillera Corp. v. Heard*, 41 Colo. App. 537, 592 P.2d 12 (Colo. Ct. App. 1978), *aff'd*, 200 Colo. 72, 612 P.2d 92 (Colo. 1980) (holding that a party is presumed to know the contents of a contract signed by that party).  Similarly, a party is bound by the terms of a contract even if he later concludes he entered into a bad deal.  *Roberts v. Adams*, 47 P.3d 690 (Colo. Ct. App. 2001) (holding that a court is not permitted to relieve a party of her obligations under a contract even when that party struck a bad bargain); *Corporate Finance Associates Paduch, Inc. v. Rathbone*, 680 P.2d 859 (Colo. Ct. App. 1984) (same).

138.     For all of these reasons, Plaintiffs failed to prove their rescission claims.

**B.     The Unjust Enrichment And Quantum Meruit Claims Fail.**

139.     The elements of unjust enrichment and quantum meruit are the same.  Each

Plaintiff must prove by a preponderance of the evidence that (1) at Plaintiff's expense, (2)

Defendants received a benefit, (3) under circumstances making it unjust for Defendants to retain

the benefit without paying for it.  *Harris Group, Inc. v. Robinson*, 209 P.3d 1188, 1205 (Colo.

App. 2009) (unjust enrichment elements); *Dudding v. Norton Frickey & Assoc.*, 11 P.3d 441, 445

(Colo. 2000) (quantum meruit elements).

140.     A party cannot recover for unjust enrichment or quantum meruit by asserting a

quasi-contract "when an express contract covers the same subject matter because the express

contract precludes any implied-in-law contract."  *Interbank Investments, LLC v. Eagle River*

*Water and Sanitation Dist.*, 77 P.3d 814, 816 (Colo. App. 2003); *Dudding*, 11 P.3d at 445; *see*

*also Hannon Law Firm, LLC v. Melat, Pressman & Higbie, LLP*, 293 P.3d 55, 64 (Colo. App.

2011) (Terry, J., dissenting) ("Quantum meruit is a theory of contract recovery that invokes an

implied contract when the parties either have no express contract or have abrogated it.") (quoting

*Dudding*, 11 P.3d at 444).

141.     Here, Plaintiffs have identified no conduct or statements that are not covered by

the Equipment Lease Agreements.  During closing argument, Plaintiffs' counsel claimed that

certain repairs should have been covered by the "warranty" but were not, and that Plaintiffs who

needed to borrow money from Pathway because they could not or did not want to pay for a repair

themselves somehow suffered an injustice.  Plaintiffs also argue that they thought they would be

independent contractors, but instead were (according to Plaintiffs) employees.[17]  Vol. VII, 1074:4-1075:21, 1077:15-23.

142.    With respect to the first contention, the Equipment Lease Agreement clearly states that the Plaintiff is responsible for the cost of repairs and maintenance, and the limited service contract expressly references those items that will be covered by Pathway.  Tr. Ex. 50 at 2-3, ¶¶ 13(f), 18-20.  Similarly, no one forced Plaintiffs to borrow money from Pathway to pay for repairs; they chose to enter into a promissory note with Pathway as a way to cover the cost of those repairs.

143.    Plaintiffs, in essence, suggest that Pathway breached the Equipment Lease Agreement by not honoring the "warranty" or limited service contract.  But they have not pled or proved a breach of contract.

144.    As for the second contention, the Court has concluded that Plaintiffs were appropriately classified as independent contractors.  Consequently, the allegation that they were misclassified, and that such misclassification somehow supports an unjust enrichment or quantum meruit theory of recovery, fails.

145.    In any event, Plaintiffs have identified no benefits received by Defendants apart from (1) lease payments, promissory note payments, and other related payments required by the lease agreements, and (2) monies paid towards the repair and maintenance of Plaintiffs' trucks.

---

[17] In a related argument, Plaintiffs' counsel asserted that the agreement between some Plaintiffs and Pathway was somehow "unjust" because they could not "walk away" from the Equipment Lease Agreement without financial consequences.  Vol. VII, 1078:15-1079:9.  In fact, Mr. Harris testified that Pathway generally does not take action in connection with a lease default, other than sending the amount to collection.  Vol. VI, 1039:4-10.  In any event, the fact that Plaintiffs might experience negative financial consequences for failing to successfully complete the lease does not render the lease "unjust."  If that were true, then nearly every contract or agreement could be challenged or set aside.

