IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Magistrate Judge Kristen L. Mix

Civil Action No. 16-cv-02242-KLM

FRANKLIN MERRILL,
    et al.,

       Plaintiffs,

v.

PATHWAY LEASING LLC, a Colorado limited liability company,
MATTHEW HARRIS, an individual,

       Defendants.

_____

**FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER OF JUDGMENT**
_____

## I. Background

Plaintiffs filed their initial Complaint [#1][1] on September 6, 2016.  In that pleading, they asserted that they leased trucks from Defendants Pathway Leasing LLC ("Pathway") and its owner, Matthew Harris ("Harris"), "believing they could operate those trucks as independent contractors and improve their lives through the exercise of entrepreneurial spirit."  *Complaint* [#1] at 2; *see also Fourth Am. Compl.* [#82] at 2.  Nevertheless, they claimed that Defendants "controlled every aspect" of their work and willfully misclassified them as independent contractors instead of employees, in violation of the Fair Labor Standards Act, 29 U.S.C. § 216, et seq. ("FLSA").  *Fourth Am. Compl.* [#82] at 2.  They

---

[1]  "[#1]" is an example of the convention the Court uses to identify the docket number assigned to a specific paper by the Court's case management and electronic case filing system (CM/ECF).  This convention is used throughout this document.

asserted that Defendants are their "joint employers" along with certain former-party carrier companies for whom Plaintiffs used their trucks to deliver goods. *Id.* at 14.

Plaintiffs brought a collective action on behalf of themselves and other similarly-situated individuals under the FLSA to recover money damages as a result of Defendants' alleged failure to pay them minimum wages, as well as damages based on purportedly unlawful retaliation under the FLSA. *Id.* at 20-21, 24. They also sought to rescind or void their leases and other agreements with Defendants based on Defendants' alleged material misrepresentations about the condition of the leased trucks and about the purpose of the agreements. *Id.* at 21-22. Finally, they brought claims under state law for "unjust enrichment and restitution" and "quantum meruit," seeking to disgorge "all amounts paid" by them under their various agreements with Defendants, including the leases. *Id.* at 22-24. Meanwhile, on March 20, 2017, Defendants asserted two counterclaims: (1) setoff against any damages obtained by Plaintiffs to cover "all amounts lawfully due and payable under each Plaintiff's respective lease agreement," and (2) breach of contract against fifteen Plaintiffs regarding their Equipment Lease Agreements and against nine of those Plaintiffs regarding promissory notes. *Counterclaims* [#95] at 41-42. On June 19, 2017, Plaintiffs' FLSA minimum wage claims were conditionally certified as a collective action. *Order* [#115].

After significant pretrial proceedings, a bench trial was held in this matter on June 25-26, July 2-3, and July 5-6, 2018. *See* [#268, #269, #270, #271, #272, #273, #274]. Fifteen named Plaintiffs and thirty opt-in Plaintiffs remained in the case at the time of trial. The named Plaintiffs were Eric Ard, Anthony Dennis, Ronald Dennis, Anthony Glover, Zigmund Gutowski, Keith Herring, Tim Hollingsworth, Joseph Horion, Larry Jurcak, Rodney

Lacy, Franklin Merrill, Sami Nasr, James Newberry, Tami Potirala, and Craig Williams. The following claims were tried:

(1) the fifteen named Plaintiffs' and the thirty opt-in Plaintiffs' FLSA minimum wage claims against Defendants, *see* [#264] at 26 ¶ 6;

(2) Plaintiff Larry Jurcak's claim for unlawful retaliation in violation of the FLSA against Defendants, *see id.* at 26 ¶ 7 (citing *Order* [#242] at 30);

(3) the fifteen named Plaintiffs' individual Colorado state law claims for rescission of their leases with Defendant Pathway, *see id.* at 26 ¶ 8;

(4) the fifteen named Plaintiffs' individual Colorado state law claims for unjust enrichment against Defendants, *see id.*;

(5) the fifteen named Plaintiffs' individual Colorado state law claims for quantum meruit against Defendants, *see id.*;

(6) Defendants' counterclaims for breach of contract against Ronald Dennis, Anthony Glover, Zigmund Gutowski, Keith Herring, Joseph Horion, Franklin Merrill, James Newberry, Tami Potirala, and Craig Williams, *see* [#264] at 27 ¶¶ 10 & 10 n.9; and

(7) Defendants' counterclaims for setoff against all Plaintiffs, *see id.* at 27 ¶ 10. *See also* [#266] at 2-3 (discussing remaining claims).

After the trial, on July 27, 2018, Defendants filed a Motion to Decertify 29 U.S.C. § 216(b) Collective Action [#275]. After briefing and a hearing, the Court granted the decertification request and dismissed the thirty opt-in Plaintiffs' claims, which consisted solely of FLSA minimum wage claims made via the collective action. *Response* [#285]; *Reply* [#288]; *Hearing Minutes* [#304]; *Order* [#333]. In light of this ruling, the remaining named Plaintiffs were given the opportunity to move for a new trial, including one narrowly

tailored to address the taking of "additional testimony" pursuant to Fed. R. Civ. P. 59(a)(2), but they chose not to do so.  *See Order* [#333] at 11, 11 n.7, 18.

Over the course of post-trial proceedings, the Court has permitted the parties leave to file amended proposed findings of fact and conclusions of law.  Plaintiffs' Second Revised Proposed Findings of Fact and Conclusions of Law [#336] and  Defendants' Third Amended Proposed Findings of Fact and Conclusions of Law [#350] are the most recent such filings by each side.  *See Pls.' Brief* [#348] at 17 (declining to file a Third Revised Proposed Findings of Fact and Conclusions of Law).[2]

## II.  Findings of Fact

### A.    General Background Facts

1.    In general, a commercial truck driver can choose to work for a freight company as a company driver, or choose to become an owner-operator[3] and sell hauling and delivery services as he or she desires.  Plaintiffs are commercial truck drivers who are also owner-operators.  They entered into  agreements  with Defendant Pathway Leasing ("Pathway") to lease a truck or trucks. Defendant Matthew Harris is the President of Pathway.  Plaintiffs also entered into agreements with XPO, Con-Way

---

[2]  The Court also asked the parties to address in post-trial briefing the impact, if any, of a new Department of Labor rule on this case, and both sides timely submitted such briefs. *Pls.' Brief* [#348]; *Defs.' Brief* [#349]. Ultimately, however, the Court's rulings rest on unrelated legal grounds.

[3]  The Court notes that the parties and witnesses tended to use the phrases "owner-operator" and "independent contractor" interchangeably. *See, e.g.*, Depo. of Hunt [#284-1] at 37:17-22 ("Q.  And I apologize.  So I've sometimes been referring, and I think you have too, to drivers as independent contractors and sometimes as owner/operators.  Do you understand and are you using those terms as one in [sic] the same?  A.  Yes, sir."  Throughout the "Findings of Fact" section, the Court uses the phrase "owner-operator". The legal issue regarding which Plaintiffs, if any, are independent contractors for purposes of the FLSA is reserved for the "Conclusions of Law" section below.

and/or CFI (collectively, the "Carrier"),[4] known as Contract Hauling Agreements, to haul freight.  *See, e.g.*, Vol. I [#276] at 39, 118, 194; Vol. III [#278] at 67 Trial Ex. 128; Trial Ex. 129.

2.  Plaintiffs made their own decisions about whether to drive their truck or trucks individually, as a team, or to hire others to haul freight for them.  Vol. III [#278] 553:6-13 (testimony by Plaintiff Ronald Dennis that he "decided to drive as part of a team" with a friend and then later "decided [he] wanted to switch to a solo lease with Pathway"); Depo. of Thomas J. Hunt [#284-1] at 30:16-21 (testimony by XPO's former Senior Manager of Operations that XPO could not force drivers to drive solo or as a team and could not force drivers to hire other(s) to drive the trucks for them). Drivers who elected to drive a team had the flexibility to drive more miles for more pay than they otherwise would have been able to earn as solo drivers.  Trial Ex. 45.

3.  In the commercial trucking business, the frequency and rates of pay for owner-operators and company drivers are different.  Depo. of Melinda Creed [#336-2] at 20:4-7 (testimony by CFI employee Melinda Creed that company drivers are paid bi-weekly and owner-operators are paid weekly), 21:23-22:2 (stating that CFI pays owner-operators $0.97 per mile plus a fuel surcharge), 22:5-23:2 (stating that CFI pays company drivers employee benefits, a potential safety bonus, and a per-mile rate which varies by experience level); Depo. of Hunt [#284-1] at 15:9-20 (stating that XPO has different pay rates for company drivers versus owner-operators

---

[4] There is no dispute among the parties that XPO, Con-Way, and CFI all refer to the same entity.  *See, e.g.*, Vol. I [#276] at 8:10-13 (Plaintiffs' counsel's statement), 12:10-11 (Defendants' counsel's statement).  Throughout these Findings of Fact, the Court has identified the Carrier by the language used by each witness during his or her testimony.

because owner-operators pay their own expenses, including fuel costs and truck maintenance, in addition to their lease payments, while company drivers are paid a flat wage regardless of their efficiency, and CFI/XPO pays all other costs), 53:17-54:2 (stating that a "fuel surcharge" is connected to a rate table in the Contract Hauling Agreement which shows compensation provided to owner-operators when fuel prices rise above a certain threshold).