Both subjects are expressly governed by the explicit terms of the lease agreements, which are valid and enforceable.  Thus, Plaintiffs' unjust enrichment claims must fail for this reason alone. *See id.*

146.    Even if the lease agreements were not enforceable, Plaintiffs' unjust enrichment claims would still fail, because Plaintiffs produced no evidence demonstrating that Pathway's receipt of the above-mentioned payments and/or benefits was "unjust."  *See Harris Group, Inc.*, 209 P.3d at 1206 (unjust enrichment requires some form of misconduct by the defendants); *Dudding*, 11 P.3d at 445 (whether "injustice results often will turn on whether a party engaged in some type of wrongdoing").  Plaintiffs thus cannot recover on their unjust enrichment or quantum meruit claims.

## IV.    COUNT V: PLAINTIFF LARRY JURCAK'S FLSA RETALIATION CLAIM

147.    To establish a prima facie case of FLSA retaliation, Plaintiff Jurcak must show the following: (1) he engaged in activity protected by the FLSA; (2) he suffered adverse action by the employer after or contemporaneous with such employee activity; and (3) a causal connection existed between his activity and the employer's adverse action.  *See Richmond v. Oneok, Inc.*, 120 F.3d 205, 208 (10th Cir. 1997) (applying burden-shifting framework under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)) (emphasis added).

148.    Mr. Jurcak claims that he was retaliated against because XPO did not agree to enter into an owner-operator agreement with him, but he offered no evidence showing why XPO did not contract with him.  The substance of the purported conversation with Ms. Creed that formed the basis of his claim was not even admitted at trial.  Nor did he offer any evidence showing that Pathway was aware of or involved in that decision in any way.

149.     Moreover, the adverse action (XPO not contracting with him) occurred more than a year after he had already bought out his lease from Pathway.  Thus, the alleged retaliation took place long after Mr. Jurcak's relationship with Pathway was concluded.

150.     Because Pathway had no relationship with Mr. Jurcak for more than a year at the time XPO allegedly retaliated against him, Pathway could not be considered an "employer" under the FLSA at that time.  The Court therefore rules in Defendants' favor on this claim.

## V.     PATHWAY'S COUNTERCLAIMS

151.     Plaintiffs Franklin Merrill, Anthony Glover, Keith Herring, Ronald Dennis, James Newberry, Tami Potirala, Zigmund Gutowski, and Joseph Horion undisputedly defaulted on their lease obligations to Pathway, resulting in Pathway's repossession of their trucks. Vol. VI, 940:25-942:1; Tr. Ex. T6.

152.     The outstanding balances owed by each of these Plaintiffs is set forth in Trial Exhibit T6 (excluding Plaintiff Williams, who was released from his obligations as Mr. Harris testified, Vol. VI, 941:10-23).

153.     These Plaintiffs did not dispute defaulting on the Equipment Lease Agreement or the amounts owed.

154.     A *prima facie* case for breach of contract requires: "(1) the existence of a contract; (2) performance by the plaintiff or some justification for nonperformance; (3) failure to perform the contract by the defendant; and (4) resulting damages to the plaintiff." *W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992) (citations omitted).  Proof of actual damages is not an essential element of a breach of contract claim, and when a plaintiff establishes breach, but fails to prove actual damages, then the plaintiff is entitled to nominal damages.  *Interbank Investments, LLC*, 77 P.3d at 818.

155.    Pathway proved all four elements of this claim: (1) Pathway had valid Equipment Lease Agreements with each of these Plaintiffs; (2) Pathway performed all material provisions of the Equipment Lease Agreements; (3) these Plaintiffs defaulted on their lease obligations to Pathway, resulting in Pathway's repossession of their trucks; and (4) Pathway suffered damages, including the outstanding balance amounts owed as set forth in Trial Exhibit T6.  Pathway is therefore entitled to judgment on its breach of contract counterclaims