4. Before deciding to become owner-operators, Plaintiffs conducted, or had the opportunity to conduct, their own independent evaluations regarding whether to lease or purchase their trucks and whether to lease their trucks from Pathway or a different leasing company, including the opportunity to contact other leasing companies and compare lease terms if they chose to do so. Vol. V [#280] at 831:6-832:5 (testimony by Plaintiff Nasr that, when discussing whether he would come back to XPO as an owner-operator or a company driver, XPO gave him the names of several leasing companies, only one of which was Pathway; Plaintiff Nasr specifically rejected one leasing company, Long Mountain, due to the amount of money required for a down payment on a truck); Vol. I [#276] at 186:11-190:16 (testimony by driver Becky Austin that, before signing a lease with Pathway, she did her due diligence by talking to other drivers, researching the type of truck she wanted, and calling at least three other leasing companies).

5. As owner-operators, Plaintiffs were exposed to a risk of monetary loss based on a number of factors relating to fuel efficiency. Vol. V [#280] at 837:8-12 (testimony by Plaintiff Nasr that drivers could spend more money on fuel in a week than could actually be earned, "if you don't know what you are doing").

6.      As owner-operators, Plaintiffs needed business acumen and financial proficiency to make a profit, because they controlled whether to drive solo or as a team, which loads to accept from carriers, which routes to take, how to manage their fuel efficiency and maintenance, and when to work.  Vol. I [#276] 50:3-9 (testimony by Plaintiff Merrill that drivers were responsible for following Department of Transportation regulations), 119:10-14 (stating that it was the driver's responsibility to determine how to load or secure cargo); Depo. of Hunt [#284-1] at 36:8-37:24 (stating that owner-operators "could take time off anytime they wished," unlike company drivers); Vol. V [#280] at 833:4-8 (testimony by Plaintiff Nasr that the decision to take time off for vacation was up to him, "like any other business owner"), 833:20-835:16 (stating that it was his decision as an owner-operator where to drive and whether to decline loads based on "business sense" relating to profitability of runs, including such considerations as the cost of fuel and meals and the length of the haul), 835:17-836:4 (stating that he had to make business decisions regarding whether to take a load based on its profitability); Vol. I [#276] at 71:22-72:8 (testimony by Plaintiff Merrill that  Pathway "didn't tell me what to do," despite the fact that he would sometimes get calls from Defendant Harris if he was running behind on lease payments or staying home too long); Vol. II [#277] at 301:23-302:14 (testimony by Plaintiff Lacy that it was his decision where not to drive, including places with lots of mountains, it was his decision not to haul freight over a certain weight, and he did not know any company drivers who owned their own trucks), 302:24-303:8 (stating that   Pathway did not establish rules or requirements regarding drivers' meal, rest, or sleeping breaks); Vol. III [#278] at

502:2-23 (testimony by Plaintiff Williams that it was his decision to turn down a load that would not be profitable enough based on considerations like weight, mileage, and safety); Vol. IV [#279] at 613:13-22, 626: 13-21 (testimony by Plaintiff Anthony Dennis that it was his decision where to haul and whether to haul heavy loads, despite advice from Defendant Harris that he should not restrict his runs in such ways), 615:25-616:9 (stating that Pathway did not establish any rules or requirements for drivers regarding meal or sleep breaks); Vol. IV [#279] at 642:1-3 (testimony by Plaintiff Potirala that it was her decision whether to decline a load for "pretty much" any reason that she wanted to); Vol. V [#280] at 833:20-835:21 (Depo. of Hunt [#284-1] at 37:23-40:2 (stating that it was the owner-operators' responsibility to decide how and when to maintain their trucks); Depo. of Garcia [#284-3] at 134:24-135:2 (stating that it was his decision where to fuel and which route to take because he paid for the fuel); Vol. V [#280] at 901:14-24 (testimony by Defendant Harris that Pathway did not control its clients' driving routes, refueling timing or location, or meal, rest, or sleep breaks); Trial Ex. 50 at 2-4, ¶¶ 7, 13, 15 (Pathway leases indicating that Plaintiffs were responsible for managing insurance, repairs, maintenance, and accounting for excess mileage charges relating to their trucks).

7.   Many of the work duties performed by owner-operators were the same as those performed by company drivers.  Vol. I [#276] I at 57:13-19 (testimony by Plaintiff Merrill that "you're still doing everything that you do as a company driver, everything"), 58:1-59:14 (stating that both company drivers and owner-operators had to "move freight from Point A to Point B," "maintain the trailer," "secure the load," "complete pre-trip inspections," "communicate," "babysit the load if there was

a breakdown," and "fuel"); Vol. I [#276] at 161:12-162:24 (testimony by driver Becky Austin that she was "doing the same job" as an owner-operator and as a company driver, including driving the truck, taking care of the freight, sweeping the trailer, and doing 72-point pre-trip inspections); Vol. I [#276] at 248:22-250:5 (testimony by Plaintiff Lacy that he felt like "a glorified company driver" and that he did the "[e]xact same thing" as an owner-operator that he had done as a company driver, including ensuring that there were proper seals on loads, going into weigh stations, and paying traffic tickets, if received); Rule 30(b)(6) Depo. of Hunt on behalf of CFI, Inc. [#336-1] at 41:2-12 (stating that both company drivers and owner-operators haul freight within the CFI network), 97:6-13 (stating that, from a customer's point of view, nothing distinguishes a company driver from an owner-operator while at the customer's property).

8.    Defendant Harris testified that, in his sixteen years of industry experience, he could not predict what or when something might go wrong with any truck.  Vol. V [#280] at 872:18- 873:5 (testimony by Defendant Harris that, despite testing and performing preventative maintenance, it is impossible to know whether or when a particular truck will break down, especially when adding in such variables as how the driver is driving the truck, in what kind of conditions the truck is being driven, the weights of loads being hauled, and the type and quality of maintenance done on the truck after it leaves Defendant Pathway's lot).

9.    There is "a direct correlation" between how a truck "is maintained and driven as to its longevity and reliability over the course of time."   Depo. of Hunt [#284-1] at 49:7-14, 50:1-3 (stating that "[e]ven a new piece of equipment will start going

downhill pretty quick if it's not taken care of properly").

**B.    Facts Bearing on Relationship Between Plaintiffs and Carrier**

10.    Plaintiffs were required to secure a lease or own a truck to perform work for XPO.

Depo. of Hunt [#284-1] 11:8-19 (stating that an owner-operator who contracted with

CFI/XPO either owned his/her own truck or used his/her own financing to lease a

truck from an entity of his/her choice).

11.    As of mid-2018, about thirty of Pathway's clients had contracts with XPO, but that

number varied over time.  Vol. V [#280] at 855:4-22 (testimony by Defendant Harris

that the number varies based on market forces, lease completions, and driver

decisions whether to remain with CFI or switch to a different motor carrier).

12.    XPO's owner-operators lease trucks from a number of different companies in

addition to Defendant Pathway.  Depo. of Leslie Killinger [#284-4] at 39:21-40:19

(naming lessors Lone Mountain, Arkansas Equipment Leasing, Wholesale Truck

and Finance, LRM, Cure Truck Leasing, Quality Truck Leasing, Bush Truck Leasing,

Schneider Finance, One Leasing, and Mission Financial); Depo. of Hunt [#284-1]

at 10:13-11:7 (noting that "[t]here were a variety of leasing companies that had

drivers on at CFI/XPO" and that "XPO would take a driver and tractor that met the

qualifications from any number of companies with the exception of two that they no

longer did business with" due to certain business practices by those companies),

11:8-22  (stating that an owner-operator who contracted with CFI/XPO could lease

a truck from an entity of his/her choice, only one of which was Pathway), 11:23-12:6

(stating that, "[a]t the peak size of the fleet, which would have been 550 trucks in the

contractor fleet, roughly 120 to 130 of those would have been . . . leased through

Pathway"); Vol. V [#280] at 831:6-832:5 (testimony by Plaintiff Nasr that XPO gave him the names of several leasing companies, one of which was Pathway, and that he believed he could lease a truck through any of them).

13. Drivers who wanted to haul freight for the Carrier were required to enter into written agreements with the Carrier to do so.  *See, e.g.*, Vol I [#276] at 118-19, 194; Vol. III [#278] at 116-17.   XPO's Contractor Hauling Agreement provides for a fixed period of two years and can be terminated by either party, with or without cause, by giving ten days' written notice.  Trial Ex. 128 at 14, ¶ 30.

14. Pursuant to the terms of their Contractor Hauling Agreements with XPO, Plaintiffs are responsible for "hiring, setting the wages, hours and working conditions and adjusting the grievances of, supervising, training, disciplining, and firing all drivers, driver's helpers, and other workers necessary for the performance of [Plaintiffs'] obligations."  Trial Ex. 128 at 4, ¶ 7A.