156.    Pathway also asserts a counterclaim for setoff against all Plaintiffs presuming they are entitled to damages under the FLSA.  Regarding claims for minimum wages under the FLSA, setoffs may be permitted against back-pay awards so long as the setoff does not cause a plaintiff's wages to fall under the statutory minimum.  *Singer v. City of Waco, Texas*, 324 F.3d 813, 828 n.9 (5th Cir. 2003); *see also Powell v. Carey Int'l, Inc.*, 483 F. Supp. 2d 1168, 1177 (S.D. Fla. 2007) (declining to enter summary judgment for plaintiff regarding defendants' setoff affirmative defense, which was based on defendants' allegations that plaintiffs owed defendants certain amounts under independent operator agreements, because the defendants' setoff arguments did not otherwise act to abridge or negate plaintiffs' rights under the FLSA).  Similarly, setoffs are permitted to mitigate any amounts owed by a defendant as a result of the plaintiff's successful state-law rescission, unjust enrichment, and/or quantum meruit claims.  *See In re Fortune*, 2010 WL 4053107, at *12 (D. Kan. Oct. 13, 2010) (setoff in the form of damages awarded to debtor exceeded the amounts owed in order to rescind the contract, and therefore, the debtor's tender obligation was completely extinguished); *Trustees of Carpenters and Millwrights Health Ben. Trust Fund v. Diversified Drywallers, Inc.*, 1991 WL 125303, at *5 (D. Colo. June 20, 1991) ("[U]nder equitable principles . . . there can be a setoff for unjust enrichment.").

157.    Allowing Plaintiffs to recover their alleged wages and penalties owed under the FLSA, without any form of setoff relating to the amounts still owed by them pursuant to the terms of their valid, enforceable Equipment Lease Agreements, would result in a windfall to Plaintiffs beyond any public remedial purposes served by the FLSA.

158.    Further, if the Equipment Lease Agreements must be rescinded or Plaintiffs are entitled to recover on a quasi-contract theory (either via unjust enrichment or quantum meruit), then any amounts disgorged by Pathway must be offset under principles of equity based on Plaintiffs' own obligations under their alleged quasi-contracts.

## PROPOSED ORDER OF JUDGMENT

Based on the foregoing findings and conclusions,

IT IS HEREBY ORDERED that on the claim for unpaid minimum wage (Count I) under the Fair Labor Standards Act, judgment shall enter in favor of Defendants Pathway Leasing LLC and Matthew Harris and against all Plaintiffs in this action.  Plaintiffs are entitled to no unpaid wages, liquidated damages, fees, costs, interest or other relief.

IT IS FURTHER ORDERED that on the claim for retaliation (Count V) under the Fair Labor Standards Act by Plaintiff Larry Jurcak, judgment shall enter in favor of Defendants Pathway Leasing LLC and Matthew Harris and against Mr. Jurcak.  Mr. Jurcak is entitled to no unpaid wages, liquidated damages, fees, costs, interest or other relief.

IT IS FURTHER ORDERED that on the claims for rescission (Count II), unjust enrichment (Count III), and quantum meruit (Count IV), judgment shall enter in favor of Defendants Pathway Leasing LLC and Matthew Harris and against all Plaintiffs in this action. Plaintiffs are entitled to no legal or equitable relief, fees, costs, interest or other relief.

IT IS FURTHER ORDERED that the counterclaim for setoff is moot because the Court has entered judgment in Defendants' favor as to all of Plaintiffs' asserted claims in this action;

IT IS FURTHER ORDERED THAT on the counterclaim for breach of contract, judgment shall enter in favor of Defendant Pathway Leasing LLC and against Plaintiffs Franklin Merrill, Anthony Glover, Keith Herring, Ronald Dennis, James Newberry, Tami Potirala, Zigmund Gutowski, and Joseph Horion in the amounts set forth as to each Plaintiff in Trial Exhibit T6.

The clerk shall ENTER FINAL JUDGMENT in favor of Defendants Pathway Leasing LLC and Matthew Harris, and against all Plaintiffs.

As the prevailing parties, Defendants Pathway Leasing LLC and Matthew Harris are entitled to their costs upon compliance with D.C.COLO.LCivR 54.1.

Respectfully submitted May 15, 2020.

> _/s/ **Mark B. Wiletsky**_
> Mark B. Wiletsky
> Holland & Hart LLP
> 1800 Broadway, Suite 300
> Boulder, CO 80302
> Phone: (303) 473-2864
> Fax: (303) 975-5292
> MBWiletsky@hollandhart.com
>
> &
>
> Jeremy B. Merkelson
> 901 K Street NW, Suite 850
> Washington, DC 20004
> Phone: (202) 654-6919
> Fax: (202) 688-2921
> JBMerkelson@hollandhart.com
>
> ATTORNEYS FOR DEFENDANTS PATHWAY LEASING, LLC AND MATTHEW HARRIS

## CERTIFICATE OF SERVICE

I hereby certify that on May 15, 2020, I have caused to be electronically filed the foregoing with the Clerk of Court using CM/ECF system which will send notification of such filing to the following e-mail addresses:

John R. Crone
john@crone-law.com

**ATTORNEY FOR PLAINTIFFS**


*s/Craig Radoci*

14559030_v3