15. As owner-operators, Plaintiffs use their own business judgment to determine whether to decline loads from XPO based on profitability considerations such as the weight of the freight and fueling costs. Plaintiffs further set their own restrictions on where they will drive, the routes they will travel, and other conditions, all without needing or obtaining the Carrier's or Pathway's permission.  Vol. II [#277] at 301:23-302:17 (testimony by Plaintiff Lacy that he chooses not to drive in mountainous regions, that he chooses not to haul freight over a certain weight, and that he chooses the routes he drives); Vol. III [#278] at 502:2-23 (testimony by Plaintiff Williams that he can decline to take a load if it would not be profitable enough based on considerations such as weight, mileage, and safety risks, and that

those decisions are honored without risk of the agreements being terminated); Vol. IV [#279] at 613:13-22 (testimony by Plaintiff Anthony Dennis that he ultimately decides whether to refuse loads despite "get[ting] harassed about it" and that he self-imposes certain restrictions such as avoiding the East Coast, primarily running loads in the South, and avoiding heavy loads because they use more fuel and create more maintenance needs based on wear and tear—even though Defendant Harris calls and speaks with him about these choices); Vol. IV [#279] at 641:8-642:15 (testimony by Plaintiff Potirala that she can decline a load for practically any reason, including destination, mileage, pay, and waiting-time considerations, without first having to seek Pathway's permission); Vol. V [#280] at 830:7-19 (testimony by Plaintiff Nasr implying that, as an owner-operator, he does not have others telling him where to go or when to work), 833:20-834:13 (stating that he is able to tell Con-Way that he does not want to drive in certain areas such as the Northeast, which he characterizes as a business decision because of operating costs there, like the cost of fuel and meals, and because the likelihood that short runs will not make enough money to justify the hauls),  834:14-23 (stating that he told Con-Way that he did not want to drive in the Northwest or Northern California because of the chain requirement and the expense of buying those chains), 834:24-835:1 (stating that he never talks to Pathway about his self-imposed restrictions), 835:2-21 (stating that he has the right to decline loads and will do so when they do not make business sense, such as when his income would mostly only cover fuel costs); Depo. of Hunt [#284-1] at 37:23-40:2 (stating that company drivers do not have any financial responsibility for their trucks, but that owner-operators are required to maintain their

own trucks); Depo. of Jose Garcia [#284-3] at 134:24-135:2 (stating: "And I say, 'I'm glad I'm an owner. I work my own route.' Because that's part of the freedom. I can fuel where I want because I pay for the fuel, and I can route myself where I want.").

16. Company drivers for XPO are subject to "forced dispatch," i.e., they cannot decline loads under most circumstances except for reasons like illness.  Vol. I [#276] at 71:7-18 (testimony by Plaintiff Merrill that company drivers have the right to refuse loads for only limited reasons such as an emergency or having the truck under repair); Vol. I [#276] at 248:2-12 (testimony by Plaintiff Lacy that company drivers cannot refuse freight and have to go wherever the company tells them to go); Vol. III [#278] at 554:7-14 (testimony by Ronald Dennis that "forced dispatch" means that, when he was a company driver, he had to go wherever the company told him to go); Depo. of Hunt [#284-1] at 31:15-32:8 (stating that "forced dispatch" applies only to company drivers and means that, if they can permissibly drive under Department of Transportation regulations, they are required to do so).

17. Unlike owner-operators, company drivers are required to follow certain fueling requirements.  Depo. of Hunt [#284-1] at 35:17-37:12 (stating that company drivers are only permitted to fuel at company-approved fuel stops with pre-negotiated fuel discounts, but that owner-operators can fuel anywhere that will take their credit cards).

18. Company drivers are required to follow a "driver handbook" that does not apply to owner-operators.  Depo. of Hunt [#284-1] at 28:13-29:1 (stating that XPO does not provide company handbook or policies to owner-operators because they are only subject to the terms of their Contract Hauling Agreements).

19. Unlike owner-operators, company drivers are not responsible for managing regular truck maintenance in order to maintain profitability in connection with variables like fuel efficiency.  Depo. of Hunt [#284-1] at 37:23-40:2.

20. As owner-operators, Plaintiffs are not subject to forced dispatch.  Vol. III [#278] at 436:20-24 (testimony by Plaintiff Ard that, as an owner-operator, he is free to accept or reject assignments from the carrier), Vol. III [#278] at 502:21-503:1 (testimony by Plaintiff Williams that owner-operators have more freedom and can independently decide whether to follow suggested routes, but, if a company driver does not follow a specific route, the driver is charged for using extra fuel); Depo. of Hunt [#284-1] at 32:9-22 (stating that "forced dispatch" does not apply to owner-operators and that the Contract Hauling Agreement protects this right by stating that contractors have the right to accept or decline freight).

21. As owner-operators, Plaintiffs are subject to no contractual or policy restrictions on when or how much time they take off.  Vol. V [#280] at 833:4-8 (testimony by Plaintiff Nasr that owner-operators do not earn vacation time and that, "like any other business owner," they can take time off but do not earn paid time off); Vol. V [#280] at 899:18-20 (testimony by Defendant Harris that owner-operators do not seek Pathway's permission to take time off for any reason); Depo. of Hunt [#284-1] at 36:8-37:12 (stating that owner-operators can take time off whenever they want for any reason, unlike company drivers).

22. XPO pays solo owner-operators an additional $.03 per mile once the driver exceeds 11,000 miles in a month as an incentive to drive more miles.  Depo. of Creed [#265-1] at 32:17-33:4 (further stating that owner-operators who drive as a team receive

an additional $.06 per mile for trips after driving 18,000 miles in a month).

23. Pursuant to written agreements between Plaintiffs, Pathway and the Carrier, some Plaintiffs occasionally receive bonuses and equipment deposits from XPO which XPO is permitted to remit to Pathway rather than to Plaintiffs.  Vol. II [#277] at 337:11-340:15; Trial Ex. 136 at 14, 24, 27, 46, 48 50, 60 ("Other Damages Sought as Part of Claim for Unpaid Wages");  Trial Ex. 50 at 23 ("This letter shall serve as Franklin Merrill's authorization and direction to remit to Pathway Leasing each and all settlement compensation <u>and other amounts</u>, less chargebacks, Franklin Merrill is owed pursuant to its [sic] independent contractor agreement with Con-Way Truckload." (emphasis added)).  These amounts were applied by Pathway to equipment lease payments, promissory notes, maintenance escrow, and back lease payments.  Vol. V [#280] at 769:18-771:10.

**C.    Facts Bearing on Relationship Between Plaintiffs and Pathway**

24. Each Plaintiff executed an "Equipment Lease Agreement" with Pathway which contains the terms and conditions of his or her truck lease with Pathway.  Trial Ex. 50; Vol. I [#276] at 5:12-23 (counsel stipulating that all such agreements are materially similar).  Each Plaintiff also executed a separate "Contractor Hauling Agreement" with XPO defining the terms and conditions of his or her freight hauling services for XPO.  Trial Ex. 128; Trial Ex. 129; Vol. I [#276] at 5:12-23 (counsel stipulating that all such agreements are materially similar).  Pathway and XPO executed a "Carrier Agreement" in May 2013 to govern their relationship.  Trial Ex. 127.

25. Each Plaintiff who wanted to lease a truck from Pathway had the option to sign

either a single-person or a team lease with Pathway. Trial Ex. 50 at 4, ¶ 13(c); Vol. V [#280] 846:11-847:10 (testimony by Defendant Harris discussing differences between driving solo versus driving as a team). Similarly, Plaintiffs were not required by XPO to drive the truck themselves but were instead permitted to hire their own drivers or work as a team. Trial Ex. 128 at ¶ 19.

26. Some Pathway clients, including Steven Kortman, Joey Brown, and Melanie Brown, drove as a team with their spouses. Trial Ex. Z6.

27. Plaintiff Hollingsworth chose to drive as a team. Vol. VI [#281] at 938:17-22 (testimony by Defendant Harris that Plaintiff Hollingsworth "started off as a solo, transitioned into a team operation. The team driver that he was running with, Ethan Thrasher, once they stopped running as a team—and this was this year—Ethan then leased a truck from us . . . .").

28. Plaintiff Hollingsworth hired his own contractor for his team, a man he knew "like a son," paying him a percentage of his net profit after fuel and lease expenses instead of a fixed or hourly wage. Vol. V [#280] at 760:4-10, 14-25.

29. Seven of the fifteen Plaintiffs (Eric Ard, Anthony Dennis, Ronald Dennis, Tim Hollingsworth, Larry Jurcak, Rodney Lacy, and Sami Nasr) as well as some other Pathway clients (including Andre Ellis, Paula Horion, Steven Kortman, Jaime Parrales, Eric Robertson, Eduardo Sustaita, Gerord Thomas, and Earnest Ward) successfully completed their leases and purchased their trucks from Pathway. *See* Trial Exs. C, G, K, W, Z, T1, H2, K2, M3, S3, S4, B5, V5, A6, H6.

30. The seven Plaintiffs who successfully completed their leases then had the opportunity to earn substantially more than their peers, in addition to owning their

trucks.  Vol. II [#277] at 294:16-295:23 (testimony by Plaintiff Lacy that he took ownership of his truck in October 2015 after finishing his lease early, that he grossed over $200,000 in 2014, over $170,000 in 2015, and over $155,000 in 2016, and that, as of mid-2018, he was still driving the same truck); Vol. III [#278] at 492:13-24 (testimony by Plaintiff Williams that he made more money as an owner-operator than he did as a company driver); Vol. III [#278] at 555:16-556:4 (testimony by Plaintiff Ronald Dennis that, although by mid-2018 he had no further business relationship with Pathway, he had purchased and taken ownership of his truck and was still driving and making money off of his investment); Vol. V [#280] at 759:17-24 (testimony by Plaintiff Hollingsworth that he completed his lease with Pathway in March of 2018 and purchased the truck, which he was still driving and earning money from as of mid-2018); Vol. V [#280] at 830:20-831:5 (testimony by Plaintiff Nasr that, at one point, he had two trucks and hired a driver to drive one of them, and that he ran, and continues to run, those trucks as a business).

31.  For at least one driver, Pathway provided the best economic option to be an owner-operator.  Vol. I [#276] at 186:23-187:19 (testimony by driver Becky Austin that she had a high credit score and enough money for a down payment on a new truck, but that she decided instead to lease a truck from Pathway).

32.  As of June 2018, thirty-eight drivers (nearly twenty percent of Pathway's lessees) were leasing their second truck from Pathway. Vol. VI [#281] at 936:2-937:14 (testimony by Defendant Harris identifying drivers who completed their payments and other lease obligations relating to their first truck from Pathway and who  then chose to lease another truck from Pathway, something which was generally

uncommon in the industry).

33.   Pathway's repossession rate is lower than that of many other companies in the truck leasing business.  Vol. V [#280] at 925:3-926:6 (testimony by Defendant Harris that Defendant Pathway's repossession rate in 2017 was just under twenty percent and in 2016 was just under twenty-six percent); Depo. of Hunt [#284-1] at 19:4-13 (stating that it was more common for Pathway's lessees to complete the lease and take ownership of the truck than it was for the lessees of the other leasing companies with which XPO did business).

34.   Pursuant to their leases with Pathway, Plaintiffs are responsible for truck payments, maintenance and repairs, fuel costs, business liability insurance, and taxes.  Trial Ex. 50 at 2-4, ¶¶ 7, 13, 15; Vol. II [#277] at 306:20-307:10 (testimony by Plaintiff Lacy that he "invested too much money to turn around and give" the truck back to Pathway).

35.   Pursuant to their leases with Pathway, Plaintiffs are responsible for paying their own business-related taxes.   Trial Ex. 50 at 5, ¶ 20; Vol. IV [#279] at 596:12-19 (testimony by Plaintiff Anthony Dennis that he retains his own business records for tax purposes).

36.   Some of Pathway's clients established and registered their own companies.  Vol. I [#276] at 194:23-195:2 (testimony by driver Becky Austin that she owned Cherokee Nomad Express prior to becoming a lessee with Pathway and that she still owned the company as of mid-2018); Vol. IV [#279] at 687:19-21 (testimony by Plaintiff Horion that he started his own business account and obtained his own business license from the State of Texas, although he later had to close the account); Vol. V

[#280] at 833:9-19 (testimony by Plaintiff Nasr that, just prior to leasing a truck with Pathway, he started an entity for his business called Nasr Transportation LLC).

37.   As Pathway's business grew and the freight market adapted to changing economic conditions and new technologies, Pathway's clients contracted with an increasing number of carriers, of which XPO is only one.  Vol. V [#280] at 849:10-850:22 (testimony by Defendant Harris that in 2016 clients contracted with carriers numbering in the "low twenties to high teens," that in 2017 the number was in the "upper twenties," and as of mid-2018 the number was "over 30").

38.   The Carrier Agreement between the Carrier and Pathway permits either the Carrier or Pathway to terminate the parties' relationship with 120 days' notice.  Trial Ex. 127 at 3.  At the same time, Pathway's leases provide for a fixed term, although several drivers, including Plaintiff Hollingsworth, negotiated changes to their lease terms. Trial Ex. Z6 (listing lease terms of all Plaintiffs by number of months).  Plaintiffs have the option of completing their leases before expiration of the term by purchasing their trucks.  Trial Ex. 50 at 10 ("Option to Purchase").

39.   Once drivers buy their trucks, Pathway has no further interaction with them unless the drivers want to lease another truck from Pathway, which occurred with approximately twenty percent of Pathway's clients.  Vol. VI [#281] at 935:20-937:25 (testimony by Defendant Harris that clients who complete their leases generally have no further formal business relationship with Pathway).

40.   Some Plaintiffs whose contracts were terminated by XPO, or who asked to switch carriers, continued to lease from Pathway while driving for other carriers.  Vol. VI [#281] at 942:5-944:24 (testimony by Defendant Harris that XPO has sometimes

terminated a particular Contractor Hauling Agreement with one of Pathway's clients, and that  Pathway had no role in that decision-making process but would continue to work with the client to find a favorable path forward).

41.     Similarly, Plaintiffs who complete or buy out their leases often continue to drive for XPO, even though they no longer have a relationship with Pathway.  Depo. of Hunt [#284-1] at 19:4-20:16 (stating that once a driver owned his/her truck outright, a new Contractor Hauling Agreement is signed with XPO to change and correct details such as titles, entity names, and tractor numbers, but the terms of the agreement otherwise remain the same); Vol. II [#277] at 295:24-296:12 (testimony by Plaintiff Lacy that after he completed his lease, he had no further relationship with Pathway but continued to drive for XPO); Vol. III [#278] at 447:5-448:23 (testimony by Plaintiff Ard that he had no further relationship with  Pathway after he bought the truck, and that he continued to drive for XPO for another year-and-a-half while he paid off his private bank loan); Vol. IV [#279] at 583:2-20 (testimony by Plaintiff Anthony Dennis that he traded his Pathway truck into a dealership, thereby ending his relationship with Pathway, but continued to drive his newly-purchased used truck for CFI for an unspecified period); Vol. V [#280] at 755:12-19 (testimony by Plaintiff Hollingsworth that after he bought his truck and ended his relationship with Pathway, he drove for CFI for about a month longer before moving to another company); Vol. V [#280] at 828:21-829:6 (testimony by Plaintiff Nasr that, after he purchased his truck, his formal business relationship with Pathway ended, but that he continues to earn income from driving his truck).

42.     Plaintiffs were able to review Pathway's Equipment Lease Agreements before

signing them.  Vol. III [#278] at 500:24-501:12 (testimony by Plaintiff Williams that he entered into an equipment lease agreement with Pathway in May 2016, that he browsed through the agreement before signing it, that no time limit was put on him to review the agreement, that he did not talk to anyone at Con-Way about the agreement before signing it, and that he did not have any concerns about the agreement before signing it); Vol. IV [#279] at 601:24-602:4 (testimony by Plaintiff Anthony Dennis that he had the opportunity to review the entire lease if he wanted to, because it was on his phone).

43.   Plaintiffs knew and understood that the Equipment Lease Agreements constituted contracts.  Vol. I [#276] at 190:17-19 (testimony by driver Becky Austin that she understood that the Equipment Lease Agreement was a contract); Vol. III [#278] at 439:21-440:4 (testimony by Plaintiff Ard that he understood that the Equipment Lease Agreement was a contract, that it set out the terms for leasing a truck through Pathway, and that signing a contract means agreement to the terms of the contract); Vol. IV [#279] at 602:5-9 (testimony by Plaintiff Anthony Dennis that he knew that he was signing a contract when he signed the Equipment Lease Agreement).

44.   The Equipment Lease Agreement signed by Plaintiffs states that Pathway makes no representations or warranties regarding the condition or fitness of the leased trucks and makes clear that the lessee accepts the truck "AS IS, WHERE IS, AND WITH ALL FAULTS."  Trial Ex. 50 at 1, ¶ 2 and 5, ¶ 21.

45.   Under the Equipment Lease Agreements, and subject to  Pathway's limited service contracts, Plaintiffs agreed that they are solely responsible for covering the cost of truck repairs and maintenance during the lease term.  Trial Ex. 50 at 2-3, ¶ 13(f) and

24 ("Truck Acceptance Form").

46.   The Equipment Lease Agreements contain a limited service contract for a defined period of time and/or mileage, which Plaintiffs refer to as a "warranty."  Trial Ex. 50 at 18-20; Vol. III [#278] at 445:23-446:1 (testimony by Plaintiff Ard that he believes he has a warranty through the limited service contract part of the lease agreement). This provision sets forth repairs that are covered by Pathway, and the terms and conditions governing Pathway's and Plaintiffs' obligations with respect to repairs. Trial Ex. 50 at 18-20.

47.   The Equipment Lease Agreements state that the agreements, "together with the other documents maintained herein or executed contemporaneously herewith, constitute[] the entire agreement of the parties and Lessor shall not be charged with any agreement or representation not contained in a writing executed by it as provided in this section."  Trial Ex. 50 at 5, ¶ 26.

48.   Although some Plaintiffs testified about what they "thought" they were getting when they leased a truck from Pathway, no Plaintiff testified about any specific promise or misrepresentation made by either Defendant with respect to a truck or the Equipment Lease Agreement.  Vol. I [#276] at 55:3-17 (testimony by Plaintiff Merrill that he thought the warranty covered the vehicle by helping the driver keep the truck "up and working").

49.   Not all Plaintiffs fully understood all portions of the Equipment Lease Agreement. Vol. I [#276] at 39:20-40:16 (testimony by Plaintiff Merrill that he took a day off to read the agreement, but that he did not read it through all the way and signed it even though he did not understand "parts of it," because he felt that he needed to

get back to work and make money).  However, no Plaintiff testified as to which portions of the lease he or she did not understand.

50. Pathway gave no verbal warranties or assurances to Plaintiffs about the condition of their leased trucks.  Vol. VI [#281] at 961:19-962:4 (testimony by Defendant Harris that Pathway does not make verbal warranties to clients, although they "do discuss the make-ready process that [they] put trucks through," and that any issues which do not meet Department of Transportation standards are addressed).

51. When entering into a working relationship with Pathway, some Plaintiffs were handed a lease, told where to sign, and directed to a truck without the opportunity to take a test drive.  Vol. I [#276] at 230:15-16 (testimony by Plaintiff Lacy that he "kind of got forced into signing" the contract), 234:10-13 (stating that Defendant Harris told him that he "couldn't test drive the truck," that Plaintiff Lacy "had to . . . sign the contract that afternoon," and that he was "faxed the contract at the dealership"), 240:9-13 (stating that "whoever" sent the contract to him had it highlighted where he needed to initial and sign); Vol. III at 485:1-13 (testimony by Plaintiff Williams that he reviewed the paperwork before signing it, he understood only some of it, including that he was signing a contract and that he was going to be an owner-operator for CFI); Vol I [#276] at 46:17-21 (testimony by Plaintiff Merrill that he had to sign the lease before he got the truck or the keys to the truck and that he was not allowed to inspect the truck ahead of time).

52. Some Plaintiffs testified that they were more comfortable taking on the risk of leasing a commercial truck because they thought the truck came with a warranty that would cover major repairs.  Vol. V [#280] at 740:11-17 (testimony by Plaintiff

Glover that, when he signed the lease, he thought that he was going to get a warranty and that he did not know that he was going to be held responsible for "any type of repairs or anything dealing with that truck" while he was under the lease, because "most companies you lease from . . . are responsible for everything until you actually purchase the vehicle").

53.   Defendants offered Plaintiffs loans documented by promissory notes on an as-needed basis to cover repair costs for which the Plaintiffs had responsibility under the leases, and some Plaintiffs received little take-home pay after making payments on the notes.  Vol. IV [#279] at 585:4-25 (testimony by Plaintiff Anthony Dennis that, "[a]fter the warranty went out," he spent most of his time paying promissory notes for a whole year, that "[a] promissory note is if you don't have the money and you borrow the funds from Pathway Leasing, they will send you a promissory note which will charge you interest to pay them back," and that he might only get $100-$900 a week from his paycheck after making that payment); Vol. IV [#279] at 661:21-662:4 (testimony by Plaintiff Gutowski that, in September 2016, he could not afford to take out any more promissory notes because he could not pay his bills after making the payments on the notes).

54.   Several Plaintiffs defaulted on their lease obligations to Pathway, resulting in Pathway's repossession of their trucks.  Trial Ex. T6; Vol. VI [#281] at 940:25-942:1 (testimony by Defendant Harris that Trial Exhibit T6 accurately reflects repossessions except that  Pathway agreed to release Plaintiff Williams from his lease obligations).

55.   Excluding Plaintiff Williams, the outstanding balances owed by each Plaintiff whose

truck was repossessed by Pathway are set forth in Trial Exhibit T6. Vol. VI [#281] at 1032:7-17 (testimony by Defendant Harris regarding Trial Exhibit T6 that the "Repo Cost" column includes repossession costs, repair costs, and past-due rent), 1031:24-1033:16 (stating that proceeds from sale of a truck are deducted from what is owed by the driver, and that the chart does not account for whether a truck was re-leased), 1034:9-18 (stating that "N/A" or "not applicable" under the Sale Proceeds column means that the vehicle was re-leased, although the chart does not indicate the date of re-leasing or the amount of the new lease payments).

56.   Excluding Plaintiff Williams, no direct evidence was presented by Plaintiffs listed on Trial Exhibit T6 disputing that they defaulted on their Equipment Lease Agreements or contesting the amounts owed.

### III.  Conclusions of Law

### A.    Plaintiffs' FLSA Minimum Wage and Retaliation Claims

Among other things, the FLSA establishes minimum wage standards and retaliation protections in certain employment situations. 29 U.S.C. § 206(a)(1)(C) (minimum wage); 29 U.S.C. § 215(a)(3) (retaliation). A threshold issue is whether Plaintiffs were employees, hence covered by the FLSA, or independent contractors who are not covered by the FLSA.

The FLSA defines "employee" as "any individual employed by an employer," so long as the individual does not fall under an exemption. 29 U.S.C. § 203(e)(1). The economic realities test is used to determine whether a person is an employee and therefore covered by the FLSA. *Baker v. Flint Eng's & Constr. Co.*, 137 F.3d 1436, 1440 (10th Cir. 1998). Courts generally look at six factors in connection with this test: "(1) the degree of control exerted by the alleged employer over the worker; (2) the worker's opportunity for profit or

loss; (3) the worker's investment in the business; (4) the permanence of the working relationship; (5) the degree of skill required to perform the work; and (6) the extent to which the work is an integral part of the alleged employer's business." *Id.* The Court must use a "totality-of-the-circumstances approach," because no one factor alone is dispositive. *Id.* at 1441.

> In deciding whether an individual is an employee or an independent contractor under the FLSA, a district court acting as the trier of fact must first make findings of historical facts surrounding the individual's work. Second, drawing inferences from the findings of historical facts, the court must make factual findings with respect to the six factors set out above. Finally, employing the findings with respect to the six factors, the court must decide, as a matter of law, whether the individual is an "employee" under the FLSA.

*Id.* at 1440. As outlined below, the Court finds that Plaintiffs were independent contractors, regardless of whether Defendant Pathway is considered independently as an employer or whether XPO and Defendant Pathway are considered collectively as joint employers.

Regarding the first factor, i.e., the degree of control exerted by the alleged employer over the worker, the Court finds that this factor weighs heavily in favor of finding independent contractor status. Each Plaintiff had the option to sign either a single-person or a team lease. Finding of Fact #2. Plaintiffs were not required to drive the leased trucks themselves but were instead permitted to hire their own drivers or work as a team. Findings of Fact #2; #25. Neither Defendants nor XPO could decide for Plaintiffs whether they drove individually, drove as a team, or hired their own employees to drive the leased trucks. Findings of Fact #2, #25. For example, some clients of Pathway drove as teams with their spouses. Finding of Fact #26. Plaintiff Hollingsworth chose to drive as a team by hiring his own contractor, a man he knew "like a son," paying him a percentage of his net profit after fuel and lease expenses were covered rather than a fixed or hourly wage.

Finding of Fact #27.  Drivers who elected to drive as part of a team had the flexibility to drive more miles for more pay than they otherwise would have been able to earn as solo drivers.  Finding of Fact #2.  Pursuant to the terms of their Contractor Hauling Agreements, Plaintiffs were responsible for "hiring, setting the wages, hours and working conditions and adjusting the grievances of, supervising, training, disciplining, and firing all drivers, driver's helpers, and other workers necessary for the performance of [Plaintiffs'] obligations." Finding of Fact #14.

Further, as owner-operators, Plaintiffs used their own business judgment to determine whether to decline loads based on profitability considerations such as the weight of the freight and fueling costs, and further set their own restrictions on where they would drive, the routes they would travel, and other conditions, all without needing Pathway's permission.  Finding of Fact #15.  In contrast, company drivers were subject to "forced dispatch," i.e., they could not decline loads under most circumstances except for reasons like illness.  Finding of Fact #16.  Similarly, unlike owner-operators, company drivers were required to follow certain fueling requirements.  Finding of Fact #17.  As owner-operators, Plaintiffs were subject to no contractual or policy restrictions on when or how much time they took off.  Finding of Fact #21.  Finally, company drivers were required to follow a "driver handbook" which does not apply to owner-operators.   Finding of Fact #18. Considered as a whole, these facts demonstrate a relatively low degree of control exerted by Defendants and/or XPO over Plaintiffs, and the Court therefore finds that this factor weighs in favor of finding that Plaintiffs were independent contractors, not employees.  *See, e.g.*, *Acosta v. Paragon Contractors Corp.*, 884 F.3d 1225, 1235 (10th Cir. 2018) (finding that this factor weighed in favor of independent contractor status where the worker "could

set his own hours and determine how best to perform his job within broad parameters," despite the requirement that he periodically report to the company).

Regarding the second factor, i.e., the worker's opportunity for profit or loss, the Court finds that this factor weighs in favor of finding independent contractor status. Seven of the fifteen Plaintiffs as well as other Pathway clients successfully completed their leases and purchased their trucks from Pathway. Finding of Fact #29. The seven Plaintiffs who successfully completed their leases could earn substantially more than their peers, in addition to owning a valuable asset in the form of their trucks. Finding of Fact #30. Plaintiffs and those who leased trucks from Pathway conducted, or at least had the opportunity to conduct, their own independent evaluations of (1) whether to lease or purchase their trucks and (2) whether to lease their trucks from Pathway or a different leasing company. Finding of Fact #4. For some, Pathway provided the best economic lease option for owner-operators. Finding of Fact #31. In fact, as of June 2018, thirty-eight drivers (nearly twenty percent of Pathway's lessees) were leasing a second truck from Pathway, which had a repossession rate much lower than that of many other companies in the truck leasing business. Findings of Fact #32, #33.

Further, the frequency and rates of pay for owner-operators differed from that for company drivers. Finding of Fact #3. XPO paid solo owner-operators an additional $.03 per mile once the driver exceeded 11,000 miles in a month as an incentive to drive more miles. Finding of Fact #22. Unlike owner-operators, company drivers were not responsible for managing regular truck maintenance in order to maintain profitability. Finding of Fact #19. Plaintiffs, on the other hand, were exposed to the risk of monetary loss based on a number of factors concerning their decision-making as related to fuel efficiency. Finding

of Fact #5.  Considered as a whole, these facts demonstrate that Plaintiffs' opportunities for profit or loss were largely within their own control, and the Court therefore finds that this factor weighs in favor of finding independent contractor status.  *See Baker*, 137 F.3d at 1441 (noting that having opportunity for profit or loss is "consistent with the characteristics of being [an] independent businessm[a]n"); *see, e.g.*, *Acosta*, 884 F.3d at 1236 (finding that this factor weighed in favor of employee status because the worker was "paid only a flat fee" and "could not increase or decrease his profit based on how well he did his job").

Regarding the third factor, i.e., the worker's investment in the business, the Court finds that this factor weighs in favor of finding independent contractor status.  Plaintiffs were required to secure a lease or own a truck to perform their work for XPO.  Finding of Fact #10.  Plaintiffs were responsible for truck payments, maintenance and repairs, fuel costs, workers compensation and business liability insurance, and tax and accounting services.  Finding of Fact #34.  Plaintiffs were responsible for paying their own business-related taxes.  Finding of Fact #35.  In addition, as owner-operators, some of Pathway's clients established and registered their own hauling companies.  Finding of Fact #36.  Considered as a whole, these facts demonstrate that Plaintiffs substantially invested in their chosen business, and the Court therefore finds that this factor weighs in favor of finding independent contractor status.  *See Acosta*, 884 F.3d at 1236 (noting that "[t]he mere fact that workers supply their own tools or equipment does not establish status as independent contractors; rather the relevant 'investment' is 'the amount of large capital expenditures, such as risk capital and capital investments, not negligible items, or labor itself'"); *see id.* (finding that employee status was indicated where the supplies and equipment were provided by the company, and where the worker's only expense (supplying buckets for

families who had not brought buckets) was negligible), *id.* at 1236 n.8 (implying that a worker supplying his own truck could justify independent contractor status where that worker does not later obtain reimbursement from the company for use of the vehicle).

Regarding the fourth factor, i.e., the permanence of the working relationship, the Court finds that this factor weighs slightly in favor of a finding of independent contractor status. Seven of the fifteen Plaintiffs and several other Pathway clients successfully completed their leases and purchased their trucks from Pathway. Finding of Fact #29. As Pathway's business has grown and the freight market has adapted to changing economic conditions and new technologies, Pathway's clients have contracted with an increasing number of carriers, of which XPO is only one. Finding of Fact #37. As of mid-2018, approximately thirty of Pathway's clients had contracts with XPO, a number which varies over time. Finding of Fact #11. XPO's owner-operators lease trucks from a number of different companies in addition to Pathway. Finding of Fact #12. The Carrier Agreement permits either XPO or Pathway to terminate the parties' relationship with 120 days' notice; at the same time, Pathway's leases provide for a fixed term, although several drivers negotiated changes to their lease terms. Finding of Fact #38. Plaintiffs had the option of completing their leases earlier than the fixed term by purchasing their trucks. Finding of Fact #38. Once drivers buy their trucks, Pathway has no further interaction with them unless the drivers want to lease another truck from Pathway, which occurred with approximately twenty percent of Pathway's clients. Finding of Fact #39. XPO's Contractor Hauling Agreement provides for a fixed period of three years and could be terminated by either party, with or without cause, by giving ten days' written notice. Finding of Fact #13. Plaintiffs whose contracts were terminated by XPO, or who asked to switch carriers,

continued to lease from Defendant Pathway while driving for other carriers. Finding of Fact #40. Similarly, Plaintiffs who completed or bought out their leases often continued to drive for XPO, even though they no longer had a relationship with Pathway. Finding of Fact #41. Considered as a whole, these facts demonstrate impermanence in the working relationship between the drivers and Pathway, based primarily on completion of the lease, and the Court therefore finds that this factor weighs slightly in favor of a finding of independent contractor status. *See Dole v. Snell*, 875 F.2d 802, 811 (10th Cir. 1989) (stating that "'[i]ndependent contractors' often have fixed employment periods and transfer from place to place as particular work is offered to them, whereas 'employees' usually work for only one employer and such relationship is continuous and of indefinite duration").

Regarding the fifth factor, i.e., the degree of skill required to perform the work, the Court finds that this factor weighs slightly in favor of a finding of independent contractor status. Many of the work duties performed by owner-operators were the same as those performed by company drivers. Finding of Fact #7. However, in addition to the required skills both company drivers and owner-operators possessed with respect to driving commercial trucks, Plaintiffs needed business acumen and financial proficiency to be profitable, because they controlled whether to drive solo or as a team, what loads to accept, what routes to take, how to manage their fuel efficiency and maintenance, and when to work. Finding of Fact #6. Although these skills were required for those in Plaintiffs' position to be successful (measured in terms of profit), there was no evidence regarding whether these were skills that company drivers possessed as well but simply did not need to utilize given the parameters of their work. In other words, it is unclear whether Plaintiffs possessed skills not possessed by company drivers which they needed to have

to perform their work.  Nevertheless, taken as a whole, these facts demonstrate that certain additional skills were required to perform Plaintiffs' work, as compared to the skills required for company drivers, and the Court therefore finds that this factor weighs slightly in favor of a finding of independent contractor status.  *See Acosta*, 884 F.3d at 1237 (stating that "we consider whether the job contains a 'requirement of specialized skills'; if such a requirement exists, the worker is more likely to be considered an independent contractor" and that "[t]hese specialized skills are distinct from general 'occupational skills' that 'any good employee in any line of work must [have]'"); *see, e.g.*, *id.* (holding that employee status was indicated where there were no specialized skills needed to attend to day-to-day operations of a pecan grove, provide security, perform general maintenance, and clean debris out of the nuts).

Regarding the sixth factor, i.e., the extent to which the work is an integral part of the alleged employer's business, the Court finds this factor to be neutral.  Neither party presented adequate evidence regarding this factor.  On the one hand, it is obvious that Defendant Pathway could not remain in business without Plaintiffs performing the hauling work for which trucks are required.  On the other hand, the actual freight hauling done by Plaintiffs was performed for XPO, and no work was performed directly for Pathway beyond the requirements necessary to fulfill lease obligations.  Regardless, in the absence of a sufficient evidentiary showing by the parties here, the Court finds this factor to be neutral.

In sum, the Court finds that application of the six-factor test results in the conclusion that Plaintiffs were not Defendants' employees for purposes of the FLSA.  Considering the totality of the circumstances, the Court finds that Plaintiffs acted with a "degree of independence" which "set[s] them apart from what one would consider normal employee

status." *Baker*, 137 F.3d at 1436.   In other words, Plaintiffs were "in business for [themselves]." *Id.* at 1443.  Because the Court finds that Plaintiffs' status precludes them from coverage under the FLSA, the Court concludes that judgment must enter in favor of Defendants on Plaintiffs' FLSA minimum wage claims and Plaintiff Jurcak's FLSA retaliation claim.

## B.   Plaintiffs' Rescission Claims

Plaintiffs seek rescission of their leases based on a theory of misrepresentation by Defendants.  *See, e.g.*, *Pls.' Brief* [#336] at 41-42.  Where "one seeks rescission by reason of misrepresentation," one "need not prove that the seller had knowledge of the falsity of the representations or was utterly indifferent to their truth or falsity." *Bassford v. Cook*, 380 P.2d 907, 910 (Colo. 1963).   Instead, Plaintiffs must prove: (1) Defendants made a fraudulent misrepresentation of material fact; (2) Plaintiffs relied upon the misrepresentation; (3) Plaintiffs were justified in doing so; and (4) the reliance resulted in damages.[5] *M.D.C./Wood, Inc. v. Mortimer*, 866 P.2d 1380, 1382 (Colo. 1994).  Whether a party seeking rescission has a right to rely on the misrepresentation is a question of fact. *Id.* (citing *Bassford*, 380 P.2d at 907) (holding a contract is voidable if the plaintiff is justified in relying on the misrepresentation).

Rescission may be available even after full performance of a contract.  *See, e.g.*, *Jacobson v. XY, Inc.*, No. 07-cv-02670-WYD-BNB, 2009 WL 4267950, at *5 (D. Colo. Nov. 20, 2009) (allowing rescission of contracts several years after full performance).  "Where the general rule is that a party seeking to rescind a contract must return the opposite party

---

[5]  The parties agree that Colorado law governs the state law claims.  *See* [#336] at 42-44; [#350] at 9, 78.

to the position in which he was prior to entering the contract, this is not a technical rule, but an equitable one . . . The standard used is substantial restoration of the status quo." *Id.* (citing *Smith v. Huber*, 666 P.2d 1122, 1124 (Colo. App. 1983)).

Plaintiffs assert that Defendants' "primary material misrepresentation" is that Plaintiffs "thought they were going to [be] true independent contractors or owner operators," and that "was never [going] to be true." *Pls.' Brief* [#336] at 48. However, the Court finds that, as to each and every Plaintiff, this claim fails on the first element, i.e., whether Defendants made a fraudulent misrepresentation of material fact. *See M.D.C./Wood, Inc.*, 866 P.2d at 1382.

First, as fully discussed above, the Court finds that Plaintiffs were indeed independent contractors for purposes of the FLSA, and there is no argument that any different standard regarding independent contractor status should be applied for purposes of the rescission claims.

Second, there is a decided lack of evidence regarding any specific material misrepresentations made by Defendants. Findings of Fact #48, #50. Although Plaintiffs may have believed that work as owner-operators would be better than work as company drivers, or their lives as owner-operators would somehow be better than their lives as company drivers, there is a lack of evidence that this misunderstanding was based on particular material misrepresentations by Defendants. Findings of Fact #48, #50.

Third, regarding the Equipment Lease Agreement, although there is a noticeable lack of evidence about which parts of the contract any given Plaintiff did not understand, there is simply no evidence that any particular Plaintiff did not realize he or she was signing a contract. Findings of Fact #42, #43, #49. Some Plaintiffs testified vaguely about feeling

time-pressured to sign their agreements, but there was no evidence that Plaintiffs could not take the time to review, ask questions, and understand the leases had they chosen to do so.  Findings of Fact #42, #43, #49.  A few Plaintiffs' testimony that they were not permitted to test drive the trucks before signing leases (Finding of Fact #51) fails to establish that any Defendant made a fraudulent misrepresentation of a material fact.  Moreover, ignorance of the contents of an agreement admittedly signed by a party does not constitute fraud, absent circumstances demonstrating a level of duress which was not present here.  *Platt v. Winnebago Indus., Inc.*, 960 F.3d 1264, 1275-76 (10th Cir. 2020) ("Under Colorado law, however, 'in the absence of fraud or concealment, a party signing a contract without reading it cannot deny knowledge of its contents and is bound by what she [or he] signed." (quoting *Day v. Snowmass Stables, Inc.*, 810 F. Supp. 289, 294 (D. Colo. 1993))); *Motto Franchising, LLC v. McCabe*, No. 19-cv-02103-CMA-STV, 2021 WL 662306, at * (D. Colo. Feb. 19, 2021) ("Although the concept of duress has expanded since the days of common law, not all coercive business practices amount to duress.") (citing *Cooper v. Flagstaff Realty*, 634 P.2d 1013, 1015 (Colo. App. 1981)).

Fourth, the Equipment Lease Agreement contains a limited service contract for a defined period of time and/or mileage, which Plaintiffs referred to as a "warranty," and which sets forth repairs that would be covered by Pathway, as well as the terms and conditions governing Pathway's and Plaintiffs' obligations with respect to repairs.  Finding of Fact #46.  The Equipment Lease Agreement states that Pathway made no representations or warranties regarding the condition or fitness of the leased trucks and makes clear that Plaintiffs accepted the trucks "AS IS, WHERE IS, AND WITH ALL FAULTS."  Finding of Fact #44.  The Equipment Lease Agreement states that the

agreement, "together with the other documents maintained herein or executed contemporaneously herewith, constitute[] the entire agreement of the parties and [Pathway] shall not be charged with any agreement or representation not contained in a writing executed by it as provided in this section."  Finding of Fact #47.  Plaintiffs agreed that, under the lease agreements, and subject to Pathway's limited service contracts, they would otherwise be solely responsible for covering the cost of truck repairs and maintenance during the lease term.  Finding of Fact #45.  Defendant Harris testified that, in his sixteen years of industry experience, he could not predict what or when something might go wrong with any vehicle, and there is "a direct correlation" between how a truck "is maintained and driven as to its longevity and reliability over the course of time."  Findings of Fact #8, #9.  Although some Plaintiffs testified that they were more comfortable in taking on the risk of leasing a commercial truck because the truck was supposed to come with a warranty that would cover major repairs, they have not directed the Court's attention to any specific misrepresentations made by Defendants in this regard.  Finding of Fact #52.  Defendants offered Plaintiffs optional loans evidenced by promissory notes to cover repair costs, and often Plaintiffs received little take-home pay after paying on the notes, but, again, there is no evidence of any specific misrepresentations made to any particular Plaintiff in connection with these loans.  Finding of Fact #53.

In short, despite the evidence that Plaintiffs thought that their working lives would generally improve after signing their truck leases, there is no evidence that this was based on any material misrepresentation(s) by either Defendant to any particular Plaintiff.  Accordingly, the Court finds that judgment must enter in favor of Defendants on Plaintiffs' rescission claims.

**C.**     **Plaintiffs' Quantum Meruit and Unjust Enrichment Claims**

In Colorado, a claim for unjust enrichment is the same as a claim for quantum meruit. *Dudding v. Norton Frickey & Assoc.*, 11 P.3d 441, 444 (Colo. 2000) ("Application of the doctrine of quantum meruit, also termed quasi-contract or unjust enrichment, does not depend upon the existence of a contract, either express or implied in fact."); *see also Cahey v. Intel Bus. Maces. Corp.*, No. 20-cv-00781-NYW, 2020 WL 5203787, at *11 (D. Colo. Sept. 1, 2020) (stating that, "[i]n Colorado, the doctrine of quantum meruit is synonymous with the doctrine of unjust enrichment," and therefore addressing the claims together).

"Quantum meruit is an equitable doctrine that invokes an implied contract where the parties either have no express contract or have abrogated it." *Matter of Gilbert*, 346 P.3d 1018, 1023 (Colo. 2015). "The doctrine does not depend on the existence of a contract, either express or implied in fact, but rather applies where a need arises to avoid unjust enrichment to a party in the absence of an actual agreement to pay for the services rendered." *Id.* "That is, the equitable doctrine of quantum meruit seeks to restore fairness when a contract fails by ensuring that the party receiving the benefit of the bargain pays a reasonable sum for that benefit." *Id.* (internal quotation marks omitted).

"To recover in quantum meruit, a plaintiff must demonstrate that: (1) the defendant received a benefit, (2) at the plaintiff's expense, and (3) it would be unjust for the defendant to retain that benefit without paying for it." *Id.*; *cf. City of Arvada ex rel. Arvada Police Dep't v. Denver Health & Hosp. Auth.*, 403 P.3d 609, 616 (Colo. 2017) ("To recover under an unjust-enrichment theory, a plaintiff must prove three elements: (1) the defendant received a benefit (2) at the plaintiff's expense (3) under circumstances that would make it unjust for

the defendant to retain the benefit without commensurate compensation." (internal quotation marks omitted)).  "Whether retention of the benefit is unjust is a fact-intensive inquiry in which courts look to, among other things, the intentions, expectations, and behavior of the parties." *Melat, Pressman & Higbie, L.L.P. v. Hannon Law Firm, L.L.C.*, 287 P.3d 842, 847 (Colo. 2012).

Under most circumstances, a party may not recover under a theory of quantum meruit or unjust enrichment when there is an express contract addressing the subject of the alleged obligation to pay. *Interbank Invs., LLC v. Eagle River Water & Sanitation Dist.*, 77 P.3d 814, 816 (Colo. App. 2003).  The only exceptions are if (1) "the express contract fails or is rescinded," or (2) "the claim covers matters that are outside of or arose after the contract." *Pulte Home Corp., Inc. v. Countryside Cmty. Ass'n Inc.*, 382 P.3d 821, 833 (Colo. 2016).  Here, given the Court's judgment in favor of Defendants on Plaintiffs' rescission claims, any recovery under quantum meruit or unjust enrichment must hinge on the second exception, i.e., the claims must cover matters outside of or arising after the contracts. *See id.*

Plaintiffs contend that Defendants were "unjustly enriched by the amount of the lease payments that the Plaintiffs made because the Plaintiffs could not fulfill the terms of their leases given the conditions of the truck or other things that were beyond their control[.]" Vol. VII [#282] at 1067:12-17.  Plaintiffs also contend that conduct outside of the contract includes "when the Plaintiffs experienced . . . a need for a repair that they could not pay for, that was not covered by the express terms of the contract, and when they sought help from Pathway[ ] Leasing in getting that repair paid for" and Defendant Pathway agreed to loan money for the repair as long as the driver would sign a promissory note. *Id.*

at 1077: 7-15.  In addition, Plaintiffs' purported damages include bonuses and equipment deposits which XPO remitted to Defendants rather than to Plaintiffs, because (according to Plaintiffs) the Equipment Lease Agreement allegedly did not permit XPO to do that. Finding of Fact #23.

The difficulty with Plaintiffs' unjust enrichment claims is that the matters which form the basis of the claims are not "outside of" the contracts at issue.  Essentially, each of Plaintiffs' contentions regarding why Defendants were unjustly enriched relates unequivocally to circumstances that are governed by their written agreements with Defendants.  For example, Plaintiffs assert that Defendants were unjustly enriched by the lease payments Plaintiffs made because Plaintiffs weren't always able to drive the trucks due to breakdowns.  But the leases between Plaintiffs and Defendant Pathway expressly provide that Plaintiffs accepted the trucks "AS IS," that certain repairs would be made by Pathway for a certain period of time, but that ultimately other repairs would be the financial responsibility of Plaintiffs.  In other words, pursuant to the parties' agreement, Plaintiffs assumed the risk that they would have to make lease payments despite the fact that they might not be able to drive their trucks due to the need for repairs that they had to pay for themselves. The parties' contract expressly so provides.  Trial Ex. 50 at PATHWAY000003-PATHWAY000004.  Because the contract signed by Plaintiffs clearly governs these circumstances, an unjust enrichment claim based on Plaintiffs' continuing obligation to make lease payments despite breakdowns is not tenable.

Likewise, Plaintiffs' contention that Pathway was unjustly enriched by their agreements to borrow money from the company for repairs, their execution of promissory notes in exchange and their payments on those notes according to their terms also lacks

merit.   Just like the Equipment Leases, the promissory notes at issue are likewise "contracts" to which Plaintiffs are bound; hence, these circumstances are also expressly governed by the parties' contracts.  *See, e.g.*, Trial Ex. 72 (Promissory Note signed by Plaintiff Merrill).  As discussed above, no evidence has been provided to suggest that the contracts are unenforceable.  Because the parties' express written agreements govern these circumstances, an unjust enrichment claim based on Plaintiffs' obligation to repay promissory notes is not tenable.

Finally, Plaintiffs' assertion that Pathway was unjustly enriched by the Carrier's payment of driver bonuses and equipment deposits to Pathway also relates to conduct which is squarely governed by the parties' leases, and thus cannot be said to fall "outside of" their contracts.  Trial Ex. 50 at PATHWAY000023.  By executing the leases, Plaintiffs expressly agreed to allow XPO to make these payments to Pathway on their behalf, in further reduction of their lease obligations.  An unjust enrichment claim is therefore also untenable in these circumstances.  Moreover, it is difficult for the Court to discern how these payments made to Pathway by XPO were "at the plaintiffs' expense," as the evidence established that the payments were used to reduce Plaintiffs' lease obligations, and thus benefitted Plaintiffs.  Finding of Fact #23.

The Court finds that Plaintiffs' claims for unjust enrichment all relate to financial obligations they undertook as parties to legally enforceable contracts.  As indicated above, no evidence has been presented to invalidate or rescind these agreements.  Plaintiffs' lack of understanding of the full extent of their obligations, although regrettable, does not void the contracts and give them the right to get their money back.  Nor does it give rise to viable claims for unjust enrichment, when the circumstances complained of are governed

by their written agreements, to which both parties are bound. *Great N. Ins. Co. v. 100 Park Homeowners Assoc., Inc.*, No. 16-cv-02009-CMA-KLM, 2021 WL 2660778, at *2 (D. Colo. June 29, 2021) ("In general, a party cannot recover for unjust enrichment by asserting a quasi-contract when an express contract covers the same subject matter because the express contract precludes any implied-in-law contract." (quoting *Interbank Invs., LLC*, 77 P.3d at 816)). Accordingly, the Court finds in favor of Defendant and against Plaintiffs on their unjust enrichment claims.

## D.    Defendants' Breach of Contract Claims

At the outset, the Court notes that, during trial, Defendant Harris testified that Plaintiff Williams has been released from his lease obligations. Finding of Fact #54. *See also Defs.' Brief* [#350] at 86 (stating that Plaintiff Williams does not owe the balance set forth in Trial Exhibit T6); Vol. VII [#282] at 1100:8-14 (Defendants' counsel conceding during closing argument that Defendants "are not seeking any affirmative relief" from Defendant Williams on the breach of contract claim). Moreover, Plaintiffs Ronald Dennis and Tami Potirala completed their leases. Finding of Fact #29; Vol. IV [#279] at 632:15-633:4, 635:1-6. Thus, the Court's discussion below pertains only to Plaintiffs Anthony Glover, Zigmund Gutowski, Keith Herring, Joseph Horion, Franklin Merrill, and James Newberry.

A prima facie case for breach of contract requires: "(1) the existence of a contract; (2) performance by the [counter-]plaintiff[s] or some justification for nonperformance; (3) failure to perform the contract by the [counter-]defendant; and (4) resulting damages to the [counter-]plaintiff[s]." *W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992) (citations omitted).

-41-

At trial, the Court asked Plaintiffs' counsel: "[F]or those [Plaintiffs] who did not complete their lease, they are not really contending that they didn't breach the contract. Right?  They're simply contending that they have an alternative basis as a defense to breach of contract which is their restitution/rescission claim.  Right?"  Vol. VII [#282] at 1072:14-19.  Plaintiffs' counsel responded: "Yeah, they are contending they are excused from performance in that manner, yes, Your Honor."  *Id.* at 20-21.  Thus, based on this concession and the Court's judgment in favor of Defendants on Plaintiffs' rescission claims, the only issue here as to each Plaintiff against whom this claim is made concerns damages. Finding of Fact #54, #56.

"Proof of actual damages is not an essential element of a breach of contract claim," and "[w]hen a [party] establishes breach, but does not prove actual damages, the [party] is entitled to nominal damages."  *Interbank Invs., LLC*, 77 P.3d at 818.  Damages flowing from a breach of contract must be established with "reasonable certainty by a preponderance of the evidence."  *Pomeranz v. McDonald's Corp.*, 843 P.2d 1378, 1381 (Colo. 1993).

The six Plaintiffs at issue on this claim argue that Defendants' Trial Exhibit T6, which lists Defendants' damages calculations, is unreliable when considered with Defendant Harris's testimony about the document.  *Pls.' Brief* [#336] at 44-45.  Plaintiffs argue that the figures are unreliable because they do not include offsets for whether a repossessed truck was re-leased, because the column for "repossession costs" includes truck repair costs and past-due rent, and because there is no date or amount listed in connection with any truck that was leased again after repossession.  *Id.*  However, Plaintiffs have not explained why combining truck repair costs and past-due rent into an overall "repossession costs" number

makes that number unreliable.  Findings of Fact #54, #55.  Plaintiffs have also not explained why, under the terms of the Equipment Lease Agreements, whether a repossessed truck is re-leased (and when and for how much) is relevant here.  Findings of Fact #54, #55.  In the absence of any clearly-developed argument to explain why Defendant's calculations are unreliable or inaccurate, the Court finds that Defendants have sufficiently proven their damages as reflected in the Total Outstanding Balance column of Trial Exhibit T6.

Accordingly, the Court enters judgment on Defendants' breach of contract claims as follows:

(1) in favor of Defendants and against Plaintiff Glover in the amount of $15,971.41;

(2) in favor of Defendants and against Plaintiff Gutowski in the amount of $28,018.60;

(3) in favor of Defendants and against Plaintiff Herring in the amount of $24,917.59;

(4) in favor of Defendants and against Plaintiff Horion in the amount of $12,348.15;

(5) in favor of Defendants and against Plaintiff Merrill in the amount of $10,794.18;

(6) in favor of Defendants and against Plaintiff Newberry in the amount of $6,612.05; and

(7) in favor of Plaintiffs Williams, Potirala, and Ronald Dennis and against Defendants.

## E.    Defendants' Set-off Claims

"Setoff is a right grounded in concepts of fairness and equity."  *In re Myers*, 362 F.3d 667, 672 (10th Cir. 2004) (citing *G.S. Omni Corp. v. United States*, 835 F.2d 1317, 1318 (10th Cir. 1987)).  "The right of setoff 'allows entities that owe each other money to apply

their mutual debts against each other, thereby avoiding the "absurdity of making A pay B when B owes A.""" *Myers*, 362 F.3d at 672 (quoting *Citizens Bank v. Strumpf*, 516 U.S. 16, 18 (1995)). "By definition, setoff is a 'common right, which belongs to every creditor, to apply the unappropriated moneys of his debtor, in his hands, in extinguishment of the debts due to him.'" *Myers*, 362 F.3d at 672 (quoting *Gratiot v. United States*, 40 U.S. 336, 370 (1841)).

Defendants concede that if Plaintiffs are entitled to no damages on their claims, then their claim for set-offs automatically fails. *See Defs.' Brief* [#350] at 10 ("Pathway alleges that *if* Plaintiffs are entitled to any damages, the amounts must be set off by the amounts they still owe Pathway under their lease agreements." (emphasis added)); *id.* at 87 ("Pathway also asserts a counterclaim for setoff against all Plaintiffs *presuming* they are entitled to damages under the FLSA." (emphasis added)).]

In short, the asserted basis for these setoff claims, as summarized by Defendants in their Counterclaim [#95] is that, if Defendants are found liable under the claims asserted by Plaintiffs in the Amended Complaint [#6], then Defendants are "entitled to a setoff which represents all amounts lawfully due and payable under each Plaintiff's respective lease agreement, in amounts to be determined at trial." *Counterclaim* [#95] 42 ¶ 35; *see also id.* 41-42 ¶¶ 25-34. In light of the Court's findings against Plaintiffs and in favor of Defendants on Plaintiffs' claims, Defendant's set-off claim fails. *See, e.g.*, *Myers*, 362 F.3d at 672 (noting that set-off only applies where each side owes money to each other).

### IV. Order of Judgment

Based on the foregoing,

IT IS HEREBY **ORDERED** that judgment shall enter in favor of Defendants and

against Plaintiffs on Plaintiffs' claims under the FLSA regarding minimum wages.

IT IS FURTHER **ORDERED** that judgment shall enter in favor of Defendants and against Plaintiff Jurcak on Plaintiff Jurcak's claim under the FLSA regarding retaliation.

IT IS FURTHER **ORDERED** that judgment shall enter in favor of Defendants and against Plaintiffs on Plaintiffs' claims regarding rescission.

IT IS FURTHER **ORDERED** that judgment shall enter in favor of Defendants and against Plaintiffs on Plaintiffs' claims regarding quantum meruit and unjust enrichment.

IT IS FURTHER **ORDERED** that judgment shall enter in favor of Defendants and against Plaintiffs Anthony Glover, Zigmund Gutowski, Keith Herring, Joseph Horion, Franklin Merrill, and James Newberry, in the amounts set forth above on Defendants' claims regarding breach of contract.

IT IS FURTHER **ORDERED** that judgment shall enter in favor of Plaintiffs Ronald Dennis, Tami Potirala, and Craig Williams and against Defendants on Defendants' claim regarding breach of contract.

IT IS FURTHER **ORDERED** that judgment shall enter in favor of Plaintiffs and against Defendants on Defendants' claims regarding set-off.

IT IS FURTHER **ORDERED** that the Clerk of Court shall **CLOSE** this case after entry of judgment as set forth above.

Dated:  July 21, 2021

BY THE COURT:

Kristen L.  Mix
United States Magistrate Judge